IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **NORFOLK COUNTY RETIREMENT SYSTEM**, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | CASE NO. 3:11-cv-0433 |
| **COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH,** and **W. LARRY CASH,** | ) ) ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| **DE ZHENG**, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | CASE NO. 3:11-cv-0451 |
| **COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH,** and **W. LARRY CASH,** | ) ) ) ) | |
| Defendants. | ) | |

**[Caption Continued on Next Page]**

| | |
|---|---|
| MINNEAPOLIS FIREFIGHTERS' RELIEF ASSOCIATION, individually and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) CASE NO. 3:11-cv-0601 ) ) |
| COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, W. LARRY CASH and THOMAS MARK BUFORD, | ) ) ) ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

This matter is before the Court upon three Motions to Consolidate Cases, Appoint Lead Counsel, and Approve Selection of Lead Counsel, filed by Plaintiff General Retirement System of the City of Detroit (Docket No. 22), Plaintiff NYC Funds (Docket No. 23), and a single Motion filed by two Plaintiffs –Alberta Investment Management Corp. and State-Boston Retirement System (hereinafter referred to as Alberta/Boston) (Docket No. 29). Judge Nixon has referred these Motions to the undersigned for consideration and a hearing, if necessary. Docket No. 51.

The moving Plaintiffs, and others, have filed three separate lawsuits in this Court, as noted in the style above. These putative private class actions, filed pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, essentially allege that Defendants Community Health Systems, Inc. ("CHS"), Wayne T. Smith, and W. Larry Cash

2

committed securities fraud.[1]

The Court notes that the three pending Motions all seek a consolidation of these three cases. Defendants, all of whom are represented by counsel, have not filed any materials in opposition to the pending Motions.

Therefore, the undersigned recommends that the Motions for Consolidation be GRANTED and that these three actions be consolidated under the lead Case 3:11-0433, and that all future filings be made in that action.

As stated above, three separate Plaintiffs, or sets of Plaintiffs, had sought to be appointed as lead Plaintiff or Plaintiffs in these actions. Shortly after the Motions were filed, the General Retirement System of the City of Detroit filed a "Notice of Non-opposition . . . for Appointment as Lead Plaintiff, Approval of Lead Counsel, and Consolidation of All Related Actions." Docket No. 43. Detroit stated in part:

> Detroit recognizes that its losses are less than those claimed by the competing movants. Accordingly, Detroit does not oppose the competing Motions.

Docket No. 43, p. 3.

Thus, the Motion at issue filed by Detroit (Docket No. 22) should be DENIED.

The Court will turn to a consideration of the competing Motions filed, on the one hand, by NYC Funds, and on the other hand, by Alberta/Boston.

The appointment of a lead Plaintiff in the cases such as these is governed by 15 U.S.C. § 78u-4(a)(3), which is part of the PSLRA and which provides in relevant part as follows:

---

[1] All three of the actions are filed against these three Defendants. There are several additional individual Defendants in Civil Action No. 3:11-0601.

3

(3) Appointment of lead plaintiff. (A) Early notice to class members. (I) In general. Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business – oriented publication or wire service, a notice advising members of the purported class –

> (I) of the pendency of the action, the claims asserted therein, and the purported class period; and
>
> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

. . .

(B) Appointment of lead plaintiff. (I) In general. Not later than 90 days after the date on which a notice is published under subparagraph (A)(I), the court shall consider any motions made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") in accordance with this subparagraph.

. . .

(iii) Rebutable presumption. (I) In general. Subject to subclause (II) for purposes of clause (I), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that –

(aa) has either filed a complaint or made a motion in response to a notice under subparagraph (A)(I);

(bb) in the determination of the court has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

> (II) Rebuttal evidence. The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff –
>
> (aa) will not fairly and adequately protect the interests of the class; or
>
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

The question, therefore, becomes which of the moving Plaintiffs has "the largest financial interest in the relief sought by the class . . . ." This question, however, does not appear to be as easy as it sounds, and has given rise to many pages of legal Memoranda filed by the moving Plaintiffs.

