## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | CONSOLIDATED CIVIL ACTION NO.: 11-cv-0433 |
| *Plaintiff*, | CLASS ACTION |
| v. | |
| COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH and W. LARRY CASH, | JUDGE ALETA A. TRAUGER MAGISTRATE JUDGE JOE B. BROWN |
| *Defendants*. | |
| | JURY TRIAL DEMANDED |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |

## FIRST AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**PAGE**

OVERVIEW OF THE CLAIM .................................................................................1

CHS'S SCHEME TO DRIVE UP REVENUE.........................................................7

      A.     The Blue Book .......................................................................................7

      B.     Pro-MED ..............................................................................................12

      C.     CHS Tracked Physician's Admission Rates and Enforced Hospital
             Admission Benchmarks ........................................................................16

      D.     CHS Terminated "Low Admitters" ......................................................18

      E.     CHS Also Used Hospitalists to Increase Admissions...........................20

      F.     CHS Paid Incentives for Admissions....................................................21

      G.     CHS's Success in Boosting Admissions................................................22

      H.     Smith and Cash Omitted the Substantial Risk of Medicare Fraud .......26

JURISDICTION AND VENUE .............................................................................32

PARTIES ..............................................................................................................32

      A.  Lead Plaintiff .........................................................................................32

      B.   Defendants ............................................................................................33

ADDITIONAL SUBSTANTIVE ALLEGATIONS.................................................37

      A.  CHS Developed a Corporate Culture Centered
          Around Boosting Admissions.................................................................37

      B.  CHS Ignored Patient Safety and Medicare Rules
          In Order to Boost Its Revenue ...............................................................40

      C.  CHS's Undisclosed Practices Increased
          Patient Admissions Improperly..............................................................45

1.     CHS Systematically Used the Blue Book's "Admissions Justifications" To Boost Medicare Revenues Despite a Lack of Medical Necessary ................................................................45

    a)     Chest Pain ........................................................................46

    b)     Syncope or Pre-Syncope .................................................50

    c)     Community Acquired Pneumonia ("CAP").....................52

    d)     Cellulitis .........................................................................53

D.     CHS's Admission Rates Diverge Dramatically From Its Competitors .................54

E.     Lead Plaintiff's Statistical Evidence Confirms That CHS's Strategies Worked ................................................................................55

    1.   CHS's Observation Rate vs. Industry .............................................56

    2.   CHS's Observation Rate vs. Average Of High Quality Systems ................................................................57

    3.   CHS's Observation Rate vs. Rural Hospitals in Same Geographic Area ................................................................57

    4.   Disproportionate Share of CHS's Admissions are "One-Day Stays" ..................................................58

F.     CHS's Improper Admissions Practices Significantly Inflated Its Revenues ................................................................60

G.     Additional Facts Support a Strong Inference of Scienter .....................................60

    1.   Defendants Drove Up Admissions to Satisfy Analysts and Increase CHS's Stock Price ................................................................61

    2.   CHS's Top-Down Reporting and Monitoring Structure Supports a Strong Inference of Scienter……………………………  ………………62

    3.   Judge Nixon's Rulings Find A Strong Inference of Knowledge……………63

    4.   Smith's and Cash's Participation and/or Knowledge .....................................64

    5.   Smith and Cash Ignored Potential Medicare Violations..................................67

　　　　6.　Smith and Cash Personally Profited by Selling their CHS
　　　　　　Stock at Inflated Prices ..................................................................71

　　　　7.　Smith's and Cash's False Denials and Dissembling of the Facts
　　　　　　Underlying Tenet's Claims Support a Strong Inference of Scienter ...............73

　　H.　Defendants' Additional Material Misstatements and
　　　　Omissions During the Class Period ........................................................78

CLASS ACTION ALLEGATIONS ........................................................................125

NO SAFE HARBOR ........................................................................................128

CLAIMS FOR RELIEF ....................................................................................129

　　COUNT I:  Against All Defendants for Violations of
　　Section 10(b) and Rule 10b-5 Promulgated Thereunder ..................................129

　　COUNT II: Against the Individual Defendants for
　　Violations of Section 20(a) of the Exchange Act ........................................130

PRAYER FOR RELIEF ....................................................................................132

DEMAND FOR TRIAL BY JURY ........................................................................133

1.     Lead Plaintiff, the New York City Pension Funds, for its First Amended Consolidated Class Action Complaint (the "Complaint"), alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief based upon the investigation made by and through its attorneys as to other matters.  Lead Plaintiff's investigation included, *inter alia*, a review and analysis of: (a) documents produced by Community Health Systems, Inc. ("CHS" or the "Company") to the Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), and plaintiffs in *In re Community Health Systems Inc. Shareholder Derivative Litig.*, No. 3:11-0489 (M.D. Tenn.) (the "*Derivative Action*"), respectively; (b) documents pertaining to CHS and its senior executive officers and directors, including filings with the SEC and the DOJ; (c) analyst reports concerning the Company; (d) transcripts of CHS's earnings conference calls and investor presentations; (e) an expert statistical analyses performed using the Center for Medicare and Medicaid Services ("CMS") database; (f) analyses by a healthcare ethicist; and (g) the proceedings in *Tenet Healthcare Corporation v. Community Health Systems, Inc., et al.*, 11-cv-00732-M (N.D. Tex.) (the "*Tenet Litigation*").

## OVERVIEW OF THE CLAIM

2.     This is a securities class action brought on behalf of all persons or entities who purchased and/or sold the publicly traded securities of CHS from July 27, 2006 through October 26, 2011 (the "Class Period") against CHS and its senior officers, CEO and Chairman of the Board, Wayne T. Smith ("Smith") and CFO and Director W. Larry Cash ("Cash"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5.  Lead Plaintiff seeks recovery of monetary damages exceeding $891,000,000 plus prejudgment interest accruing from the filing of the initial

class action on May 9, 2011.

3. This class action was precipitated by disclosures made publicly for the first time by Tenet Healthcare Corporation ("Tenet") in a complaint against CHS filed April 11, 2011. Tenet, a competitor hospital owner, revealed that CHS's successful track record of increasing revenues at other acquired hospitals was attributable to unsustainable Emergency Room ("ED" or "ER") patient admissions practices that CHS employed to improperly drive-up revenues. Improperly boosting inpatient admissions generated more Medicare revenues for CHS than discharging patients or treating them in observation status.

4. These improper and concealed practices included an edict for "ZERO" observations for Medicare patients through the use of aggressive admission justifications known as the "Blue Book" (emphasis added); and programming the "Pro-MED" software system used in CHS's ERs to prompt patient admissions to boost revenues. CHS implemented bonus programs; admission rate quotas approaching 50% for Medicare (over 65 years old) patients; messaging; and terminations to compel CHS personnel to adhere to the Company's aggressive admissions justifications.

5. Defendant Cash emphasized that hospitals must generate admission volume "to meet analyst's earnings expectations and impact CHS's stock price favorably." Increasing the Company's market capitalization facilitated CHS's growth-by-acquisition strategy by increasing the value of CHS's stock thereby facilitating CHS's ability to issue higher levels of debt to support additional acquisitions. Moreover, boosting the stock price enabled Smith and Cash to personally profit from the exercise of vested options during the Class Period.

6. Smith and Cash were repeatedly warned that CHS's use of the Blue Book and "no observation" policy created a substantial risk of a Medicare fraud enforcement action. CHS's

long-time Medicare consultant pointedly concluded that the Blue Book criteria: (1) *"lacks specificity, allowing all cases to be classified as inpatient"*; (2) *would likely be construed as "statistically biased"*; (3) *results in "overcertification of inpatient"*; *and* (4) *could be construed as "an avoidance of 'best practice.'"*

7. Moreover, the same consultant warned that the Blue Book's lack of specificity "precludes cases from undergoing secondary physician advisor review and ensuring appropriate physician documentation and valid certification." Defendants were expressly told these criteria, along with CHS's refusal to use observation status, presented a "clear medical necessity compliance risk.

8. Defendants actively misled investors about the reasons for CHS's success. Defendants touted the "consistent execution of CHS's centralized and standardized operating strategies," its "ED initiatives," and its hospital acquisition strategy as key factors in growing its business. These statements were materially false and misleading in failing to disclose, *inter alia*, that these strategies depended in large part on utilizing aggressive non-industry admissions criteria that were unsustainable and a substantial Medicare compliance risk. Indeed, once Tenet revealed CHS's improper admissions practices, CHS was forced to concede that it had recently made the decision to discontinue the Blue Book. Lower patient admissions and ED revenues would be reported in October 2011 for the time being, but the truth was still vehemently denied and actively concealed by Defendants.

9. CHS's "admit" edict was also contrary to CHS's publicly touted "mission" of providing quality patient-centered healthcare. As found by an ethicist from the University of Tennessee College of Medicine,[1] a potential loss of income, peer esteem, staff privileges, one's

---

[1] E. Haavi Morreim, J.D., Ph.D. is a medical ethicist and a professor in the Department of

job or even your entire practice group's contract, created powerful pressure at CHS to align medical staff's professional judgment with the hospital's financial interests, creating a conflict for doctors who were to act in patients' interests. Not only that, but over-admitting also compromised patient safety. CHS's reports demonstrate that 70% of "hospital acquired conditions" following admission were inflicted upon Medicare patients.

10. Defendants' representations that CHS hospitals were in substantial compliance with federal, state and local regulations and standards, were materially false and misleading in failing to disclose long-standing potential Medicare violations at numerous hospitals.

11. CHS made generalized risk disclosures that failure to comply with Medicare requirements could subject the Company to government fines, or change operations. However, these generic risk disclosures themselves were materially misleading in failing to disclose the specific, known compliance issues that created a heightened risk, often internally discussed, that CHS would be severely fined and required to change admission practices.

12. When Tenet's lawsuit exposed CHS's unsustainable practices, a key to its success as a hospital operator and acquirer, and CHS's newly-disclosed ongoing government investigations, CHS stock immediately plummeted $14.41, or nearly 36%. This statistically

---

Internal Medicine at the University of Memphis, Memphis, Tennessee. From 1993 until 2009, she was a professor at the Department of Human Values and Ethics at the College of Medicine, at the University of Tennessee Health Science Center, Memphis, Tennessee. Professor Morreim has contributed to hundreds of publications, including books, chapters of books, and journal articles about ethical questions in healthcare decision-making. For example, Professor Morreim's book entitled, "BALANCING ACT: THE NEW MEDICAL ETHICS OF MEDICINE'S NEW ECONOMICS," discusses how economic pressure on caregivers to be cost-conscious in healthcare decisions presents ethical challenges. Moreover, Professor Morreim served on the American Society for Bioethics and Humanities for four years (from 1992-1996). Professor Morreim also served on the Society for Bioethics Consultation Board of Directors from 1992 to 1995. She also served on the Ethics Committees of LeBonheur Children's Medical Center and the Regional Medical Center in Memphis.

significant decline involved extraordinarily heavy trading volume exceeding 44 million shares, reducing the Company's stock value by $1.3 billion in a single day.

13.     By virtue of their participation in the implementation of the Blue Book, Pro-MED and enforcement strategies CHS used to drive admissions, and their "central" control and monitoring of CHS hospital admission practices and performance, Smith and Cash knew or recklessly disregarded material undisclosed facts about CHS's admissions practices which made their public statements about the source of CHS's success; its substantial compliance with Medicare regulations, and its central focus on quality healthcare; materially misleading. Significantly, over-admitting also compromised patient safety; CHS's reports demonstrate that 70% of "hospital acquired conditions" following admission were inflicted upon Medicare patients.

14.     While in the possession of material, non-public information concerning impending revisions to the Blue Book which they knew would reduce ED admission rates, defendants Smith and Cash sold 980,000 CHS shares through the exercise of vested options in 2009 and 2010, reaping unlawful profits of $8,447,500 and $7,327,200, respectively.

15.     Moreover, while conceding after Tenet's disclosures that CHS had started to discontinue using the Blue Book's admission criteria at its hospitals, Defendants falsely claimed that Tenet's allegations had no merit and that the switch to industry-compliant InterQual criteria would have no material impact on CHS's operations.  Yet, CHS's experience internally showed precisely the opposite, *i.e.*, that admissions would suffer with the abandonment of the Blue Book, and that CHS's undisclosed practices subjected it to a heightened risk of a regulatory investigations and fines.

16.     By 3Q 2011, CHS's results left no doubt: the switch to InterQual resulted in a

sustained and accelerating decline in admissions. After the close of business on October 26, 2011, CHS reported that the rate of "same store" admissions in 3Q 2011 had declined 7.0% as compared to 3Q 2010, when CHS used the Blue Book (the "October Disclosure"). This constituted a decline of 26,000 admissions for the nine months ended September 30, 2011. CHS's stock price dropped $2.32, or 12%, on October 27 to close at $17.81, a statistically significant decline on heavy trading volume.

17. The market, including CHS supporters such as Wells Fargo, recognized the 3Q results as a stark indication that Tenet's analysis of CHS's admissions practices was correct.

18. Wells Fargo downgraded CHS, explaining that "[o]ur prior view which was consistent with the Company's expectations had been that CYH's admission practices were in line with the industry and therefore would not change significantly. We believe this view is incorrect …. CYH's comments about weak admission trends because of the negative press could mean Tenet's claims have more validity than originally thought."

19. J.P. Morgan also found "it[] a bit more troubling … to see inpatient volume drops of this size" and raised questions about the Company's "continued stability" in light of ongoing investigations.

20. Consistent with the 3Q 2011 results, in July 2014, CHS settled the DOJ allegations that the Blue Book was a guideline for Medicare fraud for $98 million – one of the largest *qui tam* settlements in history. Shortly thereafter, CHS agreed to yet another $75 million settlement related to Medicaid fraud.

21. As part of the DOJ's settlement, CHS was also required to enter into a Corporate Integrity Agreement with the Department of Health and Human Services-Office of the Inspector General, to create a Medicare compliance program.

22.     "This is the largest False Claims Act settlement in the district…" said David Riviera United States Attorney for the Middle District of Tennessee, on August 4, 2014.  "[I]t reaffirms this office's commitment to investigate and pursue healthcare fraud that compromises the integrity of our health care system."  Summing up, Rivera said, the DOJ "is committed to ensuring that … hospital providers do not engage in schemes to increase medically unnecessary in-patient admissions of government healthcare program beneficiaries in order to increase profits."

23.     Reflecting on the ethical problem with CHS's conduct, DOJ's U.S. Attorney Anne M. Tompkins of the Western District of North Carolina added: "Health care providers should make treatment decisions based on patients' medical needs, not profit margins .… We will not allow this type of misconduct to compromise the integrity of our health care system." Inspector General David R. Levinson, further explained that "a rigorous multi-year Corporate Integrity Agreement requiring that the Company commit to compliance with the law, [will] ensure the Company's fraudulent past is not its future."

## CHS'S SCHEME TO DRIVE UP REVENUES

**A.     The Blue Book**

24.     CHS's scheme centered on driving up inpatient admission because Medicare pays more for inpatient treatment than for an ED patient placed in observation or discharged.  The strongest push to admit was for patients in "soft" diagnostic categories (*e.g.*, chest pain, abdominal pain, and syncope).  Michael Miserocchi ("Miserocchi"), Group Operations V.P. and Senior Director of ED Programs, who was responsible for Pro-MED integration at all CHS hospitals, reminded hospital CEOs that ED admissions increased revenues:

> every admission is worth approximately $5800 in net revenue, and every patient discharged home is worth approximately $250 in net revenue.  You can pay for a

locums [temporary] physician very quickly with admissions, ancillaries, supplies and procedures generated by patients that are kept in CHS hospitals.

25.     Similarly, Carolyn Lipp ("Lipp"), Senior Vice President of Quality and Resource Management ("QRM"), who directly worked for and had "the eyes and ears" of CEO Smith, highlighted in a 2008 presentation that the maximum reimbursement for observation status was only $661; in contrast, Medicare reimbursed hospitals as much as $7,000 more for some medical conditions when the patient is admitted to the hospital,[2] and paid an average reimbursement of $4,000 to $5,000 higher when patients were admitted rather than placed in observation care.  In one 2006 presentation, Lipp touted the 12-month Company-wide revenue impact from using the Blue Book capturing what would otherwise be "missed admits" exceeded $140 million.

26.     Starting in 2000, CHS developed and implemented the "Blue Book;" a compendium of liberal admissions criteria contrary to widely-accepted medical criteria.  No other hospital chain in the U.S. used the Blue Book.  For years the Blue Book had no symptoms that indicated "observation treatment."  The Blue Book did not list an objective treatment criteria but a series of "Admission Justifications," to trigger the medical staff to admit patients who otherwise could have been placed into observation and/or released.  With it, CHS hospitals maximized admissions to charge Medicare more money for services than medically necessary.

27.     In contrast, over 75% of U.S. hospitals utilized independent, third-party admissions criteria provided by InterQual or Milliman, which are based upon objective, clinical results.  InterQual was developed by an independent panel of 1,100 physicians and medical providers, contains over 16,000 references to medical sources, and was used by 3,700 hospitals

---

[2] Zach Gaumer & Dan Zabinski, Medicare Payment Advisory Comm'n (MedPAC) Presentation, Recent Growth in Hospital Observation Care, *available at* http://www.medpac.gov/documents/september-2010-meeting-presentation-recent-growth-in-hospital-observation-care.pdf?sfvrsn=0.  MedPAC is an independent Congressional agency that advises the U.S. Congress on issues affecting the Medicare program.

across the country, over 300 health plans and CMS. Similarly, the Milliman Care Guidelines, which have more than 15,000 medical references and are used by over 1,000 hospitals, were developed by an experienced team of physicians and reviewed by approximately 100 independent doctors.

28. Prior to and until the Tenet lawsuit, CHS, at Smith's direction, mandated that the Blue Book be used at all hospitals for patient intake. A PowerPoint presentation titled "CHS Clinical Guidelines," dated February 4, 2004, prepared by Lipp and approved by Smith, set forth the company-wide protocol applicable to all CHS hospitals: "All physicians should receive a copy of the Blue Book"; "each case manager should carry one with them"; an "[e]lectronic version should be available in ER," and applicable admission criteria should be placed on the bedside hospital record of every ED patient for review by ER nurses and physicians. Moreover, Smith and Cash approved the "ED Quality Project Action Plan" in August 2006 that established the admission practices protocol CHS hospitals were required to follow. As part of the indoctrination, CHS trained all ED staff, including ER physician groups and case managers, on the use of its Blue Book.

29. The Company assured admissions using the Blue Book by implementing a "ZERO Medicare observation" policy. With no mention of observation; observation status was not presented as an option to ED physicians trained on the use of the Blue Book criteria. Lipp put the matter bluntly: "[w]e want to avoid observation as much as possible on Medicare patients and on private insurance," and issued a directive to hospital case managers – "no chest patients in observation" – rather, all such patients were to be admitted.

30. In a training presentation titled "Observation Status and One-Day Stays, What You Need to Know," Lipp, Smith's and Cash's senior report, proclaimed that with "tighter

Observation management," hospital "Medicare One-day Stay percentage[s] will probably increase." She also emphasized that "Case Management is the key to controlling use of Observation status," and required that "case management **MUST BE NOTIFIED** of every Observation case and **MUST APPROVE** the use of observation before the patient is placed into Observation status" (emphasis in original).

31. Based upon these directives, case managers understood that the Blue Book "required" inpatient admission of all chest pain complaints. The ED Medical Director at Gadsen Regional Medical Center (AL) stated that it was the "CHS way" to admit "just about all our chest pain to impatient status." In January 2009, Gadsen's Director of Health Information Management candidly expressed her concerns to CHS corporate that she "was scared to death that we are going to see some huge repercussions financially if we maintain these practices."

32. CHS laid the responsibility for patient admissions squarely on each hospital's CEO, who aggressively implemented these corporate directives. For example, in Berwick Hospital's "Action Plan" for 2Q 2006, CEO Steve Grubbs advised corporate that the "CEO, ER Director and ER Physician will work toward a "goal of ZERO Medicare observations." Grubbs set out the following action steps:

- "The CEO and ER Director will immediately implement the Blue Book Plan or other plan aimed at better identification of admission criteria though the ER."
- "The ER Director will immediately implement a process that requires the CEO to be personally called for approval for EVERY requested admission into observation."
- "The ER Director implement immediately a process that requires that the CEO or Administrator on call be contacted when any patient that meets Blue Book or other criteria is not admitted by either the attending physician or ER physician."
- "The ER Director will immediately implement a process that will require contacting of the attending physician for 70% of every patient over age 65."
- "Physicians that have experienced volume downturns will be scheduled a personal office visit from a member of the hospital administrative team."

33. Phoenixville Hospital's (PA) CEO reported to Division III President Gary

Newsome and other executives on March 9, 2007, that he was "in the ER throughout the day (including weekends)" and made sure ER physicians' "'marching orders' are to admit." Vista Health (IL) reported to Smith, Cash, and Division I President Tom Miller that the CFO and Case Management Director were "reviewing daily observations that can convert to admissions [which were] [d]iscussed daily at flash meeting." Bradley Memorial Hospital (CT) calculated that "[c]onversion of ED observation to acute admit will result in potential annualized increases in NR [net revenues] of $940K to $1,410K."

34.     When the CEO of White County Community Hospital (TN) was confronted with performance below CHS's benchmark admission percentage, he vowed to "get[] the current ED physicians in line as well as recruit[] replacement physicians who understand the expectations we have for our patients. We will get this back on track." Vista Health reported to Smith, Cash and Tom Miller in its December 2008 Operations Review that it was "[e]valuating physicians on duty in the ER and their percentages [21% admit rate] in accordance to CHS blue book."

35.     In April 2006, the Sunbury Community Hospital CEO thanked Group III VP Marty Smith "for the accolades on our conference call for the ER admit percentage. We have really just aggressively implemented the Blue Book …. I guess in final analysis I'm just doing what Group 3 has pushed from day one. The real credit goes to Deb and her ER team-they've taken something completely new to them and done an excellent job at implementing the process and enforcing the procedures." In January 2007, when the "admit percentage in the ER [fell] tremendously low," the CEO advised corporate that "I met with 2 ER docs … I may be letting one of the physicians go if we cannot maintain an appropriate level."

**B.      Pro-MED**

36.     CHS's headquarters pressured the Division Presidents, who in turn pressured hospital CEOs and administrators to meet admission benchmarks tracked by Pro-MED.  Pro-MED is a proprietary networked software system used to track, in real time, patient, ED and individual physician statistics, and uses a "scorecard" to compare them.

37.     CEO Wayne Smith directed all CHS hospitals, including newly-acquired Triad hospitals, to utilize Pro-MED to increase admissions rather than observations.  The main reason for the Pro-MED deployment was due to concerns regarding "07 hospitals [*i.e.*, newly-acquired Triad hospitals], ED admission rates being 1.2% below CHS Legacy," which translates into "approximately $40 million annually in net revenue."

38.     Smith boasted that with Pro-MED "over the last 4 or 5 years, we've been able to increase our admission rate by about 10% in our emergency rooms."  Smith failed to disclose the material fact that Pro-MED was increasing the admission rate by a means that would not bear regulatory scrutiny.

39.     CHS senior executives mandated that Pro-MED be installed in every ED, "Standardize at every hospital; Lock out [hospital physicians from making] changes."  On August 2, 2006, Michael Portacci ("Portacci"), then senior vice president of Group II Operations,[3] sent Group II hospital CEOs a revised "ED Project Immediate Action Plan," copying Smith, Cash, Lipp and the Group Management Staff.  CHS directed the CEOs to implement the following protocol:

---

[3] Portacci later became the President of Division II.

\*   \*   \*

I.      <u>Pro-MED Reports</u>

- All hospitals will fully utilize Pro-MED capabilities, *i.e.*, test mapping, interfaces, status boards.
- Pro-MED reports are to be reviewed by the ED Medical Director to identify patterns of problems among ED doctors. These patterns are to be reported to the CEO weekly.
- If patterns are identified with any one doctor, he/she should be counseled, then reevaluated. If there are issues with more than one doctor, the ED group should be evaluated for continued use.

\*   \*   \*

II.      <u>CEO Accountability</u>

- Spend minimum of 1 hour per day in ED and focus on doctors, patients in waiting room, and registration.
- CNO spend minimum of 1 hour per day in ED (different hour from CEO) and focus on triage, nurse staffing, cleanliness, throughout, processes, and use of Pro-MED.
- Continue daily ED team meetings.
- CEO to submit weekly checklist/attestation to Group office regarding ED management.

III.      <u>Group Meetings</u>

- Each Group will hold a meeting with CEOs, CNOs, ED Medical Directors, and ED Nurse Managers within the next 30-45 days to discuss review project findings and corrective actions.

40.      Portacci also provided Group II CEOs an updated "comprehensive ED checklist" that required them to report on the status of numerous action steps; for instance:

- Review Pro-MED reports (census summary, physician activity and quality review) – executive team member ownership.
- Verify [Pro-MED] test mapping is active and used during triage – daily.
- Assure Blue Book utilization and review log – daily.
- Attending [physicians] called on at least 70% of patients over 65 – daily.
- Attending [physicians] called on at least 30% of all patients – daily.
- Medicare ER admission trend being monitored, positively trending to meet goals of 35-40%.
- Admission rate being monitored, benchmark against PY [prior year] actual.

41.      A September 25, 2007 internal memo addressed to Cash described the Pro-MED

Standardization Initiative as "a multi-pronged activity affiliated with our same-store hospitals. It

includes workstations for each ED bed … and re-implementation of the standard system configuration (Chief Complaint, Assessment Questions, Test Mappings) in each market." Test mapping involved "standardizing a set of minimum tests that are required for patients with certain chief complaints."

42.     At Smith's direction, the tests ordered for each medical condition were determined, or "locked down," at the corporate level. A September 2007 internal memo sent to CHS executive officers explained that once the test mapping feature was finalized and implemented, "the future maintenance of [test mapping] will occur centrally by CHS Corporate." Those at the hospital level that wished to make changes to the test-mapping feature were required to submit a change request.

43.     At Smith's further direction, corporate also tracked hospitals' levels of Pro-MED corporate "standardization" and "how compliant [] ED docs are with the Pro-MED system recommendations for admission."

44.     Pro-MED's QualCheck feature was also installed in some hospitals. QualCheck identified patients with an "alert" or "flag" in the patient's record, which required tests or treatment before the flag could be removed. Physicians who decided to discharge patients despite the flags were required to actively override QualCheck. CHS used Pro-MED to identify and track any and all physicians who exercised that override. CHS stated that QualCheck's goal was to "pick up 2 or 3% increase in Inpatient Admissions." An August 1, 2007 email to Lipp, Sandy Carson, Debbie Cothern and Miserocchi stated that "QualCheck uses Blue Book criteria to identify patients requiring admission, it also alerts the physicians to additional documentation needed to justify an admission for case management." A 2010 Pro-MED annual report described QualCheck overrides as "lost revenues."

45.    In the 2006 Pro-MED Standardization report, Gary Seay, Vice President and Chief Information Officer, observed that "there is a correlation between the percentage of patients with quality review alerts who are discharged and the admission rate.  Thus, if the admission rate is low, in most cases the number of patients with Quality Review alerts who are discharged is high."

46.    Miserocchi pointed out to Marty Schweinhart, who reports directly to Smith, that performance metrics have been built into ED contracts with physician groups so that CHS could restrict the percentage of patients discharged with Pro-MED review flags to 35% of total visits.

47.    Many CHS physicians were outraged that CHS used Pro-MED to supersede their independent medical judgment.  In 2007, Dr. Torrence of Skyridge Medical Center wrote, "[t]o be frank, some of the indicators that Pro-MED flags in our Quality Review are ridiculous."  An internal memorandum informed Cash that numerous physicians had questioned using "a tool like Pro-MED," and that "Pro-MED was not a good tool in anyone's eyes."  An ED Director explained that physicians were "aggravated" by Pro-MED because they felt compelled to "justify their decision" to discharge patients.  Lipp noted in an ED Quality Review report that "[p]hysicians [are] not accepting automated orders in Pro-MED."

48.    Physicians also found that Pro-MED's test-mapping component compromised patient safety.  On August 30, 2007, Director of Quality Assurance at Watsonville Community Hospital, Michael McGannon, informed CHS senior management that Pro-MED's standardized test mapping "subject[s] patients to unnecessary pain, radiation and expense … The blanket use of these several tests is contrary to the standard of care.  Expecting the triage staff to manipulate chief complaint designations to get around ordering inappropriate tests is, in itself, inappropriate."  Despite these physician concerns with Pro-MED, CHS mandated that Pro-MED

be installed and used in every hospital and controlled from corporate headquarters.

49.     Similarly, on September 30, 2007, the ED Medical Director of Easton Hospital (PA) reported to CHS corporate that "[t]he diagnostic tests that are currently being used as the default standards by Pro-MED do not meet the standard of care for emergency medicine."

## C.     CHS Tracked Physician's Admission Rates and Enforced Hospital Admission Benchmarks

50.     CHS's headquarters pressured Division heads who, in turn, pressured hospital CEOs and staff to use the Blue Book to meet admission benchmarks tracked by Pro-MED.  In an August 2, 2006 memorandum titled "ED Initiative & Follow-up," Portacci attached an "ED Project Immediate Action Plan."  The Action Plan instructed the CEOs that "Pro-MED reports are to be reviewed by the ED Directors to identify patterns of problems among ED doctors … [I]f patterns are identified with any one doctor, he/she should be counseled, then re-evaluated.  If there are issues with more than one doctor, the ED group should be evaluated for continued use."

51.     Portacci, now President of Division II Operations, emphasized to Division II's hospital CEOs and officers: "there continues to be opportunity with your daily/weekly management of the ED patients and patients in the 65-older category continue to run well below the benchmark.  Other Division Presidents did the same.

52.     CHS's hospital CEOs responded to the pressure from headquarters by applying pressure on ED physicians.  Lock Haven Hospital, (PA), for example, implemented daily "flash meetings" and produced a "Score Card" to show that they were keeping up with Pro-MED benchmarks.  Every morning the CEO, CNO, CFO, and ER nursing director would meet to discuss ER visits and admissions statistics.

53.     Gateway Medical Center, Tennessee, CEO Tim Puthoff reported, "We continued to meet weekly with ER physicians to implement Pro-MED (2/1/08) and Blue Book (11/1/07)."

Vista Health reported to Smith, Cash and Tom Miller in its December 2008 Operations Review that it was "[e]valuating physicians on duty in the ER and their percentages [21% admit rate] in accordance to CHS blue book."

54.     Maureen Bodine, Chief Nursing Officer of Barstow Community Hospital wrote to Michael Miserocchi, "My nurses think I have a screw loose because we are insisting they call all over 65… I know that increased calls to physicians could lead to increased admissions but I am having a hard time with this one too… I think physicians should be called on patients who meet admission criteria, not clinic type stuff…." Staff members viewed these tactics as "arrogant[]" and a "heavy handed attempt [to get physicians] compliant" with Pro-MED benchmarks.

55.     Maggie Redmond (Director of Emergency Services at CHS corporate) advised CHS's executives that CEO Tullman also "developed a contract addition for his ED physician group" titled "ED Physician Performance Criteria" mandating that the ED physicians and physician assistants "[m]eet or exceed the following specific [Pro-MED criteria] benchmarks." Recognizing the widespread truth of this practice and that it posed regulatory compliance risks, Michael Miserocchi, CHS's V.P. of Operations, cautioned Tullman that "[w]e have always been wary of putting this in writing."

