UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff | ) ) | No. 3:11-0433 Judge Trauger/Brown |
| v. | ) ) | **Jury Demand** |
| COMMUNITY HEALTH SYSTEMS, INC., et al., | ) ) ) | |
| Defendants | ) ) | |
| This Document Relates To: ALL ACTIONS | ) ) | |

## SECOND AMENDED CASE MANAGEMENT ORDER

The Court adopts this Second Amended Initial Case Management Plan. The Magistrate Judge has considered the competing plans submitted by the parties. He has tried to resolve them and keep this 3:11-0433 plan in rough agreement with the 3:11-0489 case.

**A.     JURISDICTION**

The Court has jurisdiction pursuant to 28 U.S.C. §1331 because Lead Plaintiff, the New York City Employee Retirement System, the Teachers' Retirement System of the City of New York, the New York City Teachers' Variable Annuity Program, the New York City Police Pension Fund, and the New York City Fire Department Pension Fund (collectively, the "NYC Funds" or "Lead Plaintiff") alleges that Defendants Community Health Systems, Inc. ("CHSI"), Wayne T. Smith and W. Larry Cash (collectively, "Defendants" and with Lead Plaintiff, the "Parties") violated the federal securities laws, including Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder. Jurisdiction is not in dispute.

1

## B. PARTIES' THEORIES OF THE CASE AND PROCEDURAL HISTORY

### (1) Lead Plaintiff's Theory of the Case

Lead Plaintiff alleges that during the July 27, 2006 through October 26, 2011 Class Period, CHSI, through its senior executives, Chief Executive Officer Wayne Smith ("Smith") and Chief Financial Officer W. Larry Cash ("Cash"), misled investors about the Company's unsustainable practices that drove its success. Defendants touted CHSI's synergies, and efficiencies in CHSI's emergency department ("ED" or "ER") and its commitment to patient care, yet concealing that it imposed patient admission "benchmarks" that ran afoul of Medicare rules. Defendants' Class Period statements were materially misleading and incomplete in failing to disclose CHSI's practice of improperly admitting patients without medical necessity using the non-industry criteria contained in their internally-developed Blue Book, rigging its Pro-Med software to increase lucrative testing procedures, and setting admissions quotas and applying corporate pressure on ED physicians to increase admissions, especially of patients over 65 who are covered by Medicare. Admitting patients is more valuable than treating them in observation; criteria were permissive to trigger admission. Investors purchased CHSI stock during the period of inflation in reliance upon the accuracy of CHSI's disclosures. Defendants' concealed scheme was publicly revealed in two corrective disclosures. After each disclosure the stock price significantly declined resulting in classwide damages and prejudgment interest in excess of $1.07 billion dollars.

Senior management created the admissions practices and knew they were a substantial compliance risk that would invite scrutiny. Nevertheless, CHSI concealed its non-industry admissions practices because they were fundamental to the Company's growth and improved performance as compared to its peers. Internally, CHSI corporate spoke of a single goal: "ZERO Medicare Observations." One CHSI senior executive put it bluntly: "[w]e want to avoid

observation as much as possible on Medicare patients." This growth strategy is illustrated by CHSI's directive at newly-acquired Triad hospitals: "using the CHS Blue Book admissions criteria as soon as possible … the hospital should experience a significant reduction in Medicare and other outpatient observation status and significant increase in inpatient admissions."

Prior to and throughout the Class Period, CHSI's senior management was advised both internally and by outside experts of the substantial risks resulting from its undisclosed admissions practices. For example, CHSI's long-term Medicare consultant concluded that CHSI's admissions practices presented a "clear medical necessity compliance risk," and that the Blue Book admissions criteria (1) "lacks specificity, allowing all cases to be classified as inpatient"; (2) would likely be construed as "statistically biased"; (3) results in "overcertification of inpatient"; and (4) could be construed as "an avoidance of best practices."