The Fourth Edition of the Manual for Complex Litigation provides the following guidance with regard to such Motions:

> The PSLRA does not require courts to hold a hearing on lead plaintiff motions. . . .
>
> Where the movant is a single investor or institution, the court's task is fairly straight forward. In identifying the plaintiff with the largest financial interest, courts have considered factors such as the number of shares purchased or sold during the class period, the net number of shares purchased, the net funds spent, and approximate losses suffered by the plaintiff. These factors courts have found helpful "because they look to relatively objective indicators . . . rather than to the ultimate question of images." One option in assessing the merits of competing lead plaintiff petitions is to have those parties seeking lead plaintiff status file a joint submission setting forth their claim financial interests in comparing their financial stakes in litigation, preferably through an agreed on method. Such an approach allows the court to assess the merits of competing parties' positions without expending significant judicial resources wading through or reconstructing underlying figures on which the calculations are based. In addition, the court may find it difficult to reconcile damage calculations based on different methodologies.

Manual for Complex Litigation (Fourth Ed.) § 31.31, p. 535-36.

As discussed above, the PSLRA provides that when a class action is brought under its provisions, the Plaintiff or Plaintiffs must give notice within 20 days of the pendency of the action, the claims asserted therein, and the purported Class Period. Additionally, not later than 60 days after the date on which the Notice is published, any member of the purported class may move the Court to serve as lead Plaintiff.

In the case at bar, the first of these actions (No. 3:11-00433) was filed on May 9, 2011. That same day, the required Notice was given. Thus, Motions to serve as lead Plaintiff were due within 60 days of the Notice, which was July 8, 2011, and the two Motions at issue were filed on that date. On July 25, 2011, each of the moving parties filed a "Response" to the other's Motion. Docket Nos. 45, 48. Finally, on August 8, 2011, each of the moving parties filed a Reply to the other's Response. Docket Nos. 52, 53.

The Court believes that the parties positions can be best understood if the Court focuses upon their arguments in a chronological fashion. The Court will, therefore, attempt to do this below.

In their respective Motions, both movants argued that some district courts in the Sixth Circuit have adopted a four-factor test in determining which movant has the largest financial interest in an action. With minor variations in language, those four factors are basically those set forth in the Manual for Complex Litigation, and are as follows: (1) the number of shares purchased during the Class Period, (2) the number of net shares purchased during the Class Period, (3) the total net funds expended by the movant during the Class Period; and (4) the amount of loss suffered by the movant. Docket No. 24, p. 14; Docket No. 30, p. 12.

6

NYC argued that the most important factor is the fourth factor. Alberta/Boston recognized that the amount of loss suffered by the movant "is often the first factor reviewed by the court . . . ." Docket No. 30, p. 12. Alberta/Boston also argued, however, that the Court should focus on the number of net shares purchased during the class period. But, Alberta/Boston did not specify how many "net shares" they purchased in their Motion, nor did they discuss how many net shares NYC purchased.

In its Motion, as modified by a subsequent Correction, NYC argued that it purchased 762,966 shares of CHS common stock during the proposed Class Period, and suffered losses of $4,852,949 calculated based on the First-in, first out ("FIFO") methodology, and losses of $4,474,719 based upon the Last-in, first out ("LIFO") methodology.[2] Docket No. 24, p. 6. Unfortunately, neither party explains, at least in a manner understandable by the Court, exactly what the LIFO and/or FIFO methodologies are. NYC stated:

> Under FIFO, "a plaintiff's sales of defendant's shares in the class period are matched first against any pre-existing holdings of shares. The net gains or losses from those transactions are excluded from damages calculations." . . . "In contrast, under LIFO a plaintiff's sales of defendant's shares during the class period are matched first against plaintiff's most recent purchase of defendant's shares and gains or losses from those transactions are considered in damage calculations."

Docket No. 24, p. 14-15 n.6.

NYC's explanation was cited to *Johnson v. Dana Corp.*, 236 FRD 349 (N.D. Ohio 2006). The *Johnson* Court stated in part as follows:

---

[2] NYC stated in its Motion, "The NYC Funds' FIFO losses are $4,812,687, and LIFO losses are $4,413,165." Docket No. 24, p. 16. NYC subsequently submitted a "Supplemental Declaration of Barbara J. Hart . . ." which corrected the number of shares purchased and the amount of losses to those set forth in the text above. Docket No. 34, p. 3.

7

> The largest financial interest inquiry is not complicated when parties only purchase and sell shares within the class period. The analysis, however, becomes more complicated when parties enter the class period having previously bought the defendant's securities. Then, the question arises: how to calculate plaintiff's damages from purchasing shares at allegedly inflated prices when it has, arguably, also profited from selling shares at the same inflated prices?
>
> Under FIFO, a plaintiff's sales of defendant's shares during the class period are matched first against pre-existing holdings of shares. The net gains or losses from those transactions are excluded from damage calculations.
>
> In contrast, under LIFO, a plaintiff's sales of defendant's shares during the class period are matched first against the plaintiff's most recent purchase of defendant's shares and gains or losses from those transactions are considered in damage calculations.
>
> Consequently, under FIFO, many plaintiffs will show damages from defendant's alleged misconduct when those plaintiffs actually profited from the misconduct.