56.     On August 1, 2007, CEO Butch Naylor at White County Community Hospital, addressed "the current freefall in our ED Admit rate," and stated, "We are working on <u>getting the current ED Physicians in line</u> as well as <u>recruiting some replacement physicians who understand the expectations we have for our patients</u>." (Emphasis added).

57.     Weekly report templates called the "Comprehensive CEO Report" were emailed from CHS corporate to CEOs of numerous hospitals, listing various ER Action Plans:

> Assure blue book utilization and review log- daily
> Attending [physicians] called on at least 75% of patients over 65- daily

Attendings called on at least 30% of all patients- daily
Review Pro-MED reports (census summary, physician activity and quality review) - daily CNO report to CEO

58. The "2010 Strategic Business Plan" for Woodland Heights Medical Center, set the "Goal": a "19% admission rate"; "Increase admissions on patients over the age of 65"; and, "Focus on case management in the ED to reduce wait times, increase admission rates."

59. That CHS's Blue Book driven admissions practices were having the intended effect was clearly evidenced by the fact that un-indoctrinated temporary physicians, known as *locum tenes* physicians, admitted patients at a much lower rate than CHS's regular physicians. One hospital blamed low monthly admissions statistics on the use of a "*locum tenes* physician who only had one admission out of 26 patients."

**D.    CHS Terminated "Low Admitters"**

60. ED physicians who failed to improve their admit rates were either terminated, replaced, or had their shifts reduced.  The following are just some of the documents that exemplify how CHS treated physicians who did not follow the "admit" mantra:

- following a 13% decline in admissions, the Action Plan for SkyRidge Medical Center (OH), dated August 12, 2008, was to "*Eliminate ED physician low performers*;"

- Longview hospital (TX) Group Vice President, Tim Adams, reported to Portacci that Longview identified a variant ED Physician last month and "he was removed;"

- in a Site Visit Summary of Lock Haven Hospital (PA), Miserocchi noted that a physician with admission rates in single digits was going to be "transitioned from the schedule."  At that same hospital, CHS terminated Dr. Querci, and considered replacing Dr. Gingrich and Dr. Herberg, for consistently falling below admission benchmarks for patients over 65 years old;

- Division III President, Gary Newsome was advised that since Dr. Farooi, a member of the active staff, who did ER relief, "admitted at a 50% rate during his one shift on 9/4[05] … we will find another physician to fill

those relief shifts;"

- Division V President, Thomas Miller, was advised in June 2009 that a "low admitter [at Parkway Regional Hospital] was taken off [the] June schedule;"

- CHS executives pushed the Haywood Park Community Hospital ED physician group to "address the one physician who lags in support of admissions to the facility"; and

- at Berwick Hospital, at least one ED physician (Dr. Merriweather) had his shifts reduced because he was deemed to be a "chronic low admitter."

61.     Smith boasted to stockholders that "we have successfully fulfilled our mission to enhance the level and quality of care," but failed to advise investors that CHS was prepared to, and did replace, entire ED physician groups for low ED admission rates.  A December 11, 2009 memorandum, concerning a site visit to South Texas Regional Medical Center (TX) explicitly states: "Emergency Department Contract ....  They will be terminating their agreement with Atascosa County Emergency Physicians ....  *The percent of admissions thru the Emergency Department continues to be below benchmark and prior year. . .*  Therefore, the contract will be terminated and a new group brought in."  (Emphasis added).

62.     Smith and Cash kept tabs on CEO's push for admissions including at South Texas Regional Medical Center.  The memo quoted above on physician terminations due to low admissions was forwarded to defendants Smith and Cash with the handwritten notation, "New CEO is doing very good job."

63.     A Division IV Volume Variance Analysis (vs. PY), Projected as of February 11, 2010, reported that Spokane/Deaconess was down … 88 ED admissions "due to soft volumes and low admit rate (12.8% vs. 15.5% PY); ED group change out complete as of Feb 10."

64.     In an August 9, 2009 email to Division IV President Bill Hussey, a Hospitalist at Alta Vista Regional Hospital complained that "[w]e have been advised by the CEO that we

should 'admit' no matter what. This is against the law and can be evaluated by both [M]edicare and [Medicaid] since it comes close to fraud … I know that the ED personnel get paid a bonus in the form of a 'risk pool' for admissions and consultations. The more they get, the more the bonus. This is a fact, thus the push for admissions that are really unnecessary or not substantiated." Upon information and belief, Hussey forwarded this complaint to CHS's Compliance Officer, Andi Bosshart, who reported directly to Smith.

65. As found by a medical ethicist expert, CHS's "admit" edict was inconsistent with CHS's publicly touted "mission" of improving the quality of healthcare provided. The potential loss of income, peer esteem, staff privileges, one's job or even one's entire practice group's contract, created powerful pressure to align one's judgment with the hospital's financial interests, at the expense of patients' interests.

**E.     CHS Also Used Hospitalists to Increase Admissions**

66. CHS also created a "Hospitalist Program," which made their goal clear; as Miserocchi stated, "hospitalists should be…increasing admissions." In a March 16, 2011 memorandum to Michael Portacci, Rob Horrar, VP of Operations for Division II, proposed placing a hospitalist at Abilene Regional Hospital to drive up admissions from a 10% to a 16% benchmark.

67. Similarly, in a May 31, 2010 "Trip Report" concerning Harris Hospital (TX), the VP of Division II Operations, Michael Garfield, advised Portacci that "[w]ith the volume decline thus far for 2010, it is essential to have a 24/7 Hospitalist arrangement set up as quickly as possible."

68. A spreadsheet titled Weekly Volume Variance (Division IV) dated February 28, 2010 states:

Had the National Medical Director of our Hospitalist Group on site this week to *re-educate the Hospitalists on admission expectations* and expectations for preformance [sic] improvement. *He was notified that if immediate improvement was not seen that the contract would be terminated.* ED Physicians and ED Staff was notified that if they have a patient that meets admission criteria and the hospitalist refuses to admit, that the CEO was to be notified. …. (Emphasis added).

## F.   CHS Paid Incentives for Admissions

69.   CHS provided monetary incentives to its employees at all levels of its hospitals to systematically boost ED admission rates.[4]  According to a 2004 Incentive Bonus Plan, "[i]mprov[ing] ER Admit rate by .3% over 2003" was equivalent to 2% of the bonus; by 2010 the bonus increased to 3%.

70.   Inconsistent with its patient centric improved quality of care statement, CHS paid bonuses to hospital CEOs to admit more non-self-pay ED patients.  For example, "Wayne Smith and Larry Cash ... approved a 4Q 2007 CEO admission incentive" after "discuss[ing] significant ED admission opportunities."  The "4th Quarter Performance Plan" provided CEO bonuses of "10% of his 4th quarter salary" for meeting "non-self-pay admission goals."  This practice made CHS's representation about is patient-centric improved quality of care materially false and misleading because over-admitting also compromises patient safety; CHS's reports demonstrate that 70% of "hospital acquired conditions" following admission were inflicted upon Medicare patients.

71.   The ED physicians themselves also received additional compensation for admitting patients more aggressively.  A 2010 Weekly Management Report for Cherokee Medical Center provided to Miller states:

I feel very good about the incentive plan we have put into place for our ER

---

[4] When physicians reached the CHS benchmarks, CHS corporate would take special notice, thanking a physician for generating the highest increase in admissions for the month.

physicians … and it seems to be having a positive effect. This marks the 3rd year in a row that CMC has rolled out an incentive plan based on certain Pro-Med metrics. …. Some say "*what gets rewarded, gets repeated*," and we have found this to be true with our ER incentive plan. ER performance has been consistently good MTD. Admission percentage increased 1.3% compared to PY and 1.2% compared to PM. …. ER admission percentage over the last 6 months: August – 8.5%, September – 9.0%, October – 7.0%, November – 9.1%, December – 10.4%, January MTD – 12.9%.

72.     However, if a physician failed to meet CHS's admission benchmarks, their incentive plans would suffer. For example, Dr. Bostick at Springs Memorial Hospital was branded a "low admitter" and, as a result, CHS revised his incentive plan.

## G.     CHS's Success in Boosting Admissions

73.     CHS's standardization and centralization of ED strategies using the Blue Book's liberal, non-industry standard criteria, proved highly successful in increasing admissions regardless of medical necessity. A Division II "Executive Summary-September 2008" from President Michael Portacci to the Division II "Chief Officers," attached a Consolidated Pro-MED Report covering 51 separate metrics. The report indicated that for the nine months ended September 30, 2008, 43,009 patients were admitted while only 736 were placed in observation. A separate table captioned "Patients 65 yrs. or Older Report," reported 2,511 admits out of 6,322 total patients seen in the ED, or 39%, as compared to 23 patients in observation, or 0.4%.

74.     The impact of CHS's practices is starkly illustrated by CHS's 2007 acquisition of approximately 50 Triad Hospitals, Inc. ("Triad"). The Blue Book was the centerpiece of CHS's acquisition strategy whereby patients previously treated at Triad Hospitals in Observation would now be treated as inpatient admissions. CHS's senior management saw a huge financial opportunity in applying this strategy to Triad. Miserocchi estimated the impact on admissions at "approximately $40 million annually in net revenues."

75.     CHS senior management was well aware that Triad hospital CEOs were resistant

to use of the Blue Book. On July 30, 2007, Dr. Barbara Paul, CHS's Chief Medical Officer, who reported directly to Smith, and a member of the PAB and CHS's Management Committee, summed up the concerns at the hospitals, as follows:

> "Blue Book just not adequate. They need InterQual to succeed in the conversations they have [with] insurers. Now that Co has increased so much in size, and now that it is likely that many 'CHS07' [Triad] hospitals already subscribe to InterQual, the group felt it was time to revisit this whole issue and see what makes sense going forward."

76.     Despite the serious compliance risks, Smith and Cash refused to discontinue the Blue Book which was a central component of CHS's acquisition and revenue strategies. In fact, Smith, with Lipp, personally took the lead on developing and overseeing ED training on the Blue Book, and were widely successful. On October 3, 2007, Lipp advised her colleagues that this issue was "discussed at every Regional [Physician Advisory] PA meeting and that on October 2 she and Defendant Smith "made the rounds of all the [CHS] division meetings and discussed the issue because it is a high priority for us with the CHS 07 hospitals."

77.     In one of Lipp's corporate presentations, titled "Observation Status and One-Day Stays, What <u>You</u> Need to Know," Lipp described, among other things, how Brownwood Regional Medical Center (TX), a former Triad hospital, had implemented CHS's "Observation Initiative." Following this protocol over a 10-week period between August 29, 2007 and October 31, 2007, Brownwood reduced weekly observation rates from 20% to 3%.

78.     To achieve this dramatic reduction, Lipp stated that CHS directed the following actions at Brownville:

- "Retrained ED case managers [CM] and physicians … on the Blue Book."
- "Reviewed case manager's ED logs to see if there would have been changes in admission status using the new training [*i.e.*, Blue Book]."
- "Started flash meetings every morning and the CM Director made rounds between 7 am and 9 am ... any observation patients are reviewed in flash meeting and the Director calls the physicians to review those cases."

- "Admission unit allows CM [case manager] to review all inpatients prior to going to the floor.
- "CM dept. accountable to Admin Team [CEO, CFO, CNO] every day for any OBS admissions."
- "Staff was awarded with pizza party for reductions in observations."

79.     Similarly, David Whittaker, Regional Director of QRM, on October 31, 2007, told the CEO at Greenbrier Valley Medical Center (a former Triad facility) and Division III President Gary Newsome that:

> it is important to start using the CHS 'Blue Book' admission criteria as soon as possible.  An exercise during our discussions using existing medical records of both inpatient and observation patients evidenced that most of the observation patients in the exercise who had been admitted as outpatient observation status patients under the InterQual criteria would have been admitted as inpatients if the Blue Book criteria had been used.  By switching to CHS [Blue Book] criteria, the hospital should experience a significant reduction in Medicare and other outpatient observation status patients and a significant increase in inpatient admission.

80.     Greenbrier's 2008 Strategic Plan presented to Newsome and other executives followed CHS's directive in implementing Pro-MED and Blue Book, so the hospital would "[i]ncrease admission % from 12% to 16%," and account for $215,000, or 14% of the projected 2008 EBITDA increase.

81.     Likewise, in late October 2007, Tim Adams, the Division II VP of Operations conducted a site visit of DeTar Hospital (Victoria, TX), another former Triad hospital, and sent an "ED Action Plan" to Portacci (Division II President), which was forwarded to Smith and Cash.  The Action Plan detailed how DeTar "represents a significant opportunity to increase admissions based on patient meeting Blue Book admissions criteria."

82.     Tenet's experts determined that in 2006—before the acquisition by CHS—Triad's observation rate of 11% was almost three times CHS's 4.1% observation rate.  Under a standard two-tail t-test, CHS's divergence from the national average observation rate of 9.18% was

statistically significant (p-values 0.05) (*i.e.,* extremely unlikely to have been the result of chance).

83.     Within one year of CHS's acquisition of Triad, Triad's use of observation status decreased by 52% through the implementation of its Blue Book admission practices (again a statistically significant result).  Conversely, one year after the acquisition, the percentage of "one-day stay" admissions—which Medicare auditors consider to be potentially indicative of improper admissions—increased by one-third, with even higher increases for patients with common conditions such as chest pain, syncope, and GI-bleed.  The difference in one-day stays at Triad from 2007 to 2008 is statistically significant, meaning that the difference is extremely unlikely to have been the result of chance.  This dramatic swing toward one-day stays confirms the effects of using the Blue Book -- under CHS's direction, Triad hospitals were inappropriately admitting patients who should have been treated in observation status.

84.     CHS actively misled investors about the reasons for CHS's success.  Defendants consistently touted its "centralized and standardized operating strategies," and the synergies and operating efficiencies achieved in the Triad acquisition, while failing to disclose that its success was driven in large part by employing CHS's unique non-industry admission strategies to systematically turn patients whose medical needs likely required treatment in outpatient observation status into more lucrative inpatients.

85.     Defendants' representations touting CHS's quality patient care were materially misleading in failing to disclose the Company's "admit" edict, which created a conflict for doctors who were supposed to act in the patients' interests.  Moreover, CHS's representations about its quality patient care were materially false and misleading because over-admitting compromised patient safety; CHS's reports demonstrate that 70% of "hospital acquired

conditions" following admission were inflicted upon Medicare patients.

86.     In sustaining claims based upon similar allegations in the *Derivative Action*, Judge Nixon found that Smith, Cash and other CHS Board of Directors members knew that "obtaining significant increases in admission rates … at Triad hospitals could not have been done without using improper means."  *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss dated September 27, 2013.

## H.     Smith and Cash Omitted the Substantial Risk of Medicare Fraud

87.     CHS senior management was well aware from internal audit reviews and outside consulting experts that CHS's admissions policies created a substantial risk of a Medicare fraud enforcement action.  In a February 2004 memorandum, Chuck Reece, QRM Regional Director, informed Lipp and head compliance officer, Andi Bosshart, of "evidence of a widespread trend of one-day stays" resulting from CHS's policy of "no Medicare observations" that posed a "significant potential compliance issue relating to the use of observation within our facilities." Lipp was a direct report to Smith (and Cash), as was CHS's head of Compliance.

88.     Reece reported that "it was clearly communicated to me that the tracking of and response to reported observations made it clear to [hospital case management directors] that there was an expectation to have no Medicare observations ….  All stated that they formed this perception based on direct or indirect communications from CHS group and/or corporate staff." Case managers from both the Mid-Atlantic and Southeastern regions conveyed these same concerns to Reece.

89.     CHS's QRM department subsequently prepared CHS's observation guidelines for inclusion in the Blue Book, which were presented to the Regional Physician Advisory Committee ("RPAC").  However, the RPAC rejected these guidelines on January 8, 2005

because "including observation guidelines in the Blue Book may prompt physicians to use the observation category instead of admitting the patient to inpatient status when possible." Further, "[t]he group agreed that, while a useful tool to assist the Case Manager … the observation guidelines would only confuse the physicians." Attendees included Division IV President Bill Hussey, as well as Debbie Cothern, CHS's Vice President of Quality and Resource Management, Sandy Carson, and Jackie Moran, all of whom answered to Lipp—Smith's and Cash's direct report.

90. CHS's Physician Advisory Board ("PAB"), headed by Smith and Cash, adopted the RPAC's reasoning and recommendation in unanimously deciding on January 14, 2005 to continue excluding observation guidelines from the Blue Book. The PAB's position excluding observation continued for almost five years.

91.



92. In 2006 CHS retained Primaris to perform an independent study called the "One-Day Stay Project," and found that 61% of the randomly chosen patient files at Northeast Regional Medical Center (MO) during the second half of 2005, who had one-day stays, failed the InterQual admission criteria for admission, and calculated the Medicare overpayment at

$180,600.  Upon information and belief, these findings were reported to Smith.

93.     In May 2007, another consultant, Health Services Advisory Group, expressed its concerns to CHS (Payson Regional Medical Center) that the "Blue Book criteria, specifically the justification for patients admitted with DRG 143 chest pain [a Medicare billing reimbursement code], … would allow patients who should be categorized as *Observation status* to be admitted as *Inpatient status*."  Upon information and belief, these findings were reported to Lipp who, in turn, advised Smith.

94.     CHS's own internal audit found that patients were being inappropriately admitted using the Blue Book.  On August 17, 2007, Carol Hendry (V.P. and Corporate Compliance and Privacy Officer)—who reported directly to Smith—prepared a compliance "Status Report," reporting on a number of ongoing compliance related issues, including the findings of an internal audit performed at Chestnut Hill Hospital, which found that out of 72 "one-day stays" (*i.e.,* patients who are admitted for only one day), an astounding 56 did not meet CHS's inpatient criteria.

95.     Hendry's "Status Report" also indicated that she would "have a report to [Smith] by early next week" regarding the "Dr. Joe Zebrowitz issue."  Dr. Joseph Zebrowitz ("Zebrowitz"), of Executive Health Resources ("EHR"), a longtime expert consultant, was hired by CHS to review its admissions practices.  Zebrowitz documented for Hendry compliance problems at numerous CHS hospitals relating to the Blue Book criteria, which resulted in short-term admissions called "one day stays"—a Medicare red flag.  In his report on Watsonville Community Hospital (CA), as of November 30, 2006, Dr. Zebrowitz highlighted CHS's serious regulatory risks, observing that CMS was aggressively investigating Medicare fraud with a focus on the red flags for lack of "medical necessity."  Zebrowitz reported that at Watsonville he saw

"almost no medical observation—this is a significant red flag." Hendry sent Dr. Zebrowitz's assessment of CHS' compliance practices and his report on Watsonville Community Hospital directly to Smith and Cash.

96.     On September 7, 2007, Hendry provided Smith with a summary of the investigation of Dr. Zebrowitz's allegations.

97.     On January 21, 2008, Zebrowitz emailed Carol Hendry to reiterate his concerns regarding CHS's medical necessity compliance. Zebrowitz advised Hendry that he was retained as an expert witness and consultant in connection with the OIG's investigation and recently-concluded a $26 million settlement of claims against St. Joseph Hospital of Atlanta.

98.     Zebrowitz attached the DOJ's press release, which stated that the settlement covered claims against St. Joseph's for short stay inpatient admissions, usually of one day or less, which should have been billed on an "outpatient observation basis."

99.     Zebrowitz advised Hendry:

The lesson we took away from the St. Joe example was 'Do not get the OIG to investigate you.' . . .  However, I think your current "processes" and underlying basis (such as —we don't really have any observation) place your organization at serious risk." (Emphasis added).

Hendry forwarded Dr. Zebrowitz's investigative findings to Cash.

100.    On January 30, 2008, Dr. Zebrowitz sent his conclusions to Carol Hendry. Dr. Zebrowitz indicated that although there is no regulatory requirement that a hospital use a particular commercially available screening criteria such as InterQual, nevertheless, the basis for determining medical necessity must, in accordance with 42 C.F.R. 411.406(e), comport with either Quality Improvement Organization Guidelines or Local Standards of Care.

101.    Dr. Zebrowitz concluded that the Blue Book criteria, in contrast: (1) "lacks specificity, allowing all cases to be classified as inpatient"; (2) would likely be construed as

"statistically biased"; (3) results in "overcertification of inpatient"; and (4) could be construed as "an avoidance of best practices." Dr. Zebrowitz "strongly advise[d] against" using the Blue Book in a Medicare appeal because the "last thing" CHS wanted was a federal judge reviewing the Blue Book. Cash and Smith were informed of Dr. Zebrowitz's findings.

102. EHR's investigation also revealed that CHS's refusal to use observation status presented a "<u>clear medical necessity compliance risk</u>." In particular, Dr. Zebrowitz found that (a) CHS instructed case managers "to make everything inpatient" and not to use observation status, and (b) Physician Advisors reported that CHS hospitals "don't have any observation." He also found:

- Chestnut Hill Hospital: ED Director stated that "15% of our admissions are not appropriate, but I was told to make them inpatient" and that "[CHS] Corporate tells us not to use observation, except for extended post-surgical care."
- Porter Hospital: The Director of Case Management was "told not to use observation."
- Laredo Medical Center: one-third of the 24 esophagitis/gastroenteritis cases reviewed failed to support inpatient admission.
- Watsonville Community Hospital: "Almost no medical observation -- this is a significant red flag," and 55% of the 31 one-day stay cases reviewed failed to support inpatient admission.

103. Dr. Zebrowitz reported that "case managers have repeatedly expressed their discomfort at following [CHS's no-observation] instructions, <u>creating an environment of clear medical necessity compliance risk and exposure</u>." He concluded that "the fact that Blue Book is utilized by these hospitals as a rubber stamp and not a screening tool is a potential problem."

104. Despite being informed of Dr. Zebrowitz's determinations, Smith and Cash chose not to take any affirmative action. The Blue Book was implemented *en masse* at former Triad hospitals. No comprehensive changes were made to provide observation status guidelines for

another two and one-half years.[5]  Despite knowing about long-standing potential Medicare violations, Smith and Cash made unqualified representations throughout the Class Period that CHS hospitals were in substantial compliance with government regulations.

105.    As a result, CHS hospitals continued to improperly drive patient admissions using the Blue Book.  For example, in August 2009, QRM Regional Director David Whittaker, sent a "red alert" report to Cash, Division I President, David Miller, and other CHS executives, relating to the "the lack of Medicare Observation Patients at Southern Va. Regional Medical Center." The report noted that the Medical Center "continued its 2008 trend of no observations into 2009." Whittaker stated "the zero volume of observations for such an extended period of time is a red flag for CMS and could trigger an audit of short-stay admission patients at the hospital."

106.    Lipp's own staff confirmed that "there is a tremendous amount of differences between Blue Book and InterQual" and that "there is no way we can replicate [InterQual]." These facts are supported by numerous audits performed on CHS's patients.  For example, in February 2009, a CMS audit of 40 chest pain patients admitted to Oro Valley Hospital in Arizona revealed that 70% "did not meet InterQual Criteria for admission."

107.    An audit of Dyersburg Hospital in early 2011 revealed that out of 185 cases – only one met inpatient [InterQual criteria]" and that CHS should not be "forcing them into a status that we cannot defend."  Similarly, a Division III Volume Summary Report for 1Q 2011 stated that for Dyersburg and Pottstown, "RAC audits and its review of all chest pain admissions, were "threats to volume."

---

[5] Observation guidelines for chest pain only were implemented in July 2009.

## JURISDICTION AND VENUE

108.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder.

109.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

110.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

111.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.    Lead Plaintiff

112.    Lead Plaintiff the New York City Employees' Retirement System ("NYCERS"), the Teachers' Retirement System of the City of New York ("NYCTRS"), the New York City Fire Department Pension Fund ("FIRE"), the New York City Police Pension Fund ("POLICE"), and the Teachers' Retirement System of the City of New York Variable Annuity Program ("NYCTRS Variable A") (collectively, the "Funds" or "Lead Plaintiff"), are part of one of the largest pension systems in the nation.  As of June 30, 2015, Lead Plaintiff collectively had more than $160 billion in assets.  On December 28, 2011, this Court appointed the Funds as Lead Plaintiff in this action.

113.    NYCERS, established under Section 12-102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who are not

eligible to participate in separate Fire Department, Police Department, Teachers, or Board of Education pension funds.

114.    NYCTRS maintains two separate retirement programs, the Qualified Pension Plan ("QPP") and the Tax-Deferred Annuity Program ("TDA").  The QPP, established pursuant to Section 13-502 of the Administrative Code of the City of New York, provides pension benefits to those with regular appointments to the pedagogical staff of the New York City Board of Education.  The TDA was established pursuant to Internal Revenue Code Section 403(b), to provide a means of deferring income tax payments on voluntary tax-deferred contributions.  The variable investment fund of the TDA is known as NYCTRS Variable A.

115.    FIRE, established pursuant to Section 13-301 of the Administrative Code of the City of New York, provides pension benefits for full-time uniformed employees of the New York City Fire Department.

116.    POLICE, created pursuant to New York Local Law 2 of 1940, provides pension benefits for full-time uniformed employees of the New York City Police Department.

117.    Each of the Funds purchased or acquired CHS common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein. During the Class Period, the NYC Funds purchased a total of approximately 800,000 shares of CHS common stock on the open market, as set forth in their amended certifications annexed hereto.

**B.    <u>Defendants</u>**

118.    Defendant CHS is a Delaware corporation headquartered at 4000 Meridian Boulevard in Franklin, Tennessee.  CHS's common stock is listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "CYH."

119.    CHS is one of the largest publicly-traded hospital companies in the United States and a leading operator of general acute care hospitals in communities across the country. Through its subsidiary, Community Health Systems Professional Services Corp., the Company by the end of 2011, leased or owned 131 affiliated hospitals in 29 states with an aggregate of approximately 19,695 licensed beds.  The Company's headquarters are located in Franklin, Tennessee, a suburb south of Nashville.  In 2011, CHS reported $13.6 billion in net revenue.

120.    In pursuit of its growth by acquisition strategy, from 2006 through 2011, CHS increased the number of hospitals by 70%, growing from 77 to 131 hospitals; increased the number of beds from 9,117 to 19,695 and more than tripled its net revenues from $4.3 billion to $13.6 billion.  The bulk of this growth occurred through the July 2007 acquisition of the Triad hospital system for $6.8 billion.

121.    From 2006 through 2011, between 26.8% and 32.0% of CHS's net operating revenue was derived from Medicare reimbursement payments, so CHS's success necessarily depended upon compliance with the Medicare regulations.

122.    Defendant Wayne Smith has served as CHS's President, Chief Executive Officer ("CEO") and Director since 1997, and Chairman of the Board of Directors (the "Board"), since 2001.  Defendant Smith is also President and CEO of Community Health's wholly owned subsidiary, Community Health Systems Professional Services Corporation, and an officer and/or director of certain of Community Health's hospitals, including: (i) Roswell Hospital Corporation; (ii) San Miguel Hospital Corporation; and (iii) Deming Clinic Corporation.

123.    As an experienced industry professional, Smith knew that CHS was required to comply with Medicare reimbursement standards and other federal and state laws and approved, *inter alia*, public disclosures with the SEC that the Company was in substantial compliance with

these requirements. Yet, internally he drove improper admission practices at CHS hospitals for the purpose of obtaining higher Medicare revenue. He also closely monitored the results of the centralized and systemic "ZERO Medicare observation" strategy employed at CHS hospitals.

124. For fiscal year 2011, Smith's total compensation was approximately $21.6 million. This included $3.95 million in bonuses and incentives.

125. As described herein, while in possession of material, non-public information concerning changes in CHS's admissions practices that could impact its results, Defendant Smith sold 500,000 shares of his CHS stock, reaping unlawful profits of $8,443,908.

| Insider Last Name | Transaction Date | Shares | Price | Option strike price | Profit |
|---|---|---|---|---|---|
| SMITH | 5/20/2009 | 250,000 | $26.07 | $13.00 | $3,267,500 |
| | 5/13/2010 | 243,093 | $41.02 | $20.30 | $5,036,887 |
| | 5/14/2010 | 6,907 | $40.50 | $20.30 | $139,521 |
| | | **500,000** | | | $8,443,908 |

126. Defendant Larry Cash has been CHS's Chief Financial Officer ("CFO") and Executive Vice President since 1997 and Director since 2001. In addition to CHS, Cash has been an executive and/or director of several public healthcare companies and as an experienced industry professional, Cash knew that CHS was required to comply with Medicare reimbursement standards and other federal and state laws, and approved public disclosures with the SEC that the Company was in substantial compliance with these requirements. Yet, internally he drove improper admission practices at CHS hospitals for the purpose of obtaining higher Medicare revenue. He also closely monitored the results of the centralized and systemic "ZERO Medicare observation" strategy employed at CHS hospitals.

127. For fiscal year 2011, Cash's total compensation was approximately $8.7 million, including $1.4 million received in bonuses.

128.     As described here, while in possession of material, non-public information concerning admissions practices, Defendant Cash sold 480,000 shares of his CHS stock, reaping unlawful profits of $7,432,100.

| Insider Last Name | Transaction Date | Shares | Price | Option strike price | Profit |
|---|---|---|---|---|---|
| CASH | 8/4/2009 | 240,000 | $30.79 | $20.30 | $2,517,600 |
| | 4/26/2010 | 240,000 | $40.34 | $20.30 | $4,809,600 |
| | | **480,000** | | | $7,327,200 |

129.     Defendants Smith and Cash are collectively referred to herein as the "Individual Defendants," and together with CHS, are referred to as the "Defendants."

130.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of CHS's business, and the contents of CHS's public disclosures to the investing public.

131.     The Individual Defendants were provided with and approved the Company's reports and press releases alleged herein to be misleading, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Many statements in public company releases and conferences were specifically made by the Individual Defendants.  Thus, the Individual Defendants expressly, knowingly and intentionally committed the fraudulent acts alleged herein.

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

**A.    CHS Developed a Corporate Culture Centered
Around Boosting Admissions**

132.    Throughout the Class Period, CHS highlighted in its public filings (signed by
Smith and Cash), that the key components of its business strategy were: increasing revenues and
earnings at its hospital facilities and growing through acquisition of other hospital chains.  CHS
explained that since "60% of [its] hospital admissions originate in the Emergency Room," CHS
took affirmative steps to grow its ED admissions.  CHS also highlighted the importance of
Medicare and Medicaid programs which accounted for 37% to 42% of the Company's net
operating revenues between 2006 and 2011, a large percentage of which was generated through
ED admissions.  CHS's ability to drive up ER admissions rates in existing and newly acquired
hospitals thus was critical to the Company's financial performance.

133.    CHS senior executives were keenly focused on this central, publicly disclosed,
goal.  For example, Defendant Cash made a presentation to the Board on December 10, 2008 that
emphasized that CHS could sustain revenue growth by "increase[ing] inpatient ER visits."  In the
Company's quarterly earnings releases, they issued projections regarding "same store" admission
growth and other financial metrics, as "guidance for analysts and investors." On November 8,
2008, Cash explained to his Management Committee that boosting admissions was needed "to
meet analyst's earnings expectations and impact CHS's stock price favorably."  Increasing the
Company's market capitalization facilitated CHS's growth-by-acquisition strategy by increasing
the value of CHS's stock thereby facilitating CHS's ability to issue higher levels of debt to
support additional acquisitions.