Notwithstanding that Smith and Cash directed, set, and enforced the undisclosed admissions policy, they failed to disclose these practices which created substantial regulatory exposure, and were unsustainable as reflected in the increased denials of claims by CMS and third-party payors of which CHSI was keenly aware. Defendants falsely represented to investors that its management acumen, operating efficiencies and "ED Initiatives" were the basis for the Company's growth. Defendants' generalized risk disclosures did not reveal their operating practices so that investors could assess the risks and sustainability of these strategies.

The exposure of the fraudulent nature of CHSI's undisclosed admission practices revealed the basis for much of the Company success. These fraudulent admissions practices were corroborated by expert analysis of raw Medicare data.[1] Once publicly disclosed, CHSI's stock

---

[1] The fact that the allegations made by Tenet Healthcare Corporation's ("Tenet") expert analysis was derived from a "publicly available" database, maintained by the Centers for Medicare and Medicaid services "(CMS)", does not mean that Tenet's complaint did not disclose new information and does not

3

price immediately declined by 36%, and shareholders were damaged. Yet, CHSI vehemently denied the allegations. At the same time CHSI discontinued its use of the Blue Book, implicitly conceding that its aggressive non-industry admission criteria were unsustainable. To try to prop up the market, CHSI falsely claimed that the switch to InterQual would not impact its operations and performance. However, as CHSI hospitals transitioned to InterQual, the same-store admissions declined at an accelerating rate. On October 26, 2011, CHSI released financial results reporting that the decline in same store admissions accelerated to 7.0% in 3Q 2011, which alerted the market to the falsity of CHSI's claims of management efficiency, Medicare Compliance, and that switching to the industry standard would not adversely impact operations. The next day, CHSI's stock price again dropped $2.32 per share to the detriment of class members.

In July, 2014, the Company settled a U.S. Department of Justice ("DOJ") investigation into its admission practices for $98 million, in one of the five largest Medicare fraud settlements in history. Shortly thereafter, CHSI also announced it reached another settlement with the government in which CHSI agreed to pay $75 million to settle claims that it fraudulently and systematically overbilled Medicaid/Medicare from three of its hospitals in New Mexico by, *inter alia*, marking up its services, and then billing the government.

The DOJ strongly rebuked CHS' actions. The United States Attorney for the Middle District of Tennessee, David Rivera, emphasized that his office "is committed to ensuring that … hospital providers do not engage in schemes to increase medically unnecessary in-patient admissions of government healthcare program beneficiaries in order to increase profits." U.S. Attorney Anne M. Tompkins for the Western District of North Carolina added: "Heath care providers should make treatment decisions based on patients' medical needs, not profit margins …

---

constitute a corrective disclosure as a matter of law. On the contrary, the market had no idea about the hidden Medicare data, as reflected in the huge market price decline in CHS stock.

4

We will not allow this type of misconduct to compromise the integrity of our health care system." U.S. Attorney Kenneth Madison of the Southern District of Texas, echoed that "these types of fraudulent practices will not be tolerated."

As part of the DOJ's settlement, CHS entered into a Corporate Integrity Agreement with the Department of Health and Human Services-Office of the Inspector General, to create a compliance program that addressed and ensured adherence to the requirements of Medicare and other Federal Health care programs. Inspector General David R. Levinson further explained that "a rigorous multi-year Corporate Integrity Agreement requiring that the Company commit to compliance with the law, [will] ensure the Company's fraudulent past is not its future."

This Court's prior rulings in the related derivative action captioned *Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund et al. v. Smith et al.*, No. 11-cv-00489 (M.D. Tenn.) (the "Derivative Action") upheld similar allegations of company-wide wrongdoing. The Court found that "Defendants' wealth of knowledge and experience with the business and management of healthcare entities, combined with their diligence and concern with increasing admission rates at CHSI hospitals, allows the Court to reasonably infer that *Defendants were aware* that obtaining significant increases in admissions rates—including a 50% increase in admissions at Triad hospitals—could not have been done without using improper means." The Court's ruling is unquestionably supportive of the viability of Plaintiff's claims here. *See* Derivative Action, Dkt. No. 87 at 18 (emphasis added).