236 FRD at 352.

Alberta/Boston did not mention FIFO, nor did it make any attempt to explain the difference between the LIFO and FIFO methodologies.[3]

In their Motion, Alberta/Boston stated that they purchased 479,170 shares of CHS common stock and that they suffered *total* losses of $4,098,606, as calculated under the LIFO

---

[3] In other materials, Alberta/Boston appears to state that their total FIFO losses were $4,098,606, the same as their LIFO losses. Docket No. 31-2, p. 3. Alberta/Boston later took the position that LIFO is "the method of loss calculation preferred by all courts . . . ." Docket No. 48, p. 9. In their Reply, Alberta/Boston states that, over the past decade, courts "have universally rejected FIFO calculations because this methodology has a tendency to artificially inflate loss figures by allowing a movant who actually profited from a defendant's fraud to demonstrate damages." Docket No. 52, p. 9.

methodology.[4]  Docket No. 30, p. 11, 12.  Alberta/Boston's Motion stated that they were "presently unaware of any other movant with a larger financial interest in the outcome of the Action."  Docket No. 30, p. 13.

As discussed above, each of the competing lead Plaintiffs filed a "Response" to the other's Motion.  Docket Nos. 45, 48.  NYC reiterated its position that it had the largest financial interest in the relief sought by the class based upon its losses under either LIFO or FIFO.  NYC further argued that the Court did not need to look further "to the less-important factors," particularly because (at least some of) those other factors support the same result.  Specifically, NYC argued that it had indisputably purchased the largest number of shares (although not "net" shares) during the class period.  NYC argued:

> With respect to "net shares" purchased and retained at the end of the class period, the NYC funds have more net shares than Alberta and Boston . . . and expended more net funds, if the LIFO and FIFO matching methodology is applied to shares sold during the Class Period. . . .  If one abandons the well-accepted logic of LIFO and FIFO, finally the result splits, but only if one adds Alberta's and Boston's numbers together.  Hence, if shares purchased are simply artificially netted against shares sold during the Class Period, Alberta when added to Boston ekes ahead on net shares and net funds expended.  Yet, under either of these methods, the NYC Funds have more net shares than either Alberta or Boston individually.

Docket No. 45, p. 4 (citations omitted).

NYC also referred to legal memoranda in other cases involving Boston and its attorneys, the Labaton firm, in which counsel agreed with the proposition that the largest loss was

---

[4] This amount represents the LIFO losses of Alberta and the LIFO losses of Boston added together.  Alberta's LIFO losses were $3,568,494, and Boston's LIFO losses were $530,112.07, for a total of $4,098,606.68.  Docket No. 31-2, p. 2-3.

9

determinative without further inquiry into the other factors. Docket No. 45, p. 16-17.

Specifically, with regard to any argument concerning net shares, counsel who now represents Alberta/Boston argued on behalf of its client in a previous case that a movant with the highest losses should prevail over a competing movant with higher net shares and net expenditures as follows:

> The only dispute is whether a movant's "net shares purchased" should be given more weight than losses suffered. Respectfully, the answer is no.
>
> First, the PSLRA does not direct courts to assess "financial interests" in a vacuum. Rather, a district court is required to determine which movant possesses the "largest financial interest in the relief sought by the class." . . . The relief sought by the class in this case is monetary damages . . . and, the PSLRA provides that damages are tethered to an investor's loss, not the number of net shares purchased.

Docket No. 46-5, p. 1 (footnote and citations omitted).

In their Response, Alberta/Boston conceded, "LIFO is the preferred measure of Losses." Docket No. 48, p. 10. Alberta/Boston next argued that NYC's LIFO loss was less than NYC had claimed, because NYC had improperly included "the trading losses of Fire, a fund whose sales of fraud-inflated shares actually resulted in a net profit of nearly half a million dollars."[5] Docket No. 48, p. 10. Alberta/Boston argued that Fire was both a "net seller" (a Plaintiff who sold more shares than they purchased during the Class Period) and a "net gainer" (a Plaintiff who profited from sales of inflated stock during the Class Period). Alberta/Boston argued, "Net sellers and

---

[5] The NYC Funds, as the name implies, are a group of related funds including the New York City Employees Retirement System, the Teachers Retirement System of the City of New York, the New York City Teachers Variable Annuity Program, the New York City Police Pension Fund, and the New York City Fire Department Pension Fund. Docket No. 24, p. 6.

gainers are not suitable lead Plaintiffs because they are subject to the unique defenses that they cannot prove damages and may have profited from a company's fraud." Docket No. 48, p. 11.