134.    CHS, however, then concealed from the investing public the improper practices
that made the growth in its admission rates possible.

135.    In order to centrally organize and manage its hospitals, CHS divided its geographically dispersed hospitals in 29 states into five operating "Divisions" listed below as well as a corporate leadership team or group:[6]

Division I:     Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Virginia;

Division II:    Arkansas, Louisiana, Texas;

Division III:   Pennsylvania, New Jersey, Tennessee;

Division IV:    Alaska, Arizona, California, Nevada, New Mexico, Oklahoma, Oregon, Utah, Wyoming; and

Division V:     Illinois, Indiana, Kentucky, Missouri, Ohio, West Virginia.

136.    As described herein, the misuse of the Blue Book criteria and admission benchmark enforcement techniques are evidenced at every division at CHS.

137.    CHS states that each hospital affiliated with the CHS holding company or the professional services corporation is owned or leased and operated by a separate and distinct legal entity.  CHS maintains publicly that each of these legal entities is responsible for the healthcare services delivered at its respective facility and employs its own management teams.  In practice, however, at all times relevant to this action, CHS did not allow these subsidiaries any autonomy in the most important aspect of running a medical facility namely, ensuring that patients receive medically appropriate care.

138.    CHS utilized a tight reporting and monitoring structure as described in ¶ 135 *supra*, whereby each hospital reported to its Division President, who in turn reported directly to Smith and Cash, and the Board.

---

[6] According to CHS's internal records, the States included within each Division have, from time to time, been reorganized.  This list depicts the Divisions as they existed between 2008 and 2013. In 2013, CHS reordered the Divisions to add a sixth Division.

139.     Each of the five Divisions is headed by a President, and executive staff.  Each Division submitted presentations directly to CHS's Board of Directors.  Cash and Smith received and reviewed all Division presentations.  These Presentations reported the financial results of the Division and focused on several key metrics, including EBITDA, ER "Volume Growth," "ER Visits" and ER "Admission Rate," ER 65-over admissions rate and Length of Stay ("LOS").

140.     The consolidated admission statistics of each Division and the hospitals within each Division were closely monitored by CHS, Smith and Cash.  For example, on September 12, 2007, Division I reported to the Board of Directors that three of its hospitals needed to "improve" their ER admissions rates.  Similarly, on May 20, 2008, Divisions I though IV submitted presentations to the Board of Directors.  For example, Division I President, David Miller, reported that his entire Division's "admission rate" improved to 15.8%.

141.     The Board presentation submitted by Division III's President, Gary Newsome,[7] on May 20, 2008, is typical of Division presentations in both the manner in which it reports and its focus on admissions statistics.  In particular, Newsome reported that CHS's Division III successfully attained a 17.6% "overall Group admissions rate" for the First Quarter of 2008.  The report also indicated that (1) the Chestnut Hill Hospital in Pennsylvania achieved 4.5% "Admissions growth"; (2) the Heartland Regional Medical Center in Marion, IL achieved 5.5% "Admission growth"' (3) Tennessee's "[c]ollective admission ahead of prior year" by 7.6%; (4) "Jackson - admissions up 21% over PY"; and (5) Gateway Medical Center in Clarksville, TN achieved "17% Admissions growth."  Newsome also explained that Heartland's ER services "are

_____

[7] In September 2008, Newsome, former CHS President of Division II and later Division III, left CHS to become the President and CEO of Health Management Associates, Inc. ("HMA").  HMA is currently the target of government investigations and a defendant in civil *qui tam* litigation alleging that HMA, like CHS, was overbilling Medicare by improperly admitting patients who should have been placed in observation.  Newsome has since retired from HMA and is now reportedly living in Uruguay.

consistently one of Division III's top performers on all Pro-MED metrics."

142.    Moreover, according to the minutes of the Board meeting held on May 19, 2009, the Board of Directors reviewed an "Operations Update" PowerPoint presentation prepared by Marty Schweinhart, CHS's Senior Vice President of Operations, which reviewed the "standardized and centralized" aspects of CHS's operations.  Schweinhart reported that one of the "key areas and initiatives on the *revenue side*" included "emergency room management – installation of Pro-MED with 12 months of acquisition and focus on emergency room inpatient admission rates."  (Emphasis added).

**B.      CHS Ignored Patient Safety and Medicare Rules
          in Order to Boost Its Revenues**

143.    CHS failed to disclose that the Company had adopted a policy that violated a fundamental principle of medical care: to treat patients based upon their clinical needs, rather than boost the hospital's bottom line, and to seek reimbursement for only those services that are reasonable and medically necessary to serve the patient.

144.    When a patient suffering from a medical condition seeks treatment at a hospital's ED or is otherwise referred to the hospital, physicians have three choices with respect to forms of treatment: (1) treat the patient at the hospital on an inpatient basis; (2) admit the patient on an outpatient observation basis for care and monitoring that is generally expected to last less than 24 hours; or (3) not admit the patient, instead discharging the patient following treatment.

145.    The use of observation status to treat patients is widely recognized as an essential tool for improving clinical decision making and providing cost effective medical care.  The Medicare Benefit Policy manual, Ch. 4, provides an overview of the observation level of care, Paragraph 209.1, Observation Services Overview, states:

> Observation care is a well-defined set of specific, clinically appropriate services,

which include ongoing short term treatment, assessment, and reassessment, that are furnished while a decision is being made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital. Observation services are commonly ordered for patients who present to the Emergency Department and who then require a significant period of treatment or monitoring in order to make a decision concerning their admission or discharge. Observation services are covered only when provided by the order of a physician or another individual authorized by State licensure law and hospital staff bylaws to admit patients to the hospital or to order outpatient services.

146. Outpatient observation care is typically appropriate for patients whose medical conditions require diagnostic evaluation because: (1) the balance between the probability and severity of disease warrants further evaluation; (2) the patient presents a condition that cannot be readily diagnosed without additional testing; or (3) the physician needs more time to evaluate the patient's symptoms to determine the most appropriate medical treatment. Louis Graff, MD, *Principles of Observation Medicine*, *in Observation Medicine* (Louis Graff ed. 2010), *available at* http://www.acep.org/content.aspx?id=46142&terms= Observation%20Medicine.

147. Medicare Benefit Policy Manual, Chapter 6, Section 20.6B, provides that "when a physician orders that a patient receive observation care, the patients' status is that of an outpatient. The purpose of observation is to determine the need for further treatment or for patient admission. Thus, a patient receiving observation services may improve and be released, or be admitted as an inpatient."

148. Medicare reimbursement for inpatient services is substantially greater than reimbursement for observation services. Both inpatient and observation services are reimbursed under prospective payment systems. Medicare inpatient reimbursement is based upon Diagnosis Related Groups ("DRG's") and based upon the patient's diagnosis.

149. DRG's refer to a patient classification system adopted by Medicare in 1983 and are based upon distinct diagnosis groupings. This system provides a means for relating the type

of patients a hospital treats with the associated costs of treating the patient. DRG's are based upon the patient's principal diagnosis, gender, age surgical and diagnostic procedures, discharge status and the presence of complications or co-morbidities. Medicare utilizes this system to reimburse acute care hospitals prospectively, utilizing a predetermined rate per case, based upon the patient's principal diagnosis. Medicare's view is that patients within a given DRG category are clinically similar having common demographic, diagnostic, and therapeutic attributes and use approximately the same proportion of hospital resources and have similar acuity levels. If other co-morbidities (diagnoses) are documented or other procedures are performed, the DRG can change and the prospective payment in turn increased.

150. Medicare reimburses outpatient services, including observation services, based upon Ambulatory Payment Classifications ("APC's"). The Outpatient Prospective Payment System was introduced by Medicare in 2000 and since then, all outpatient services are assigned to one of approximately 900 categories and each APC is assigned a national payment rate that is based upon the median cost for all services within the APC.

151. Outpatient observation care is also appropriate for patients who require short-term treatment of emergency conditions. In addition, patients who require therapeutic procedures that do not necessitate inpatient admissions, but who nonetheless require some period of hospital care, are generally treated in observation.

152. One benefit of outpatient observation care is its cost effectiveness relative to inpatient treatment, because the former requires shorter hospital stays and, typically, less testing and monitoring. The decision of whether to treat a patient on an inpatient admission basis or outpatient observation basis also has significant financial ramifications for hospitals. Hospitals receive a much larger reimbursement from Medicare for treatment of a patient on an inpatient

admission basis than on an outpatient observation basis.

153.     According to the Medicare Payment Advisory Commission ("MedPAC"), for some medical conditions, during the Class Period, the Medicare program reimburses hospitals nearly 1000% more (or approximately $7,000 more per patient) when the patient is admitted to the hospital as compared to treatment for the same patient in observation status.  Presentation, MedPAC, "Recent Growth in Hospital Observation Care" (Sept. 30, 2010), *available at* http://www.medpac.gov/transcripts/observation%20sept%202010.pdf.

154.     In order to temper the incentive hospitals may have to improperly steer patients into admission, Medicare laws and guidelines prohibit hospitals from billing Medicare for treatment of a patient admitted to the hospital unless a physician, at the time the patient presents to the hospital, determines that the severity of the patient's condition requires care that the physician expects to meet or exceed 24 hours, and that placing the patient in a less intensive setting would significantly and directly threaten the patient's safety or health.  *See* Medicare Benefit Policy Manual, Ch. 1 § 10; Medicare Program Integrity Manual, Ch. 6 § 6.5.2.

155.     The Medicare Program, 42 U.S.C. § 1395, *et. seq.*, ("Medicare") reimburses hospitals only for treatment that is "reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A).  In addition, Medicare intermediaries who make Medicare payments are prohibited under federal law from using Medicare funds to pay for services if those services were not "medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary."  Medicare Program Integrity Manual, Ch. 6 § 6.5.2. In this regard, "[i]npatient care, rather than outpatient care is required only if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting."  *Id*.

156. Under Federal law and applicable Medicare guidelines, absent a medical need to treat the patient on an inpatient basis, the patient must not be admitted as an inpatient and Medicare is not responsible for payment of inpatient treatment. Additionally, Medicare participants are required to disclose all known errors and omissions in their claims for reimbursement, and failure to do so is a violation of law. 42 U.S.C. § 1320 7b(a)(3).

157. The use of outpatient observation is also appropriate when the need for inpatient admission cannot be medically determined and when additional time is needed to evaluate the patient or when the physician believes the patient will respond rapidly to treatment. Generally, Medicare coverage for outpatient observation is limited to a 24 hour period.

158. CHS contravened these Medicare provisions by creating and utilizing the Blue Book's inappropriate inpatient admissions criteria and "no observation" policy. CHS management had the Blue Book written to provide a criteria to justify the admission of patients who should instead have been observed and/or released.

159. Defendants were experienced in billing for Medicare patients and knew the prohibitions at all relevant times. Defendants knew (i) patients in hospitals are exposed to the risk of hospital-acquired conditions; and (ii) that CHS could incur significant penalties and liability arising from Medicare fraud investigations and fines.

160. CHS failed to disclose these improper admissions practices and when they were exposed in the *Tenet Litigation*, CHS conceded it had recently started to phase out the Blue Book, the use of which led to a $98 million settlement with the DOJ. Defendants falsely claimed that the switch to criteria that complied with Medicare regulations would not have a negative impact. However, by October 2011, it was clear that CHS's abandoning the Blue Book had resulted in an accelerating decline of admissions.

**C.** **CHS's Undisclosed Practices Increased Patient Admissions Improperly**

**1.** **CHS Systemically Used the Blue Book's "Admissions Justifications" to Boost Medicare Revenues Despite a Lack of Medical Necessary**

161.     Under Medicare regulations, hospitals are required to maintain a set of admissions guidelines for determining whether a patient's condition is serious enough to warrant inpatient treatment.  Such criteria are required to support treatment that is medically necessary.  42 C.F.R. § 482.30(c)-(d) ("The UR plan must provide for review for Medicare and Medicaid patients with respect to the medical necessity of -- (i) Admissions to the institution; (ii) The duration of stays . . . .").

162.     In contravention of these Medicare rules, CHS developed corporate-wide admissions criteria under the Blue Book that systematically encouraged medically unnecessary inpatient admissions at its hospitals.  In doing so, CHS management directed CHS Hospital CEOs, ED Directors and Case Managers to use a "no observation" policy, notwithstanding repeated warnings to senior management that these practices were a clear "medical necessity" compliance risk.  Newly acquired Triad hospitals were instructed that by "using the Blue Book admission criteria as soon as possible … the hospital should experience a significant reduction in Medicare and other outpatient observation status and a significant increase in inpatient admission."  CHS's own CMO cautioned that the "Blue Book [is] not adequate" and that the CEOs "felt it was time to revisit the whole issue."  They also ignored Dr. Zebrowitz's findings that the Blue Book's lack of specificity allows "all cases to be classified as inpatient" and "precludes cases from undergoing appropriate physician review and ensuring appropriate physician documentation and valid certification."

163.     The following examples, revealed in the *Tenet Litigation*, highlight the Blue

Book's improper admission criteria as compared to objective clinical factors in InterQual.

a) **Chest Pain**

164. The Blue Book contained Admission Justifications that were either inappropriate or not relevant for physicians to consider in determining whether it was medically necessary to admit a chest pain patient to the hospital or treat in observation.

165. Under standard clinical practice, when a patient presents to the hospital with chest pains, there are varying levels of care that may be provided to the patient, depending on the severity of the patient's condition. Given that chest pain is a very non-specific complaint, meaning that there are many causes of chest pain other than a heart attack, patients often are initially evaluated in observation in order to determine whether or not they are in fact having a heart attack or suffering from a lack of oxygen to the heart. Many chest pain patients are appropriately treated in observation, where standard tests may be run to determine whether the patient has had a heart attack, in which case the patient likely would be admitted to the hospital, and if not, the patient would likely be discharged. Once a decision is made to admit a patient to the hospital, there are varying levels of care in the hospital depending on the severity of the patient's clinical condition. The initial level of care for stable patients requiring admission is the inpatient general medicine or surgical floor setting. Those requiring a higher level of care may be placed in telemetry or intermediate care setting. Those patients that are most critically ill may be placed in the critical care unit.

166. Prior to August 13, 2009, the Blue Book did not include any criteria for placing ED patients in observation. On the contrary, in her presentation, "Observation Status and One-Day Stays, What <u>You</u> Need To Know," Lipp, Smith's direct report, directed hospital case managers that "no chest patients in observation"; rather, all such patients were to be admitted.

167.     The revised 2009 Blue Book set forth observation status for a single condition—chest pain.  The three levels of care, include two levels of admissions for chest pain patients, and one for observation, each with separate "Admissions Justifications": 1) "Very Low Risk: Observation or Discharge;" 2) "lower risk/telemetry (Green/Blue cases)"; and 3) "high and moderate risk levels/CCU (Orange/Red cases)."  For each of these categories of care, the Blue Book contained admissions criteria that are both inappropriate and inconsistent with standard clinical decision-making.

168.     With respect to chest pain observation, when a patient presented to the hospital with chest pain - one of the most common presenting emergency room complaints - it is accepted clinical practice to run two to three sets of blood tests on the patient every six to eight hours to measure the levels of cardiac enzymes (specifically, a cardiac marker known as troponin) in the blood.  An elevated troponin level from one test to the next indicates that the patient's cardiac wall likely has suffered a loss of blood flow, meaning that the patient is at risk of suffering or having suffered a heart attack.  If, as is often the case, the patient's troponin level does not increase from one blood test to the next, the physician may rule out a heart attack and send the patient home.  In addition, it is standard practice to perform two electrocardiograms ("ECGs"), which measure changes in heart rhythm that may be indicative of a heart attack during the same time period that the cardiac enzymes are measured.

169.     Because these cardiac enzyme tests and ECGs may be completed in less than 24 hours, it is standard practice for these patients to be treated in observation, rather than admitted to the hospital.  Indeed, treating chest pain patients in observation is so common that some hospitals have observation units dedicated solely to evaluating patients complaining of chest pain.

170.     However, the Blue Book justified placement of a patient in observation only *after* the patient has two negative serial ECGs and two negative sets of cardiac enzyme tests (meaning they are not in cardiac arrest).  In other words, under the Blue Book, these evaluation tests were not to be performed until after patients are already admitted to the hospital.

171.     With respect to Chest Pain Telemetry Admissions, the Blue Book Admission Justification criteria for chest pain, lower risk/telemetry were at odds with standard criteria.  For example, at CHS hospitals a patient with chest pain was to be admitted to the telemetry unit rather than placed in observation if he or she merely had a general risk factor for cardiac disease (*e.g.*, hypertension, diabetes, or hyperlipidemia) coupled with only one of the following:

(a)     New chest pain in the presence of a significant history of coronary artery disease;
(b)     A recent visit to the hospital with complaints of chest pain;
(c)     Chest pain that may be reproduced by pressing on the chest; or
(d)     "Atypical symptoms," such as shortness of breath, fatigue, sleeplessness, and/or anxiety.

172.     These Admission Justification criteria were weighted toward admissions and inconsistent with accepted clinical standards for inpatient admissions, because many patients who present with chest pain have a history of a common cardiac risk factor that is not necessarily indicative of a medical need for inpatient care, such as hypertension (a very common diagnosis in the U.S. population).  Furthermore, the criteria identified in (a) through (d) above are very different from the accepted clinical standards for hospital admission, such as having positive cardiac enzymes.  For example, the Blue Book treats a "recent visit to the hospital with chest pain" as a criterion for admission.  While it is certainly a part of a patient's history, it is not any indication of a patient's clinical severity of illness.  Upon information and belief, none of these criteria are representative of standard clinical criteria that physicians consider when deciding whether to admit a patient with chest pain to the hospital.  Moreover, under InterQual, these Blue

Book criteria would not support the admission of a patient to the hospital.

173.   With respect to Chest Pain Cardiac Care Unit ("CCU") Admissions, the CCU is reserved for patients with the most critical medical conditions who require intensive and rapid treatment for survival.  The Blue Book Admissions Justification criteria for CCU admission, however, included, many diagnoses that had no bearing on the severity of the patient's existing illness, but rather, addressed only the patient's medical history or conditions that are common among many chest pain patients - conditions, under standard clinical practice, with no impact on whether a patient should be placed into the CCU.  For example, the Blue Book Admission Justification criteria for admission to the CCU include several criteria, two or more of which must be met to justify an admission to the CCU.  Several of these criteria, upon information and belief, are out of line with standard clinical decision-making, including the following:

(a)   A history of smoking, hypertension, hyperlipidemia, or diabetes;
(b)   Two or more episodes of pain;
(c)   Oxygen saturation less than 90;
(d)   Rest angina less than 20 minutes (resolved with rest or nitrates); and
(e)   Indeterminate CKMB or Troponin.

174.    Upon information and belief, each of these criteria is not relevant to the determination of whether care in the CCU is medically necessary.  For example, whether a patient is a smoker or has hypertension, for example, has no bearing on the severity of the patient's condition and does not inform the need for CCU admission.  Further, upon information and belief, chest pain patients frequently present with two or more episodes of pain, meaning that this criterion is not indicative of the severity of a patient's chest pain necessary to require the highest level of care.  In addition, having a patient with an oxygen saturation level of less than 90 is extremely common, not in and of itself life threatening, and easily treatable with supplemental oxygen.  When angina is resolved with rest or nitrate therapy, there is no medical necessity of

treating such patients in an intensive care setting, which is reserved for the most critically ill patients. Indeterminate test results for a patient's troponin levels are not, under standard clinical practice, a justification for admitting the patient into the CCU, but rather, just an indication that further testing should be performed.

175.     In sum, in many cases where the Blue Book criteria inappropriately dictated admission for a chest pain patient, Medicare and industry-accepted clinical practice would place the patient in observation status. In the case where patients present with chest pain, the standard of care through an electrocardiogram and cardiac enzyme blood testing may be used to determine whether or not a patient may be having a heart attack. If so, then patients may then be admitted to the appropriate inpatient setting and appropriate level of care intensity. Patients that are ruled out for an acute heart attack, as the vast majority of "chest pain" patients are, may be discharged home. CHS's Blue Book, however, barred that standard medical practice.

**b)     Syncope or Pre-Syncope**

176.     In addition to Chest Pain, the Blue Book's Admissions Justifications included many criteria that are inappropriate for determining whether a patient with pre-syncope or syncope (dizziness or fainting) should be admitted to the hospital or should instead be treated in observation.

177.     Under standard clinical practice, when a patient presents to the hospital complaining of dizziness (pre-syncope) or fainting (syncope), the physician performs several tests to eliminate any critical causes that may be responsible for these episodes, such as the potential for a heart attack, a stroke in the brain, or some form of structural heart disease or acute heart arrhythmia. These tests are standard in most hospital settings and can be performed within a 24-hour period. Such patients typically are placed in observation so that these critical, though

rare, causes of syncope may be ruled out. Once in observation, syncope or pre-syncope is often found to be due to dehydration (as determined by measuring a patient's drop in blood pressure between lying down and standing up) or a vasovagal reaction (a very common cause of fainting in adults). Both of these etiologies are much less critical and can be treated simply in observation. Patients with dehydration will be rehydrated during their observation stay through intravenous ("IV") fluids, and, as long as the syncope does not recur, will be sent home. Patients with vasovagal episodes will follow up with their primary care physician as an outpatient, with further treatment if the episodes recur. Regardless, these patients typically are treated in observation.

178.    Rather than treat these patients on an outpatient basis, the Blue Book Admission Justification criteria called for the admission of patients over 60 with fainting episode. Upon information and belief, age is irrelevant in the case of syncope. Regardless of the etiology, age is not a risk factor for syncope, and all patients, regardless of age, will undergo the same workup and battery of testing discussed in the previous paragraph, which are appropriately conducted in observation. Additionally, the Blue Book admissions criteria included patients who have a "Postural BP greater than 15 mm," indicating that patients found to have a positive "orthostatic testing" (such as a drop in BP of greater than 15mm Hg between a standing and sitting position) was admitted. However, such a blood pressure drop may be due to dehydration, which is something easily treated in an observation status with IV fluids and rehydration. Once again, this Blue Book criterion was out of line with the clinically accepted standard of care.

179.    In comparing InterQual to the Blue Book, InterQual states that the criteria for observation are, as described above, pre-syncope or syncope of unknown etiology. Upon information and belief, this is appropriate and consistent with accepted standards of clinical care.

Further, once a patient is found to have a more critical cause of syncope, such as structural heart disease or an arrhythmia, InterQual indicates that it is reasonable to admit such patients to the hospital, but the majority of patients are simply dehydrated, appropriately treated with IV fluids in observation, and discharged home.

c)    <strong><u>Community Acquired Pneumonia</u></strong>

180.    Another example of where the Blue Book justified patient admission, but the standard accepted practice does not, involves Community Acquired Pneumonia ("CAP"). On information and belief, the Blue Book's Admission Justifications criteria ignored accepted clinical practices for determining whether a patient presenting with CAP is ill enough to require inpatient treatment, or whether the patient could, instead, appropriately be treated in observation.

181.    Admission of a patient with CAP is justified under the Blue Book if the patient presents with a cough and rales (the presence of fluid in the lungs). However, on information and belief, many patients who have pneumonia - regardless of severity – show a cough and rales on exam. Thus, the mere existence of these findings tells the physician nothing about whether a patient presenting with a cough and rales has a clinical picture that correlates with severity of illness requiring admission to the hospital.

182.    Similarly, an admission of a patient with CAP is justified under the Blue Book if the patient presents with a cough and infiltrate or atelectasis. On information and belief, the mere existence of a cough and abnormal chest X-ray is only relevant to informing the physician that the patient may have CAP; standing alone, the presence of these findings provides information on a possible diagnosis, but does not justify hospital admission. Clinical presentation, a critical component of the decision-making process regarding admission or observation, is not taken into account in the Blue Book.

183.    Under InterQual, patients presenting with a cough and rales or an abnormal chest X-ray would not, absent other symptoms, be admitted to the hospital for treatment.  Instead, such patients would be examined to determine whether they have an elevated breathing rate, a fever, or a high white blood cell count, and most importantly, whether the patient is 65 or older.  In the absence of serious additional criteria (for example, a breathing rate above 29), the patient would be treated in observation with IV antibiotics and monitored for up to 24 hours for improvement.  In the typical case where the patient responded favorably to such treatment, the patient would be sent home, and if the condition worsened, the patient would be admitted to the hospital.

184.    Finally, the Blue Book permitted the admission of a CAP patient with a cough and a temperature of 102 degrees and a white blood cell count of 15,000 or greater.  On information and belief, it is well accepted, however, that a patient's temperature and white blood cell count do not strongly correlate with the severity of disease without consideration of age and presence of co-morbidities.  Thus, absent other factors (such as advanced age or an immune system disease), there was no absolute clinical basis for inpatient admission.

### d)    Cellulitis

185.    On information and belief, the Blue Book's Admission Justification criteria also were deficient when applied to patients presenting with signs of cellulitis, an infection of the skin that can cause pain, fever, and elevated white-blood-cell counts.  For example, a patient presenting with a possible cellulitis and either an elevated white blood cell count and a temperature over 102 degrees, or a "weeping wound," may be admitted to the hospital.  On information and belief, these admission criteria fall outside accepted clinical practice as they individually do not provide evidence as to the severity of a patient's cellulitis.  A patient presenting with only these conditions would not, under InterQual, be admitted to the hospital.

On information and belief, such patients would either be effectively treated with IV antibiotics in observation for 24 hours and discharged when their condition improved, as cellulitis often does with 24 hours of antibiotic treatment, or would be given one dose of IV antibiotics in the emergency room and sent home with antibiotics by mouth and a follow up appointment soon after the ER visit.

186.     The Blue Book Admission Justification criteria ignored the important inquiry regarding complexity and severity of cellulitis, a question that doctors often face when determining whether a patient may be treated in observation or admitted to the hospital for treatment, and the length of time that would be required to treat a cellulitis patient with IV antibiotics.  On information and belief, this determination is driven by the part of the body that is affected (cellulitis of the face, hand, or foot is more difficult to treat than the upper arm, thigh, or calf); co-existing medical conditions of the patient (patients with diabetes face greater risk associated with cellulitis, often supporting inpatient treatment); and signs of sepsis or shock (patients with low blood pressure, acute confusion, or bacteria in the blood are at the highest risk for complications).  These widely accepted clinical factors are primary considerations under the InterQual admissions criteria, but under the Blue Book, less clinically relevant factors were considered to justify inpatient admissions.

187.     In sum, CHS ignored Medicare rules to create a liberal and over-simplified set of ER admissions criteria and enforced admissions practices.

**D.     CHS's Admission Rates Diverge Dramatically From Its Competitors**

188.     The success of CHS's inappropriate practices becomes readily apparent when CHS's observation and admission rates are compared to the hospital industry and to its competitors.

189.    Tenet initially retained two "leading" healthcare consulting firms, to study how CHS's observation and admission rates compared to other well-known hospital systems. Avalere Health LLC ("Avalere") analyzed available data from CMS while Tenet's other consultant analyzed data from the American Hospital Directory.  Both consultants reached substantially similar conclusions.  Lead Plaintiff's industry specialist independently confirmed the conclusion of Tenet's experts.

190.    Specifically, statistical analyses performed by Tenet's consulting firms revealed that in 2009, nearly 95% of CHS's hospitals had outpatient observation rates below the national average, with nearly 70% of CHS's hospitals more than 50% below the national average.

191.    Conversely, CHS's percentage of one-day stays in 2009 was a statistically significant 22.5% higher than the national average.

**E.    Lead Plaintiff's Statistical Evidence Confirms That CHS's Strategies Worked**

192.    CHS's undisclosed practices were highly successful in boosting its ED admission rates.  As part of its investigation, Lead Plaintiff retained a world-renowned expert in health economics and finance to perform numerous statistical analyses of CHS's Medicare data.  This healthcare consultant has worked for 25 years as a consultant for RAND, the largest funded health research service in the world.  CHS hospitals were a consistent outlier with higher admits and lower observations than peer hospitals.

193.    Lead Plaintiff's healthcare consultant found that over 93% of CHS's hospitals had observation rates below the national average.  This means that a patient was far more likely to be treated in the higher-paying inpatient admission status, and far less likely to be treated in lower-paying observation status, if the patient visited a CHS hospital than if the patient visited a hospital operated by CHS's peers.  Further, nearly 70% of CHS hospitals admitted ER patients

for one-day stays at a rate substantially above the national average.  The findings of Lead

Plaintiff's healthcare consultant are consistent with those of Avalere's as follows:

       1.     **CHS's Observation Rate vs. Industry**

      194.    Lead Plaintiff's healthcare industry specialist's analysis determined that CHS's

Medicare observation rate in 2009 was 60% below the national average.



      195.    The analyses performed by Lead Plaintiff's healthcare industry specialist

demonstrate system-wide differences in performance between CHS and its industry peers that

cannot be attributed to a few outlier hospitals that skew the averages.  Rather, the findings show

that 93%, or 117 out of 125 CHS hospitals, were below the national average for the percentage

of ER visits with observation.

**2.** **CHS's Observation Rate vs. Average of High Quality Systems**

196.    Lead Plaintiff's healthcare industry specialist's analysis also shows that CHS's

2009 Medicare average observation rate is 55% to 83% below the averages of High Quality

Systems:[8]



**3.** **CHS's Observation Rate vs. Rural Hospitals in Same Geographic Area**

197.    Lead Plaintiff's healthcare industry specialist's analysis found Medicare

observation rate in 2009 at CHS hospitals was far below other rural hospitals in 20 out of 20

states in which they operated:

---

[8]  High Quality Systems included the following:  the Cleveland Clinic, Stanford, Texas Health Resources, the Mayo Clinic, Baylor, and the University of Michigan.



The ED Observation Rate at CHS Hospitals is Below the Rural Average in Their Respective States

CHS ED observation rate is below the average for non-CHS rural hospitals in 20 of the 20 states that CHS operates in (2009).

Each bar represents CHS rural operations in a single state

4.      **Disproportionate Share of CHS's Admissions are "One-Day Stays"**

198.    Lead Plaintiff's healthcare industry specialist analyzed CHS's admission of patients with "one-day stays" – as compared to the national average.  Hospitals with a high rate of "one-day stays" are considered a Medicare "red flag" as to patients who may not have required treatment on an inpatient admitted status.  His analysis found that nearly 70% of CHS hospitals admitted ER patients for one-day stays at an average rate of 32% higher than the national average:



The Percentage of ER Admits w/ 1 Day LOS at CHS Hospitals Is Above the National Average

Nearly 70% (87/125) of CHS Hospitals are 32% above the national average for % of ER admits with a 1 day stay (2009).

National Average 13.0%

CHS Average 17.1%

Each bar represents a CHS hospital

199.    The testing performed by Lead Plaintiff's healthcare industry expert also establishes substantial differences in admissions and observation rates at CHS and comparison groups of hospitals over an extended time period.  For example, Lead Plaintiff's expert's analysis of data for the three year period from 2008-2010 revealed that CHS hospitals have an average rate for ER visits with observation that is 58% lower than the average observation rate for large systems and 77% below the average observation rate for quality hospital systems for this time period.  Conversely, CHS hospitals' average ER admission rate during this three year period was also 25% higher than the average admission rates for quality systems and 22% higher than larger systems.