**(2) Defendants' Theory of the Case**

The three essential facts that Lead Plaintiff must prove in its case are: (1) that CHSI defrauded investors by intentionally making misstatements about the reasons for its strong financial performance and the "regulatory exposure" it faced in this highly regulated industry; (2)

5

that the real reason for CHSI's financial performance was that it unlawfully charged the Medicare program for inpatient admissions when the patient's physician did not consider the patient to be sick enough to be admitted to the hospital; and (3) that the alleged fraud caused damages to CHSI's investors. All three parts of Lead Plaintiff's claim are false; indeed, Lead Plaintiff fails even to state a claim for securities fraud.

First, all of the statements that Lead Plaintiff claims were false were *true*. Thus, for example, CHSI told investors that its acquisitions had led to "greater operating efficiencies," and that its record proved its "ability to deliver improved results" in acquired facilities. Cplt. ¶ 212. True. CHSI also disclosed that its improved performance "reflect[s] the benefits of our proven centralized operating strategy and the assimilation of recently acquired hospitals." *Id.* True again. See also Cplt. ¶ 211 (same). Also true were CHSI's disclosures about its ethics and compliance program (¶ 232-233), and its belief that CHSI-affiliated hospitals were in "substantial compliance" with legal requirements (¶ 230). And, far from hiding the attendant regulatory risks from investors, CHSI took pains to warn them that "there are heightened coordinated civil and criminal enforcement efforts by both federal and state government agencies relating to the healthcare industry" and that "some pending or threatened proceedings against us"—including "qui tam or 'whistleblower' actions initiated under the civil False Claims Act"—may "involve potentially substantial amounts as well as the possibility of civil, criminal, or administrative fines, penalties, or other sanctions, which could be material." CHSI Form 10-K, December 31, 2008. Lead Plaintiff thus was adequately apprised of the material facts concerning CHSI.

Second, Lead Plaintiff cannot show that Defendants engaged in a scheme to fraudulently bill Medicare for unnecessary admissions in order to inflate revenue. Proof of such a fraudulent admissions scheme would involve evidence that physicians at CHSI-affiliated hospitals across the

country abdicated their responsibility to make admissions decisions based on their "complex medical judgment," CMS, Medicare Benefit Policy Manual, Ch. 1, § 10 (Rev. 189, June 27, 2014), and patients' unique circumstances upon presentation to the hospital. In fact, exactly the opposite is true. If this case proceeds past a motion to dismiss, Defendants will establish that the admissions practices at CHSI-affiliated hospitals were reasonable and appropriate, and that Defendants strove to comply with regulatory and legal requirements relating to admissions.

At bottom, Lead Plaintiff's allegations are little more than regurgitated allegations made by one of CHSI's competitors in an attempt to fend off a hostile takeover bid. That competitor lawsuit was dismissed before discovery and lends no support for Lead Plaintiff's theory. Lead Plaintiff's invocation of two settlements between CHSI (and its affiliates) and the U.S. Department of Justice is similarly unpersuasive. Far from showing that Defendants committed Medicare fraud, the settlement between CHSI and DOJ relating to admissions included no finding of liability or admission of misconduct, and involved the payment of a small fraction of what Lead Plaintiff's complaint alleges was at stake. The second settlement noted by Lead Plaintiff resolved an entirely separate state-specific claim involving a funding dispute between the State of New Mexico and the federal government that had nothing to do with admissions practices or criteria.

Third, Lead Plaintiff fails adequately to allege loss causation because it fails to identify a "corrective disclosure" that reveals the alleged truth that was previously concealed by Defendants. The only such disclosure alleged—the allegations contained in the lawsuit against CHSI filed by Tenet—merely repeated information that was publicly available and in any event amounted to mere allegations. That is insufficient as a matter of law to constitute a corrective disclosure. See *Sapssov v. Health Management Ass'n, Inc.*, 608 Fed. *App'x* 855 (11th Cir. 2015) (holding, in affirming the dismissal of an analogous case against a hospital system, that loss causation cannot

7

rest on an alleged corrective disclosure that repackages publicly available information or constitutes mere allegations of fraud). And even if Lead Plaintiff could overcome that legal hurdle, it will be unable to prove that the stock-price drop that it points to as the basis for its damages claim was caused by the "correction" of the alleged fraud.[2]

### (3) Procedural History

This putative securities class action was filed on May 9, 2011 on behalf of purchasers of CHSI's common stock.