After making these arguments regarding Fire, however, Alberta/Boston admitted that even without Fire, NYC's LIFO loss was $4,118,988, which is greater than the LIFO loss of Alberta/Boston ($4,098,606).[6] Apparently recognizing that they would lose under the LIFO methodology, Alberta/Boston shifted its focus and made two arguments to avoid that result: (1) even though NYC had the greater LIFO loss, the difference was "only $20,382 or barely one-half of one percent more than [Alberta/Boston's] losses" and that such a difference was not significant; and (2) the Court should disregard the insignificant difference and focus on the other factors, such as net shares purchased and net expenditures. Docket No. 48, p. 12.

Alberta/Boston next argued that it should be appointed lead Plaintiff because it purchased the most net shares. Docket No. 48, p. 15. According to Alberta/Boston, "a movant's net shares is determined by 'substract[ing] the number of shares sold by a candidate from those purchased during the Class Period.'" *Id.* Alberta/Boston argued that its net shares purchased were 453,820, while NYC's net shares purchased (not including Fire) were 406,217.

Finally, Alberta/Boston argued that their "net expenditures" exceed those of NYC. Alberta/Boston defined net expenditures as "the total amount spent purchasing stock during the Class Period less the total amount gained from the sale of the stock during the Class Period."

---

[6] Alberta/Boston did not explain how it calculated NYC's LIFO loss, without Fire, at $4,118,988. It is unclear whether, in making this calculation, Alberta/Boston started with NYC's LIFO loss set out in the Complaint ($4,413,165) or the corrected LIFO loss of $4,474,719. NYC stated that, even if Fire was excluded, NYC suffered FIFO losses of $4,761,925 and LIFO losses of $4,268,272. Docket No. 45, p. 22. Obviously, if NYC is correct, the difference in LIFO losses is approximately $169,000.

Docket No. 48, p. 11-12.  Alberta/Boston argued that it has more net expenditures than NYC whether or not Fire is included.

Each of the moving parties later filed a Reply to the other's Response.  Docket Nos. 52, 53.  In its Reply, NYC cited two cases for the proposition that "the largest loss is the critical ingredient in determining the largest financial interest and outweighs net shares purchased and net expenditures."  *See Richmond v. Goldman Sachs Group, Inc.,* 2011 WL2360291 at *6 (S.D.N.Y.); *Foley v. Transocean Ltd.,* 272 FRD 126 (S.D.N.Y. 2011).

It its Reply, NYC also argued that it purchased the *most* shares, 726,966.[7]  Docket No. 53, p. 6.  It cited no authority, however, for the proposition that the entity that simply purchased the most shares has the largest financial interest.  NYC funds also made a complex argument that it had more "net shares," but only "if LIFO/FIFO matching is applied to shares sold during the Class Period."  Docket No. 52, p. 2-3.

NYC also argued, and Alberta/Boston agreed, that "Courts are loath to appoint groups of movements as lead plaintiff when doing so would mean the individual movant with the largest financial interest would not serve as lead plaintiff."  Docket No. 53, p. 6; Docket No. 48, p. 9 n.5; *Goldberger v. PXRE Group, Ltd.,* 2007 WL980417 at *5 (S.D.N.Y.).  NYC argued, essentially, that Alberta and Boston are unrelated funds that have merely sought to "team up to surpass the movant with the largest financial interest . . . ."  Docket No. 53, p. 6.  NYC pointed out, however, that it should be considered a single fund (although there are several funds under the umbrella of NYC), *citing Aronson v. McKesson HBOC, Inc*., 79 F. Supp. 2d 1146, 1157 &

---

[7] It appears to the undersigned that this is a typographical error, and that NYC actually purchased 762,966 shares of CHS common stock.  Docket No. 34, p. 3.

12

n.11, which stated that the NYC

> Funds are essentially one person for purposes of the Reform Act, because they fall under the jurisdiction of the New York City Comptroller's Office, and are represented in their dealings with private counsel through one "in-house" counsel, the corporate counsel of the city of New York.