200.    These statistical analyses and evaluation of CHS's internal admission practices leads to the inescapable conclusion that patients whose medical needs likely required treatment

in outpatient observation status were systematically admitted for higher-paying inpatient care at CHS hospitals.

201. Defendants knew their practices were increasingly likely to invite scrutiny. By 2007, the DOJ had announced at least four multimillion-dollar settlements with hospitals for improperly billing outpatient observation admissions as inpatient admissions, including a $26 million settlement with St. Joseph, that Dr. Zebrowitz brought to CHS's attention, resulting from claims of lack of medical necessity for short stay admissions. This enhanced scrutiny of improper hospital billing was driven by CMS, which had expanded its use of Recovery Audit Contractors or "RACs," auditors paid contingency fees to identify improper Medicare billings.

## F. CHS's Improper Admissions Practices Significantly Inflated Its Revenues

202. Tenet's expert estimated that as a direct result of CHS's improper practices, CHS received up to $306 million from improperly billing Medicare during 2006-2009, and up to $345 million during 2003-2009.

203. CHS's windfall from Medicare payments likely represents only one component of the total windfall CHS received through billing for unnecessary services. In 2010, CHS received as much as 27.2% of its total revenue from Medicare. But, CHS's improper admission guidelines also resulted in the billing of private payers and state Medicare and Medicaid programs for unnecessary inpatient admissions.

## G. Additional Facts Support a Strong Inference of Scienter

204. With knowledge and complicity, Smith and Cash made virtually all of the alleged misstatements in CHS's SEC filings and the Company's earning calls, as well as at investor presentations and healthcare conferences.

205. Since patient admissions, particularly in the ER, were a primary driver of the

Company's revenues, senior management was intimately involved in crafting and monitoring these Company-wide practices which were critical to CHS's successful business model. CHS emphasized in its Form 10-Ks and other public statements that because 55% to 60% of hospital admissions originated in the ER, "we systematically take steps to increase patient flow in our ER as a means of optimizing utilization rates for our hospitals." What was undisclosed was that these steps included practices that would not bear scrutiny including (1) use of the Blue Book's unique and warped non-industry Admissions Justifications criteria; (2) programming the Pro-MED system used in all ERs to justify patient admissions; and (3) the use of hospital incentive programs, quotas, and terminations of "low admitter" physicians, to achieve higher admissions levels.

206.     Smith and Cash directed, approved, and/or participated with their seasoned management team in the standardization and centralization of CHS's operations, which they publicly acknowledged "encompass nearly every aspect of our business" and were a "key element in improving our operating results."

**1.     Defendants Drove Up Admissions to Satisfy Analysts and Increase CHS's Stock Price**

207.     Smith and Cash personally focused on admissions as the driver of the Company's stock value. In the Company's quarterly earnings releases, they issued projections regarding admission growth and other financial metrics, as "guidance for analysts and investors." Cash made clear to the Management Committee that CHS hospitals must increase "admissions to meet analyst earnings expectations and impact stock price favorably."

208.     For example, Morgan Stanley (November 8, 2006) highlighted that CHS's standout performances compared to the rest of industry should soon be reflected in its stock price: "[W]e believe that CYH shares should be among the first to appreciate when industry

fundamentals turn given its superior portfolio management and expense control coupled with relatively stronger admissions and pricing growth" (Emphasis added).

209.    In his "Message to CEOs dated November 24, 2008, Marty Smith, Division III Group VP, reported that as a result of "18 of our 22 hospitals having an ER admissions rate that is either higher than 20% or better than prior year," CHS had achieved very good 3Q 2008 results, and was impacted far less by the stock market downturn far better than hundreds of other companies that had posted negative results.  Marty Smith praised the Division CEOs:  "For a Division that has long prided itself as a lead in ER performance, in the last three months you have significantly moved the needle even higher."

210.    Increasing the Company's market capitalization facilitated CHS's growth-by-acquisition strategy by increasing the value of CHS's stock and facilitating CHS's ability to issue higher levels of debt to support additional acquisitions.  Moreover, boosting the stock price enabled Smith and Cash to personally profit from the exercise of vested options during the Class Period.  These facts support a strong inference that Defendants were motivated to mislead investors about its admission practices in order to meet or exceed investors' earnings expectations and therefore cause its stock to trade at prices higher than otherwise would have been the case.

## 2.    CHS's Top-Down Reporting and Monitoring Structure Supports a Strong Inference of Scienter

211.    Smith and Cash were key participants with outsized influence on the boards and committees that created and implemented CHS's operating strategies.  For example, Smith and Cash were members of (i) the PAB which oversaw revisions to the Blue Book, including the decision not to add observation guidelines for much of the Class Period, (ii) the Corporate Compliance Workgroup that oversaw changes to CHS's observation policy, (iii) the

Management Revenue Committee, which implemented and monitored admission practices at CHS hospitals, and (iv) the Board of Directors, which regularly received detailed admission metrics from the Presidents of CHS's Five Divisions.

212.    Smith also (a) received direct reports from Carol Hendry (VP, Legal, in charge of investigating Medicare compliance violations), and (b) directly supervised (with Cash) Carolyn Lipp (Sr. VP, Quality & Resource Management) relating to the development, implementation and training of the Blue Book, including CHS's decision to enforce a "no observation" policy.

213.    CHS's five Division Presidents reported directly to Smith and Cash and provided them with consolidated reports on hospital admissions from their respective Divisions, and forwarded weekly ED action plans, site reviews, and admissions statistics received from hospital CEOs and administrators.

214.    Smith and Cash paid bonuses to hospital executives, administrators, and ED staff to meet admission rate benchmarks.  Conversely, they were advised when physicians or a physician group were terminated for being "low admitters."

### 3.    Judge Nixon's Rulings Find a Strong Inference of Knowledge

215.    This Court has credited the allegations in the *Derivative Action* showing that CHS's scheme to boost inpatient admissions, especially with respect to CHS's newly acquired hospitals, could not have been achieved without using improper means.[9]  The Court observed that one year after CHS's acquisition of the Triad hospital chain, observation status rates at Triad hospitals dropped by 52%, while "one-day admissions"—a red flag for improper admissions and potential overbilling—increased by almost 33%.  Order at 7.  While CHS management attributed its financial success to the realization of synergies at Triad and standardization efficiencies that

---

[9] *See*, Order dated September 27, 2013 (Derivative Action Dkt. No. 70) ("Order").

was a half-truth because it failed to disclose that CHS's success was in fact due to improper admissions practices. The Court concluded that the derivative complaint supported the inference that "obtaining significant increases in admissions rates… at Triad hospitals could not have been done without using improper means." *Id.* at 18. The Court further explained in denying defendants' motion for reconsideration that "Defendants' wealth of knowledge and experience with the business and management of healthcare entities, combined with their diligence and concern with increasing admission rates at CHSI hospitals, allows the Court to reasonably infer that Defendants were aware that obtaining significant increases in admissions rates – including 50% increase in admissions at Triad hospitals—could not have been done without using improper means."

### 4. Smith's and Cash's Participation and/or Knowledge

216. Numerous documents confirm Smith's and Cash's direction and/or knowledge of CHS's improper admissions practices that increased ED revenues. Smith and Cash supervised (with Lipp) the implementation and training on the Blue Book through corporate-imposed ED Action Plans at existing facilities and newly-acquired Triad hospitals, in order to increase ED admission rates. Indeed, Lipp was called Smith's "trusted eyes and ears." To make sure Triad hospitals understood how important this issue was to Smith and Cash, Smith and Lipp made the "rounds of all of the [CHS] division meetings and discussed the issue [of converting observations into admissions] because it is a high priority."

217. The goal was clear – use CHS's aggressive non-industry Blue Book criteria to admit patients who would be observed under InterQual's industry-approved criteria. In other words, the same Medicare condition (*e.g.*, chest pain) that would prompt observation status in other hospitals generated increased admissions with higher reimbursement for CHS. In her

standardized training sessions at former Triad hospitals, Lipp and her staff urged the ED staff to

"start using CHS's Blue Book's admission criteria as soon as possible:"

> An exercise during our discussions using existing medical records of both inpatient and observation patients evidenced that <u>most of the observation patients in the exercise who had been admitted as outpatient observation status patients under the InterQual criteria would have been admitted as inpatients if the Blue Book criteria had been used. By switching to CHS [Blue Book] criteria, the hospital should experience a significant reduction in Medicare and other outpatient observation status patients and a significant increase in inpatient admissions</u> (emphasis added).

218.    Smith and Cash wanted the Triad hospitals to be indoctrinated with the Blue Book. In late October 2007, Portacci (Division II President), forwarded DeTar Hospital's (Victoria, TX), "ED Action Plan" to Smith and Cash. In the Action Plan, DeTar's CEO enthusiastically observed how DeTar "represents a significant opportunity to increase admissions based on patient meeting Blue Book admissions criteria."

219.    Similarly, Greenbrier's 2008 Strategic Plan projected that by switching to the Blue Book, admissions would increase from 12% to 16%, and contribute 14% of the expected 2008 EBITDA increase.

220.    Smith was instrumental in assuring that all of the Triad hospitals install Pro-MED in order to increase their admission rates. At his direction, corporate tracked hospitals' levels of Pro-MED corporate "standardization" and "how compliant [] ED docs are with the Pro-MED system recommendations for admissions."

221.    The protocol used at Triad was developed with Smith's and Cash's participation. In early July 2006, Lipp sent them correspondence relating to the "ED Quality Project Action Plan," which was an effort to implement CHS admissions practices on a systematic, corporate-wide basis. The centerpiece of the project was the Blue Book, Pro-MED, along with physician and case manager training on the Blue Book. For example, Vista Health alerted both Smith and

Cash in its December 2008 Monthly Operations Review that it was "reviewing daily observations that can convert to admissions," discussing them at daily flash meetings, and evaluating physicians on duty in the ER and their 21% admit rate in accordance with the CHS Blue Book.

222. Smith and Cash also approved handsome incentive bonuses to hospital CEOs and ED staff for meeting the benchmark admissions percentages. For example, in an e-mail from Division IV President Bill Hussey to multiple hospital CEOs, Hussey told them that "Wayne Smith and Larry Cash approved a 4Q 2007 CEO admission incentive" after "discuss[ing] significant ED admission opportunities." The "4th Quarter Performance Plan" provided CEO bonuses of "10% of his 4th quarter salary" for meeting "non-self-pay admission goals."

223. Further, Smith and Cash were apprised when physicians or physician groups were branded as "low admitters" and/or terminated for failing to meet CHS's admission rate benchmark. A December 11, 2009 memorandum, concerning a site visit to former Triad South Texas Regional Medical Center (TX) explicitly states: "Emergency Department Contract....They will be terminating their agreement with Atascosa County Emergency Physicians....*The percent of admissions thru the Emergency Department continues to be below benchmark and prior year. . . Therefore, the contract will be terminated and a new group brought in*." (Emphasis added). This memorandum was forwarded to defendants Smith and Cash with the handwritten notation, "New CEO is doing good job." Similarly, when admissions rates at each Division I hospital declined in 2Q 2010, at Smith's request, Division President Miller prepared an "analysis of the drop by physician and by medical discipline." Vista Health also alerted both Smith and Cash in this December 2008 Monthly Operations Review that the CEO was working with the medical director to "address issues with non productive physicians."

224.     CHS's initiatives at Triad hospitals were successful and Smith and Cash took the credit.  By 2009, Triad's observation rate declined by 52% while the one-day stay admissions rate—a red flag for improper admission and potential over billing – increased by almost one third.  Defendant Cash, speaking at a Robert W. Baird & Co. Health Care Conference on September 9, 2009, stated:  "When we came to the company about 12 years ago, the admission rate out of ER was 10, 11%.  Now it's 15%.  Actually, the Triad hospitals had an admit rate which was lower than the CHS, and we've improved that admit rate so far."

225.     While publicly touting the standardized and centralized operating strategy as the key to CHS's success as an operator and acquirer, Smith and Cash omitted to advise investors about Defendants' indefensible and centrally imposed admissions practices.

### 5.     Smith and Cash Ignored Potential Medicare Violations

226.     Because Medicare services were one of the Company's chief sources of income, knowledge of Medicare's regulations and their impacts was intrinsic to CHS's business model.  Defendants acknowledged in CHS's SEC filings that government regulation was extensive and that CHS's Medicare compliance was key to success.

227.     However, Smith and Cash repeatedly refused to permit observation in CHS's admission criteria even in the face of multiple warnings from staff and consultants about Medicare non-compliance at numerous hospitals.  Listed below are a few examples gleaned from the DOJ production:

     (a)     Reports from the Mid-Atlantic and Southeastern regions that "the tracking of and response to reported observations made it clear to the [case management directors] that there was an expectation to have no medical observation";

     (b)     Redacted

(c)      Report concerning Northeast Regional Medical Center (MD) that 61% of randomly chosen patient files who had one-day stays failed the InterQual criteria for admission;

(d)      Report concerning Payson Regional Medical Center (AZ) that the Blue Book Admission Justifications for chest pain "would allow patients who should be categorized as Observation Status to be admitted as Inpatient Status";

(e)      Report from Hendry that 68% of one-day stays sampled at Chestnut Hill (PA) did not meet inpatient criteria;

(f)      "Red alert" report concerning the "trend of no observation into 2009" at Southern Virginia Regional Medical Center, which was a "red flag for CMS and could trigger an audit of short-stay admission patients at the hospital";

(g)      Redacted
and

(h)      Lipp's directive discussed throughout CHS corporate that "[w]e want to avoid observation as much as possible on Medicare patients and on private insurance unless the reimbursement is close to inpatient rates," which QRM acknowledged was the "exception rather than the rule," and her training directive for "no chest pain in observation."

228.      CHS's Quality Review Management prepared certain observation guidelines for inclusion in a revision of the Blue Book, but that revision was rejected in January 2005 by the Regional Physician Advisory Committee because "including observation guidelines in the Blue Book may prompt physicians to use the observation category instead of admitting the patient to inpatient status when possible."

229.      On January 14, 2005, the PAB, headed by Smith and Cash, unanimously adopted the Regional PAB's reasoning and decided to continue improperly excluding observation guidelines from the Blue Book.  The impact of this decision, and the manner in which CHS trained its hospital staff, to avoid putting patients in observation greatly increased the number of ED inpatient admissions which should instead have been given observation status.

230.      Defendants were also aware of the DOJ's multi-million dollar settlements with hospital proprietors for improper inpatient admissions.  This included the $26 million settlement with St. Joseph's Hospital of Atlanta in December 2007, involving use of short-stay inpatient

admission which prompted Dr. Zebrowitz's warning to Hendry (shared with Smith) about CHS: "I think your current process and underlying basis (such as – we don't really have any observation) place your organization at serious risk."

231. Smith was also advised of Dr. Zebrowitz's critique of the Blue Book that its lack of specificity allowed "all cases to be classified as inpatient."

232. Notwithstanding the extensive evidence suggesting long-standing Medicare violations, CHS continued to prevent any observation criteria from being included in the Blue Book. Instead, Smith and Cash disingenuously sent around a one-page, one-time memo that briefly mentioned observation as a possible option, while leaving completely unchanged the elements of the Blue Book, Pro-MED and incentives which made any actual use of observation status extremely unlikely.

233. Specifically, on February 14, 2008, Smith and Cash, as members of the Company Compliance Work Group, authorized Lipp to circulate a memorandum to "clarify" observation policy. In her February 19, 2008, one-page memorandum, titled "Clarification of Observation Status," Lipp blamed the widespread lack of observation status on "possible confusion concerning our policy regarding placing patients in observation."

234. Lipp stated that "our policy is, and always has been" that a patient who "meets medical necessity criteria for inpatient admission" should be admitted to inpatient status. "If further evaluation is needed to determine whether the patient should be admitted or discharged, then the patient should be admitted to outpatient observation status."

235. Although the memorandum purported to "clarify" existing policy, the irony of course was that observation status was intentionally excluded as a treatment option in the Blue Book for several more years. The actual practice at CHS hospitals, as repeatedly documented by

Dr. Zebrowitz and others, and promoted internally by Lipp (*e.g.*, "We want to avoid observation as much as possible on Medicare patients"), was to pursue a "no observation" policy. Indeed, in a follow-up observation training presentation, Lipp instructed hospitals: "No chest pain patients in Observation," those patients were to be admitted under the Blue Book.

236. Smith and Cash approved the self-serving memorandum while obscuring the nature and extent of the Company's continuing divergence from industry practices and recognized standards of care. On February 29, 2008, ten days after Lipp's memorandum was sent to CHS hospitals, Smith and Cash represented in the Company's 2007 Form 10-K that CHS hospitals were in "substantial compliance" with Medicare and other government regulations and standards (the "Compliance Representation"), without disclosing known facts that called that representation into question.

237. Defendants also made the generalized risk disclosures in the 2007 Form 10-K that if CHS failed to comply with government regulations it could suffer penalties or be required to make significant changes to its operations. However, the generic risk disclosures were themselves misleading in failing to disclose current factual findings, including those detailed by Dr. Zebrowitz less than one month before that created a very specific heightened risk that CHS could be subjected to fines and be required to change its admission practices.

238. Defendants Smith's and Cash's statements support a strong inference that they knew or recklessly disregarded that CHS engaged in improperly aggressive admissions practices, leading to an abundance of one-day stays. During CHS's 2Q 2008 earnings call, Defendant Cash stated: "[O]ne thing's happened as we had pretty good growth with ER admissions which generally are a little bit less acuity business. So while we've got very good admissions growth, it is a little bit less acuity." Smith then stated:

One of the things that's maybe driving some of our volume is that we've had an – we've been working hard on these emergency rooms, and increased our emergency room admissions of over 3%, and we are getting a little less acuity in terms of those, and that would be expected when you start really pushing them and working to improve your emergency services.

239.     ████████████████ Redacted ████████████████

████████████████████████████████████████████████████████

████████████████████████████. Despite the overwhelming evidence that CHS's "no observation" policy and other ED practices were a compliance risk, Smith's direct involvement in pushing inappropriate admissions and thwarting the less profitable use of observation, continued until the Tenet lawsuit exposed them. Smith denied the effect of the switch to InterQual, and that the criteria was different than the current Blue Book. In November, 2010, Dr. Lynn Simon, Carolyn Lipp's replacement, reported "that there is a concern or a bias against observation units (including WTS)" referring specifically to Defendant Smith to whom she was now a direct report.

### 6.     Smith and Cash Personally Profited by Selling Their CHS Stock at Inflated Prices

240.     Strongly indicative of their scienter, Defendants Smith and Cash made significant illegal profits by exercising their stock options and selling the shares during the Class Period after the changes in the Blue Book that would allow observation (and the consequent decline in ED admissions revenue) were implemented or publicly disclosed. By exercising options and selling shares before this material non-public information could be disclosed, Smith and Cash committed insider trading. The fact that they did so is further evidence of scienter, since it shows Smith and Cash both knew that CHS's profits had been built on improper admissions practices, and that if investors realized that fact, CHS's stock price could plummet, as it later did when Tenet made that fact public for the first time.

241.    On April 24, 2009, during a PAB conference call, changes to the 2009 version of the Blue Book were approved, which permitted observation for low level chest pain (rather than admission) for the first time in CHS's history.

242.    On May 20, 2009, prior to the implementation of the new policy, or any disclosure of it, Smith exercised vested stock options and sold 250,000 shares at $26.07 per share, yielding $3,267,500 in profits.

243.    On August 4, 2009, nine days before the Blue Book change was implemented at CHS hospitals, Cash exercised vested stock options and sold 240,000 shares at $30.79 per share, yielding $2,517,600 in profits.

244.    Smith and Cash followed the same pattern of selling in 2010.  On March 19, 2010, the Physician Advisory Board - with Smith and Cash in attendance - unanimously approved changes to the Blue Book adding observation for many medical conditions.  These revisions to the Blue Book criteria meant reduced inpatient admissions and reduced revenues.

245.    On April 26, 2010, prior to the circulation of the revised Blue Book, Defendant Cash sold 240,000 shares at $40.34 per share, receiving $4,809,600 in profits.

246.    Similarly, on May 13 and 14, 2010, Defendant Smith sold 250,000 shares at $41.02 and $40.50 per share, receiving $5,176,408 in profits.

247.    On July 15, 2010, the revised Blue Book was circulated to CHS hospitals.  As anticipated, admissions declined following the 2009 and 2010 revisions to the Blue Book, as described in ¶¶ 15-16, 370, 464, 466.

248.    The timing of these trades by Smith and Cash is strong evidence of scienter because they occurred after the PAB approved revisions to the Blue Book to permit observation for chest pain, but prior to circulating the revised Blue Book to CHS hospitals, which was

followed by the inevitable decline of admissions. The suspicious timing of these trades is strong evidence of scienter because Smith and Cash were well aware that CHS admissions were inflated and that, with these changes to the Blue Book, less admission would occur.

249. Finally, the stock options that Defendants Smith and Cash received helped explain why Smith and Cash were willing to use concealed, improper and unlawful steps to boost admissions: the options provided little downside if the Company's underlying shares decline but exponential upside on the rise.

250. Consistent with the findings of a study titled "Throwing Caution to the Wind: The Effect of C.E.O. Stock Option Pay on the Incidence of Product Safety Problems" by Adam J. Wowak, Michael J. Mannor, and Kaitlin D. Wowak of the Notre Dame Mendoza College of Business, Defendants Smith and Cash were incentivized to take risks recklessly to maximize their personal gains from stock options by aggressively admitting patients even when outpatient observation services were medically sufficient. Smith and Cash then cashed in on the options before the Company's admissions and revenues could be adversely affected by policy changes that they had approved, but of which the investing public was unaware.

**7. Smith's and Cash's False Denials and Dissembling of the Facts Underlying Tenet's Claims Support a Strong Inference of Scienter**

251. When CHS's conduct was initially exposed by Tenet, the Individual Defendants attempted to temper the market's response by making false and misleading statements, which were inconsistent with CHS's internal documents and, their prior representations, and lacked a reasonable basis in fact.

252. For example, Defendants' repeated representations, after the Tenet exposé, that switching from the Blue Book to InterQual would not have a material impact on its operations were materially false and misleading. Even CHS's incremental changes toward the Blue Book in

2009 and 2010, which attempted to move toward the industry standard, had a negative impact on the Company's inpatient admissions rate. Defendants also knew that lower admissions generally meant lower Medicare reimbursements for most medical conditions.

253. By way of example:

- Division I President David Miller, acknowledged: "with the recent update and education on the new Blue Book we are seeing an observation admits double. This is having a *devastating impact on our inpatient admits*."

- Division II President Michael Portacci was informed in a March, 2011 memorandum that due to the changes in the Blue Book, at least one hospital had "seen a major increase in observations, up 79 or 91.8% from prior year."

- Division III reported a 30% increase in observations, which was "*wiping out*" there admissions statistics, due to the 2010 changes to the Blue Book.

254. Defendants knew that if incremental changes to the Blue Book caused an admissions downturn, then a wholesale abandonment of the Blue Book and adoption of InterQual, was certain to significantly reduce admissions, as ultimately evidenced on October 26, 2011, when CHS released its 3Q 2011 earnings results.

255. Cash's communications with analysts dismissing the charges made by Tenet support a strong inference that he knowingly misled them about the viability of Tenet's claims, and the impact of the Company's decision to discontinue the Blue Book, in order to temper market response.

256. In CHS's lengthy 112-page presentation dated April 28, 2011, CHS falsely claimed that switching from the Blue Book to InterQual would not have a material impact on its operations. CHS also falsely asserted that Triad's substantial increase in admission rate, and decrease in observations, were attributable to, *inter alia*, "improved case management" and a "strong flu season."

257. Defendants' one-sided response on April 28, 2011 to Tenet's charges supports an

inference that they knew or recklessly misled analysts and investors in an effort to assuage the market concerning the impact of discontinuing the Blue Book, CHS's ability to effect its proposed takeover of Tenet, and the Company's potential exposure to the government investigations and fines. *See* ¶ 438, *infra.*

258.    In addition, while acknowledging during a May 2, 2011 Deutsche Bank Healthcare Conference call that CHS had recently decided to move from the Blue Book to InterQual, Cash denied that there were significant distinctions between the Blue Book and InterQual, but rather claimed InterQual was "fairly close to our current Blue Book criteria." Cash posited that "rapid changes" would need to be done as CHS transitioned to InterQual, because the Blue Book was based on "current clinical practice."

259.    But the Defendants' statements are contradicted by what CHS, Smith and Cash had all known for years – that there were substantial clinical differences between the Blue Book and InterQual which materially impacted CHS's revenues.  Debbie Cothern, CHS's Vice President of Quality and Resource Management, wrote an e-mail on August 6, 2007 to Lipp acknowledging that "there is a tremendous amount of differences between the blue book and interQual" and that "there is no way we can replicate [InterQual]."  Lipp recognized this "issue was too hot" and needed answers because she would be briefing the "Senior Management Committee."  Even CHS's Chief Medical Officer and member of the PAB wrote that "the Blue Book is just not adequate" in comparison to InterQual.

260.    Even after the latest 2010 revisions to the Blue Book, the Chief Nursing Officers continued to report that "there continues to be a difference in the Blue Book to InterQual criteria . . . the Blue Book is not inclusive of the InterQual and therefore patients are not meeting criteria [for admission], especially Blue Cross patients."

261.    On January 21, 2011, Lynn Simon observed that Smith "knows that fighting [observation] status is not going to be sustainable …we need to solve this InterQual question first and get the organization on a standardized industry compliant tool."

262.    Similarly, during the April 28, 2011 1Q 2011 conference call, as well as during a Bank of America Merrill Lynch Health Care Conference on May 10, 2011, in an obvious attempt to discredit the claims made by Tenet and temper the market, CHS claimed that Pro-MED was "simply a tracking system" and denied that Pro-MED was used as a tool to increase admissions and that the "system does not order tests."  However, CHS's internal documents contradicted their position.  For example, at Smith's request, the tests ordered for each medical condition were determined, or "locked down," at the corporate level.  Smith also directed that corporate track hospitals' levels of Pro-MED corporate "standardization" and "how compliant [] ED docs are with the Pro-MED system recommendations for admission."

263.    After Tenet exposed CHS's improper practices, the Company belatedly disclosed numerous government investigations, lawsuits and shareholder inquiries relating to these same admission and billing practices, including:

> (1)    the receipt of a subpoena on March 31, 2011 from the U.S. Department of Health and Human Services and OIG, "in connection with an investigation of possible improper claims submitted to Medicare and Medicaid"; and
>
> (2)    an investigation commenced by the Office of the Attorney General of the State of Texas on November 15, 2010 concerning the ED procedures and billing for CHS's 18 Texas hospitals which accounted for 15% of the Company's revenues.

264.    The foregoing facts therefore, support a strong inference Smith and Cash knowingly or recklessly misled investors about the validity of Tenet's claims in failing to disclose that (1) CHS's successful operating strategies depended on the Company-wide use of the Blue Book's improper admissions justifications; and (2) the Blue Book's improper

admissions justifications were responsible in large part for reducing the Triad hospitals' observation rate and increasing their admission rates. Defendants also knew that admissions and related ED revenues would soften significantly as CHS switched over to InterQual at all its hospitals.

265. These facts, along with the DOJ investigation and CHS's $98 million settlement of that investigation into CHS's admission practices, support an inference of knowing or reckless conduct.

266. A strong inference is warranted from the fact that the "no observation" practice was directed from headquarters and prevalent in multiple hospitals in CHS's divisions. At the top, Lipp candidly promoted the practice "[w]e want to avoid observation as much as possible on Medicare patients" and there should be "no chest patients in observation," rather, all such patients were to be admitted. And, in the face of compliance warnings going back to 2004, the PAB decided to continue excluding observation altogether in January 2005 and for the next five years.

267. It is clear that the "no observation" policy permeated CHS's hospital system. For example:

| Division Hospital (State) | Statement | Source |
|---|---|---|
| III Berwick Hospital (PA) | "CEO, ER Director and ER Physician will work toward a goal of <u>ZERO</u> Medicare observations." | CEO |
| IV Watsonville Hospital (CA) | "almost no medical observation—this is a significant red flag" and that CHS's "no observation" policy created "an environment of clear medical necessity compliance risk and exposure." | Zebrowitz |

| | | |
|---|---|---|
| V<br>Porter<br>Hospital (IN) | the Director of Case Management was "told not to use observation." | Zebrowitz |
| III<br>Phoenixville<br>Hospital (PA) | "in the ER throughout the day (including weekends)" to make sure ER physicians' "'marching orders' are to admit." | CEO |
| I<br>Southern Va.<br>Regional<br>Medical<br>Center (VA) | "continued…trend of no observations into 2009" which was a "red flag for CMS and could trigger an audit of short-stay admission patients at the hospital" | Whittaker |
| I<br>Mid-Atlantic<br>and<br>Southeastern<br>Regions | "evidence of a widespread trend of one-day stays" resulting from CHS's policy of "no Medicare observations" that posed a "significant potential compliance issue relating to the use of observation within our facilities." | Reece |

## H. Defendants' Additional Material Misstatements and Omissions During the Class Period

268. Throughout the Class Period, Defendants' statements about CHS's operating efficiencies, growth strategies, quality care and admissions gains were materially false and/or misleading in failing to disclose that, for years, CHS had engaged in a systematic scheme to improperly boost its inpatient admissions through its unsustainable practices discussed above, thereby driving up Medicare reimbursement revenues.

### Second Quarter 2006

269. On July 26, 2006, CHS issued a release announcing improved financial results for the second quarter ended June 30, 2006 (the "2Q 2006 Release") as compared to the same period of the prior year. CHS also reported, on a same-store basis, admissions growth of 1.1% and adjusted admissions growth of 0.5%, when compared to the same period of the prior year.

270. In the 2Q 2006 Release, Smith attributed CHS's strong performance to

"consistent execution of its centralized and standardized operating strategy," and touted CHS's successful acquisition strategy which "led to greater operating efficiencies while improving [admission] volumes and revenues." These representations were materially false and misleading in failing to disclose the unsustainable admissions practices that enabled CHS to deliver improved results at existing and newly-acquired hospitals. Likewise, Defendants' representation that "our proven ability to deliver improved results…was a distinct competitive advantage" was materially misleading in failing to disclose CHS's unsustainable admissions practices.

271.    The 2Q 2006 Release included projections for same hospitals annual admissions growth, net operating revenues, and other financial metrics derived in part from projected admissions performance. Defendants' projections were materially false and misleading in failing to disclose that they were driven in part by the undisclosed admissions practices discussed above.

272.    CHS issued projections in its quarterly earnings releases from 3Q 2006 through 1Q 2011.[10] These projections were materially false and misleading for the same reasons in failing to disclose improper admissions practices which drove the Company's expected growth.

273.    On July 27, 2006, CHS held its Q2 2006 earnings conference call. On the call, Smith stated, "Our strong revenue and margin trends through the first half of 2006 validate the strength of our operating model." It was materially false and misleading for Smith to attribute CHS's "strong revenue and margin trends" to the "strength of our operating model" without disclosing its improper admissions practices.

274.    On July 28, 2006, the Company filed with the SEC its Form 10-Q for the second quarter of 2006, which was signed by Defendants Smith and Cash (the "2Q 2006 Form 10-Q").