On December 28, 2011, the Court consolidated this action with two other similar securities class actions and appointed the NYC Funds as Lead Plaintiff. Dkt. No. 64. On March 23, 2012, the parties jointly agreed to a scheduling order for the filing of a consolidated class action complaint and Defendants' motion to dismiss. Dkt. No. 67. In addition, the parties stipulated to the production of certain books and records that were produced by CHSI in the related Derivative Action.

On July 29, 2012, Lead Plaintiff filed its Consolidated Class Action Complaint (the "Complaint") alleging that investors suffered damages when Tenet exposed CHSI's unsustainable improper admissions practices. Dkt. No. 70. On September 11, 2012, Defendants moved to dismiss the Complaint. Dkt. No. 73.

---

[2] Lead Plaintiff now suggests that CHSI's announcement of a decline in same store-admissions in October 2011 constitutes an additional corrective disclosure. But claims arising from stock purchases after April 8, 2011, were not part of the putative class as originally pled and are now time-barred under the statute of limitations. In any event, the October 2011 earnings release—like the Tenet lawsuit—was not corrective of any alleged fraud.

8

On January 14, 2015, Lead Plaintiff moved this Court to lift the stay of discovery imposed by the Private Litigation Reform Act of 1995 (Dkt. Nos. 112-114) and for a hearing on that motion. Dkt. No. 115.

On January 16, 2015, the Court issued an order granting the motion for a hearing and setting an initial case management conference, stating that it believed "the stay should be lifted and this case should proceed on a roughly parallel scheduling order with the [Derivative Action]." Dkt. No. 116. The Court then entered an Initial Case Management Order ("Initial CMO") (Dkt. No. 121) that adopted the parties' agreement that Defendants would produce copies of the documents produced to the DOJ in response to subpoenas during its investigation into short-stay admission practices at CHSI-affiliated hospitals. Defendants provided those documents before the parties' mediation. A final determination of the Motion to Lift the Stay was continued pending a resolution of the mediation.

On April 27, 2015, the parties jointly participated in a private mediation session, which was unsuccessful. Shortly thereafter, Lead Plaintiff advised the Magistrate Judge of the failed mediation and renewed its request for a case management conference. Dkt. No. 122.

On May 11, 2015, Magistrate Judge Brown held a second case management conference. Defendants agreed to produce all discovery produced in the related Derivative Action for a period of 90 days (ending August 7, 2015), during which time the PLSRA stay of discovery would otherwise remain in place. Defendants also agreed to permit Lead Plaintiff to attend depositions held in the Derivative Action during that 90-day period, if any occurred. On May 13, 2015, the Court entered an order setting forth the parties' agreement. *See* Dkt. No. 136 ("First Amended CMO").

On May 12, 2015, Judge Nixon granted Lead Plaintiff's motion to lift the PSLRA stay entirely, thereby creating a conflict with the case management order Magistrate Judge Brown had entered the previous day. Dkt. No. 135. In the same order, Judge Nixon recused himself from this action. *Id*.

On May 13, 2015, this action was re-assigned to Judge Aleta A. Trauger.

On May 18, 2015, Defendants filed a motion to reconsider Judge Nixon's order lifting the stay and requested that the Court clarify that the First Amended CMO continued in effect. The Court (Aleta, J.) granted Defendants' motion on May 26, 2015. In doing so, it clarified that the PLSRA stay of discovery remained in effect as modified by the First Amended CMO.

On August 19, 2015, Magistrate Judge Brown held a conference to discuss Lead Plaintiff's request to amend the complaint before class certification briefing and to lift the PLSRA stay of discovery. Counsel in the Derivative action was invited to participate during this call. Judge Brown noted during the Court's conference call that there "if the stay is lifted, there needs to be some coordination of discovery so we don't, in effect, have to chew something twice. Now that doesn't necessarily mean that there has to be absolute coordination between the two cases." *See* Transcript, Dkt. No 162 at p. 33.