In their Reply, Alberta/Boston argued that NYC wishes to "simply muddy the waters before the Court." Docket No. 52, p. 6. They accused NYC of having offered no fewer than eight different estimates of their financial losses. Alberta/Boston repeated their argument that the Fire fund is a net seller and net gainer and should not be included in NYC's calculations. At the same time, however, Alberta/Boston recognized that, even without Fire, NYC has the largest loss calculated under the LIFO methodology. Docket No. 52, p. 6-7. Alberta/Boston also began to raise additional arguments, based on the proposition that NYC Funds should not be considered as one fund, but should be split into its component funds.

Counsel for the movants have, as discussed above, raised a number of interesting and complex arguments, and obviously have attempted to zealously represent their clients. At the same time, however, it appears that each side has attempted to "muddy the waters," by raising arguments that have nothing to do with the essential questions before the Court. Echoing the concerns of the Manual for Complex Litigation, the Court notes that it could expend (and has expended) "significant judicial resources" in attempting to assess the merits of the competing parties' positions. As the Manual says, in what is undoubtedly a gross understatement, "The Court may find it difficult to reconcile damage calculations based on differing methodologies."

Under the PSLRA, the primary focus of the Court must be upon the Plaintiff who "has the largest financial interest in the relief sought by the class . . . ." 15 U.S.C. § 78u-

4(a)(3)(B)(iii)(bb). The Court is further mindful of the fact that, "[T]he method used and the factors considered in determining each movant's financial interest remain fully within the discretion of the district court." *Garden City Employees' Retirement System v. Psychiatric Solutions, Inc.,* 2010 WL1790763 at *3 (M.D. Tenn.) (*citing Pirelli Armstrong Tire Corp. Retiring Med. Benefits Trust v. LaBranche & Co.,* 229 FRD 395, 406-07 (S.D.N.Y. 2004).

In the final analysis, the Court agrees that NYC has the largest financial loss in the case at bar under either the LIFO or FIFO methods. Under either of these methods, NYC funds has the largest financial interest in the relief sought by the class, and it is the "most adequate plaintiff."

The Class Period in these cases is almost five years, from July 27, 2006, through April 11, 2011. According to the Complaint filed in Case No. 3:11-00433, the stock reached a high during the Class Period of $43.04 on July 18, 2007. On April 8, 2011, prior to the disclosure of the alleged fraud, the stock price was $40.30. The next trading day after the disclosure of the alleged fraud, April 11, 2011, the stock dropped to $25.89. These are the only hard numbers the Court has with regard to the fluctuation of the stock price during the almost five years of the Class Period. The Court believes that the three other factors discussed by the parties (number of shares purchased or sold during the Class Period, the net number of shares purchased, and the net funds spent), do not necessarily provide an appropriate measurement for identifying the Plaintiff with the largest financial interest.

The Court's conclusion regarding the largest financial interest triggers the rebutable presumption set forth in § 78u-4(a)(3)(B)(iii)(I). There is no evidence that NYC will not fairly and adequately protect the interests of the class, nor is there any evidence to show that NYC is

14

subject to unique defenses that render it incapable of adequately representing the Class, so the presumption has not been rebutted.

For the foregoing reasons, the undersigned recommends that NYC's Motion for Appointment as Lead Plaintiff (Docket No. 23) be GRANTED.

The PSLRA also provides in relevant part, "The most adequate Plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). NYC seeks the approval of Lowey Dannenberg Cohen & Hart, P.C., as Lead Counsel for the Class and Miller & Martin PLLC as local counsel. The Court must consider whether the proposed counsel are qualified, experienced, and generally able to conduct the litigation. *See Stout v. J. D. Byrider,* 228 F.3d 709, 717 (6th Cir. 2000). Those firms have submitted Resumes (Docket Nos. 25-6, 25-7) showing that the proposed counsel are qualified, experienced, and generally able to conduct the litigation. NYC has also stated:

> Lowey Dannenberg was selected by the NYC Funds to act as Lead Counsel through the NYC Funds' rigorous multi-phased selection process . . . This process included the negotiation of a limitation of attorneys' fees that Lowey Dannenberg may seek that are far less than fees typically awarded in securities fraud class action litigation . . . This selection process and fee negotiation demonstrate the NYC Funds commitment to run the litigation and forestall a lawyer-driven result disfavored by the PSLRA.

Docket No. 24, p. 21 (citations omitted).

For the foregoing reasons, the undersigned recommends that the Court approve NYC's selection of counsel.

The undersigned further recommends that the Motion of Alberta/Boston for Appointment as Lead Plaintiff and Approval of Selection of Counsel (Docket No. 29) be DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14)

days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

_____
E. Clifton Knowles
United States Magistrate Judge