275.    The 2Q 2006 Form 10-Q incorporated by reference the risk disclosures from the

_____

[10] CHS's earnings releases for 1Q 2007 and 2Q 2007 did not include any projections.

10-K of the prior year, which stated "If we fail to comply with extensive laws and government regulations, including fraud and abuse laws, we could suffer penalties or be required to make significant changes to our operations." However, these risk disclosures materially misled the class members by failing to disclose known risks and unsustainable practices, including (i) the Blue Book, (ii) CHS's "no observation" policy (through August 2009), and (iii) related compliance concerns identified internally and by outside consultants concerning CHS's admissions practices, which created a heightened risk that CHS would be subjected to fines and be required to change its admission practices.

276. From 3Q 2006 through 1Q 2011, CHS made substantially identical representations in each Form 10-Q, incorporating by reference the risk disclosures from the 10-K of the prior year. These risk disclosures were materially false and misleading in failing to disclose known risks and unsustainable practices.

277. Pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the 2Q 2006 Form 10-Q included certifications by Smith and Cash, stating that the Q2 2006 Form 10-Q "d[id] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made… not misleading…"

278. The SOX certifications in the 2Q 2006 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, *supra*.

279. From 3Q 2006 through 1Q 2011, each Form 10-Q and each Form 10-K included substantially identical SOX certifications by Smith and Cash, which were similarly false and misleading in light of misstatements in the SEC filings described herein.

### Third Quarter 2006

280.    On October 25, 2006, CHS issued a release announcing improved financial results for the third quarter ended September 30, 2006 ("3Q 2006 Release").  CHS reported a 16.9% increase in total inpatient admissions and a 2.6% increase in same-store admissions compared to the same period of the prior year.

281.    In the 3Q 2006 Release and 3Q 2006 earnings call held the next day, Smith attributed CHS's improved performance and gain in patient volume and revenue to its "proven centralized operating strategy," and "centralized operating platform and successful integration of our acquired hospitals." These representations were materially false and misleading in failing to disclose that its performance involved the use of improper admissions practices.

282.    On October 27, 2006, the Company filed with the SEC its Form 10-Q for the third quarter of 2006, which was signed by Defendants Smith and Cash (the "3Q 2006 Form 10-Q"). The 3Q 2006 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

283.    The SOX certifications in the 3Q 2006 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, *supra*.

### Fourth Quarter and Full Year 2006

284.    On November 15, 2006, at a Credit Suisse Boston Healthcare Conference, Defendant Cash stated, "We came to the company in 1997, we had about 2% to 11% of the ER visit became inpatient as a result to adding specialists and adding services and a better management [sic].  We now get about 14% to 15%."  Similarly, on November 29, 2006, at a Merrill Lynch Health Service Investor Conference, Defendant Cash stated, "back when we came

into the company in 1997 and our 10% or 11% of our ER patients turns into an inpatient admission today is 14% or 15%. We do that by better monitoring the quality and the transfers from our hospitals."

285. Cash's representations about "better monitoring" were materially false and misleading in failing to CHS's unsustainable admissions practices.

286. On February 15, 2007, the Company issued a release announcing improved financial results for the fourth quarter and year ended December 31, 2006. CHS also reported a 15.7% increase in total admissions and a 3.2% gain in same-store admissions compared to 4Q 2005 and a 1.1% gain for the full year.

287. Commenting on the results, CEO Smith misleadingly stated, "Our same store growth metrics are another important measure of our success in 2006 and these favorable trends demonstrate consistent execution of our operating strategy." Smith's representation, touting the Company's "operating strategy" as the source of the improved "same store growth metrics," was materially false and misleading in failing to disclose its improper admissions practices.

288. On February 20, 2007, the Company filed with the SEC its Form 10-K, which was signed by Defendants Smith and Cash (the "2006 Form 10-K"). In the 2006 Form 10-K, Defendants set forth four components of CHS's business strategy:

- Increase revenue at our facilities;
- Grow through selective acquisitions;
- Improve profitability; and
- Improve quality.

289. Defendants made "Emergency Room Initiatives" the central feature of its revenue strategies:

> Given that over 60% of our hospital admissions originate in the emergency room, we systematically take steps to increase patient flow in our emergency rooms as a means of optimizing utilization rates for our

hospitals. …. One component of upgrading our emergency rooms is the implementation of specialized computer software programs designed to assist physicians in making diagnoses and determining treatments.

290.     CHS's representations concerning the systematic steps taken as a means of "optimizing utilization rates" were materially false and misleading in omitting that the use of the Blue Book and Pro-MED exposed CHS to significant regulatory risk.

291.     CHS also stressed "Case and Resource Management" as a core of its success. Specifically, CHS stated:

> *Case and Resource Management.*  Our case and resource management program is a company-devised program developed with the goal of improving clinical care and cost containment. The program focuses on:
>
> \*          \*          \*
> - developing and implementing standards for operational best practices; and
> - using on-site clinical facilitators to train and educate care practitioners on identified best practices.
>
> Our case and resource management program integrates the functions of utilization review, discharge planning, overall clinical management, and resource management into a single effort to improve the quality and efficiency of care. …. [P]atient care begins with a clinical assessment of the appropriate level of care, discharge planning, and medical necessity for planned services.

292.     CHS's representations above were materially false and misleading in failing to disclose CHS's unsustainable admission practices developed by CHS and imposed on its hospitals' staffs.  Further, Defendants' asserted commitment to best practices and quality care was false and misleading in light of the ethical conflict it forced upon physicians by insisting on its "no observation" edict that forced admissions regardless of a patient's need.  Significantly, Defendants' representations regarding the quality and efficiency of care were materially false and misleading because over-admitting also compromised patient safety; CHS's reports demonstrate that 70% of "hospital acquired conditions" following admission were inflicted upon

Medicare patients.

293.     Each of CHS's Forms 10-K from 2007 through 2010 included substantially similar representations about CHS's four components of business strategy, which were materially false and misleading for these same reasons.

294.     In the 2006 Form 10-K, Defendants also represented that (a) "[w]e share information among our hospital management to implement best practices and assist in complying with regulatory requirements"; (b) "[w]e maintain quality assurance programs to support and monitor quality of care standard and to meet Medicare and Medicaid accreditation and regulatory requirements"; and (c) "[w]e believe that our hospitals are in substantial compliance with current federal, state, and local regulations and standards."

295.     However, by late February 2007, Defendants were aware of contemporaneous facts suggesting long-standing Medicare violations (as described in ¶¶ 24-40, 69, 82, 87-92, 143-187, 226-229, *supra*) which were inconsistent with quality of care and best practices, and made Defendants' compliance representations untrue.

296.     The 2006 Form 10-K also contained risk disclosures, which stated: "If we fail to comply with extensive laws and government regulations, including fraud and abuse laws, we could suffer penalties or be required to make significant changes to our operations." However, these risk disclosures themselves were materially misleading in failing to disclose Defendants' knowledge of the heightened risk that CHS would be fined and required to change its admission practices.

297.     Each of CHS's Forms 10-K from 2006 through 2010 included substantially similar compliance representations and risk disclosures, which were also materially false and misleading in light of the misstatements described in ¶ 296, *supra*.

Case 3:11-cv-00433   Document 170   Filed 10/15/15   Page 88 of 160 PageID #: 4778

298. The SOX certifications in the 2006 Form 10-K signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 288-92, 294-96, *supra*.

**First Quarter 2007**

299. On April 25, 2007, the Company issued a release announcing improved financial results for the first quarter ended March 31, 2007, as compared to the same period of the prior year. CHS also reported, on a same-store basis, admissions increased 1.0% and adjusted admissions increased 1.2%, compared to the same period of the prior year.

300. CEO Smith's representations in the 1Q 2007 Release attributing CHS's strong quarterly performance to "proven centralized operating strategy," were materially false and misleading in failing to discuss that its improved results were dependent in large part upon CHS's unsustainable admissions practices, utilizing the Blue Book. For similar reasons, Defendants' statements touting the "track record of assimilating new hospitals into our system with favorable results" were materially false and misleading in failing to disclose the Company's unsustainable admission practices.

301. On April 26, 2007, the Company filed with the SEC its Form 10-Q for the first quarter of 2007, which was signed by Defendants Smith and Cash (the "1Q 2007 Form 10-Q"). The 1Q 2007 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

302. In "Management's Discussion and Analysis of Financial Condition and Results of Operations," Defendants similarly represented that CHS's "increase in admissions continues to reflect the application of our operating strategies of growing through selective acquisitions and improving same-store hospital performance." Defendants' attribution was materially false and

misleading in failing to disclose that the admissions growth was dependent in large part upon CHS's unsustainable admissions practices, utilizing the Blue Book, which were also used to deliver improved results at newly-acquired hospitals.

303. The SOX certifications in the 1Q 2007 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, 302, *supra*.

### Second Quarter 2007

304. On July 30, 2007, the Company issued a release announcing improved financial results for the second quarter ended June 30, 2007. On a same-store basis, admissions decreased 0.2% and adjusted admissions decreased 0.4% compared to the same period of the prior year.

305. CEO Smith made similarly misleading representations attributing the Company's solid financial and operating performance to CHS's "consistent execution of our centralized and standardized strategy and our ongoing focus on quality care," while failing to disclose that the Company's success was dependent in large part upon CHS's unsustainable admissions practices, and that those practices compromised patient care. Additionally, Smith's representation regarding CHS's ongoing focus on quality care was materially false and misleading because over-admitting compromised patient safety: CHS's reports demonstrate that 70% of "hospital acquired conditions" following admission were inflicted upon Medicare patients.

306. On July 31, 2007, the Company filed with the SEC its Form 10-Q for the second quarter of 2007, which was signed by Defendants Smith and Cash (the "2Q 2007 Form 10-Q"). The 2Q 2007 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

307. The same day CHS held a Q2 2007 earnings conference call. On the conference

call, CEO Smith discussed potential growth opportunities through the recently announced Triad acquisition:

> We have spent a long period of time, trying to perfect our work in our emergency rooms as it relates to emergency room admissions. We have done a lot of good work with that. We have a lot of good systems in place. …. [Triad's] admission rate is lower than ours, which historically you would think would be higher, because generally speaking, they may have hospitals that have a larger number of specialists.

308. The SOX certifications in the Q2 2007 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, *supra*.

309. Smith's discussion of "the good systems in place" in the ED was materially false and misleading in failing to disclose CHS's unsustainable admissions practices. It was also misleading to feign surprise at lower admissions rates at the Triad hospitals relative to the legacy CHS hospitals. Defendants gave the misleading impression that CHS's admissions rates outpaced Triad due to the exceptional ED systems it had in place without disclosing the unsustainable admissions practice that had contributed to CHS's higher rates.

### Third Quarter 2007

310. On October 30, 2007, CHS issued a release announcing results for the third quarter ended September 30, 2007. As to the Triad acquisition, CEO Smith touted CHS's "proven track record for finding suitable hospitals and successfully assimilating these facilities into our system," which it attributed to "an effective centralized and standardized operating platform." However, Smith failed to disclose that unsustainable admission practices enabled CHS to deliver improved results at newly-acquired hospitals, including Triad.

311. On November 2, 2007, the Company filed with the SEC its Form 10-Q for the third quarter of 2007, which was signed by Defendants Smith and Cash (the "3Q 2007 Form 10-

Q"). The 3Q 2007 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

312. The SOX certifications in the 3Q 2007 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, *supra*.

## Fourth Quarter and Full Year 2007

313. CEO Smith discussed the integration of Triad hospitals at a Credit Suisse China Healthcare Conference held on November 13, 2007. Smith emphasized the "area that we found opportunity in historically for our hospitals has been our emergency services, and we work on our emergency services in terms of standardizing and centralizing our approach." Smith's representation was materially false and misleading because he failed to disclose the unsustainable admission practices used in standardizing and centralizing ED services at existing and newly-acquired hospitals, which accounted for CHS's success.

314. On February 21, 2008, the Company issued a release announcing its financial results for the fourth quarter ended December 31, 2007 (the "2007 Release"). In the 2007 Release, Defendants reiterated that CHS "remains focused on the key areas for success in its business — an effective centralized and standardized operating platform, effective cost management, a successful physician recruitment program and a favorable reputation in the marketplace." CEO Smith also stated, "We intend to build on our past success as a proven operator and leverage these assets to further extend our record of growth."

315. On February 28, 2008, the Company filed its 2007 annual report on Form 10-K, which was signed by Smith and Cash (the 2007 Form 10-K").

316. In the 2007 Form 10-K, Defendants made representations regarding compliance

with federal, state and local regulations and standards essentially identical to the representations made in the 2006 Form 10-K as set forth in ¶¶ 294-95, *supra*. Defendants' representations that CHS hospitals were in substantial compliance with regulatory requirements were materially false and misleading in failing to disclose material contemporaneous facts suggesting long-standing potential Medicare violations at numerous hospitals, as set forth in ¶¶ 24-57, 59, 69-70, 74-79, 82-96, 143-187, 202-203, 216-218, 220-222, 226-229.

317. The 2007 Form 10-K contained risk disclosures stating, "If we fail to comply with extensive laws and government regulations, including fraud and abuse laws, we could suffer penalties or be required to make significant changes to our operations," which were materially false and misleading for the same reasons set forth in ¶ 296, *supra*.

318. The 2007 Form 10-K also contained representations regarding (i) the Emergency Room Initiatives, and (ii) Case and Resource Management, which were essentially identical to the representations made in 2006 Form 10-K as set forth in ¶¶ 288-92. These representations were also materially false and misleading in failing to disclose CHS's unsustainable admission practices in the ED by using Pro-MED and the Blue Book, and also in failing to disclose the conflict CHS created between its stated commitment to quality healthcare and efficiency and its goal of boosting revenues through improper admissions using unsustainable admissions practices.

319. The SOX certifications in the 2007 Form 10-K signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 288-92, 294-96, 315-18, *supra*.

**First Quarter 2008**

320. At a JP Morgan Chase & Co. Healthcare Conference on January 9, 2008, Smith

described CHS's "simple" strategy, which he "articulate[d] very straight forwardly" -- "building market share" through "recruiting physicians [and] improving operations [and] expanding services [and] renovating facilities and upgrading facilities…"

321.    Similarly, at the March 4, 2008 Raymond James Institutional Investors Conference, Cash stated that CHS spent probably about "$140 million on 42 ER renovations," and noted that when "[w]e came to this company about 10 years ago, the admit rate through the ER was about 10%, now it's about 15%." Cash also gave some of the credit to Pro-MED, which he described as "a standard data tracking system," stating "Pro-MED is in all our hospitals, and we've put that in the Triad hospitals."

322.    Smith's representations that CHS was forthright about the reasons for its success were materially misleading in failing to disclose that CHS's success was dependent in large part upon the unsustainable admissions practices, including the use of Pro-MED, which incorporated improper admissions criteria, to deliver improved results. Smith's descriptions of Pro-MED as a "standard data tracking system" were also materially incomplete in minimizing its function, for the reasons set forth in ¶¶ 42-49, *supra*, (test-mapping).

323.    On March 18, 2008, at the Lehman Brothers Global Healthcare Conference, Smith stated "we have a lot of opportunities in terms of margin improvements from the Triad acquisition. We have absolutely a strong record." Smith's representation was materially false and misleading in failing to disclose that CHS's success was dependent in large part upon the unsustainable admission practices that enabled CHS to deliver improved results at newly-acquired hospitals.

324.    On April 29, 2008, CHS issued a release announcing improved financial results for the first quarter ended March 31, 2008, as compared to the same period of the prior year ("1Q

2008 Release").  The Company reported, on a same-store basis, admissions growth of 3.8% and adjusted admissions growth of 3.8%, when compared to the same period of the prior year.

325.    In the 1Q 2008 Release, Smith attributed CHS's improved performance to "our ability to drive revenue and improve the operating performance of both our existing and recently acquired facilities."  Generally, Smith cited "an effective centralized and standardized operating platform" as underlying a key area of CHS's success.

326.    Similarly, in the 1Q 2008 earnings call held on April 30, 2008, Smith attributed CHS's increase in admission volume in part to the "strong flu benefit" as well as the extra day in February.

327.     Smith's representations attributing CHS's solid performance to the flu and the extra day caused by the leap year were materially misleading in failing to disclose that CHS's success was due in large part to CHS's unsustainable admissions practices.  Likewise, Smith failed to disclose the Company's centralized and standardized operating platform was driven in part by the Blue Book and "no observation" strategies.

328.    On May 2, 2008, the Company filed with the SEC its Form 10-Q for the first quarter of 2008, which was signed by Defendants Smith and Cash (the "1Q 2008 Form 10-Q").  The 1Q 2008 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

329.    The SOX certifications in the 1Q 2008 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 328-29, *supra*.

**Second Quarter 2008**

330.    On June 11, 2008, at the Goldman Sachs Healthcare Conference, Smith discussed

the acquisition and integration of Triad's hospitals stating "[w]e're in a good solid operating mode now, and we should start beginning to see performance as we go forward, improved performance."

331. Smith's foregoing representations regarding the "good solid operating mode" at Triad and that "we don't know of any systemic issues related to volume," boasting that CHS believed it had "the best opportunity for growth in this industry" were materially misleading in failing to disclose facts recently communicated to senior management suggesting huge compliance risks, ¶¶ 6, 24-35, 105-107, *supra*, CHS's "no observation" policy and use of the Blue Book at new and existing hospitals. For these reasons, Defendants' claim that CHS had the "best opportunity for growth in this industry," was materially misleading. Indeed, once CHS's operations fraud was exposed, its expansion opportunities nearly vanished. During 2011, CHS acquired only 1 hospital and only 4 hospitals during 2012.

332. On July 28, 2008, CHS issued a release announcing its financial results for the second quarter ended June 30, 2008 ("2Q 2008 Release"). On a same-store basis, CHS reported admissions increased 2.3% and adjusted admissions increased 2.4%, compared to the same period of the prior year.

333. In the 2Q 2008 Release, Smith claimed that CHS's improved results "reflect[ed] consistent execution of our strategy and our continued progress with respect to the integration of the significant number of facilities acquired in 2007." Smith cited CHS's proven business model for improving the operating performance at both its existing and acquired facilities."

334. Smith's representations attributing CHS's operating performance to "consistent execution of our strategy and our continued progress with respect to the integration" of the facilities acquired in 2007 were materially false and misleading in failing to disclose that CHS's

success was dependent in large part upon the unsustainable admission practices.

335. On July 29, 2008, CHS held its 2Q 2008 earning conference call. On the call, Cash noted "we had pretty good growth with ER admissions which are generally a little bit less acuity business. So while we've got very good admissions growth, it is a little bit less acuity." Smith echoed this sentiment, stating "[o]ne of the things that's maybe driving some of our volumes is that we've had an – we've been working hard on these emergency rooms, and increased our emergency rooms [] over 3%, and we are getting a little less acuity in terms of those, and that would be expected when you start really pushing them and working to improve your emergency services."

336. Cash's representations regarding the Company getting maximum use of its emergency rooms while ensuring appropriate admissions was materially false and misleading in light of the fact that CHS implemented a policy of increasing inpatient admissions and decreasing observations based on improper admissions criteria.

337. On August 5, 2008, the Company filed with the SEC its Form 10-Q for the second quarter of 2008, which was signed by Defendants Smith and Cash (the "2Q 2008 Form 10-Q"). The 2Q 2008 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

338. The SOX certifications in the 2Q 2008 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, *supra*.

**Third Quarter 2008**

339. On October 29, 2008, CHS issued a release announcing financial results for the third quarter ended on September 30, 2008 ("3Q 2008 Release"). On a same-store basis, the

Company reported admissions increased 2.3% and an adjusted admissions increased 2.5%, when compared to the same period of the prior year.

340.    On October 31, 2008, the Company filed its Form 10-Q, which was signed by Smith and Cash.  The 3Q 2008 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

341.    The SOX certifications in the 3Q 2008 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, *supra*.

342.    On November 9, 2008, at the Morgan Stanley Global Healthcare Unplugged Conference, Cash stated "one of the things we work very hard [on] is trying to get maximum use of emergency room and appropriate admissions through there."  Cash also discussed installing and utilizing Pro-MED in the Triad hospitals, making substantially similar representations to those stated herein.

343.    Cash's representations regarding the Company getting maximum use of its emergency rooms, while ensuring appropriate admissions was materially false and misleading in light of the fact that CHS implemented a policy of increasing inpatient admissions and decreasing observations based on improper admissions criteria.  Cash's representations regarding Pro-MED were materially false and misleading for the reasons discussed in ¶¶ 36-49.

### Fourth Quarter and Full Year 2008

344.    On February 19, 2009, CHS issued a release announcing its improved financial results for the fourth quarter and year ended December 31, 2008.  On a same-store basis, the Company reported admissions growth of 2.0% and adjusted admissions growth of 42.1% compared to the prior year.

345.     On February 20, 2009, CHS held its 4Q 2008 earnings call, during which Smith touted CHS's "very strong year" for same-store admissions, which were "higher than anybody else in the country."  Defendants' representations about CHS's success in admissions growth and ER management were false and misleading in failing to disclose the fact that CHS's success was dependent in large part upon the undisclosed and unsustainable improper admissions practices.

346.     On February 27, 2009, the Company filed with the SEC its Form 10-K, which was signed by Smith and Cash (the "2008 Form 10-K").

347.     In the 2008 Form 10-K, Defendants made representations regarding compliance with federal, state and local regulations and standards essentially identical to the representations made in 2006 Form 10-K as set forth in ¶¶ 294-95, *supra*.  Defendants' representations that CHS hospitals were in substantial compliance with regulatory requirements were materially false and misleading in failing to disclose material contemporaneous facts suggesting long-standing potential Medicare violations at numerous hospitals, as set forth in ¶¶ 24-57, 59-60, 69-70, 73-104, 138, 140-141, 143-187, 216-222, 226-238.

348.     The 2008 Form 10-K contained risk disclosures stating, "If we fail to comply with extensive laws and government regulations, including fraud and abuse laws, we could suffer penalties or be required to make significant changes to our operations," which were materially false and misleading for the same reasons set forth in ¶ 296, *supra*.

349.     The 2008 Form 10-K also contained representations regarding (i) the Emergency Room Initiatives, and (ii) Case and Resource Management, which were essentially identical to the representations made in the 2006 Form 10-K as set forth in ¶¶ 288-92, *supra*.

350.     These representations were also materially false and misleading in failing to disclose CHS's unsustainable admission practices in the ED by using Pro-MED and the Blue

Book, and also in failing to disclose that CHS's commitment to quality healthcare and efficiency were compromised by its goal of boosting revenues by unsustainable admissions practices.

351.     The SOX certifications in the 2008 Form 10-K signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 288-92, 294-96, 347-50, *supra*.

### First Quarter 2009

352.     On April 23, 2009, CHS issued a release announcing its financial and operating results for the first quarter ended March 31, 2009 (the "1Q 2009 Earnings Release").  On a same-store basis, admissions decreased 4.9% and adjusted admissions decreased 2.4%, compared with the same period in 2008.

353.     In the 1Q 2009 Earnings Release, Smith described CHS's first quarter performance this way:

> We are pleased with our solid financial performance for the first quarter of 2009. *These results reflect our proven operating strategy and our ability to drive revenues and improve the financial performance of our hospitals* in spite of a challenging operating environment.  We will continue to manage our operations as efficiently as possible in this uncertain economy and, at the same time, *meet our commitment to provide quality healthcare* in the communities we serve.

(Emphasis added).

354.     Smith's representations attributing the solid financial performance to "our proven operating strategy and our ability to drive revenues and improve the financial performance of our hospitals" were materially false and misleading in failing to disclose that the Company's performance was dependent in large part upon CHS's unsustainable admissions practices, utilizing the Blue Book.  Additionally, Smith's representation that CHS would continue to "meet our commitment to provide quality healthcare" was materially false and misleading in failing to disclose that CHS's commitment to provide quality healthcare was compromised by CHS's

commitment to boosting revenues by unsustainable admissions practices. Moreover, Smith's representation regarding CHS's commitment to provide quality healthcare was materially false and misleading because over-admitting also compromised patient safety.

355. On April 29, 2009, the Company filed with the SEC its Form 10-Q for the first quarter of 2009, which was signed by Smith and Cash (the "1Q 2009 Form 10-Q"). The 1Q 2009 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

356. The SOX certifications in the 1Q 2009 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, 356, *supra*.

### Second Quarter 2009

357. On July 30, 2009 CHS issued a release announcing its financial and operating results for the second quarter ended June 30, 2009 (the "2Q 2009 Release"). On a same-store basis, admissions decreased 0.4% and adjusted admissions increased 1.7%, compared with the same period in 2008.

358. In the 2Q 2009 Release, Smith touted the ability of CHS's "proven operating model [to] favorable support our business" despite adverse economic trends that put the hospital industry volumes under pressure. This representation was materially false and misleading in failing to disclose that CHS's ability to positively impact volumes was dependent in large part upon the unsustainable admissions practices.

359. On July 31, 2009, the Company filed with the SEC its Form 10-Q, signed by Defendants Smith and Cash (the "2Q 2009 Form 10-Q"). 2Q 2009 Form 10-Q incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons

set forth in ¶ 275, *supra*.

360.    The SOX certifications in the 2Q 2009 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, 360, *supra*.

### Third Quarter 2009

361.    On October 28, 2009, CHS issued a release announcing its financial and operating results for the third quarter and nine months ending September 30, 2009 (the "3Q 2009 Release"). On a same-store basis, admissions decreased 0.2% and adjusted admissions increased 1.9%, compared with the same period in 2008.

362.    In the 3Q 2009 Release, CEO Smith proclaimed that CHS "again exceed[ed] expectations," which he attributed to "favorable revenue trends," noting that "the fundamentals of our business are strong and our centralized operating strategy is working across all of our markets." Smith, however, failed to disclose that CHS's favorable revenue trends and operating performance was dependent in large part upon the unsustainable admissions practices.

363.    On September 10, 2009, Defendant Cash, speaking at a Robert W. Baird & Co. Health Care Conference, discussed CHS's ER strategy with respect to newly acquired Triad hospitals:

> Another strategy is ER. We get about 55 to 60% of our admissions [through] the ER. When we came to the company about 12 years ago, the admission rate out of ER was 10, 11%. Now it's 15%. Actually, the Triad hospitals had an admit rate which was lower than the CHS, and we've improved that admit rate so far. And a mid-sized market should have a little better admit rate.

364.    Cash's foregoing representations were materially false and misleading in failing to disclose that the higher admission rate at CHS was due in part to implementing unsustainable admissions practices.

365.     CHS's Form 10-Q for the third quarter of 2009, signed by Smith and Cash (the "3Q 2009 Form 10-Q") was materially misleading because it incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

366.     The SOX certifications in the 3Q 2009 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, 365, *supra*.

**Fourth Quarter and Full Year 2009**

367.     On February 17, 2010, CHS issued a release announcing its financial and operating results for the fourth quarter ended December 31, 2009 (the "4Q 2009 Release"). On a same-store basis, admissions decreased 0.5% and adjusted admissions increased 1.6%, compared with the same period in 2008.

368.     Commenting on the year end results, CEO Smith stated:

Our results also reflect the continued success of our centralized operating strategy as evidenced by favorable annual same-store revenue growth and solid margin expansion. We have continued to focus on improving the performance at the individual hospital level in all of our markets, especially at our more recently acquired facilities.

369.     Smith's representation attributing record results to "the continued success of our centralized operating strategy" was materially false and misleading in failing to disclose that CHS's success was dependent in large part upon unsustainable admissions practices, which was also used to deliver improved results at newly-acquired hospitals.

370.     On February 18, 2010, during the 4Q 2009 earnings call, Cash addressed the decrease in same-store admissions, stating, "we did see a decline in one-day stays that affects inpatient volume and a corresponding increase in outpatient observation visits." The statement

was materially misleading because Cash failed to disclose the fact that this reduction in one-day stays was a result of the changes made to the 2009 version of the Blue Book, which for the first time allowed observation for one condition: chest pain.

371. On February 26, 2010, the Company filed with the SEC its Form 10-K, which was signed by Smith and Cash (the "2009 Form 10-K").

372. In the 2009 Form 10-K, Defendants made representations regarding compliance with federal, state and local regulations and standards essentially identical to the representations made in 2006 Form 10-K as set forth in ¶¶ 294-95, *supra*. Defendants' representations that CHS hospitals were in substantial compliance with regulatory requirements were materially false and misleading in failing to disclose material contemporaneous facts suggesting long-standing potential Medicare violations at numerous hospitals, as set forth in ¶¶ 24-57, 59-62, 69-70, 73-106, 133, 138, 140-187, 204-210, 216-222, 226-238.

373. The 2009 Form 10-K contained risk disclosures stating, "If we fail to comply with extensive laws and government regulations, including fraud and abuse laws, we could suffer penalties or be required to make significant changes to our operations," which were materially false and misleading for the same reasons set forth in ¶ 296, *supra*.

374. The 2009 Form 10-K also contained representations regarding (i) the Emergency Room Initiatives, and (ii) Case and Resource Management, which were essentially identical to the representations made in 2006 Form 10-K as set forth in ¶¶ 288-92, *supra*. These representations were also materially false and misleading in failing to disclose CHS's unsustainable admission practices in the ED by using Pro-MED and the Blue Book, and also in failing to disclose that CHS's commitment to quality healthcare and efficiency were superseded by its goal of boosting revenues by unsustainable admissions practices.

375. The SOX certifications in the 2009 Form 10-K signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 288-92, 294-96, 372-74, *supra*.

### First Quarter 2010

376. On April 21, 2010, CHS issued a release announcing its financial and operating results for the first quarter ended March 31, 2010 (the "1Q 2010 Release"). In the 1Q 2010 Release, Smith represented that "[o]ur success as an operator is supported by consistent growth in revenues and earnings, in spite of a challenging economic environment. These results confirm that the fundamentals of our business are strong and our centralized operating strategy is working across our markets."

377. Smith's representations attributing the consistent growth in revenues and earnings to CHS's "success as an operator," strong fundamentals, and "our centralized operating strategy" are materially false and misleading in failing to disclose that CHS's performance was dependent in large part upon the unsustainable admissions practices.

378. On April 22, 2010, CHS held its 1Q 2010 earnings conference call. On the call, Cash reported that same-store admissions decreased 1.2%, due in part to "reductions in one-day stays with a corresponding increase in outpatient observations." Cash made similar representations at a May 5, 2010 Deutsche Bank Securities Health Care Conference.

379. This reduction in one-day stays resulted from a modest revision to the Blue Book. Cash's representation was materially misleading in failing to disclose the fact that even with the revision, the Blue Book's criteria generally still diverged significantly from the industry standard.

380. On April 28, 2010, the Company filed with the SEC its Form 10-Q for the first

quarter of 2010, which was signed by Defendants Smith and Cash (the "1Q 2010 Form 10-Q"). The 1Q 2010 Form 10-Q also incorporated by reference the risk disclosures, which were materially false and misleading for the same reasons set forth in ¶ 275, *supra*.

381.    The SOX certifications in the 1Q 2010 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading risk disclosures described in ¶¶ 275, 277-78, 379, *supra*.