On August 20, 2015, Magistrate Judge Brown issued an Order ("8/20/15 Order") permitting Lead Plaintiff to amend the Complaint, setting deadlines for a new motion to dismiss, and lifting the PLSRA stay of discovery so that the parties in this action can coordinate certain discovery with the parties in the Derivative Action. *See* Dkt. No. 159 at p.3 ("It is the Magistrate Judge's intent to carefully coordinate discovery in the 433 and 489 cases to prevent duplication of effort in the depositions on Rule 30(b)(6) and individual witnesses").

C.  **IDENTIFICATION OF ISSUES**

**ISSUES RESOLVED**

**(1)    Jurisdiction and venue are not in dispute.**

**(2)    PSLRA Stay of Discovery**

Magistrate Judge Brown's Court's 8/20/15 Order resolved Lead Plaintiff's Motion to Lift the PSLRA Stay (Dkt. No. 135) by granting it. Defendants reserve the right to seek to reimpose the stay or to otherwise modify the discovery schedule if the Derivative Action is resolved, or as may be warranted by any ruling by the Court in this action.

**(3)    Amendment of the Complaint**

Pursuant to the 8/20/15 Order, Magistrate Judge Brown granted Lead Plaintiff's request to amend the Complaint. Lead Plaintiff filed its First Amended Consolidated Complaint ("FAC") on October 5, 2015.

**(4)    Motion to Dismiss the FAC**

Pursuant to the August 20, 2015, Order, Defendants shall move to dismiss or otherwise respond to the FAC on **November 4, 2015**. Lead Plaintiff shall file a response by **December 2, 2015**. Defendants shall file a reply by **December 16, 2015** which shall be limited to **10 pages**, absent Court permission for a longer reply pleading.

**ISSUES IN DISPUTE**

Class certification, liability, and damages are in dispute.

**D.    MOTION FOR CLASS CERTIFICATION**

**(1) Briefing**

The parties agree that Lead Plaintiff's motion for class certification, pursuant to Rule 23 of the Federal Rules of Civil Procedure, shall be taken up promptly in the event Defendants' Motion to Dismiss is denied. The following schedule shall apply:

- Lead Plaintiff's Motion for Class Certification shall be filed within **30 days** from the denial of Defendants' Motion to Dismiss;
- Defendants' Opposition thereto shall be filed within **28 days** from the filing of the Motion for Class Certification; and
- Lead Plaintiff's reply shall be filed within **14 days** from Defendants' opposition to class certification.

Lead Plaintiff's Motion for Class Certification, as well as Defendants' opposition, may not exceed **25 pages**, absent Court permission for longer a longer submission. Any reply brief shall be limited to **10 pages**, absent Court permission for a longer submission.

**(2) Class Expert Depositions**

Defendants shall have **30 days** from the filing of Lead Plaintiff's Motion for Class Certification to take the deposition of Lead Plaintiff's class expert(s). Lead Plaintiff shall have **30 days** from the filing of Defendants' opposition to take the deposition of Defendants' class expert(s).

**E.    INITIAL DISCLOSURES**

Pursuant to the Initial CMO, on February 18, 2015, Defendants served their initial disclosures pursuant to Rule 26(a) of the Federal Rules of Civil Procedure. Lead Plaintiff will serve its initial disclosures within **seven days** of the entry of this Order.

**F.    DISCOVERY**

No motions concerning discovery are to be filed until after the parties have conferred in good faith and, unable to resolve their differences, have scheduled and participated in a conference telephone call with the Court.

**(1) Protective Order**

The parties stipulated to a Protective Order governing the exchange of discovery which was entered by the Court on January 29, 2015.

**(2) Witness Disclosures**

The following is an initial list of potential witnesses currently known by the Parties: the NYC Funds, CHSI, current and former employees of affiliates of CHSI and current and former contractors, including physicians, hospital administrators and staff at certain CHSI-affiliated facilities, current and former executives and directors, including Defendants Wayne T. Smith, and W. Larry Cash, representatives of other healthcare providers and/or systems, certain third-parties and vendors, including Pro-MED Systems, Inc., Executive Health Resources, Inc., Premiere Global Services, Inc., and other persons or entities revealed through the course of discovery. Attached as Exhibit "A" is an initial list of potential witnesses prepared by Lead Plaintiff that have, to date, been revealed through discovery.