382.    On May 11, 2010, at a Bank of America Merrill Lynch Healthcare Conference, Smith stated:

> In 2010, our admissions from our emergency rooms are up from 15.5% to 16.1% so that's up from about 11% if you go back a number of years kind of going forward.  Our same store visits, I stumbled on this, was 2.3% this year.  One of the things that we do and is sort of the backbone of our organization is we have a standardized, centralized platform.  This is the reason that we have very consistent earnings and our performance is very consistent. ….You look down this list, everything on here is a standardized, centralized function that we have in place. It's very good in terms of consistency of performance.  It's all about process improvement, best practices.  It's great for regulatory compliance and it's really good for good governance.

383.    Smith's foregoing representations, attributing CHS's consistent earnings and performance to the "standardized, centralized platform," which was "great for regulatory compliance," were materially false and misleading in failing to disclose that CHS's performance was dependent in large part upon unsustainable admissions practices.

**Second Quarter 2010**

384.    On July 28, 2010, CHS issued a release announcing its financial and operating results for 2Q 2010 (the "2Q 2010 Earnings Release").  Smith highlighted that CHS's "consistent execution of our centralized operating strategy" had "continue[d] to drive revenues and achieve solid margins" and that the Company "consistently demonstrated our ability to deliver favorable operating results through our efforts to implement best practices in all of our hospitals."

385.    Smith's representations were materially false and misleading in failing to disclose that CHS's operating strategy and ability to deliver favorable operating results were dependent in large part upon the unsustainable admissions practices.

386.    In the 2Q 2010 earnings call held on July 29, 2010, Cash reported "same-store admissions decreased 2.5%" due in part to "a reduction in one-day admissions with a corresponding increase in outpatient observation of 70 basis points."  This representation was misleading in failing to disclose that one-day stays declined due to revisions of the Blue Book, which allowed for observation.

387.    On July 30, 2010, the Company filed with the SEC its Form 10-Q for the second quarter of 2010, which was signed by Defendants Smith and Cash (the "2Q 2010 Form 10-Q"). The 2Q 2010 Form 10-Q incorporated by reference the risk disclosures from the 2009 Form 10-K, which were materially false and misleading for the reasons set forth in ¶ 275, *supra*.

388.    The SOX certifications in the 2Q 2010 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, 386, *supra*.

### Third Quarter 2010

389.    On October 27, 2010, CHS issued a release announcing its financial results for the third quarter ended September 20, 2010 (the "3Q 2010 Release").  On a same-store basis, admissions decreased 3.6% and adjusted admissions decreased 1.3%, compared with the same period in 2009.

390.    In commenting on the results, CEO Smith stated:

We are pleased with our solid financial performance for the third quarter of 2010, in what has continued to be a challenging economic environment.   Our conservative operating strategy and strong focus on expense management have served us well.  *We continue to benefit from a consistent performance at the*

*hospital level, as evidenced by favorable same-store revenue trends for the third quarter and year to date periods.*

Throughout 2010, we have continued to extend our market reach through selective acquisitions.  We have identified hospital facilities that meet our operating profile with the most opportunity for growth.  *We have a proven track record for the successful integration of these facilities with improved operating results.*

(Emphasis added).

391.    Smith's representations touting CHS's consistent performance as "evidenced by same-store [hospital] revenue trends" and its "proven track record for the successful integration of these [acquisition targets] with improved operating results" were also materially false and misleading in failing to disclose the unsustainable admissions practice used to achieve improved revenue trends and operating results.

392.    On October 28, 2010, CHS held its 3Q 2010 earnings conference call.  As in the prior two quarters of 2010, Cash reported that same-store admissions decreased 3.6% due in part to a "reduction[ ] in one-day stays with the corresponding increase in outpatient observations."

393.    In its 3Q 2010 Form 10-Q filed the next day, CHS explained that the "decrease in inpatient admissions was due primarily to … a less severe flu season as compared to the prior year period, lower birth rates driven by the downturn in the economy, reductions in one day stays and certain service closures during the three months ended September 30, 2010, as compared to the three months ended September 30, 2009."  The 3Q 2010 Form 10-Q incorporated by reference the risk disclosures from the 2009 Form 10-K, were materially false and misleading for the same reasons set forth in ¶ 297, *supra*.

394.    Defendants' representations were materially false and misleading in failing to disclose the fact that this reduction in one-day stays was attributable in large part to the recent revision of the Blue Book, which allowed for observation for some medical conditions.  The

result, as described in ¶¶ 252-53, *supra*, was that CHS hospitals saw "observation admits double," "wiping out admissions statistics."

395. The SOX certifications in the 3Q 2010 Form 10-Q signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 275, 277-78, 393-94, *supra*.

### Fourth Quarter and Full Year 2010

### CHS's Attempt to Takeover Tenet

396. On December 9, 2010, CHS issued a press release publicly announcing a cash-and-stock proposal to acquire Tenet at $6.00 per share. In the press release, which was filed with the SEC, CHS stated, *inter alia*, that CHS had a "reputation for superior operating performance and a successful track record of integrating acquisitions."

397. CHS included Smith's December 9, 2010 letter to Tenet's Board of Directors, which questioned the Board's rejection of a "substantial premium" offer and touted CHS's "extremely successful acquisition and integration track record, most notably evidenced by our acquisition of Triad Hospitals in 2007."

398. CHS attached to its press release a presentation entitled "Community Health Systems and Tenet Healthcare: A Compelling Opportunity For Value Creations." In a slide entitled "CHS Management Team Has a Proven Track Record of Superior Operating Performance," CHS stated its average annual same-facility revenue growth from 2008 to 2010 was 5.4%, outpacing Tenet's 4.1%.

399. The statements in ¶¶ 396 to 398 were materially false and misleading in light of CHS's failure to disclose that CHS's superior operating performance was the product of CHS's improper practices, discussed in detail above, to drive patient admissions despite the absence of a

clinical basis for these patients to be admitted into the hospital. These unsustainable practices exposed Medicare and other payers to millions of dollars of improper additional costs. CHS's purported reputation as a successful operator and acquirer was based on the same improper conduct.

400.    CHS continued to tout its proven operating strategy and acquisition track record, with special emphasis on Triad. On December 10, 2010, in an analyst call to discuss CHS's proposed acquisition of Tenet, Defendant Smith touted CHS's "proven track record of unmatched operating performance," including through CHS's acquisition of Triad, which CHS "successfully integrated."

401.    On December 20, 2010, CHS announced that it was commencing a proxy contest to take control of Tenet's Board of Directors at Tenet's upcoming 2011 annual meeting.

402.    On January 11, 2011 at the J.P. Morgan Healthcare Conference, Smith discussed, *inter alia*, CHS's offer to buy Tenet as well as CHS's business strategy:

> So when you think about us, we think we have a very clear executable strategy. It's predictable. It's sustainable, as we've proven over the last 10 years…And definitely we've a proven operating permanent strategy that works with consistent financial performance and margin improvement.

403.    During the January 11th conference, Smith stated that CHS is an "Industry Leader in Admissions Growth," and provided data showing that CHS's admissions and adjusted patient admissions had grown in every year from 2000 to 2009. In addition, CHS stated that one of its "Significant Opportunities for Growth in Revenue and Operating Profit" is to "Increase Inpatient ER Visits." CHS further stated that its "ER Strategy" has "[c]ontributed to same store admission growth." Smith also boasted that "we've improved [Triad's] margin about 280 basis points."

404.    On February 8, 2011, Defendant Smith delivered a presentation at the UBS Global Healthcare Services Conference; excerpts of Smith's remarks at the UBS conference

were filed with the SEC. These materials contained similar material misstatements as Smith made in prior healthcare conferences. For example, Smith touted CHS's ability to improve margins and performance in its acquired hospitals, citing the Triad acquisition as the primary example, and observed that the investment community has favorably received CHS's proposed acquisition of Tenet.

405. The statements in ¶¶ 400 to 403 were materially false and misleading in light of CHS's failure to disclose that its same-store admissions growth, ER strategy, operating strategy and successful integration of Triad depended in large part on CHS's improper admissions practices, discussed in detail above.

### 2010 Year-End Results

406. On February 24, 2011, CHS issued a release announcing improved financial and operating results for the three months and year ending December 31, 2010 (the "Q4 2010 Earnings Release"). The Company reported a 2.0% increase in total admissions, a 5.1% increase in total adjusted admissions, and a 1.5% decrease in same-store admissions, compared to the same period of the prior year.

407. Commenting on the 2010 results, CEO Smith touted, "[o]ur consistent pattern of growth reflects our success as an operator, especially in what has continued to be a challenging economic environment."

408. On February 25, 2011, the Company filed its 2010 Form 10-K, which was signed by CEO Smith and CFO Cash (the "2010 Form 10-K").

409. In the 2010 Form 10-K, Defendants made representations regarding compliance with federal, state and local regulations and standards essentially identical to the representations made in 2006 Form 10-K as set forth in ¶¶ 294-95, *supra*. Defendants' representations that CHS hospitals were in substantial compliance with regulatory requirements were materially false and

misleading in failing to disclose the material contemporaneous fact that the revised Blue Book was still significantly divergent from the industry standard, creating a heightened risk for compliance violations, as set forth in ¶¶ 24-62, 65-106,133, 138, 140-187, 204-210, 216-239.

410.    The 2010 Form 10-K contained risk disclosures stating, "If we fail to comply with extensive laws and government regulations, including fraud and abuse laws, we could suffer penalties or be required to make significant changes to our operations," which were materially false and misleading for the same reasons set forth in ¶ 296, *supra*.

411.    The 2010 Form 10-K also contained representations regarding (i) the Emergency Room Initiatives, and (ii) Case and Resource Management, which were essentially identical to the representations made in 2006 Form 10-K as set forth in ¶¶ 288-92, *supra*.  These representations were also materially false and misleading in failing to disclose CHS's unsustainable admission practices in the ED by using Pro-MED and the Blue Book, and also in failing to disclose that CHS's commitment to quality healthcare and efficiency were superseded by its goal of boosting revenues by unsustainable admissions practices.

412.    The SOX certifications in the 2010 Form 10-K signed by Smith and Cash were materially false and misleading in light of the misleading statements and risk disclosures described in ¶¶ 288-92, 294-96, 409-11, *supra*.

413.    The same day CHS held a fourth quarter 2010 earnings call.  On the call, Cash reported that same-store admissions decreased 2.8% due in part to "reductions in one-day stays with a corresponding increase in outpatient observations."  Smith suggested, however, that the trend away from inpatient stays would have little impact on CHS's revenues given that "there are certain insurance companies that payment on observation is essentially the same as when [patients] stay."

414. Smith reiterated that the trend was "an industry-wide issue, and I don't see anything that's problematic for us…It's just a change in location basically." He also touted CHS's "success as an operator and consolidator in the industry."

415. The foregoing representations were materially misleading and incomplete because Smith failed to disclose that the reduction in one-day stays was not due simply to pressure from managed care providers, but also, in large part, to revisions to the Blue Book adding observations. For example, an October 2010 Weekly Management Report for Fannin Regional Hospital noted that the "recent update" to the Blue Book, which involved adding observation criteria for the first time, caused the hospital's "observation admits to double," which had a "devastating impact on our inpatient admits."

416. Moreover, Smith's suggestion that there was little cost differential to the payor between billing for a one-day stay as opposed to observation, and that the difference between an admission and observation was merely a change in "location," was materially misleading in creating the false impression that the reimbursement amount for admissions and observations were equivalent when Medicare typically reimbursed far less for observation. Despite Smith's claimed treatment by a few insurers, Medicare and other payors rarely paid as much for observation as for admissions. CHS acknowledges this "was the exception rather than the rule."

417. Defendants also misleadingly characterized the shift as merely "a change in location," *i.e.*, from admission to observation units, when, in fact, CHS hospitals were far more vulnerable than their peers in the industry to pressure from payors to shift admitted patients to observation status because CHS had vastly underutilized observation status by design as compared to CHS's peer hospital operators.

418. On March 1, 2011, Smith delivered a presentation at the Citi Global Healthcare

Conference. The presentation and excerpts of Smith's remarks were filed with the SEC. These materials contained numerous materially false and misleading statements, similar to those contained in the JP Morgan Investor Conference on January 11, 2011. Smith also misleadingly touted CHS's ability to improve margins and performance in its acquired hospitals, citing the Triad acquisition as the primary example.

419. Smith's statements concerning CHS's success as an acquirer and its operational performance were misleading in failing to disclose CHS's admission practices on which it success depended.

### The Truth Emerges Despite CHS's Denials

420. On April 11, 2011, Tenet filed a lawsuit, alleging that CHS had been "systematically overbill[ing] Medicare and likely other payors as well…by causing patients to be admitted to its hospitals unnecessarily when, under standard clinical practice, these patients should have been treated in outpatient observation status." Tenet asserted that CHS's improper admissions practices, which the hospital had discovered as "a result of due diligence [] conducted while evaluating" CHS's proposal to acquire Tenet, "overstated CHS's admissions statistics and trends, revenues, profits, and cash flow, and has created substantial undisclosed liabilities to Federal and State healthcare programs, private health insurers and patients."

421. On April 11, 2011, CHS stock suffered a precipitous, statistically significant price decline of $14.41 per share, or 35.8%, to a closing price of $25.89. This price decline reflected the market's reassessment of the value of CHS's operations and its attractiveness as a potential participant in future health care industry consolidation. CHS reported trading volume totaled 44.7 million shares on April 11, 2011. April 11, 2011 was at the time, and remains to this day, the date of the largest price decline and highest trading volume in CHS's history.

422.     In its April 11, 2011 press release, CHS asserted "Tenet's allegations are completely without merit and we intend to vigorously defend ourselves…Providing high-quality patient care is the Company's most important priority." CHS also rejected the lawsuit as a "self-serving" tactic to ward off CHS's hostile takeover bid.

423.     On the same day, Wells Fargo reported that Cash told Wells Fargo that Blue Book use was discontinued in 25-30 hospitals and CHS "planned to convert the remainder of its hospitals to this system by the end of 2011 without any material negative impact." As a result, Wells Fargo maintained its "outperform" rating on CHS stock. SIG Susquehanna Financial, LLP made the same point in concluding CHS had "solid answers to the allegations raised by THC [Tenet]."

424.     Morgan Stanley and Deutsche Bank also expressed confidence in CHS management. On April 13, 2011, Morgan Stanley reported that its "read is that CYH[11] will be able to offer context around its policies that will help near-term sentiment." On April 15, 2011, Deutsche Bank announced it was "increasingly comfortable with CYH's exposure to THC's allegations," believing that CHS's stock value would rebound "once the market becomes more informed about CYH's exposure to THC's allegations."

425.     In an April 18, 2011 press release, Smith reiterated CHS's position that the Tenet litigation was "irresponsible and inaccurate." He also stated "[w]e are confident that our business practices are appropriate. CHS also amended its previous offer to acquire Tenet in an all-cash offer at $6 per share.

426.     CHS's efforts at influencing analysts' sentiment was successful with its stock price partially rebounding from a closing price of $25.89 on April 11, 2011, to a closing price of

---

[11] CYH is the stock symbol for CHS.

$31.38 on April 12, 2011.  CHS stock continued to generally trade within a $29 to $33 per share price range from April 13, 2011 through May 9, 2011.  However, after CHS withdrew its bid to acquire Tenet on May 9, 2011, its common stock began to trade at prices almost exclusively below $30 per share, below its $31.90 price level immediately before the Company's December 9, 2010 public announcement of its offer to acquire Tenet.  CHS's stock price continued to fall further over the next months, closing at $20.28 per share immediately before the Company announced its 3Q 2011 earnings on October 26, 2011.

427.    On April 22, 2011, Tenet announced that the Board of Directors had again unanimously rejected CHS's offer.  Tenet explained that, in addition to finding that the offer still grossly undervalued Tenet, it "could not ignore the concerns regarding disclosure and regulatory compliance that we raised in the lawsuit filed against Community Health on April 11."  The release stated that "[a]lthough [CHS] characterized our claims as 'baseless'…[CHS] subsequently disclosed that [the OIG] issued a subpoena…and that this subpoena was similar in scope to one previously issued by the Attorney General of the State of Texas in November 2010."

428.    On April 22, 2011, after receiving Tenet's rejection, CHS issued a press release expressing disappointment in Tenet's decision and characterizing the Tenet lawsuit as "irresponsible."

429.    The statements in ¶¶ 422, 425, 428 were false and misleading.  As described herein, CHS knew that the Blue Book and the Company's "no observation" policy were used to improperly admit patients who would have been placed in less-profitable observation using InterQual.  Further, CHS was also well aware that the tools the Company used to boost its admissions numbers, including the Blue Book, Pro-MED, admissions benchmarks and physician

incentives, put CHS at risk for substantial non-compliance with Medicare, which could subject the Company to government investigations and fines. It also raised questions whether CHS's financial pressure on physicians or hospital staff conflicted with its stated "quality of care" priority. In fact, Defendants knew that CHS's admissions practices were the subject of numerous governmental investigations, which resulted in a substantial payment to the DOJ to settle those claims.

### First Quarter 2011

430.    On April 27, 2011, after the close of business, CHS issued financial results for the first quarter ending March 31, 2011 (the "1Q 2011 Release"). In the release, CHS disclosed that although total admissions increased 1.4% from 1Q 2010, same-store admissions decreased by 1.4% from the prior year period.

431.    On April 28, 2011, the Company filed its Form 10-Q, which was signed by CEO Smith and CFO Cash (the "1Q 2011 Form 10-Q"). In the 1Q 2011 Form 10-Q, the Company attributed the decrease in same-store admissions to a decrease in admissions from lower birthrates "driven by the downturn in the economy, reductions in one day stays of which over 75% related to non-Medicare patients, [and] reductions due to weather and service closings."

432.    That same day, CHS also held its 1Q 2011 earnings call, during which the Company provided an 112-slide PowerPoint presentation titled "CHS Response Presentation" (later filed with the SEC as an attachment to a Form 8-K), which refuted the allegations made against the Company by Tenet.

433.    In the earnings call, Smith suggested that the shift in revenue from inpatient to outpatient was due, in part, on the "unintended result of the economy over the last number of years," which was a high level of unemployment (the implication being that in times of high

unemployment, prospective patients postpone and defer procedures). Smith explained that when "more people get employed or go back to work, then the commercial enrollment will go up, which will drive the commercial admissions."

434. Smith's focus on the economy as driving admissions was materially misleading and incomplete in failing to account for the effect on admission due to CHS hospitals' change in admissions criteria. As Cash long made clear to CHS's Management Committee, "82% of admissions are not related to economy."

435. On the same call, Cash addressed Pro-MED, representing that "[t]his system does not order tests. This system does not make any recommendation to physicians to admit patients, place patients in observation, or discharge patients." However, Cash falsely minimized Pro-MED's functions by characterizing it as exclusively a tracking system in the ED. On the contrary, Pro-MED was used to influence physician decision-making by systematically ordering patient tests through test-mapping.

436. During the call, Lynn T. Simon ("Simon"), CHS's SVP and Chief Quality Officer, denied that CHS offered incentive payments to emergency department physicians to admit higher numbers of patients, stating "CHS maintains strong controls regarding physician contracts, and we do not believe that there have been any bonus payments to physicians related to ER admissions." CHS had previously made this same misleading claim to analysts after news of the *Tenet litigation* broke.

437. However, CHS failed to disclose that it provided monetary incentives at all levels of its hospitals to systematically boost ED admission rates. For example, in 2009, two emergency department staff members of Alta Vista Hospital sent CHS management letters in which, although written separately and at different times, they both reported that emergency

department physicians were receiving bonuses – called a "risk pool" – for "the number of people that they see and admit." "The more [admissions] they get, the more the bonus." In January 2010, Cherokee Medical Center told Division President Miller: "I feel very good about the incentive plan we have put in place for our ER physicians…and it seems to be having a positive effect."

438. In its presentation, CHS repeated many of the same assertions it had made since its initial April 11, 2011 denial of Tenet's allegations, including:

(a) "Tenet's lawsuit has no merit…and no material impact on CHS operations going forward."

(b) "We believe that Tenet is wrong in claiming CHS forced observations into inappropriate admissions at Triad."

(c) "Pro-MED does not order tests."

(d) "[N]o statistical correlation exists between outpatient observation visits and inpatient admission at CHS hospitals."

(e) Tenet makes a faulty inference that "all observation cases are inappropriate admission [which] ignores patients treated and released from ER."

(f) "CHS emergency room admission rate is in line with peer group."

439. The foregoing representations in items (a)-(c) were materially false and misleading for the reasons set forth in ¶¶ 15-20, 370, 464, 466.

440. CHS's claim that there was no "statistical" correlation between outpatient observation visits and inpatient admissions was materially misleading and incomplete in failing to disclose that CHS's practices produced a direct and meaningful correlation between the two. In October 2007, CHS told the CEO at its newly acquired Greenbrier Hospital (a Triad Hospital) that by "using CHS 'Blue Book' criteria…the hospital should experience a significant reduction in Medicare and other outpatient observation status patients and a significant increase in

inpatient admission." Lipp made it abundantly clear that "we want to avoid observation as much as possible" and that applying the Blue Book would result in increasing one-day stays and reduce observation numbers.

441. Moreover, the Blue Book's exclusion of observation status produced CHS's desired result. Tenet's expert analysis showed that one year after the acquisition of Triad hospitals, the observation rate dropped 52% while the one-day stay admission rate increased by about 33%. *See* ¶¶ 83, 224, *supra*. Both the large declines in observation rates and increase in the rate of one-day stays were statistically significant.

442. Lead Plaintiff's healthcare data specialist also showed that CHS's 2009 observation rates of 4.89% were substantially below the national average of 12.7% and CHS's peers and that CHS's admission rate was substantially above the national average. In addition, CHS saw a rapid increase in CHS's one-day stays, which is a recognized "red flag" to the government. Nearly 70% of CHS's hospitals were substantially above the national average for the number of ED admits with one-day stays in 2009.

443. CHS was also wrong in suggesting in its April 2011 presentation that Tenet's analysis of CHS's low observation rate was flawed in failing to consider the simple explanation that a large number of patients, instead of being placed in observation status, are treated in the ED and discharged.

444. To examine this contention, Lead Plaintiff's expert reviewed calculations using three sets of data: (1) CHS's "ED-to-Observation" rate, as the percentage of all patients presenting to EDs who are treated in observation status; (2) "ED-to-Inpatient" rate, as the percentage of all patients visiting EDs who are admitted to a CHS hospital; and (3) CHS's "ED-to-Home/Other" rate, as the percentage of all patients visiting the EDs who are treated in the ED

on an outpatient basis and then discharged home.  Each of these data sets was adjusted for patient case-mix, teaching status, urban/rural, disproportionate share and size.

445.    Under this methodology, CHS's ED-to-Observation rate (2.01%) is approximately 57% below the national average (4.72%).  CHS's divergence from the national average is statistically significant, meaning that this difference is extremely unlikely to have been the result of chance.

446.    Similarly, the Medicare data shows that CHS has a much higher ED-to-Inpatient rate (40.11%) than the national average (35.76%), and a higher rate than most of its peers.  Again, CHS's divergence from the national average is statistically significant, meaning that this difference is extremely unlikely to have been the result of chance.

447.    In contrast, CHS's ED-to-Home/Other rate (57.99%) is virtually the same as (in fact, slightly lower than) the national average and within the same range as its peer hospital operators.  Thus, CHS's low observation rate is not explained by a higher than normal ED-to-Home/Other rate.

448.    Moreover, the analysis of the Medicare data shows that CHS's low ED-to-Observation rate correlates with its high ED–to-Inpatient rate relative to the industry.  In short, CHS did not discharge patients who would have to be observed at other hospitals.  Rather, CHS admitted these would-be-observation patients to the hospital, generating significantly more revenues that if these patients had been observed after assessment and stabilization in the ED.

449.    Across common patient conditions, such as chest pain, syncope and GI bleeding, CHS's over-admission and under-observation trends are even more persuasive because it makes for a direct comparison for the same medical condition.  For each of these conditions, CHS's substantially higher-than-average admissions rate was approximately double (on a percentage

point basis) CHS's substantially below-average observation rate.  Again, CHS's divergence from the national average ED-to observation and ED-to inpatient rates are statistically significant, meaning that those differences are extremely unlikely to have been the result of chance.

450.     In sum, these analyses of Medicare data showed that CHS was admitting, and did not send home, ED patients who would be observed at other hospitals.

451.     Finally, CHS's representation that "CHS's emergency room admission rate is in line with its peers," (Presentation, p. 36), and the statistical analysis used to support that claim was also materially false and misleading.  As determined by Plaintiff's expert, to make CHS's performance fall within industry norms, CHS presented a faulty analysis that misleadingly aggregated all patient conditions.

452.     However, it was common industry practice to adjust for patient case mix in order to perform an apples-to-apples comparison among peer hospital systems.  Lead Plaintiff's healthcare expert determined that taking case mix differences into account, the data reveals precisely the opposite results than presented by CHS.  In fact, the data, as adjusted, shows CHS is a "consistent outlier" with the highest system-wide ER rate for non-specific chest pain for 2009: over 73% of CHS's hospitals had admission rates above the 80th percentile of the national benchmark.[12]

453.     Moreover, it is appropriate to adjust system-wide ED admission rates to account for the time it takes new hospitals to implement and enforce the Blue Book.  Lead Plaintiff's

---

[12] According to the Short-Term Acute Care Program for Evaluating Payment Patterns Electronic Report ("PEPPER"), which was designed to assist hospitals in monitoring compliance with Medicare guidelines and preventing fraud and abuse, hospitals that are at or above the 80th percentile are outliers that warrant closer scrutiny.  TMF Health Quality Institute. 2011. "Short-Term Acute Care Program for Evaluating Payment Patterns Electronic Report User's Guide, 6th Ed." *Program for Evaluating Payment Patterns Electronic Report. available at* http://www.pepperresources.org.

expert confirms that, when considering 2003-2009 data (within two years of the Triad acquisition) hospitals' one-day stays soared from below the national average to 30% above for all diagnosis groups and 100% above the average for non-specific chest pain.

454. On May 2, 2011, CHS increased its Tenet bid to $7.25 all cash as its best and final offer. CHS stipulated that if Tenet did not begin good faith negotiations by May 9, 2011, "the offer will expire and CHS will withdraw its nominees for election to Tenet's Board of Directors." That afternoon, Cash presented at the Deutsche Bank Annual Healthcare Conference. At the conference, Cash again stated that InterQual was "fairly close to our current Blue Book criteria." Cash also reasserted that Pro-MED "doesn't change to admit or put into observation or anything of that nature. It's simply a tracking system." Cash reiterated his claim concerning Pro-MED at a Merrill Lynch conference on May 11, 2011.

455. The foregoing representations in ¶ 454 were materially false and misleading half-truths. Although modified in 2009 and 2010, the criteria for the Blue Book and InterQual still diverged in many respects. Cash's statement created the false impression that the switch to InterQual did not and would not have any impact on CHS's admissions.

456. Cash also misled investors with respect to Pro-MED because it was used to track compliance with the Blue Book criteria and enforcement of revenue-driving benchmarks. *See*, ¶ 438, *supra*.

457. On May 9, 2011, Tenet issued a press release announcing that it had rejected CHS's final offer. That same day, CHS publicly withdrew its offer.

458. On June 17, 2011, Wells Fargo issued another report supporting CHS's position. Wells Fargo explained that it did not find Tenet's charges convincing based upon CHS's representations in the April 28, 2011 earnings call and presentation, which provided a "detailed

illustration" of how the Company's "lower rate of observation did not drive a meaningfully higher than average admission rate for the company."

459.    On July 28, 2011, CHS issued a press release announcing its 2Q 2011 operating results (the "2Q 2011 Earnings Release").  CHS reported that while total admissions remained flat from 2Q 2010, same-store admissions decreased 2.5% from the prior year and 1Q 2011.

460.    In CHS's 2Q 2011 Form 10-Q filed the same day, and signed by Smith and Cash, the Company attributed the decrease in same-store admissions to a decrease in women's services, fewer flu and respiratory-related admissions, and reduction due to competition and certain service closures.  On CHS's 2Q 2011 earnings call, Smith indicated that the economy was driving higher outpatient rates at the cost of inpatient admissions, and that the situation would remain this way "as long as the economy is in pretty poor shape."

461.    While Defendants attempted to portray the shift from inpatient to outpatient as the result of an industry trend due to economic forces, they failed to disclose that the Company was more vulnerable than other healthcare providers to the shift from inpatient admissions to observations, as CHS could not sustain its high level of inpatient admissions once it began removing the Blue Book from its hospitals.  CHS claimed that the rise of ED patients put into observation was due to a whole host of environmental, economic and service-related factors. While literally true, Defendants failed to disclose that a central reason was that CHS hospitals were no longer relying on the Blue Book's improper admissions criteria.

462.    On August 2, 2011, Deutsche Bank reported that CHS had "confirmed that there was no impact on the day to day operations at any of its hospitals" from the allegations or government investigations, however, CHS misled the analysts in failing to disclose that the hospitals were uniformly seeing a reduction in admissions.

**The October Disclosure**

463.    On October 26, 2011, CHS issued a press release announcing financial results for the third quarter ending September 30, 2011 (the "3Q 2011 Release"). Earnings were modestly lower from 3Q 2010 while same-store admissions decreased 7.0% from the prior year. The Company also filed its Form 10-Q, which was signed by CEO Smith and CFO Cash (the "3Q 2011 Form 10-Q"). The 3Q 2011 Form 10-Q also reported the substantial drop in same-store admissions.

464.    During the 3Q 2011 conference call, Cash conceded that the adverse impact of the transition from the Blue Book to InterQual was company-wide – 75% of the hospitals that converted to InterQual had a decline in inpatient admissions. Smith and Cash attributed the 7.0% admissions decline in part to a "[r]eduction in one day medical admissions," stating that "chest pain admissions accounted for 40% of the decline."

465.    Cash also admitted that CHS's admissions challenge "will continue into the fourth quarter," while Smith acknowledged that "there's no question we've had some adverse impact related to issues…around the Tenet lawsuit."

466.    CHS's reversal of its prior position stunned investors and industry analysts. A J.P. Morgan analyst expressed he was "just a little surprised" to see the steep decline, given that in many rural communities CHS was "the only guy in the market." Kevin Fishbeck of Bank of America remarked that "a 7 percent decline in admissions is just a really big number." The Jeffries Group also observed that CHS "suffered from a sharp decline in admissions."

467.    On October 27, 2011, CHS's stock price dropped by $2.32 per share, or 11.4% from its October 26, 2011 closing price of $20.28 per share. This was a statistically significant price decline. October 27, 2011 trading volume of 8.7 million shares was higher than any date

during the Class Period with the notable exceptions of (1) the day CHS publicly announced its offer to acquire Tenet (December 10, 2010); and (2) four days immediately after Tenet publicly announced its allegations against CHS (April 11, 12, 13, and 18, 2011).

468.     The decline reflected the market recognition that, contrary to the Company's prior representations that the transition to InterQual would not adversely impact CHS's observations, CHS was clearly unable to maintain its level of inpatient admissions. Moreover, the admissions decline highlighted the divergence between Blue Book admissions practices and InterQual's industry-accepted criteria that underlie the Tenet lawsuit.