**(3) Initial Document Production**

Pursuant to the Initial CMO, Defendants produced to Lead Plaintiff all documents that CHSI and its affiliates had provided to the DOJ in connection with a series of Government subpoenas, the first of which was received in April 2011, related to short-stay admissions originating in the emergency department as well as the federal government's investigation into a Laredo, Texas, hospital affiliated with CHSI. Defendants also produced to Lead Plaintiff all

applicable agreements of insurance, and insurance policies, including Director and Officer insurance policies during this same time frame.

Pursuant to the First Amended CMO, between May 13, 2015 and August 7, 2015, Defendants produced copies of all documents they produced in the Derivative Action, as well as all pleadings, motions and written discovery requests/responses filed or served in the Derivative Action.

**(4) Meet and Confer Obligations**

The parties have agreed to meet and confer concerning any questions that arise concerning discovery.

**(5) Merits Discovery Plan**

    **(a)**     **Initial Discovery Requests**

The parties shall serve their initial discovery requests within **seven days** of the entry of this Order. Written objections/responses to those discovery requests will be due within the time period set forth in the Federal Rules of Civil Procedure. Responsive materials are to be produced on a rolling basis.

    **(b)**     **Number of Depositions**

        (i)     The number of depositions imposed by the Federal and Local Rules of Civil Procedure is increased to a maximum of **20 per side**, plus Lead Plaintiff may utilize a total of **50 hours** to examine **all witnesses** noticed in the Derivative Action.

        (ii)     Any deposition noticed in the Derivative Action shall not count toward the **20** deposition limit. However, if Lead Plaintiff examines any witness noticed in the Derivative Action, that examination time

will count toward the 50 hour limit referenced in 5(b)(i). If it appears any party is abusing the process of taking repeated depositions of witness, the Magistrate Judge will modify this order.

 (iii) Expert and class depositions shall not count toward the 20 deposition limit.

 (iv) The parties may agree to more depositions, if necessary, but if they are unable to agree, they should request a telephone conference with the Court to resolve the issue.

**(c)** **Interrogatories**

Local Rule 33.01(b) shall be expanded to allow **40 interrogatories**, including subparts.

 **Fact Discovery Cut-off**

Factual discovery shall close on **August 31, 2016**.

**G.** **MOTIONS TO AMEND**

Shall be filed by **May 2, 2016.**

**H.** **EXPERT REPORTS AND EXPERT DISCOVERY**

Initial reports and disclosures from Lead Plaintiff's and Defendants' retained experts under Rule 26(a)(2) shall be served on **October 16, 2017**. Rebuttal expert reports and disclosures, if any, will be served on **November 30, 2017**. Expert discovery depositions shall close on **February 10, 2017.**

**I.** **JOINT MEDIATION REPORT**

On April 16, 2015, the parties participated in a private mediation that was unsuccessful.

## J. DISPOSITIVE AND DAUBERT MOTIONS

Summary judgment and/or summary adjudication and Daubert motions shall be filed with the Court on or before **March 21, 2017**. Oppositions to dispositive motions shall be filed on or before **April 18, 2017**, and a reply shall be filed on or before **May 2, 2017.** Any motion or response may not exceed **25 pages**, absent Court permission for a longer submission. Any subsequent reply brief is limited to **10 pages**, absent Court permission for a longer submission.

## K. ELECTRONIC DISCOVERY

The parties have agreed to meet-and-confer to discuss and develop certain protocols, within **14 days** following the entry of this order, that will govern the production of ESI and anticipate agreeing to an appropriate searchable format. Absent agreement, Administrative Order 174 will apply.

## L. ESTIMATED TRIAL TIME

The parties agree that this action will be subject to a jury trial. The parties also agree that any discussion of a target trial date or trial duration is premature until after Defendants' motion to dismiss is resolved.

IT IS SO **ORDERED**.