469.     Recognizing the new reality, analysts were quick to revise their opinion of CHS. On October 28, 2011, Wells Fargo reported that it was downgrading CHS's rating to Market Perform from Outperform. Wells Fargo explained:

> …we had expected CYH's admission practices would see little or no impact from the allegations made by Tenet…this does not appear to be the case. *Same-store inpatient admissions declined by 7% overall and by a greater amount at smaller facilities due to what the company described as negative press it has received because of the allegations by Tenet and subsequent OIG investigation.* Our prior view which was consistent with the company's expectations had been that CYH's admission practices were in line with the industry and therefore would not change significantly. We believe this view was incorrect…CYH's comments about weak admission trends because of the negative press could mean Tenet's claims have more validity than originally thought, in our view.
>
> ***
>
> CYH's acknowledgement that the admission trends were hurt by the negative publicity could make it more likely that the OIG investigation may find some issue with CYH's prior admitting practice, in our view.

470.     Similarly, on October 26, 2011, J.P. Morgan remarked that it found "it[] a bit more troubling…to see inpatient volume drops of this size." Further, while CHS offered "reasonable explanations," J.P. Morgan was not convinced, explaining that "the print [explanation] likely does less to satisfy the market's quests for signs of continued stability than

2Q did. The latter factor is mostly about whether the ongoing investigations will be a meaningful hindrance/distraction...[C]ompared to the 2Q, the 3Q is somewhat less persuasive in diffusing that view."

471. RBC Capital Markets reported on October 28, 2011, "CYH shares sold off after 3Q 2011 results failed to impress." RBC Capital Markets also noted that it found CHS's "[f]undamentals were disappointing."

### CHS Settles with the DOJ

472. On August 4, 2014, the DOJ announced that CHS agreed to pay $98.15 million to settle multiple whistleblower *qui tam* lawsuits which alleged that CHS "knowingly submitted or caused to be submitted claims for payment to the Government healthcare Programs for certain inpatient admissions…that were medically unnecessary and should have been billed as outpatient or observation services."

473. Specifically, the United States alleged that from 2005 to 2010, CHS engaged in a deliberate corporate-driven scheme to increase admissions of inpatient beneficiaries over the age of 65 who frequented EDs at 119 CHS hospitals. CHS then improperly submitted claims for repayment to Medicare, Medicaid and the Department of Defense's Tricare program in violation of the False Claims Act.

474. In the DOJ's August 4, 2014 press release, United States Attorney for the Middle District of Tennessee, David Rivera, observed that "[t]his is the largest False Claims Act settlement in the district and it reaffirms this office's commitment to investigate and pursue health care fraud that compromises the integrity of our health care system." Rivera emphasized that his office "is committed to ensuring that all companies billing government healthcare programs are responsible corporate citizens and that hospital providers do not engage in schemes

to increase medically unnecessary in-patient admissions of government healthcare program beneficiaries in order to increase profits."

475.     In the release, U.S. Attorney Anne M. Tompkins for the Western District of North Carolina echoed these sentiments: "Health care providers should make treatment decisions based on patients' medical needs, not profit margins…We will not allow this type of misconduct to compromise the integrity of our health care system."  (Emphasis added).

476.     As part of CHS's settlement with the DOJ, CHS also entered into a Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services – Office of the Inspector General, to create a compliance program that addressed and ensured adherence to the requirements of Medicare and other Federal health care programs.  CHS was required under the CIA to engage in significant compliance efforts for the next five years.  The CIA also created several new measures that gave the HSS-OIG additional oversight over the Company.

477.     As one of the compliance measures, CHS was required to overhaul its policies and procedures to cover, *inter alia*, Federal health care program requirements and CHS's code of conduct.  The CIA mandated CHS amend its billing and reimbursement requirements to address (i) the proper and accurate submissions of claims and cost reports to Federal health care programs, (ii) the proper and accurate documentation of medical records, (iii) the proper and accurate assignment and designation of patients into inpatient, outpatient, or observation status, and (iv) the necessary and appropriate length of stays and timely discharges for all patients.

478.     Regarding the documentation of medical records, CHS was required to include provisions that would ensure physicians were aware of relevant Federal health care program requirements governing admission and any relevant Medicare regulation regarding treatment of a patient as inpatient.  Further, the Company was obligated to inform Case Management

employees of the requirements for determining the medical necessity and appropriateness of inpatient admissions, such as applicable Medicare rules and regulations.

479. CHS also agreed to employ an independent review organization to ensure CHS was in compliance with both the CIA and Federal health care program requirements.

480. As explained in the August 4, 2014 release by Inspector General David R. Levinson, "*a rigorous multi-year Corporate Integrity Agreement requiring that the company commit to compliance with the law [will] ensure the company's fraudulent past is not its future*." (Emphasis added).

## CLASS ACTION ALLEGATIONS

481. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class, which consists of all those who purchased or otherwise acquired CHS common stock during the Class Period and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

482. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CHS common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Members of the Class may be identified from records maintained by CHS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

483. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

484. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

485. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)     were the federal securities laws violated by Defendants' acts as alleged herein;

      (b)     were material misrepresentations made by Defendants to the investing public during the Class Period about the business, operations, and management of CHS;

      (c)     did Defendants act knowingly or recklessly in issuing false and misleading statements;

      (d)     did Defendants' conduct artificially inflate the prices of CHS common stock during the Class Period;

      (e)     did the members of the Class sustain damages and if so, what is the proper measure of damages; and

      (f)     does pre-judgment interest continue to accrue to compensate the Class for the time value of money since the alleged wrongdoing.

486. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as

a class action.

487. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or omitted facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) CHS common stock traded in efficient markets;

(d) the Company's shares traded with liquidity in moderate to heavy volume during the Class Period;

(e) the Company's common stock traded on the NYSE, and the Company was covered by numerous securities analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to overvalue the Company's common stock; and

(g) Lead Plaintiff and members of the Class purchased and/or sold CHS common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

488. The extension of the end Class Period through October 26, 2011, and the claims asserted during that extended period, relate back to the filing of the initial complaint in this consolidated action on May 9, 2011. Lead Plaintiff purchased CHS shares at inflated prices during this extended period. *See* Amended Certifications (appended to this complaint).

489. The claims asserted during this period arise out of the *same course of conduct* challenged in the initial complaints and as further clarified in the Consolidated Complaint filed on July 12, 2012. Dkt. No. 68. Between April 11, 2011 and October 26, 2011, CHS repeatedly publicly denied the allegations set forth in Tenet Complaint and misrepresented the true impact discontinuing the Blue Book would have on CHS financial performance.

490. Defendants were on notice of the facts that support extending the close of the

Class Period to October 26, 2011 since these facts were substantially alleged in the Consolidated Complaint. *See e.g.,* Dkt. No. 68, ¶¶ 180-183. The Consolidated Complaint also alleged in detail how, after Tenet filed its complaint, CHS went to great lengths to deny Tenet's allegations by contacting analysts who followed CHS stock and by preparing a 112-page presentation on April 28, 2011, in an attempt to discredit Tenet and its claims. *Id.* at ¶¶ 28, 33, 195-96, 198-204.

491.    Accordingly, pursuant to Fed. R. Civ. P. 15(c)(1)(B), the allegations in this complaint relate back to the filing of the Initial Complaint.

## NO SAFE HARBOR

492.    CHS's generalized "Safe Harbor" warnings that accompanied its forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those FLS from liability. For example, CHS's warnings in its 2010 Form 10-K that the statements included in the annual report "could differ from actual future results" (p. 31) was generalized boilerplate that was not meaningful and failed to provide substantive information tailored to the known risk that CHS faced; for example, that discontinued use of aggressive admissions practices would have a substantial negative impact on its same store admissions and ED revenues going forward.

493.    Moreover, Defendants' risk disclosures were themselves misleading in failing to disclose current facts that (a) undercut the reliability and good faith basis of the FLS, and (b) minimized and concealed the actual heightened risks that the Company faced.

494.    Defendants are also liable for any false FLS pleaded because, at the time each FLS was made, Smith or Cash knew the FLS was false and they authorized and/or approved the FLS knowing that the FLS was false.

495.    The historic or present tense statements, including opinion statements relating to the Company's current condition and/or compliance with federal rules and regulations, made by

Defendants, were not forward looking.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of**
**Section 10(b) and Rule 10b-5 Promulgated Thereunder**

496.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

497.    During the Class Period, Defendants engaged in a course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; and made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase and sale of common stock.  Such practices were intended to, and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of CHS common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase CHS common stock at artificially inflated prices.  In furtherance of this course of conduct, Defendants, and each of them took the actions set forth herein.

498.    Information showing that the Individual Defendants acted knowingly, or with reckless disregard for the truth, is peculiarly within their knowledge and control, because as senior officers and/or directors of CHS, the Individual Defendants had knowledge of the details of CHS's internal affairs and core operations.

499.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CHS common stock. Lead Plaintiff and the Class would not have purchased CHS common stock at the prices they paid, had they been aware that the market prices were artificially and falsely inflated by Defendants' misleading statements. Lead Plaintiff and the Class have sold CHS stock purchased at inflated prices and suffered damage as a result. The market price of CHS common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

500.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

501.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act

502.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

503.     During the Class Period, the Individual Defendants participated in the operation and management of CHS, and conducted and participated, directly and indirectly, in the conduct of CHS's business affairs. Because of their senior positions, they knew the adverse non-public information about CHS's misstatements concerning CHS's improper admission practices and unsustainable operating strategy.

504. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CHS's business practices, financial condition and results of operations, and to correct promptly any public statements issued by CHS that had become materially false or misleading.

505. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings that CHS disseminated in the marketplace during the Class Period, as well as statements made during earnings and securities and healthcare analyst conference calls. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CHS to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CHS within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CHS securities.

506. Each of the Individual Defendants, therefore, acted as a controlling person of CHS. By reason of their senior management positions and/or being directors of CHS, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CHS to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CHS and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

507. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CHS.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment against Defendants as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Lead Plaintiff and the other members of the Class pre- and post-judgment interest, as well as their reasonable attorneys' fees, experts' fees, and other costs; and

D.    Awarding such other equitable and injunctive relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff demands trial by jury of all issues that may be so tried.

Dated:  October 5, 2015

PROVOST UMPHREY, LLP

W. Michael Hamilton
TN Bar No. 10720
Hobbs Building, Suite 303
4205 Hillsboro Pike
Nashville, Tennessee 37215
Tel:  (615) 297-1932
Fax:  (615) 297-1986
E-mail: MHamilton@provostumphrey.com

LOWEY DANNENBERG COHEN
    & HART, P.C.

By:  /s/ Barbara J. Hart_____
    Barbara J. Hart        (admitted *pro hac vice*)
    David C. Harrison    (admitted *pro hac vice*)
    Scott V. Papp          (admitted *pro hac vice*)
    One North Broadway, Suite 509
    White Plains, NY 10601
    Tel:  (914) 997-0500
    Fax:  (914) 997-0035
    E-mail: bhart@lowey.com
    E-mail: dharrison@lowey.com
    E-mail: spapp@lowey.com

    *Attorneys for Lead Plaintiff*

## AMENDED CERTIFICATION RE:  LEAD PLAINTIFF

I, Kathryn E. Diaz, as General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.    I am fully authorized to enter into and execute this Certification on behalf of the New York City Employees' Retirement System (hereinafter "NYCERS").

2.    NYCERS did not purchase or acquire the securities of Community Health Services Inc. ("CHS") at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.    I have reviewed the First Amended Consolidated Class Action Complaint filed against CHS and others, captioned *Norfolk County Retirement Systems v. Community Health, Inc.*, 11-cv-00433 (M.D. Tenn.), alleging violations of the securities laws on behalf of all those who purchase or otherwise acquired CHS securities from July 27, 2006 through and including October 26, 2011 (the "Class Period").  As of this date, NYCERS adopts these claims and Class Period.

4.    NYCERS is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.    NYCERS's transactions in the securities of CHS during the Class Period are identified in the annexed chart.

6.    NYCERS has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *Jahm v. Bankrate, Inc. et al*, No. 9:14-cv-81323 (S.D. Fla.) (not appointed) and *In re American Realty Capital Properties, Inc.*, No. 1:15-mc-00040 (S.D.N.Y.) (not appointed).  As previously reported in its original

Certification, NYCERS sought to serve as lead plaintiff in *In re Wachovia Equity Securities Litigation*, No. 1:08-cv-06171 (S.D.N.Y.) (appointed).

7.     NYCERS will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  October 2, 2015

Kathryn E. Diaz
General Counsel for the Office of the New
York City Comptroller

NYC Retirement Systems
NYCERS
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| **Opening Position** | | 130,549.00 | | | |
| 8/10/2006 | Buy | 2,181.00 | 36.77 | (80,222.85) | |
| 8/29/2006 | Buy | 1,370.00 | 38.89 | (53,303.28) | |
| 8/29/2006 | Buy | 2,077.00 | 38.89 | (80,784.92) | |
| 10/5/2006 | Sell | (13,400.00) | 37.11 | | 496,757.57 |
| 10/9/2006 | Sell | (21,400.00) | 36.00 | | 769,646.60 |
| 10/30/2006 | Sell | (900.00) | 32.35 | | 29,087.55 |
| 10/31/2006 | Buy | 1,251.00 | 32.45 | (40,616.84) | |
| 10/31/2006 | Buy | 106.00 | 32.45 | (3,440.23) | |
| 11/17/2006 | Sell | (600.00) | 33.33 | | 19,987.84 |
| 12/4/2006 | Sell | (5,000.00) | 36.00 | | 179,868.97 |
| 12/4/2006 | Sell | (3,300.00) | 35.98 | | 118,670.95 |
| 12/5/2006 | Sell | (1,800.00) | 35.90 | | 64,586.69 |
| 12/5/2006 | Sell | (9,100.00) | 35.86 | | 326,075.74 |
| 12/5/2006 | Sell | (1,400.00) | 35.95 | | 50,314.45 |
| 1/9/2007 | Buy | 835.00 | 36.07 | (30,122.63) | |
| 1/29/2007 | Buy | 880.00 | 35.48 | (31,226.80) | |
| 2/9/2007 | Buy | 936.00 | 37.30 | (34,917.48) | |
| 3/1/2007 | Sell | (500.00) | 37.22 | | 18,601.67 |
| 3/27/2007 | Buy | 300.00 | 35.32 | (10,602.12) | |
| 4/5/2007 | Buy | 100.00 | 35.60 | (3,561.50) | |
| 5/25/2007 | Sell | (1,343.00) | 37.25 | | 50,002.48 |
| 6/22/2007 | Sell | (2,524.00) | 40.70 | | 102,715.63 |
| 6/22/2007 | Buy | 4,500.00 | 40.70 | (183,150.00) | |
| 6/25/2007 | Buy | 200.00 | 41.19 | (8,241.50) | |
| 7/2/2007 | Sell | (800.00) | 40.21 | | 32,156.30 |
| 8/27/2007 | Sell | (200.00) | 33.30 | | 6,657.03 |
| 8/27/2007 | Sell | (400.00) | 33.30 | | 13,314.07 |
| 9/24/2007 | Buy | 100.00 | 32.84 | (3,285.29) | |
| 9/24/2007 | Buy | 200.00 | 32.84 | (6,570.58) | |
| 11/26/2007 | Sell | (200.00) | 30.61 | | 6,119.06 |
| 11/30/2007 | Sell | (702.00) | 33.26 | | 23,341.77 |
| 11/30/2007 | Buy | 702.00 | 0.00 | (23,460.84) | |
| 12/21/2007 | Buy | 500.00 | 36.69 | (18,356.00) | |
| 1/9/2008 | Buy | 200.00 | 35.40 | (7,083.00) | |
| 1/28/2008 | Buy | 1,555.00 | 32.15 | (50,008.80) | |
| 2/8/2008 | Buy | 1,557.00 | 0.00 | (49,782.74) | |
| 2/27/2008 | Buy | 620.00 | 32.88 | (20,414.18) | |
| 2/27/2008 | Buy | 2,560.00 | 32.88 | (84,290.82) | |
| 2/28/2008 | Buy | 645.00 | 31.85 | (20,574.02) | |
| 2/28/2008 | Buy | 2,660.00 | 31.85 | (84,847.88) | |
| 3/4/2008 | Sell | (100.00) | 32.31 | | 3,229.42 |
| 3/31/2008 | Buy | 200.00 | 33.57 | (6,717.00) | |
| 4/10/2008 | Buy | 600.00 | 36.72 | (22,039.50) | |
| 4/30/2008 | Buy | 400.00 | 37.53 | (15,010.80) | |
| 5/28/2008 | Buy | 200.00 | 35.29 | (7,061.32) | |
| 6/13/2008 | Sell | (24,185.00) | 34.77 | | 840,912.57 |

NYC Retirement Systems
NYCERS
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| 6/25/2008 | Sell | (100.00) | 33.33 | | 3,331.15 |
| 6/25/2008 | Buy | 100.00 | 33.56 | (3,357.34) | |
| 6/27/2008 | Buy | 700.00 | 33.40 | (23,380.00) | |
| 6/27/2008 | Buy | 300.00 | 33.38 | (10,015.38) | |
| 7/17/2008 | Buy | 300.00 | 35.55 | (10,672.20) | |
| 7/21/2008 | Buy | 60.00 | 35.86 | (2,152.39) | |
| 7/21/2008 | Buy | 230.00 | 35.86 | (8,250.84) | |
| 7/25/2008 | Buy | 1,100.00 | 34.68 | (38,179.46) | |
| 7/31/2008 | Sell | (600.00) | 31.89 | | 19,124.41 |
| 8/19/2008 | Buy | 29,972.00 | 34.57 | (1,036,368.82) | |
| 8/28/2008 | Del. Free | (29,972.00) | 0.00 | 0.00 | |
| 9/18/2008 | Buy | 380.00 | 31.23 | (11,885.37) | |
| 9/18/2008 | Buy | 1,580.00 | 31.23 | (49,418.13) | |
| 11/12/2008 | Buy | 2,000.00 | 16.29 | (32,683.20) | |
| 11/14/2008 | Buy | 1,000.00 | 18.22 | (18,273.60) | |
| 1/12/2009 | Buy | 400.00 | 16.85 | (6,747.48) | |
| 2/17/2009 | Buy | 1,700.00 | 18.68 | (31,796.29) | |
| 3/3/2009 | Sell | (1,400.00) | 13.70 | | 19,116.75 |
| 4/9/2009 | Buy | 2,700.00 | 15.50 | (41,912.10) | |
| 5/8/2009 | Buy | 13,347.00 | 24.31 | (324,580.35) | |
| 5/28/2009 | Sell | (100.00) | 25.82 | | 2,580.59 |
| 5/28/2009 | Sell | (100.00) | 25.74 | | 2,572.43 |
| 6/23/2009 | Sell | (260.00) | 23.98 | | 6,223.03 |
| 6/23/2009 | Sell | (1,070.00) | 23.98 | | 25,610.22 |
| 6/26/2009 | Sell | (1,094.00) | 25.50 | | 27,887.74 |
| 6/26/2009 | Buy | 400.00 | 25.52 | (10,208.00) | |
| 6/26/2009 | Buy | 100.00 | 25.50 | (2,550.47) | |
| 6/26/2009 | Sell | (300.00) | 25.52 | | 7,646.80 |
| 7/2/2009 | Buy | 100.00 | 24.86 | (2,487.85) | |
| 7/2/2009 | Buy | 100.00 | 24.95 | (2,496.14) | |
| 7/29/2009 | Sell | (6,341.00) | 29.56 | | 187,385.04 |
| 8/7/2009 | Sell | (420.00) | 30.74 | | 12,890.34 |
| 8/7/2009 | Sell | (1,750.00) | 30.74 | | 53,709.79 |
| 8/26/2009 | Sell | (100.00) | 30.10 | | 3,009.05 |
| 8/26/2009 | Sell | (100.00) | 30.10 | | 3,009.47 |
| 10/15/2009 | Buy | 1,027.00 | 36.01 | (36,992.54) | |
| 11/25/2009 | Buy | 200.00 | 31.90 | (6,381.46) | |
| 11/25/2009 | Buy | 300.00 | 31.76 | (9,531.51) | |
| 12/3/2009 | Buy | 850.00 | 30.33 | (25,790.16) | |
| 1/5/2010 | Sell | (200.00) | 36.56 | | 7,309.95 |
| 1/5/2010 | Sell | (300.00) | 36.52 | | 10,953.94 |
| 1/15/2010 | Sell | (310.00) | 38.38 | | 11,896.35 |
| 1/21/2010 | Sell | (300.00) | 33.48 | | 10,028.45 |
| 1/21/2010 | Sell | (1,230.00) | 33.48 | | 41,116.65 |
| 3/19/2010 | Buy | 1,307.00 | 37.83 | (49,463.02) | |
| 3/22/2010 | Sell | (540.00) | 39.82 | | 21,499.76 |
| 4/8/2010 | Sell | (800.00) | 38.38 | | 30,683.56 |
| 7/21/2010 | Sell | (800.00) | 30.43 | | 24,304.14 |

# NYC Retirement Systems
## NYCERS
### Community Health Systems, Inc.
### Common Stock Transactions
### (AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| 8/13/2010 | Sell | (871.00) | 30.21 | | 26,301.13 |
| 8/13/2010 | Sell | (4,872.00) | 30.17 | | 146,973.57 |
| 8/13/2010 | Sell | (499.00) | 30.21 | | 15,067.99 |
| 8/13/2010 | Sell | (2,784.00) | 30.17 | | 83,984.90 |
| 8/26/2010 | Buy | 100.00 | 27.16 | (2,717.36) | |
| 8/26/2010 | Buy | 400.00 | 27.16 | (10,867.24) | |
| 8/31/2010 | Sell | (800.00) | 25.93 | | 20,704.36 |
| 9/28/2010 | Sell | (651.00) | 30.45 | | 19,806.27 |
| 9/28/2010 | Sell | (2,674.00) | 30.45 | | 81,354.80 |
| 9/29/2010 | Sell | (74.00) | 30.42 | | 2,249.22 |
| 9/29/2010 | Sell | (306.00) | 30.42 | | 9,300.83 |
| 10/18/2010 | Buy | 719.00 | 32.19 | (23,146.41) | |
| 12/17/2010 | Buy | 1,382.00 | 36.84 | (50,924.49) | |
| 1/18/2011 | Buy | 88,700.00 | 37.49 | (3,325,983.90) | |
| 1/24/2011 | Buy | 6,100.00 | 0.00 | (212,739.33) | |
| 3/1/2011 | Sell | (100.00) | 40.04 | | 4,002.47 |
| 3/1/2011 | Sell | (400.00) | 40.81 | | 16,321.12 |
| 3/16/2011 | Buy | 300.00 | 38.39 | (11,517.00) | |
| 3/16/2011 | Buy | 68,945.00 | 39.00 | (2,689,048.04) | |
| 3/17/2011 | Sell | (500.00) | 38.70 | | 19,345.92 |
| 3/25/2011 | Sell | (825.00) | 38.94 | | 32,122.82 |
| 3/30/2011 | Buy | 100.00 | 40.27 | (4,028.48) | |
| 3/30/2011 | Buy | 400.00 | 40.69 | (16,279.68) | |
| 4/27/2011 | Buy | 2,113.00 | 31.36 | (66,274.25) | |
| 5/25/2011 | Sell | (100.00) | 28.50 | | 2,850.80 |
| 5/31/2011 | Buy | 87.00 | 28.64 | (2,492.22) | |
| 6/14/2011 | Sell | (5,125.00) | 26.17 | | 134,169.90 |
| 6/24/2011 | Buy | 100.00 | 24.81 | (2,481.53) | |
| 6/24/2011 | Sell | (100.00) | 24.44 | | 2,444.51 |
| 6/30/2011 | Sell | (1,800.00) | 25.67 | | 46,211.86 |
| 7/14/2011 | Buy | 6,500.00 | 25.26 | (164,227.70) | |
| 8/16/2011 | Buy | 200.00 | 20.91 | (4,183.30) | |
| 9/8/2011 | Buy | 990.00 | 18.86 | (18,680.10) | |
| 9/20/2011 | Sell | (7,100.00) | 17.93 | | 127,371.55 |
| 9/20/2011 | Sell | (16,100.00) | 17.93 | | 288,828.45 |
| 9/30/2011 | Buy | 100.00 | 16.64 | (1,664.63) | |

**<u>AMENDED CERTIFICATION RE:  LEAD PLAINTIFF</u>**

I, Kathryn E. Diaz, as General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of the New York City Police Pension Fund (hereinafter "Police").

2.      Police did not purchase or acquire the securities of Community Health Systems Inc. ("CHS") at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I have reviewed the First Amended Consolidated Class Action Complaint filed against CHS and others, captioned *Norfork County Retirement Systems v. Community Health, Inc.*, 11-cv-00433 (M.D. Tenn.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired CHS securities from July 27, 2006 through and including October 26, 2011 (the "Class Period").  As of this date Police adopts these claims and Class Period.

4.      Police is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.      Police's transactions in the securities of CHS during the Class Period are identified in the annexed chart.

6.      Police has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *Jahm v. Bankrate, Inc. et al*, No. 9:14-cv-81323 (S.D. Fla.) (not appointed) and *In re American Realty Capital Properties, Inc.*, No. 1:15-mc-00040 (S.D.N.Y.) (not appointed).  As previously reported in its original

Certification, Police sought to serve as lead plaintiff in *In re Wachovia Equity Securities Litigation*, No. 1:08-cv-06171 (S.D.N.Y.) (appointed).

7.      Police will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  October 2, 2015

Kathryn E. Diaz
General Counsel for the Office of the New
York City Comptroller

NYC Retirement Systems
Police
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| **Opening Position** | | 40,863.00 | | | |
| 10/27/2006 | Buy | 300.00 | 32.51 | (9,768.96) | |
| 10/30/2006 | Buy | 5,300.00 | 32.36 | (171,748.09) | |
| 10/31/2006 | Buy | 900.00 | 32.33 | (29,143.98) | |
| 11/1/2006 | Buy | 541.00 | 32.32 | (17,515.15) | |
| 1/4/2007 | Sell | (6,200.00) | 36.55 | | 226,355.04 |
| 1/5/2007 | Sell | (3,500.00) | 36.17 | | 126,457.06 |
| 2/5/2007 | Sell | (3,500.00) | 37.23 | | 130,160.29 |
| 3/19/2007 | Sell | (8,904.00) | 36.82 | | 327,662.18 |
| 6/22/2007 | Buy | 1,800.00 | 40.70 | (73,260.00) | |
| 12/27/2007 | Buy | 300.00 | 36.78 | (11,039.40) | |
| 12/27/2007 | Buy | 50.00 | 36.81 | (1,841.25) | |
| 1/15/2008 | Buy | 200.00 | 35.17 | (7,037.34) | |
| 2/27/2008 | Buy | 150.00 | 32.88 | (4,938.92) | |
| 2/28/2008 | Buy | 160.00 | 31.85 | (5,103.63) | |
| 3/4/2008 | Sell | (50.00) | 32.31 | | 1,614.71 |
| 3/31/2008 | Buy | 100.00 | 33.57 | (3,358.50) | |
| 4/4/2008 | Buy | 4,500.00 | 36.33 | (163,521.00) | |
| 4/10/2008 | Buy | 300.00 | 36.72 | (11,019.75) | |
| 4/30/2008 | Buy | 200.00 | 37.53 | (7,505.40) | |
| 5/23/2008 | Buy | 400.00 | 35.56 | (14,238.20) | |
| 5/23/2008 | Buy | 286.00 | 35.52 | (10,166.79) | |
| 5/27/2008 | Buy | 214.00 | 35.49 | (7,602.24) | |
| 5/28/2008 | Buy | 50.00 | 35.29 | (1,765.33) | |
| 6/3/2008 | Buy | 1,400.00 | 36.04 | (50,491.00) | |
| 6/3/2008 | Buy | 3,800.00 | 36.00 | (136,863.08) | |
| 6/5/2008 | Buy | 2,700.00 | 36.54 | (98,781.12) | |
| 6/13/2008 | Sell | (300.00) | 34.77 | | 10,431.00 |
| 6/19/2008 | Sell | (200.00) | 33.46 | | 6,687.96 |
| 6/27/2008 | Buy | 100.00 | 33.40 | (3,340.00) | |
| 6/27/2008 | Buy | 100.00 | 33.38 | (3,338.46) | |
| 7/11/2008 | Sell | (400.00) | 34.61 | | 13,831.92 |
| 7/17/2008 | Buy | 200.00 | 35.55 | (7,114.80) | |
| 7/21/2008 | Buy | 10.00 | 35.86 | (358.73) | |
| 7/24/2008 | Sell | (500.00) | 34.18 | | 17,076.85 |
| 7/31/2008 | Sell | (7,700.00) | 31.68 | | 243,882.27 |
| 9/18/2008 | Buy | 100.00 | 31.23 | (3,127.73) | |
| 11/12/2008 | Buy | 1,300.00 | 16.29 | (21,244.08) | |
| 11/14/2008 | Buy | 600.00 | 18.22 | (10,964.16) | |
| 1/12/2009 | Buy | 200.00 | 16.85 | (3,373.74) | |
| 2/17/2009 | Buy | 1,000.00 | 18.80 | (18,822.00) | |
| 3/3/2009 | Sell | (800.00) | 13.70 | | 10,923.85 |
| 4/9/2009 | Buy | 1,600.00 | 15.48 | (24,793.44) | |
| 5/1/2009 | Buy | 1,300.00 | 22.68 | (29,506.49) | |
| 5/4/2009 | Buy | 336.00 | 22.41 | (7,535.27) | |
| 5/8/2009 | Buy | 1,677.00 | 24.31 | (40,782.28) | |
| 5/28/2009 | Sell | (50.00) | 25.82 | | 1,290.29 |

NYC Retirement Systems
Police
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| 6/17/2009 | Buy | 80.00 | 25.06 | (2,006.20) | |
| 6/23/2009 | Sell | (70.00) | 23.98 | | 1,675.43 |
| 6/26/2009 | Buy | 300.00 | 25.52 | (7,656.00) | |
| 6/26/2009 | Buy | 1,308.00 | 25.52 | (33,380.94) | |
| 6/26/2009 | Sell | (634.00) | 25.50 | | 16,161.63 |
| 7/21/2009 | Buy | 1,226.00 | 29.07 | (35,641.05) | |
| 7/29/2009 | Sell | (796.00) | 29.56 | | 23,522.87 |
| 8/7/2009 | Sell | (100.00) | 30.74 | | 3,069.13 |
| 10/15/2009 | Buy | 561.00 | 36.01 | (20,207.22) | |
| 11/24/2009 | Buy | 1,283.00 | 32.00 | (41,068.83) | |
| 11/25/2009 | Buy | 50.00 | 31.76 | (1,588.59) | |
| 11/25/2009 | Buy | 50.00 | 31.90 | (1,595.37) | |
| 12/3/2009 | Buy | 540.00 | 30.35 | (16,395.55) | |
| 1/5/2010 | Sell | (50.00) | 36.52 | | 1,825.66 |
| 1/5/2010 | Sell | (50.00) | 36.56 | | 1,827.49 |
| 1/15/2010 | Sell | (200.00) | 38.38 | | 7,675.07 |
| 1/21/2010 | Sell | (70.00) | 33.48 | | 2,339.97 |
| 1/27/2010 | Buy | 62.00 | 33.39 | (2,070.34) | |
| 1/27/2010 | Buy | 450.00 | 33.15 | (14,926.19) | |
| 3/5/2010 | Sell | (200.00) | 36.94 | | 7,384.40 |
| 3/5/2010 | Sell | (147.00) | 36.85 | | 5,415.04 |
| 3/19/2010 | Buy | 262.00 | 37.83 | (9,915.31) | |
| 3/22/2010 | Sell | (340.00) | 39.82 | | 13,536.88 |
| 7/21/2010 | Sell | (600.00) | 30.43 | | 18,228.11 |
| 8/13/2010 | Sell | (566.00) | 30.21 | | 17,091.26 |
| 8/13/2010 | Sell | (3,162.00) | 30.17 | | 95,388.01 |
| 8/19/2010 | Buy | 611.00 | 29.44 | (17,997.01) | |
| 8/26/2010 | Buy | 100.00 | 27.16 | (2,716.81) | |
| 8/31/2010 | Sell | (500.00) | 25.93 | | 12,940.23 |
| 10/18/2010 | Sell | (180.00) | 31.94 | | 5,747.30 |
| 12/22/2010 | Buy | 14,981.00 | 37.08 | (555,597.35) | |
| 12/23/2010 | Buy | 7,700.00 | 37.18 | (286,306.79) | |
| 12/27/2010 | Buy | 1,900.00 | 36.25 | (68,886.21) | |
| 12/28/2010 | Buy | 100.00 | 35.78 | (3,578.64) | |
| 12/29/2010 | Buy | 219.00 | 36.82 | (8,065.90) | |
| 1/4/2011 | Buy | 600.00 | 38.50 | (23,109.12) | |
| 1/10/2011 | Buy | 1,256.00 | 37.10 | (46,610.41) | |
| 1/10/2011 | Buy | 15,593.00 | 37.10 | (578,679.62) | |
| 1/10/2011 | Buy | 2,107.00 | 36.80 | (77,542.87) | |
| 1/10/2011 | Buy | 25,907.00 | 36.80 | (953,442.37) | |
| 1/11/2011 | Buy | 200.00 | 37.42 | (7,485.62) | |
| 1/11/2011 | Buy | 2,300.00 | 37.42 | (86,084.63) | |
| 2/25/2011 | Buy | 500.00 | 39.95 | (19,975.00) | |
| 3/1/2011 | Sell | (100.00) | 40.81 | | 4,080.28 |
| 3/18/2011 | Buy | 786.00 | 38.63 | (30,363.81) | |
| 3/30/2011 | Buy | 100.00 | 40.69 | (4,069.92) | |
| 4/27/2011 | Buy | 450.00 | 31.36 | (14,114.25) | |
| 6/14/2011 | Sell | (2,807.00) | 26.17 | | 73,485.83 |

NYC Retirement Systems
Police
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| 6/24/2011 | Sell | (50.00) | 24.44 | | 1,222.25 |
| 6/24/2011 | Buy | 50.00 | 24.81 | (1,240.77) | |
| 6/30/2011 | Sell | (300.00) | 25.67 | | 7,701.97 |
| 7/12/2011 | Buy | 2,200.00 | 25.61 | (56,342.00) | |
| 8/16/2011 | Buy | 50.00 | 20.91 | (1,045.83) | |
| 9/8/2011 | Buy | 600.00 | 18.82 | (11,296.53) | |
| 9/9/2011 | Buy | 28,740.00 | 17.72 | (509,448.11) | |
| 9/20/2011 | Sell | (19,700.00) | 17.93 | | 353,411.21 |

## AMENDED CERTIFICATION RE:  LEAD PLAINTIFF

I, Kathryn E. Diaz, as General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of the New York City Fire Department Pension Fund (hereinafter "Fire").