      /s/    Joe B. Brown
Joe B. Brown
United States Magistrate Judge

# EXHIBIT A

# LEAD PLAINTIFFS LIST OF POTENTIAL WITNESSES

## *Norfolk v. Community Health Sys.*, 11-vc-0433

| | NAME | TITLE |
|---|---|---|
| 1 | Wayne T. Smith | CEO |
| 2 | W. Larry Cash | CFO |
| 3 | T. Mark Buford | SVP, Chief Accounting Officer; Corporate Controller; SVP Internal Audit |
| 4 | Carolyn Lipp | *Former* Senior VP of Quality Resource Mgmt. |
| 5 | Lynn Simon, M.D. | Senior VP of Quality Resource Mgmt. |
| 6 | Debbie Cothern | *Former* VP of Quality Resource Mgmt. |
| 7 | Andrea Bosshart | VP, Corporate Compliance Officer |
| 8 | Mike Miserocchi | VP, Operations Support |
| 9 | Martin G. Schweinhart | Senior VP, Operations |
| 10 | Rachel Seifert | SVP, Secretary and General Counsel |
| 11 | Carol Hendry | Senior Counsel |
| 12 | David L. Miller | Division I President |
| 13 | Michael Portacci | Division II President |
| 14 | Martin J. Bonick | Division President |
| 15 | Gary Newsome | *Former* Division III President |
| 16 | Martin Smith | Division III President |
| 17 | William Hussey | Division IV President |
| 18 | Tom Miller | Division V President |
| 19 | Cully Chapman | Division President, Former CFO Northside Medical Ctr. |
| 20 | J. Gary Seay | VP, Chief Information Officer |
| 21 | Debbie Cothern | VP Quality Resource Mgmt. |
| 22 | Larry Carlton | Senior VP, Revenue Management |
| 23 | Maureen Murphy | Director, Case Management |
| 24 | Joanne Hardin | Case Management/Corporate Director Core Measures |
| 25 | Michele Reynolds | Director, Emergency Srvcs., Pro-MED Task Force |
| 26 | Maggie Redmond | Director, Emergency Services |
| 27 | Brad Cash | Observation Task Force |
| 28 | Paul Smith | VP Operations, Division I |
| 29 | David Medley | VP Operations, Division II |
| 30 | Gary Link | VP Operations, Division II / III |
| 31 | Mike Douzuk | VP Operations, Division IV |
| 32 | Ronald Shafer | SVP, Human Resources; VP Operations, Division III |
| 33 | Mike Lynd | VP Financial Services |
| 34 | Michael Healey | CHS Corporate-Accounting; VP Finance, Division II |
| 35 | Douglas Gleeson | VP Finance, Division II |
| 36 | Julie Thompson | Executive Asst., Finance Division |
| 37 | Jackie Moran | Corporate Director of Survey Management; |

| | NAME | TITLE |
|---|---|---|
| | | Regional Director, Quality Resource Mgmt. |
| 38 | Tammy Taylor | Carolyn Lipp's Senior Admin. Assistant |
| 39 | Ken Hawkins | SVP, Acquisitions |
| 40 | Marion Wedo | Regional Mgr., Case Management |
| 41 | Raquel Sparkman | Dir. of Compliance |
| 42 | Cheryl Hammen | VP HIM (Health Information Management) |
| 43 | Jerry Weismann | VP Physician Recruitment |
| 44 | Brooks Turkel | CEO, Chestnut Hill Health System |
| 45 | Russell Pigg | CEO, Gateway Health System |
| 46 | Edward Sanchez | HIM Director, Laredo Medical Center |
| 47 | CEO/CFO at 150+ CHSI Affiliated hospitals | |
| | **THIRD PARTY WITNESSES** | |
| 48 | Pro-MED Systems | |
| 49 | McKesson Corporation | |
| 50 | Tenet Corporation | |
| 51 | Executive Health Resources; Dr. Joseph Zebrowitz | |
| 52 | Wells Fargo | |
| 53 | J.P. Morgan Chase | |
| 54 | Deutsche Bank | |
| 55 | Citibank | |