2.      Fire did not purchase or acquire the securities of Community Health Systems Inc. ("CHS") at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I have reviewed the First Amended Consolidated Class Action Complaint filed against CHS and others, captioned *Norfolk County Retirement Systems v. Community Health, Inc.,* 11-cv-00433 (M.D. Tenn.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired CHS securities from July 27, 2006 through and including October 26, 2011 (the "Class Period').  As of this date, Fire adopts these claims and Class Period.

4.      Fire is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.      Fire's transactions in the securities of CHS during the Class Period are identified in the annexed chart.

6.      Fire has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re American Realty Capital Properties, Inc.*, No. 1:15-mc-00040 (S.D.N.Y.) (not appointed).  As previously reported in its original Certification, Fire sought to serve as lead plaintiff in *In re Wachovia Equity Securities Litigation*, No. 1:08-cv-06171 (S.D.N.Y.) (appointed).

7.     Fire will not accept payment for serving as lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

8.     I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  October 2, 2015

_____
Kathryn E. Diaz
General Counsel for the Office of the New
York City Comptroller

NYC Retirement Systems
FIRE
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| **Opening Position** | | 41,950.00 | | | |
| 10/17/2006 | Sell | (3,400.00) | 35.04 | | 119,081.34 |
| 10/17/2006 | Sell | (7,250.00) | 35.20 | | 255,047.89 |
| 10/30/2006 | Sell | (700.00) | 32.35 | | 22,623.65 |
| 11/17/2006 | Sell | (600.00) | 33.33 | | 19,987.84 |
| 12/4/2006 | Sell | (5,700.00) | 36.00 | | 205,050.62 |
| 12/4/2006 | Sell | (3,900.00) | 35.98 | | 140,247.49 |
| 12/5/2006 | Sell | (2,000.00) | 35.90 | | 71,762.99 |
| 12/5/2006 | Sell | (10,300.00) | 35.86 | | 369,074.73 |
| 12/5/2006 | Sell | (1,500.00) | 35.95 | | 53,908.34 |
| 6/22/2007 | Buy | 400.00 | 40.70 | (16,280.00) | |
| 6/22/2007 | Buy | 200.00 | 40.67 | (8,134.70) | |
| 11/30/2007 | Sell | (78.00) | 33.26 | | 2,593.53 |
| 11/30/2007 | Buy | 78.00 | 0.00 | (2,606.76) | |
| 12/27/2007 | Buy | 100.00 | 36.78 | (3,679.80) | |
| 1/15/2008 | Buy | 100.00 | 35.17 | (3,518.67) | |
| 2/27/2008 | Buy | 455.00 | 32.88 | (14,981.38) | |
| 2/28/2008 | Buy | 470.00 | 31.85 | (14,991.92) | |
| 2/29/2008 | Buy | 100.00 | 31.07 | (3,108.00) | |
| 4/10/2008 | Buy | 100.00 | 36.72 | (3,673.25) | |
| 6/27/2008 | Buy | 100.00 | 33.40 | (3,340.00) | |
| 7/21/2008 | Buy | 40.00 | 35.86 | (1,434.93) | |
| 7/25/2008 | Buy | 300.00 | 34.68 | (10,412.58) | |
| 8/26/2008 | Buy | 1,000.00 | 33.54 | (33,553.40) | |
| 8/26/2008 | Buy | 2,100.00 | 33.54 | (70,461.72) | |
| 9/18/2008 | Buy | 280.00 | 31.23 | (8,757.64) | |
| 11/12/2008 | Buy | 1,000.00 | 16.29 | (16,341.60) | |
| 11/14/2008 | Buy | 500.00 | 18.22 | (9,136.80) | |
| 2/19/2009 | Buy | 6,300.00 | 18.94 | (119,468.79) | |
| 3/3/2009 | Sell | (600.00) | 13.70 | 8,192.89 | |
| 3/31/2009 | Buy | 1,400.00 | 15.48 | (21,693.98) | |
| 4/13/2009 | Buy | 2,000.00 | 15.71 | (31,468.00) | |
| 5/1/2009 | Buy | 900.00 | 22.66 | (20,410.47) | |
| 5/4/2009 | Buy | 233.00 | 22.41 | (5,225.35) | |
| 6/23/2009 | Sell | (190.00) | 23.98 | | 4,547.61 |
| 6/26/2009 | Sell | (100.00) | 25.52 | | 2,548.93 |
| 6/26/2009 | Sell | (200.00) | 25.52 | | 5,104.00 |
| 6/26/2009 | Buy | 72.00 | 25.52 | (1,837.48) | |
| 7/21/2009 | Buy | 1,333.00 | 29.06 | (38,750.85) | |
| 8/7/2009 | Sell | (310.00) | 30.74 | | 9,514.30 |
| 12/3/2009 | Buy | 440.00 | 30.38 | (13,372.80) | |
| 1/15/2010 | Sell | (160.00) | 38.38 | | 6,140.05 |
| 1/21/2010 | Sell | (220.00) | 33.48 | | 7,354.19 |
| 1/27/2010 | Buy | 53.00 | 33.39 | (1,769.80) | |
| 1/27/2010 | Buy | 390.00 | 33.15 | (12,936.03) | |
| 3/5/2010 | Sell | (439.00) | 37.07 | | 16,268.03 |
| 3/22/2010 | Sell | (280.00) | 39.82 | | 11,148.02 |

NYC Retirement Systems
FIRE
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| 4/8/2010 | Sell | (200.00) | 38.38 | | 7,670.89 |
| 4/30/2010 | Buy | 261.00 | 40.86 | (10,665.77) | |
| 6/25/2010 | Sell | (145.00) | 34.25 | | 4,966.03 |
| 6/25/2010 | Sell | (15.00) | 34.25 | | 513.74 |
| 7/21/2010 | Sell | (500.00) | 30.43 | | 15,190.09 |
| 8/5/2010 | Sell | (1,500.00) | 33.36 | | 50,012.90 |
| 8/13/2010 | Sell | (162.00) | 30.21 | | 4,891.77 |
| 8/13/2010 | Sell | (904.00) | 30.17 | | 27,270.95 |
| 8/19/2010 | Buy | 371.00 | 29.44 | (10,927.81) | |
| 8/31/2010 | Sell | (400.00) | 25.93 | | 10,352.18 |
| 9/16/2010 | Sell | (1,900.00) | 30.71 | | 58,317.04 |
| 9/28/2010 | Sell | (471.00) | 30.45 | | 14,329.89 |
| 9/29/2010 | Sell | (54.00) | 30.42 | | 1,641.32 |
| 10/13/2010 | Sell | (5,000.00) | 32.18 | | 160,872.28 |
| 10/14/2010 | Sell | (1,300.00) | 32.15 | | 41,785.97 |
| 1/19/2011 | Rec. Free | 171.00 | 0.00 | | |
| 1/19/2011 | Rec. Free | 19,200.00 | 0.00 | | |
| 2/25/2011 | Buy | 500.00 | 39.95 | (19,975.00) | |
| 3/25/2011 | Sell | (194.00) | 38.94 | | 7,553.72 |
| 6/14/2011 | Sell | (971.00) | 26.17 | | 25,420.29 |
| 9/8/2011 | Buy | 510.00 | 18.83 | (9,607.70) | |
| 9/9/2011 | Buy | 19,360.00 | 17.72 | (343,177.30) | |
| 9/20/2011 | Sell | (5,400.00) | 17.93 | | 96,874.13 |

## AMENDED CERTIFICATION RE:  LEAD PLAINTIFF

I, Kathryn E. Diaz, as General Counsel for the Office of the New York City Comptroller, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of the New York City Teachers Retirement System (hereinafter "TRS").

2.      TRS did not purchase or acquire the securities of Community Health Services Inc. ("CHS") at the direction of counsel, or in order to participate in any private action under the federal securities laws.

3.      I have reviewed the First Amended Consolidated Class Action Complaint filed against CHS and others, captioned *Norfolk County Retirement Systems v. Community Health, Inc.*, 11-cv-00433 (M.D. Tenn.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired CHS securities from July 27, 2006 through and including October 26, 2011 (the "Class Period').  As of this date, TRS adopts these claims and Class Period.

4.      TRS is willing to serve as lead plaintiff in these consolidated cases, including proving testimony at deposition and trial, if necessary.

5.      TRS's transactions in the securities of CHS during the Class Period are identified in the annexed chart.

6.      TRS has not sought to serve as lead plaintiff in any class action under the federal securities law during the last three years, except in *Jahm v. Bankrate, Inc. et al*, No. 9:14-cv-81323 (S.D. Fla.) (not appointed) and *In re American Realty Capital Properties, Inc.*, No. 1:15-mc-00040 (S.D.N.Y.) (not appointed).  As previously reported in its original Certification, TRS

sought to serve as lead plaintiff in *In re Wachovia Equity Securities Litigation*, No. 1:08-cv-06171 (S.D.N.Y.) (appointed).

7.      TRS will not accept payment for serving as lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

Dated:  October 2, 2015

Kathryn E. Diaz
General Counsel for the Office of the New
York City Comptroller

NYC Retirement Systems
Teachers Retirement System
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| **Opening Position** | | 78,892.00 | | | |
| 11/17/2006 | Buy | 3,680.00 | 33.91 | (124,818.24) | |
| 11/17/2006 | Buy | 60.00 | 33.91 | (2,034.81) | |
| 3/28/2007 | Buy | 499.00 | 35.48 | (17,707.02) | |
| 3/28/2007 | Buy | 1,072.00 | 35.48 | (38,039.92) | |
| 9/24/2007 | Buy | 2,395.00 | 32.70 | (78,340.45) | |
| 11/26/2007 | Buy | 100.00 | 30.64 | (3,065.42) | |
| 12/26/2007 | Buy | 2,373.00 | 36.67 | (87,057.54) | |
| 1/8/2008 | Buy | 713.00 | 35.44 | (25,270.50) | |
| 1/8/2008 | Buy | 142.00 | 35.26 | (5,008.70) | |
| 2/8/2008 | Buy | 4,356.00 | 0.00 | (139,084.90) | |
| 2/8/2008 | Buy | 292.00 | 32.24 | (9,414.08) | |
| 2/27/2008 | Buy | 380.00 | 32.88 | (12,511.92) | |
| 2/27/2008 | Buy | 2,340.00 | 32.88 | (77,047.07) | |
| 2/28/2008 | Buy | 395.00 | 31.85 | (12,599.59) | |
| 2/28/2008 | Buy | 2,430.00 | 31.85 | (77,511.41) | |
| 3/4/2008 | Sell | (100.00) | 32.31 | 3,229.42 | |
| 5/23/2008 | Buy | 600.00 | 35.56 | (21,357.30) | |
| 5/28/2008 | Buy | 100.00 | 35.29 | (3,530.66) | |
| 7/11/2008 | Sell | (600.00) | 34.61 | | 20,747.88 |
| 7/21/2008 | Buy | 40.00 | 35.86 | (1,434.93) | |
| 7/21/2008 | Buy | 210.00 | 35.86 | (7,533.37) | |
| 8/19/2008 | Buy | 51,902.00 | 34.57 | (1,794,708.88) | |
| 8/26/2008 | Buy | 3,512.00 | 33.60 | (118,032.35) | |
| 8/26/2008 | Buy | 8,203.00 | 33.60 | (275,687.25) | |
| 8/28/2008 | Del. Free | (51,902.00) | 0.00 | 0.00 | |
| 9/18/2008 | Buy | 230.00 | 31.23 | (7,193.78) | |
| 9/18/2008 | Buy | 1,440.00 | 31.23 | (45,039.31) | |
| 11/12/2008 | Buy | 1,400.00 | 16.29 | (22,878.24) | |
| 11/14/2008 | Buy | 700.00 | 18.22 | (12,791.52) | |
| 2/26/2009 | Buy | 550.00 | 17.80 | (9,799.63) | |
| 3/3/2009 | Sell | (900.00) | 13.70 | | 12,289.34 |
| 4/24/2009 | Sell | (10.00) | 19.49 | | 194.78 |
| 4/30/2009 | Buy | 3,058.00 | 22.84 | (69,831.57) | |
| 4/30/2009 | Buy | 2,543.00 | 22.84 | (58,088.48) | |
| 5/27/2009 | Buy | 4,430.00 | 26.06 | (115,456.88) | |
| 5/28/2009 | Sell | (100.00) | 25.82 | | 2,580.59 |
| 6/23/2009 | Sell | (160.00) | 23.98 | | 3,829.56 |
| 6/23/2009 | Sell | (970.00) | 23.98 | | 23,216.74 |
| 6/26/2009 | Sell | (666.00) | 25.53 | | 17,004.40 |
| 6/26/2009 | Sell | (2,969.00) | 25.52 | | 75,765.15 |
| 6/26/2009 | Sell | (2,656.00) | 25.50 | | 67,705.53 |
| 6/26/2009 | Sell | (200.00) | 25.52 | | 5,104.00 |
| 7/2/2009 | Buy | 100.00 | 24.95 | (2,496.14) | |
| 7/24/2009 | Buy | 740.00 | 28.70 | (21,249.10) | |
| 8/7/2009 | Sell | (260.00) | 30.74 | | 7,979.74 |
| 8/7/2009 | Sell | (1,820.00) | 30.79 | | 55,980.48 |

NYC Retirement Systems
Teachers Retirement System
Community Health Systems, Inc.
Common Stock Transactions
(AMENDED)

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| 8/26/2009 | Sell | (100.00) | 30.10 | | 3,009.47 |
| 9/4/2009 | Buy | 282.00 | 29.48 | (8,318.30) | |
| 10/15/2009 | Buy | 1,664.00 | 36.01 | (59,937.28) | |
| 11/25/2009 | Buy | 200.00 | 31.76 | (6,354.34) | |
| 11/25/2009 | Buy | 100.00 | 31.90 | (3,190.73) | |
| 12/3/2009 | Buy | 610.00 | 30.35 | (18,519.00) | |
| 1/5/2010 | Sell | (200.00) | 36.52 | | 7,302.63 |
| 1/5/2010 | Sell | (100.00) | 36.56 | | 3,654.97 |
| 1/15/2010 | Sell | (230.00) | 38.38 | | 8,826.32 |
| 1/21/2010 | Sell | (180.00) | 33.48 | | 6,017.07 |
| 1/21/2010 | Sell | (1,270.00) | 33.48 | | 42,453.78 |
| 1/27/2010 | Buy | 4,244.00 | 33.15 | (140,770.51) | |
| 1/27/2010 | Buy | 583.00 | 33.39 | (19,467.83) | |
| 3/22/2010 | Sell | (380.00) | 39.82 | | 15,129.46 |
| 7/21/2010 | Sell | (600.00) | 30.43 | | 18,228.11 |
| 8/13/2010 | Sell | (1,051.00) | 30.21 | | 31,736.50 |
| 8/13/2010 | Sell | (5,875.00) | 30.17 | | 177,231.06 |
| 8/26/2010 | Buy | 200.00 | 27.16 | (5,433.62) | |
| 8/26/2010 | Buy | 100.00 | 27.16 | (2,717.36) | |
| 8/31/2010 | Sell | (600.00) | 25.93 | | 15,528.27 |
| 9/28/2010 | Sell | (399.00) | 30.45 | | 12,139.33 |
| 9/28/2010 | Sell | (2,773.00) | 30.45 | | 84,366.82 |
| 9/29/2010 | Sell | (46.00) | 30.42 | | 1,398.17 |
| 9/29/2010 | Sell | (317.00) | 30.42 | | 9,635.18 |
| 10/18/2010 | Buy | 598.00 | 32.19 | (19,251.12) | |
| 11/30/2010 | Buy | 482.00 | 31.86 | (15,357.73) | |
| 1/10/2011 | Buy | 17,704.00 | 37.02 | (655,513.62) | |
| 1/10/2011 | Buy | 26,735.00 | 36.80 | (983,914.84) | |
| 1/11/2011 | Buy | 761.00 | 36.76 | (27,973.60) | |
| 1/18/2011 | Buy | 88,300.00 | 37.49 | (3,310,985.10) | |
| 2/25/2011 | Buy | 3,000.00 | 39.95 | (119,850.00) | |
| 3/1/2011 | Sell | (200.00) | 40.81 | | 8,160.56 |
| 3/1/2011 | Sell | (100.00) | 40.04 | | 4,002.47 |
| 3/16/2011 | Buy | 24,550.00 | 39.00 | (957,518.74) | |
| 3/25/2011 | Sell | (2,189.00) | 38.94 | | 85,232.55 |
| 3/28/2011 | Buy | 6,360.00 | 39.05 | (248,574.88) | |
| 3/30/2011 | Buy | 200.00 | 40.69 | (8,139.84) | |
| 4/14/2011 | Buy | 1,100.00 | 32.56 | (35,823.26) | |
| 4/27/2011 | Buy | 1,133.00 | 31.36 | (35,536.55) | |
| 5/23/2011 | Sell | (1,100.00) | 27.85 | | 30,645.08 |
| 5/31/2011 | Buy | 67.00 | 28.63 | (1,918.63) | |
| 6/14/2011 | Sell | (3,682.00) | 26.17 | | 96,392.88 |
| 6/24/2011 | Sell | (100.00) | 24.44 | (2,444.51) | |
| 6/24/2011 | Buy | 100.00 | 24.81 | (2,481.53) | |
| 6/30/2011 | Sell | (900.00) | 25.67 | | 23,105.92 |
| 8/16/2011 | Buy | 100.00 | 20.91 | (2,091.65) | |
| 9/8/2011 | Buy | 710.00 | 18.86 | (13,391.20) | |

## CERTIFICATION RE: LEAD PLAINTIFF

I, Susan Stang, as Deputy Director of Investment Administration for the Teachers Retirement System of the City of New York hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of the New York City Teachers Retirement System Variable Annuity Program (hereinafter "TRS-VA").

2.      TRS-VA did not purchase or acquire the securities of Community Health Services Inc. ("CHS") at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.      I have reviewed the Class Action Complaint filed against CHS and others, captioned *Norfolk County Retirement Systems v. Community Health, Inc.*, 11-cv-00433 (M.D. Tenn.), alleging violations of the securities laws on behalf of all those who purchased or otherwise acquired CHS securities from July 27, 2006 through and including April 8, 2011(the "Class Period"). As of this date, TRS-VA adopts these claims and Class Period.

4.      TRS-VA is willing to serve as lead plaintiff in these consolidated cases, including providing testimony at deposition and trial, if necessary.

5.      TRS-VA's transactions in the securities of CHS during the Class Period are identified in the annexed chart.

6.      TRS-VA has not sought to serve as a lead plaintiff in any class action under the federal securities laws during the last three years, except in *In re Wachovia Equity Securities Litigation,* No. 1:08-cv-06171 (S.D.N.Y.) (appointed).

7.      TRS-VA will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

2100 / MISC / 00085964.WPD v3

I declare that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: July 8, 2011

SUSAN STANG
Deputy Director of Investment
Administration for the Teachers Retirement
System of the City of New York

# NYC Retirement Systems
## Teachers Variable A
### Community Health Systems, Inc.
### Common Stock Transactions

| Trade Date | Trans | Quantity | Price | Amount Paid | Proceeds |
|---|---|---|---|---|---|
| 11/13/06 | Buy | 21,899.00 | 33.62 | 736,244.38 | |
| 12/18/06 | Buy | 23,432.00 | 36.43 | 853,627.76 | |
| 06/22/07 | Sell Long | (1,787.44) | 40.70 | | 72,748.68 |
| 06/22/07 | Sell Long | (1,912.56) | 40.70 | | 77,841.32 |
| 09/17/08 | Sell Long | (1,218.84) | 32.20 | | 39,246.61 |
| 09/17/08 | Sell Long | (1,304.16) | 32.20 | | 41,993.99 |
| 04/17/09 | Sell Long | (1,927.05) | 17.70 | | 34,108.79 |
| 04/17/09 | Sell Long | (2,061.95) | 17.70 | | 36,496.51 |
| 07/20/09 | Buy | 2,130.00 | 29.26 | 62,319.97 | |
| 07/20/09 | Buy | 2,450.00 | 29.35 | 71,918.28 | |
| 07/20/09 | Buy | 1,400.00 | 29.37 | 41,114.50 | |
| 07/28/09 | XFR+ | 3,000.00 | 28.22 | 84,660.00 | |
| 07/28/09 | Buy | 1,250.00 | 29.02 | 36,275.00 | |
| 07/28/09 | Buy | 1,510.00 | 29.04 | 43,851.31 | |
| 07/29/09 | Buy | 440.00 | 29.75 | 13,089.65 | |
| 07/29/09 | Buy | 330.00 | 29.55 | 9,749.85 | |
| 08/06/09 | Buy | 1,320.00 | 31.09 | 41,032.20 | |
| 08/06/09 | Buy | 1,320.00 | 31.13 | 41,086.19 | |
| 09/21/09 | Sell Long | (3,420.00) | 33.89 | | 115,905.60 |
| 10/29/09 | Buy | 3,000.00 | 31.49 | 94,466.70 | |
| 10/29/09 | Sell Long | 3,000.00 | 33.38 | 100,134.64 | |
| 10/29/09 | Buy | 2,220.00 | 32.59 | 72,347.14 | |
| 12/14/09 | Buy | 140.00 | 32.64 | 4,569.53 | |
| 12/14/09 | Buy | 550.00 | 32.59 | 17,925.11 | |
| 12/14/09 | Buy | 840.00 | 32.58 | 27,364.85 | |
| 12/14/09 | Buy | 610.00 | 32.64 | 19,910.40 | |
| 02/09/10 | Buy | 540.00 | 31.78 | 17,161.20 | |
| 02/09/10 | Buy | 380.00 | 32.61 | 12,389.90 | |
| 02/09/10 | Buy | 1,810.00 | 32.50 | 58,831.52 | |
| 03/19/10 | Sell Long | (370.00) | 37.81 | | 13,991.37 |
| 03/19/10 | Sell Long | (560.00) | 37.64 | | 21,079.70 |
| 03/19/10 | Sell Long | (2,280.00) | 37.74 | | 86,046.78 |
| 03/19/10 | Sell Long | (810.00) | 37.95 | | 30,742.34 |
| 05/04/10 | Sell Long | 1,800.00 | 40.95 | 73,718.83 | |
| 05/04/10 | Sell Long | 1,200.00 | 40.95 | 49,138.21 | |
| 06/11/10 | Buy | 1,340.00 | 37.54 | 50,303.60 | |
| 07/30/10 | Buy | 1,000.00 | 31.91 | 31,911.70 | |
| 07/30/10 | Buy | 1,360.00 | 31.40 | 42,708.76 | |
| 08/02/10 | Buy | 1,950.00 | 33.31 | 64,951.77 | |
| 08/23/10 | Sell Long | (770.00) | 28.57 | | 21,998.52 |
| 08/23/10 | Sell Long | (4,680.00) | 28.50 | | 133,374.00 |
| 08/27/10 | Sell Long | (6,190.00) | 26.61 | | 164,716.82 |
| 08/27/10 | Sell Long | (5,810.00) | 26.85 | | 155,987.15 |
| 03/03/11 | Sell Long | (3,511.00) | 40.74 | | 143,038.14 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2015, a copy of the redacted version of Lead

Plaintiff's First Amended and Consolidated Class Action Complaint was filed with the Clerk of

the Court using the CM/ECF system, which will automatically serve a copy of same upon all

counsel of record, as identified in the following chart:

| | |
|---|---|
| Gary A. Orseck<br>Michael L. Waldman<br>Alison Barnes<br>Matthew Madden<br>**Robbins Russell Englert Orseck Untereiner**<br>**& Sauber LLP**<br>1801 K Street NW, Suite 411<br>Washington, DC 20006<br>Email: mwaldman@robbinsrussell.com<br>Email: gorseck@robbinsrussell.com<br>Email: abarnes@robbinsrussell.com<br>Email: mmadden@robbinsrussell.com<br><br>*Counsel for Defendants Community*<br>*Health Systems, Inc., Wayne T. Smith,*<br>*W. Larry Cash, and Thomas Buford* | Steven S. Riley<br>John R. Jacobson<br>James N. Bowen<br>Milton S. McGee, III<br>Elisabeth Gonser<br>**Riley, Warnock & Jacobson PLC**<br>1906 West End Avenue<br>Nashville, TN 37203<br>Email: sriley@rwjplc.com<br>Email: jjacobson@rwjplc.com<br>Email: jimbowen@rwjplc.com<br>Email: tmcgee@rwjplc.com<br>Email: egonser@rwjplc.com<br><br>*Counsel for Defendants Community*<br>*Health Systems, Inc., Wayne T. Smith,*<br>*W. Larry Cash, and Thomas Buford* |
| Christopher J. Keller<br>Michael W. Stocker<br>Rachel A. Avan<br>**Labaton Sucharow LLP**<br>140 Broadway<br>New York, NY 10005<br>Email: ckeller@labaton.com<br>Email: mstocker@labaton.com<br>Email: ravan@labaton.com<br><br>*Counsel for Norfolk County Retirement*<br>*System, Alberta Investment Management Corp.*<br>*and State-Boston Retirement System* | Peter D. Doyle<br>Seth D. Fier<br>**Proskauer Rose LLP**<br>Eleven Times Square<br>New York, New York 10036-8299<br>Email: pdoyle@proskauer.com<br>Email: sfier@proskauer.com<br><br><br><br>*Counsel for Defendants Community*<br>*Health Systems, Inc., Wayne T. Smith,*<br>*W. Larry Cash, and Thomas Buford* |

| | |
|---|---|
| Jeffrey A. Berens<br>**Dyer & Berens LLP**<br>303 E. 17th Ave. – Suite 300<br>Denver, CO 80203<br>Email: Jeff@dyerberens.com<br><br>*Counsel for De Zheng* | James Gerard Stranch, IV<br>**Branstetter, Stranch & Jennings**<br>227 Second Avenue, N – 4th Floor<br>Nashville, TN 37201<br>Email: gstranch@branstetterlaw.com<br><br>*Counsel for Norfolk County Retirement System, Alberta Investment Management Corp. and State-Boston Retirement System* |
| Robert J. Robbins<br>David R. George<br>**Robbins Geller Rudman & Dowd LLP**<br>120 E. Palmetto Park Road – Suite 500<br>Boca Raton, FL 33432<br>Email: rrobbins@rgrdlaw.com<br>Email: dgeorge@rgrdlaw.com<br><br>*Counsel for De Zheng* | James L. Davidson<br>**Greenwald Davidson PLLC**<br>5550 Glades Road , Suite 500<br>Boca Raton, FL 33431<br>Email: jdavidson@mgjdlaw.com<br><br>*Counsel for De Zheng* |
| Frederic S. Fox<br>Joel B. Strauss<br>Pamela A. Mayer<br>**Kaplan Fox & Kilsheimer LLP**<br>850 Third Ave. – 14th Floor<br>New York, NY 10022<br>Email: ffox@kaplanfox.com<br>Email: strauss@kaplanfox.com<br>Email: pmayer@kaplanfox.com<br><br>*Counsel for Minneapolis Firefighters' Relief Association* | Michael K. Radford<br>**Flynn & Radford**<br>320 Seven Springs Way, Suite 150<br>Brentwood, TN 37027<br>Email: mradford@allen-kopet.com<br><br>*Counsel for Minneapolis Firefighters' Relief Association* |
| David S. Hagy<br>**David S. Hagy, Attorney at Law**<br>1507 16th Avenue South<br>Nashville, TN 37212<br>Email: dhagy@hagylaw.com<br><br>*Counsel for General Retirement System of the City of Detroit* | Richard A. Lockridge<br>Karen H. Riebel<br>**Lockridge Grindal & Nauen, PLLP**<br>100 Washington Ave. S. – Suite 2200<br>Minneapolis, MN 55401<br>Email: lockrra@locklaw.com<br>Email: khriebel@locklaw.com<br><br>*Counsel for Minneapolis Firefighters' Relief Association* |

Dated: October 15, 2015

/s/ Scott V. Papp