# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

NORFOLK COUNTY RETIREMENT    )
SYSTEM, individually and on behalf    )
of all others similarly situated,    )
    )
    Plaintiff,    )
    )
    v.    )    No. 3:11-00433
    )    Judge Sharp
COMMUNITY HEALTH SYSTEMS,    )
INC., WAYNE T. SMITH and W.    )
LARRY CASH,    )
    )
    Defendants.    )

## MEMORANDUM

In this consolidated class action alleging securities fraud brought by Plaintiff Norfolk County Retirement System ("Norfolk County"), Defendants Community Health Systems, Inc. ("CHS"), Wayne T. Smith, and Larry Cash have filed a Motion to Dismiss the Amended Complaint (Docket No. 177). Plaintiff has filed a response in opposition (Docket No. 185), to which Defendants have replied (Docket No. 191).

After the motion was fully briefed, the case was transferred to the undersigned, and the Court heard oral argument on April 11, 2016. For the reasons that follow, Defendants' Motion will be granted.

## I. Factual Background

The complaint is now in its third iteration, spans more than 130 pages, and contains 507 paragraphs. For present purposes, the relevant factual allegations can be summarized as follows:

1

## A. Overview

Plaintiff Norfolk County has more than 8,200 active and retired members from 40 governmental units throughout the County of Norfolk, Massachusetts, and has approximately $600 million in assets under management. It claims to have been damaged by the purchase of publicly-traded common stock of CHS at artificially-inflated prices during the class period, which runs from July 27, 2006 through October 26, 2011.

Defendant CHS operates and leases more than 130 acute-care hospitals in non-urban markets in 29 states. Defendants Ward Smith and Larry Cash are senior officers of CHS, with Smith serving as Chief Executive Officer and Chairman of the Board, and Cash serving as Chief Financial Officer and Director.

Hospitals admit on an inpatient basis patients who present for treatment while suffering from complex medical conditions that will likely require care for 24 hours or more. Hospitals admit on an outpatient observation basis patients whose medical condition requires care for less than 24 hours, and whose condition is not so serious that the full spectrum of inpatient services is indicated.

At its facilities, CHS provides both inpatient admission and outpatient observation services. However, its use of observational status prior to 2011 was less than half the national average rate for United States hospitals. This was not a fluke, according to Plaintiffs, because, for at least ten years prior to the filing of the initial complaint, CHS improperly yet systematically boosted its Medicare revenues by admitting patients for inpatient service when all that was medically required was outpatient observation. This resulted in huge earnings as more than 27 percent of CHS' net operating revenue is derived from Medicare reimbursement payments.

Medicare pays more for inpatient treatment than for outpatient observation because the latter

2

requires a shorter hospital stay and typically less testing and monitoring. During the relevant time period, CHS received on average $3,300 (or 257 percent more) from Medicare for a given inpatient admission than for an outpatient observation admission. This point was driven home to the CEO's and physicians at CHS's hospitals in various ways. For example, Michael Miserocchi, Group Operations V.P. and Senior Director of Emergency Department ("ED") programs reminded CEOs that every admission was worth approximately $5,800 in net revenue, while every patient discharged home was worth approximately $250 in net revenue. Similarly, Carolyn Lipp, Senior Vice President of Quality and Resource Management and a direct report to Smith and Cash, gave a 2008 presentation during which she stated that the maximum reimbursement for observation status was only $661, but Medicare reimbursed hospitals up to $7,000 for admitted patients.

After being made the subject of a hostile takeover attempt by CHS, Tenet Healthcare Corporation ("Tenet") sued CHS on April 11, 2011. It was that suit that served as the impetus for this lawsuit because the complaint publicly revealed that CHS's successful track record of increasing revenues at acquired hospitals was attributable to improper and unsustainable ED admission practices. More specifically, CHS employed practices to drive up Medicare revenues by admitting patients rather than discharging them.

These improper and concealed practices included the lofty goal of zero observations for Medicare patients. To achieve that desired end, CHS used aggressive admission justifications, known as the Blue Book, and programming in CHS's Pro-MED software system. CHS also implemented bonus programs; admission rate quotas approaching 50% for Medicare (over 65 years old) patients; and employment terminations to compel CHS personnel to adhere to the aggressive admissions policy.

3

## B.  Blue Book and Pro-MED

Starting in 2000, CHS developed and implemented the Blue Book, a compendium of liberal admissions criteria.  The Blue Book did not list an objective treatment criteria but, rather, a series of "Admission Justifications" that would trigger the medical staff to admit patients who otherwise could have been placed in observation and/or released.

The Blue Book was used for patient intake at least until the filing of the Tenet lawsuit, and providers were schooled in its use.  For example, in 2004, Lipp prepared a PowerPoint presentation, approved by Smith, that set forth the company-wide protocol applicable to all CHS hospitals: "All physicians should receive a copy of the Blue Book"; "each case manager should carry one with them"; an "[e]lectronic version should be available in ER"; and applicable admission criteria should be placed on the bedside hospital record of every ED patient for review by emergency nurses and physicians. (Docket No. 167, First Amended Complaint ("FAC") ¶ 28).

With observation not being mentioned, observation status was not an option for physicians trained on the Blue Book criteria.  The goal, instead was a "ZERO Medicare observation" policy, with Lipp stating, "[w]e want to avoid observation as much as possible on Medicare patients and on private insurance," and issuing a directive to hospital case managers, "no chest patients in observation."  (Id. ¶ 29).  Indeed, in a training presentation titled "Observation Status and One-Day Stays," Lipp emphasized that "case management MUST BE NOTIFIED of every Observation case and MUST APPROVE the use of observation before the patient is placed into Observation status." (Id.).

The edicts were taken to heart.  Steve Grubs, the CEO of Berwick Hospital, informed corporate in a 2006 quarterly report that "the CEO and ER Director will immediately implement the

4

Blue Book Plan or other plan," and would work toward a "goal of <u>ZERO</u> Medicare Observation." (<u>Id</u>. 32). Similarly, the Medical Director of the Emergency Department at Gadsen Regional Medical Center stated that it was "the CHS" way to admit "just about all our chest pain to inpatient status." (<u>Id</u>. ¶ 31). Likewise, the Phoenixvile Hospital's CEO reported to his division president and other executives that he was "in the ER throughout the day (including weekends)" and made sure ER physicians' "marching orders are to admit." (<u>Id</u>. ¶ 33).

No other hospital chain in the United States used the Blue Book. Instead, the vast majority used independent, third-party admissions criteria provided by InterQual or the Milliman Care Guidelines. The former was developed by a panel of 1,100 healthcare providers and used by 3,700 hospitals; the latter was developed by a team of physicians, reviewed by approximately 100 doctors, and used by over 1,000 hospitals.

In addition to the Blue Book, CHS used Pro-MED, a proprietary networked software system, to track, in real time, patient, ED and individual physician statistics. Performance of hospital, departments, and physicians were compared to each other, and Pro-Med helped to insure that benchmarks were met.

Pro-MED was deployed after CHS acquired Triad hospitals and learned that their ED rates were unacceptably low. This resulted in the loss of approximately $40 million annually in net revenue to Triad.

Smith mandated that Pro-Med be installed in every hospital to increase admissions rather than observation. Moreover, the software was standardized at every hospital and contained a "lock out" feature that prevented physicians from making changes. All hospitals were to "fully utilize Pro-

MED capabilities," including "test mapping,[1] interfaces, [and] status boards." (Id. ¶ 49). Corporate tracked hospitals levels of Pro-MED corporate "standardization," and "how compliant [] ED docs [we]re with the Pro-MED system recommendations for admission." (Id. ¶ 43).

Not only were hospitals required to use Pro-MED, Medical Directors were tasked with reviewing its reports to identify patterns or problems among ED doctors and report those findings weekly to the CEO of the hospital.[2] If patterns of non-admission were discovered, doctors were to be counseled.

At some hospitals, a "QualCheck" feature was installed in the Pro-MED system. This feature identified patients with an "alert" or "flag" in the patient's record and required tests or treatment before the flag could be removed. Physicians who decided to discharge patients despite the flags were required to actively override QualCheck and that override – considered to be "lost revenues" – was identified and tracked by CHS. (Id. ¶ 44). Further, performance metrics were built into contracts with physician groups so that CHS "could restrict the percentage of patients discharged with Pro-MED review flags to 35% of total visits." (Id. ¶ 46)

Many physicians were unhappy that CHS used Pro-MED to supersede their independent medical judgment. One viewed the indicator for some of the flags as "ridiculous." Another stated, that he was aggravated with the use of Pro-MED because doctors felt compelled to justify their decision to discharge a patient. An internal memorandum informed Cash that numerous physicians

---

[1] Test mapping involved "standardizing a set of minimum tests that are required for patients with certain chief complaints." (Id. ¶ 41). At Smith's direction, the tests ordered for each medical condition were determined, "locked down" at the corporate level, and health care providers who desired to make changes to the feature were required to submit change requests.

[2] Additionally, CEOs were to spend an hour a day in the ED and daily meetings with that department were to be held.

6

questioned using "a tool like Pro-MED," and that "Pro-MED was not a good tool in anyone eyes." (Id. ¶ 47).

Some physicians also found that the Pro-MED "test-mapping component" compromised patient safety.  In this vein, the Director of Quality Assurance at Watsonville Community Hospital, Michael McGannon, informed CHS senior management in 2007 that Pro-MED's standardized test mapping "subject[s] patients to unnecessary pain, radiation and expense," that the "blanket use of these several tests is contrary to the standard of care," and that "[e]xpecting the triage staff to manipulate chief complaint designations to get around ordering inappropriate tests is, in itself, inappropriate."  (Id. ¶ 48).  Notwithstanding such concerns, CHS mandated that Pro-MED be used in every hospital and controlled from corporate headquarters.

CHS's headquarters pressured Division Heads, who, in turn, pressured hospital CEOs and staff to use the Blue Book to meet or exceed the benchmarks tracked by Pro-MED.  For example, Lockhaven Hospital implemented daily "flash meetings" and produced a "Score Card" to show that they were keeping up with the benchmarks, and every morning the chief executives there met to discuss emergency room visits and admissions statistics.  The CEO of White County Community Hospital, when faced with "the current freefall in our ED admit rate," indicated he was "working on getting the current ED Physicians in line as well as recruiting some replacement physicians who understand the expectations we have for our patients."  (Id. ¶ 56).

## C.  Enforcement of No-Admission Policy

Physicians who had low admit rates, or failed to improve their admit rates, were either terminated, replaced, or had their shifts reduced. Just by way of example, (1) after a 13% decline in admissions, the Action Plan for Skyridge Medical Center was to "eliminate ED physician low

7

performers"; (2) a physician at Lock Haven Hospital who had admissions rates in the single digits "was going to be transitioned from the schedule," and another was terminated for consistently falling below the benchmarks for patients over 65; (3) a "low admitter" at Parkway Regional Hospital was "taken off [the] June [2009] schedule"; and (4) a physician at the Berwick Hospital had his shift reduced because he was a "chronic low admitter."  (Id. at ¶ 60).

No only were individual physicians disciplined, entire practice groups were subject to termination.  This occurred at the South Texas Regional Medical Center, as well as at the Spokane Deaconess Hospital.

On the other hand, those who performed well, *i.e.* met or exceeded the benchmarks, were rewarded.  This included not only bonuses for CEOs, but also incentive plans for individual doctors.

CHS' standardization and centralization of ED practices through use of the Blue Book and Pro-MED proved highly successful in increasing admissions.  A Division II "Executive Summary-September 2008"  indicated that for the nine months ending September 30, 2008, 43,009 patients were admitted while only 736 were placed in observation, and that, for those patient over 65, only 23 patients were placed in observation.

When CHS acquired the 50 or so Triad Hospitals in 2007, those hospitals' performance increased as well through the use of the Blue Book, notwithstanding resistance by the CEOs of those hospitals to its implementation.  Following implementation of the CHS's protocols, Brownwood Regional Medical Center, a former Triad hospital, reduced weekly observation rates from 20% to 3% over the ten week period from August 29 to October 31, 2007.  Overall, within a year of Triad's acquisition, the use of observation status at the former Triad hospitals decreased by 52% through the implementation of Blue Book admission practices, while the percentage of "one-day stay"

admissions increased by one-third, with even higher increases for patients with common conditions such as chest pain, syncope (fainting), and gastro-intestinal bleeding.

## D. Knowledge of Medicare Compliance Issues

Plaintiff claims that Defendants' misrepresentations were made with full knowledge that the metric used to drive increased admission likely violated Medicare requirements. This problem, moreover, was known for years from both internal audit review and consulting experts.

In a February 2004 memorandum, Chuck Reece, QRM Regional Director, informed Lipp and CHS's head compliance officer about "evidence of a widespread trend of one-day stays," resulting from CHS's policy of "no Medicare observations" that posed a "significant potential compliance issue relating to the use of observation within our facilities." (Id. ¶ 87). Reece also indicated that he had been informed that the goal of no Medicare observation came from corporate.

Subsequently, the QRM department prepared observation guidelines. Those guidelines, however were rejected by the Regional Physician Advisory Committee on January 8, 2005 because, even though they could be a "useful tool to [the] case manager," such guidelines "could confuse the physicians" and "may prompt physicians to use the observation category instead of admitting the patient to inpatient status when possible." (Id. ¶ 90). The CHS Physician Advisory Board, headed by Smith and Cash, adopted that rationale and, on January 14, 2005, decided to continue excluding observation guidelines from the Blue Book. That exclusion from the Blue Book continued for almost five years.

In 2006 CHS retained Primaris to perform an independent study called the "One-Day Stay Project." The study revealed that 61% of the randomly chosen patient admitted under the Blue Book

for one-day stays at Northeast Regional Medical Center during the second half of 2005 failed the InterQual admission criteria for admission, resulting in additional Medicare payments of $180,600. Another consultant, Health Services Advisory Group, expressed concerns in May 2007 that the Bluebook criteria justifying admission of patients with the Medicare billing code for chest pain "would allow patients who should be categorized as Observation status to be admitted as Inpatient status." (Id. ¶ 93).

Additionally, CHS's own internal audits found that patients were being inappropriately admitted pursuant under the Blue Book. On August 17, 2007, Carol Hendry, a Vice President and Corporate Compliance and Privacy Officer (and a direct report to Smith), prepared a compliance Status Report that indicated 56 of the 72 patients admitted for one-day stays at Chestnut Hills Hospital did not meet admissions criteria. In that same report, Hendry informed Smith that she would provide him with a submission about the "Dr. Joe Zebrowitz issue" the following week.

Dr. Zebrowitz of Executive Health Resources, a longtime expert consultant, was hired by CHS to review its admissions practices. He documented compliance problems at numerous CHS hospitals relating to the Blue Book criteria that resulted in one-day stays, a known Medicare red flag. In his report on Watsonville Community Hospital in 2006 for example, Dr. Zebrowitz noted CHS' serious risk because there were almost no observations and the Centers for Medicare and Medicaid Services ("CMS") was aggressively investigating Medicare fraud with a focus on the red flags for lack of medical necessity. On September 7, 2007, Hendry provided Smith with a summary of Dr. Zebrowitz's investigation.

On January 21, 2008, Dr. Zebrowitz emailed Hendry and reiterated his concerns regarding CHS's medical necessity compliance. Dr. Zebrowitz advised Hendry that he had been retained as

an expert witness and consultant in connection with the Office of Inspector General's ["OIG's"] investigation that resulted in a $26 million settlement of claims against St. Joseph Hospital of Atlanta. Attached to the email was a Department of Justice release, that stated the settlement covered claims against St. Joseph's for short stay inpatient admissions, usually of one day or less, which should have been billed on an outpatient observation basis. He went on to write:

> The lesson we took away from the St. Joe example was "Do not get the OIG to investigate you" . . . I think your current processes and underlying basis (such as – we don't really have any observation) place your organization at serious risk.

(Id. at ¶ 99).

On January 30, 2008, Dr. Zebrowitz sent his conclusions to Hendry. Dr. Zebrowitz indicated that, although there is no regulatory requirement that a hospital use a particular commercially available screening criteria such as InterQual, the basis for determining medical necessity must, in accordance with 42 C.F.R. 411.406(e), still comport with either Quality Improvement Organization Guidelines or Local Standards of Care. The Blue Book criteria, however, (1) "lack[ed] specificity, allowing all cases to be classified as inpatient"; (2) would likely be construed as "statistically biased"; (3) results in "overcertification of inpatient"; and (4) could be construed as "an avoidance of best practices." (Id. ¶ 101).

Dr. Zebrowitz's investigation also revealed that CHS's refusal to use observation status presented a "clear medical necessity compliance risk." He also wrote that CHS instructed case managers "to make everything inpatient," and that

> (1) the ED Director at Chestnut Hill Hospital stated "15% of our admissions are not appropriate, but I was told to make them inpatient" and "not to use observation, except for extended post-surgical care";

> (2) the Director of Case Management at Porter Hospital was "told not to use observation" and that "[CHS] Corporate tells us not to use observation, except for

11

extended post-surgical care";

(3) the Director of Case Management at Porter Hospital "was told not to use observation";

(4) one-third of the 24 esophagitis/gastroenteritis cases reviewed failed to support inpatient admission; and

(5) 55% of the one-day stay cases reviewed at Watsonville Community Hospital failed support inpatient admission.

(Id. ¶ 102).

Dr. Zebrowitz also reported that case managers had "repeatedly expressed their discomfort at following [the no-observation] instructions, creating an environment of clear medical necessity compliance risk and exposure." (Id. ¶ 103). He concluded "the fact that Blue Book is utilized by these hospitals as a rubber stamp and not a screening tool is a potential problem." (Id).

Smith and Cash were informed of Dr. Zebrowitz's findings and conclusions. Nevertheless, the Blue Book was implemented en masse at former Triad hospitals, and no comprehensive changes were made to provide observation status guidelines for another two and one-half years. During that period, improper admissions under the Blue Book continued, with a February 2009 CMS audit of 40 chest pain patients admitted to Oro Valley Hospital showing that 70% did not meet InterQual criteria for admission, and an early 2011 audit of Dyerburg Hospital showing that only one of 185 patients met the InterQual criteria for admission.

### E. Growth and Stock Trading

From 2006 through 2011, CHS pursued a growth by acquisition strategy, increasing the number of hospitals from 77 to 131, increasing the number of beds from 9,117 to 19,695, and more

12

than tripling its net revenues from $4.3 billion to $13.6 billion.[3] During his same period, between 26.8% and 32.0% of CHS's net operating revenue was derived from Medicare reimbursement payments, and it allegedly received up to $306 million from improperly billing Medicare.

Between May 2009 and May 2010, Smith sold 500,000 shares of his stock, receiving a profit of $8,443,908 on those sales. For fiscal year 2011, his total compensation was approximately $21.6 million, including $3.95 in bonuses and incentive.

Between August 2009 and April 2010, Cash sold 480,000 shares of his CHS stock and received profits totaling $7,432, 100. For fiscal year 2011, his total compensation was approximately $8.6 million, including $1.4 million received in bonuses.

According to Plaintiff, the sale of stock by both Smith and Cash was not happenstance. Smith sold 250,000 shares of CHS stock (yielding $3,267,500 in profits), and Cash sold 240,000 shares (yielding $2,517,600 in profits) after the PAB decided – for the first time in CHS's history – to change the Blue Book to permit observation for low level chest pain, but before that new policy was implemented. Similarly, after the PAB approved adding observation for many other medical conditions, but again before those changes were implemented, Cash sold another 240,000 shares (for $4,809,600 in profits), and Smith sold an additional 250,000 shares (for $5,176,409 in profits).

As noted, Tenet filed a lawsuit against CHS on April 11, 2011. Tenet alleged CHS had "systematically overbill[ed] Medicare and likely other payors as well . . . by causing patients to be admitted to its hospitals unnecessarily when, under standard clinical practice, these patients should have been treated in outpatient observation status." (Id. ¶ 420). Tenet also alleged that the

---

[3] The bulk of this growth occurred through the July 2007 acquisition of the Triad hospital system for $6.8 billion.

"overstated . . . admissions statistics and trends, revenues, profits, and cash flow . . . has created substantial undisclosed liabilities to Federal and State healthcare programs, private health insurers and patients." (Id.).

When the Tenet lawsuit was filed, CHS stock suffered a 35.8% decline on heavy trading. In fact, the trading volume totaled 44.7 million shares on April 11, 2011. This was the highest volume of trading in CHS's history and the decline in stock price is the largest to date.

CHS repeatedly denied the claims made by Tenet, calling them inaccurate and meritless. Nevertheless, on August 4, 2014, CHS entered into an agreement with the Department of Justice to settle multiple *qui tam* lawsuits for $98.15 million. In those lawsuit it was alleged that CHS "knowingly submitted or caused to be submitted claims for payment to the Government healthcare Programs for certain inpatient admissions . . . that were medically unnecessary and should have been billed as outpatient or observation services." (Id. ¶ 472). More specifically, the Government alleged that from 2005 to 2010, CHS engaged in a deliberate corporate-driven scheme to increase admissions for patients over the age of 65 who sought treatment in the EDs at almost 120 CHS hospitals and then improperly submitted claims for repayment to Medicare, Medicaid, and the Department of Defense's Tricare program in violation of the False Claims Act. As part of the settlement, CHS entered into a Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services and agreed to create a compliance program that addressed and ensured adherence to the requirements of Medicare and other Federal health care programs.

## F. Claims in the Complaint

The initial complaint in this Court was filed on May 9, 2011. The complaint was amended on July 13, 2012, and again on October 15, 2015, the last of which raised new allegations about

14

misrepresentations after the filing of the first complaint.

In the now-controlling First Amended and Consolidated Class Action Complaint, Norfolk County, on behalf of itself and all persons or entities who purchased and/or sold the publicly traded securities of CHS from July 27, 2006 through October 26, 2011, brings two claims. Count I is directed at all three Defendants and alleges violations of Section 10(b) of the Exchange Act and Securities Exchange Commission Rule 10b-5. Count II is directed at Smith and Cash and alleges they are liable under Section 20(a) of the Exchange Act for the violations committed by CHS.[4]

The bulk of the allegations in Plaintiff's First Amended Complaint relate to alleged misrepresentations about the basis of CHS's success before the Tenet complaint was filed. Those representations generally fall into three areas as set forth in the following allegations:

> 8. Defendants actively misled investors about the reasons for CHS's success. Defendants touted the "consistent execution of CHS's centralized and standardized operating strategies," its "ED initiatives," and its hospital acquisition strategy as key factors in growing its business. These statements were materially false and misleading in failing to disclose, inter alia, that these strategies depended in large part on utilizing aggressive non-industry admissions criteria that were unsustainable and a substantial Medicare compliance risk. Indeed, once Tenet revealed CHS's improper admissions practices, CHS was forced to concede that it had recently made the decision to discontinue the Blue Book. Lower patient admissions and ED revenues would be reported in October 2011 for the time being, but the truth was still

---

[4] "Because a primary violation of the securities law is an essential element of a § 20(a) derivative claim, a plaintiff who pleads a § 20(a) claim can withstand a motion to dismiss only if the primary violation is pleaded with legal sufficiency." Thompson v. RelationServe Media, Inc., 610 F.3d 628, 635-36 (11th Cir. 2010); see also, ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 67 (1st Cir. 2008) ("The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation."); In re Rockefeller Ctr. Properties, Inc. Sec. Litig., 311 F.3d 198, 211 (3rd Cir. 2002) (holding that "dismissal of the § 10(b) claims against [the corporation] made it impossible to hold the individual defendants liable under § 20(a)" because "derivative claims under Section 20(a) depend on proof of a separate underlying violation of the Exchange Act").

vehemently denied and actively concealed by Defendants.

9. CHS's "admit" edict was also contrary to CHS's publicly touted "mission" of providing quality patient-centered healthcare. As found by an ethicist from the University of Tennessee College of Medicine a potential loss of income, peer esteem, staff privileges, one's job or even your entire practice group's contract, created powerful pressure at CHS to align medical staff's professional judgment with the hospital's financial interests, creating a conflict for doctors who were to act in patients' interests. Not only that, but over-admitting also compromised patient safety. CHS's reports demonstrate that 70% of "hospital acquired conditions" following admission were inflicted upon Medicare patients.

10. Defendants' representations that CHS hospitals were in substantial compliance with federal, state, and local regulations and standards, were materially false and misleading in failing to disclose long-standing potential Medicare violations at numerous hospitals.

(Id. ¶¶ 8-10).

As for the alleged misrepresentations after the Tenet lawsuit was filed, Plaintiff contends Defendants falsely, yet knowingly, claimed that Tenet's allegations had no merit – labeling them at one point as being "irresponsible" – and falsely asserted that the switch to InterQual criteria would have no material impact on CHS's operations. Such statements were materially false, according to Plaintiff, because past experience showed precisely the opposite, i.e., that admissions suffered when the Blue Book began to include criteria for observation.

## II.  Standards of Review

In considering a Motion to Dismiss a complaint alleging fraud in violation of federal securities law, three standards of review come into play. Those standards derive from Rules 12(b)(6) and 9(c) of the Federal Rules of Civil Procedure, and from the Private Securities Litigation Reform Act of 1995 ("PSLRA").

First, under Rule 12(b)(6), "all well-pleaded material allegations of the pleadings" are accepted as true, and those allegations must "be sufficient to give notice to the defendant as to what

16

claims are alleged, and . . . plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Fritz v. Charter Twp of Comstock, 592 F.3d 718, 722 (6ᵗʰ Cir. 2010) (quoting Ashcroft v. Iqbal, 129 S. Ct., 1937, 1949–50 (2009)). In determining whether a complaint sets forth a plausible claim, a court may consider not only the allegations, but "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." Ley v. Visteon Corp., 543 F.3d 801, 805 (6ᵗʰ Cir. 2008) (citation omitted).

Second, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This rule requires a plaintiff: (1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent." Republic Bank & Trust Co. v. Bear Stearns, 683 F.3d 239, 247 (6ᵗʰ Cir. 2012). "Although 'conditions of a person's mind may be alleged generally,' Fed. R. Civ. P. 9(b), the plaintiff still must plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation 'plausible on its face.'" Id. (quoting, Iqbal, 129 S. Ct. at 1949) (internal quotation marks omitted).

Third, and "[b]olstering this rule of specificity, the PSLRA imposes further pleading requirements." Indiana State Dist. Council of Laborers v. Omnicare, Inc., 583 F.3d 935, 942–43 (6ᵗʰ Cir. 2009) ("Omincare I"). The "complaint must 'specify each statement alleged to have been misleading,'" along with "the reason or reasons why the statement is misleading,'" and "must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Id. In short, "[a] valid claim under Section 10(b) of the Act and Rule 10b-5 'must

allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.'" <u>Zaluski v. United Am. Healthcare Corp.</u>, 527 F.3d 564, 571 (6th Cir. 2008) (citation omitted).

### III.  Application of Law

"Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the 'use or employ[ment] . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 341 (2005) (quoting, 15 U.S.C. § 78j(b)). "Commission Rule 10b-5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" <u>Id</u>. (quoting 17 C.F.R. § 240.10b-5).  "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Stoneridge Inv. Partners, LLC v. Sci.-Atlanta</u>, 552 U.S. 148, 157 (2008); <u>see</u> <u>also</u> <u>Brown v. Earthboard Sports USA, Inc.</u>, 481 F.3d 901, 917 (6th Cir. 2007).

Defendants contend that Plaintiffs fail to sufficiently allege the essential elements of a securities act claim, raising specific arguments in relation to the alleged misrepresentations that preceded the filing of the Tenet lawsuit, and those that followed the filing of that complaint. They also argue that the post-Tenet allegations are untimely. The Court considers the arguments roughly in the order presented by Defendants.

18

**A. Allegations Regarding Public Statements Up to the Filing of the Tenet Complaint**

Defendants move for dismissal of the allegations regarding statements made prior to the filing of the Tenet lawsuit on three primary grounds. First, they contend that the First Amended Complaint does not adequately allege any actionable misrepresentations prior to April 11, 2011. Second, they argue that Plaintiff fails to plead facts giving rise to a strong inference of scienter. Third, Defendants contend that Plaintiff fails to plead that the decline in stock prices when the Tenet lawsuit was filed was caused by any alleged fraud.

*1. Actionable Misrepresentations*

Defendants note that in the First Amended Complaint, Plaintiff alleges a series of misrepresentations regarding CHS's "business strategy," "operating strategies," "growth strategies," "acquisition strategy," "revenue strategies," "ER strategy," and the like. They characterize the "nub of Plaintiff's claim [to be] that all of these statements were misleading because *they failed to disclose* that CHSI's business strategies depended, in part, on admissions criteria that were unsustainable and a substantial Medicare compliance risk." (Docket No. 178 at 11, emphasis in original). Defendants insist that CHS's statements attributing its performance to a "business strategy are not actionable, as a matter of law" because (1) CHS "had no duty to opine on whether that strategy presented legal risks"; (2) "Defendants' touting of [CHS's] 'synergies,' 'efficiencies,' and other business-school jargon is immaterial to a reasonable investor, and therefore created no duty to disclose"; and (3) "Defendants did disclose information regarding ED admissions initiatives and risks that Plaintiff faults them for failing to disclose." (Id.).

A company is not required to divulge to the public each tidbit of information it possesses "because corporations might otherwise 'face potential second-guessing in a subsequent disclosure

19

suit,' a regime that would threaten to 'deluge investors with marginally useful information, and would damage corporations' legitimate needs to keep some information non-public.'" City of Monroe Emp. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 669 (6th Cir. 2005) (citations omitted). Thus, "[i]n order to be actionable, a misrepresentation or omission must pertain to material information that the defendant had a duty to disclose, id., and generally this duty does not apply to forecasts, or soft information. Zaluski, 527 F.3d at 571.

In this regard, Defendants point out the "black-letter law" that "'[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5a' Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)," and note that "the Sixth Circuit has made clear that "companies have no duty to opine about the legality of their own actions," because "[s]uch information is considered 'soft,' and, therefore, disclosure is not required." Omnicare I, 583 F.3d at 945." (Docket No. 178 at 12). They then argue that "Plaintiff tries to wordsmith around that dispositive obstacle by repeatedly calling CHSI affiliates' admissions practices 'unsustainable' instead of labeling them 'illegal[.]'" (Id.).

CHS has engaged in a bit of wordsmithing itself, however. In between the phrases excerpted by Defendants from Omnicare I, the Sixth Circuit, in response to the assertion that statements regarding "legal compliance" are not actionable, wrote that, "[a]s a general matter, that is true." Id. The essence of Plaintiff's complaint in this case is not simply that Defendants misled investors about its legal compliance. Moreover, simply characterizing a statement as either being forward-looking or soft, does not mean that liability cannot attach because "[w]hen a company chooses to speak, it must 'provide complete and non-misleading information.'" Omnicare I 583 F.3d at 941 (citation omitted). Thus, "if a company chooses to disclose information about the future, 'its disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional

20

material facts to the extent that the volunteered disclosure was misleading.'" <u>Zaluski</u>, 527 F.3d at 572. "[E]ven with 'soft information,' a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." <u>In re Ford Motor Co. Securities Litig.</u>, 381 F.3d at 569.

"When an alleged misrepresentation concerns 'soft information' which 'includes predictions and matters of opinion,' . . . a plaintiff must additionally plead facts showing that the statement was 'made with knowledge of its falsity[.]'" <u>In re Omnicare, Inc. Sec. Litig.</u>, 769 F.3d 455, 470 (6th Cir. 2014) ("<u>Omnicare II</u>"). Plaintiff has fulfilled the requirement in this case.

The underlying premise of the First Amended Complaint is that while Defendants touted CHS's "ED initiatives," its "growth by acquisition strategy," and its "consistent execution of CHS's standardized operating strategies" as key factors in the growth of its business, CHS neglected to disclose mandated, non-compliant ,and unsustainable companywide practices that drove that success, and made those misrepresentations with full knowledge that the Blue Book's guidelines were not defensible. Cases like <u>In re Sofamor Danek Group, Inc.</u>, 123 F.3d, 394, 400 (6th Cir. 1997) and <u>In re Almost Family, Inc. Securities Litigation</u>, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012) which Defendants characterize as rejecting the same misrepresentation theory on which Plaintiff relies, are inapposite.

<u>In re Sofamor</u> contained allegations that a medical-device company's revenues and success were attributed "to such things as increased sales volume without properly explaining how the sales were being achieved." 123 F.3d at 400. In Defendants' view, "the Sixth Circuit squarely rejected that argument, noting that the plaintiffs – like Plaintiff here – never challenged the accuracy of the sales figures," and " went on to hold that defendants were under no obligation to disclose exactly

how they arrived at those sales figures – namely, by 'engaging in illegal promotion of its products.'" (Docket No. 178 at 12-13, quoting, id. at 401). Even though that may be a proper characterization of the case, the holding was rendered in an entirely different context.

The allegation in In re Sofamor that the company was involved in the illegal promotion of its product had to do with funding a foundation and allowing its sales representatives to attend operations where surgeons made attachments to the pedicle in contravention of a Food and Drug Administration ("FDA") warning. However, the company disclosed its receipt of the warning letter and, while it may have downplayed the warning in its discussion with analysts, "any analyst could easily obtain a copy of the letter and could make an independent judgment of its significance." Id. at 402. Moreover, "[e]ach of the company's 10-K forms explicitly mentioned the risk that the FDA might obtain an injunction[.]" Id.

No such revelations were made in this case. Rather, at least according to the allegation in the First Amended Complaint, CHS hid core facts about the basis for the excessive ED admissions, all the while touting its success. A reasonable investor could certainly view such non-disclosures as important to their investing decisions since, when the facts are viewed in Plaintiff's favor, it was an all but foregone conclusion that the aggressive growth strategies would tank when use of the Blue Book – which no other hospital used – was subjected to scrutiny.

In re Almost Family found that statements about a company's "strategy, success, and management" were not misleading, even where plaintiff attributed the company's growth to a scheme to manipulate Medicare's reimbursement system. As Defendants in this case note, the court held that where a company's success could be attributed to several factors, the company was not required to discuss all of the factors which lead to the success, particularly since plaintiff did not

22

show that the factors discussed were not "farcical."  2012 WL 443461, at *7.

The court in In re Almost Family did not end its discussion on that point, however.  Rather, it observed that individual defendants may have a duty "to disclose even so-called soft information," such as when "the defendants knew of the illegal nature of their conduct at the time they made the allegedly material misstatement."  Id.  Moreover, the court observed that it was incumbent upon a plaintiff to set forth "a clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law[,]'" id. (quoting Kushner v. Beverly Enters., Inc., 317 F.3d 820, 831 (8th Cir.2003), but that simply was not the case where plaintiff relied upon statements of confidential witnesses and a paragraph from a five page resignation letter, none of which "reflect[ed] on Individual Defendants or their actual knowledge of any fraud occurring" within the company.  Id.  The allegations here are, of course markedly different, with the claim being that the two individual Defendants spearheaded the "zero admissions" policy with knowledge that Medicare would likely take issue with the Blue Book.

Moreover, the court in In re Almost Family distinguished City of Monroe, *supra*, which involved allegations of securities fraud against a tire manufacturer.  There, the Sixth Circuit found that statements like the company's tires were "the best tires in the world," that it had "no reason to believe there is anything wrong with" the tires, and that its successful sales were due to "high regard among automakers for our strengths in product quality," were "best characterized as loosely optimistic statements insufficiently specific for a reasonable investor to 'find them important to the total mix of information available.'" Id. at 671 (quoting In re Ford Sec. Litig., 381 F.3d 563, 570–71 (6th Cir. 2004)).  However, noting that "the context of the statement is often telling," the court found that a press release which stated the "objective data clearly reinforces our belief that these are high-

23

quality, safe standards" could, "without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way[,]" be viewed by a reasonable jury as a misrepresentation, particularly since there were internal memos that indicated significant problems with certain tires that were failing at "unprecedented rates." Id. at 672-73. In so ruling, the Sixth Circuit emphasized that the decision was being made in the context of a motion to dismiss and cited several cases as support for the conclusion that the company's "representation concerning 'objective data' could be deemed a material misrepresentation by a reasonable fact-finder." Id. at 673. These include Hanon v. Dataproducts Corp., 976 F.2d 497, 502 (9th Cir. 1992), which held "that the defendants' statements emphasizing superior quality were material because a 'reasonable jury could conclude that [the company] publicly released optimistic statements . . . when it knew [its product] could not be built reliably'" and In re F & M Distribs. Inc. Sec. Litig., 937 F. Supp. 647, 653 (E.D. Mich. 1996), which held "that the defendant chain store's failure to disclose an adverse industry trend that made the 'deal buying' strategy touted in its prospectus less viable than otherwise known could be actionable." Id. In the Court's view, touting an unsustainable and allegedly unlawful admissions practice is akin to touting a less than viable business strategy, or saying that a product can be reasonably built when it is known that it cannot be.

Nor can the statements attributed to Defendants about ER initiatives and increased admissions be swept away as immaterial because they were mere puffery or hyperbole. In Omnicare II, on which Defendants rely, the Sixth Circuit cautioned that a court "must tread lightly at the motion-to-dismiss stage," as "the federal judiciary has a limited understanding of investor behavior and the actual economic consequences of certain statements." 769 F.3d at 471. It also observed that "[t]he purpose of 'the materiality requirement is not to attribute to investors a child-like simplicity,

an inability to grasp the probabilistic significance of [opinion statements], but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision.'" Id. at 471-72 (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 234 (1988)). "[A] 'fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" Id. at 472. Certainly, a reasonable investor could find it important that the very basis on which the trumpeted ER success was based on a business model that would collapse.

True, and as Defendants point out, "'public companies praise their products and their objectives.'" (Docket No. 178 at 15, quoting In re Ford, 381 F.3d at 570). Indeed, "[c]ourts everywhere 'have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" In re Ford, 381 F.3d at 570-71 (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir.1996)). Nevertheless, and as already noted, the "securities laws . . . require an actor to 'provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'" City of Monroe, 399 F.3d at 670. Thus, while a company may not be required "to denigrate its own product, . . . Rule 10b-5 imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." Hanon, 976 F.2d at 503.

Here, Defendants attributed their growth success to ED initiatives, but did so without disclosing a potential serious flaw with the very reason for that success. Although they did "not

have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation," once they "put the topic of the cause of [CHS's] financial success at issue," they were "obligated to disclose information concerning the source of the success," and "the alleged failure to disclose the true source of this revenue could give rise to liability under § 10(b)." Sapssov v. Health Mgmt. Assoc., Inc., 22 F. Supp. 3d 1210, 1227 (M.D. Fla. 2014), aff'd, 608 F. App'x 855 (11th Cir. 2015); see also In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013) (citation omitted) ("The Court has no doubt that information relating to Gentiva's purported push to provide medically unnecessary services to secure extra reimbursement from Medicare, even if only accounting for a small percentage of Gentiva's actual profits, was not 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'").

Defendants next argues that, in any event, the statements they made were not misleading because they actually disclosed the risks that Plaintiffs claim they concealed. More specifically, Defendants assert:

> CHSI expressly – and repeatedly – warned investors of the Company's exposure to "heightened coordinated civil and criminal enforcement efforts" relating to "the health care industry," including investigations related to "billing practices." . . . CHSI also warned investors about potential lawsuits under the federal False Claims Act, . . . and that "[s]ettlements of suits involving Medicare and Medicaid issues routinely require both monetary payments as well as corporate integrity agreements," . . . "If we fail to comply with extensive laws and government regulations, including fraud and abuse laws," Defendants explained, "we could suffer penalties or be required to make significant changes to our operations." . . .
>
> What is more, Defendants also repeatedly disclosed that a core part of the business strategy of CHSI and its affiliates was their "Emergency Room Initiatives" to "systematically take steps to increase patient flow in our ER as a means of optimizing utilization rates for our hospitals." . . . Indeed, one of the "steps" specifically disclosed was "the implementation of specialized computer software" – i.e., Pro-MED – "designed to assist physicians in making diagnoses and determining treatments." . . . Defendants also told investors that CHSI-affiliated hospital's admission growth was "higher than anybody else['s] in the country," . . .

that their "ER Strategy has contributed to same store admission growth," . . . that "CHS reported a 16.9% increase in total inpatient admissions," . . . and that, over a dozen years, "the admission rate out of ER" had increased from 11% to 15%.

(Docket No. 178 at 16-17). In short, because "Defendants told investors that CHSI was pursuing a business strategy of increasing admissions through the ED in an environment in which intense regulatory scrutiny of 'billing practices' made Medicare claims for inpatient admissions vulnerable to regulatory scrutiny . . . In light of those risk disclosures, no reasonable investor could have been misled by Defendants' other statements into thinking those risks did not exist." (Id. at 17).

No doubt, from the disclosures made, investors were forewarned about the general risks involved when claims are made to Medicare, assuming they placed any stock in such disclosures. Plaintiff's argument is more nuanced, however. It claims that Defendants failed to point out the known risks because of the use of the Blue Book and the fact that the practice was unsustainable.

Contrary to Defendants' argument, the Sixth Circuit decision in Bondali v. Yum! Brands, 620 F. App'x 483 (6th Cir. Aug. 20, 2014) does not bar such a claim. That case involved the assertion that it was false and misleading for Yum food brands to state that food safety issues "have occurred in the past, and could occur in the future," when it knew (prior to exposés in the press) that batches of chicken being supplied to its KFC China subsidiary had tested positive for drug and antibiotic residues. Id. at 491 (citations omitted). While the Sixth Circuit observed that "several courts have concluded, 'cautionary statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results," and that there is a "good reason" for this conclusion because "[r]isk disclosures like the ones accompanying 10-Qs and other SEC filings are inherently prospective in nature," it also opined "there may be circumstances under which a risk disclosure might support Section 10(b)

27

liability [but] this is not that case." Id. It was not the case in Bondali because plaintiffs failed to allege that the problems of the two suppliers of bad chicken "were so severe that they would have resulted in financial loss for Yum" – "eight batches of chicken testing positive for drug and antibiotic residues is hardly a companywide food safety epidemic." Id.

Here the allegations are quite different. The allegations, when construed in Plaintiff's favor, suggest that a huge reasons for the ED success had to do with sketchy admission/no observation policies about which Defendants had been repeatedly warned, but did not disclose. "[C]ertainly a company could have enough internal information to know that it had severe compliance issues." Omnicare II, 769 F.3d at 480.

Based on the foregoing, the Court finds the allegations regarding CHS' operating and admissions strategies, its emergency room initiatives, and its substantial compliance with Medicare as summarized in paragraphs 8 and 10 of the First Amended Complaint meet the requirements of material misrepresentations or omissions for purposes of the first element of a securities fraud claim and are sufficiently pled. The Court reaches the opposite conclusion, however, with respect to Defendants' touting of its quality patient care as summarized in paragraph 9.

In paragraph 9, Plaintiff alleges that CHS's purported mission of "providing quality patient-centered healthcare" was false because the "admit" edict led to admissions and treatment that were not necessary. Even if this is true, Plaintiff does not explain how a reasonable investor would be mislead into making an investment decision based on such statements. Presumably most, if not all hospitals, for profit or not, claim to be dedicated to taking care of their patients. This seems to be the very essence of corporate hyperbole or puffery. See, Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc., 2016 WL 523613, at *7 (10th Cir. Feb. 9, 2016) (hospital's claim

28

"to identify and implement best medical practices at the lowest available cost" is "emblematic of sales puffery"); <u>Corley v. Rosewood Care Ctr., Inc. of Peoria</u>, 388 F.3d 990, 1008-09 (7th Cir. 2004) (in wire fraud case against nursing home, court noted that the "phrase 'high quality' is highly subjective" and that "[w]ithout elaboration, it comes under the category of sales puffery upon which no reasonable person could rely in making a decision and therefore it does not qualify as material"); <u>Maio v. Aetna Inc.</u>, 1999 WL 800315, at *2 (E.D. Pa. Sept. 29, 1999) ("as a matter of law, it is highly doubtful that advertising one's commitment to 'quality of care' can serve as the predicate for a fraud claim").

### 2. Scienter

"In run-of-the-mill fraud cases," a plaintiff can allege the requisite "mental state 'generally,' Rule 9(b), but in securities-fraud actions, Congress has imposed a higher standard, requiring plaintiffs to 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" <u>Omnicare II</u>, 769 F.3d at 472-73 (quoting 15 U.S.C. § 78u-4(b)(2)).[5] Relying on the Supreme Court's decision in <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322-23 (2007), the Sixth Circuit has summarized the "three-part test for lower courts to apply in determining assessing plaintiff's scienter allegations":

> First, a court must "accept all factual allegations in the complaint as true." . . . Second, a court must consider the complaint in its entirety" and decide "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." . . . Third, assuming that plaintiff's allegations create a "powerful or cogent" inference of scienter, . . . , a court must compare this inference with other competing

---

[5] Where an individual's mental state is at issue, the analysis is relatively straightforward, but the analysis for corporate scienter can be "complicated." <u>Id.</u> at 473. Here, because Plaintiff attributes virtually all of the alleged misstatements or omission to Smith and Cash, Defendants acknowledge that those individual's mental states are the ones at issue.

possibilities, allowing the complaint to go forward "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged[.]

Omincare II, 769 F.3d at 473 (internal citations to Tellabs omitted).

Defendants argue that Plaintiff fails to "plead facts that give rise to a strong inference that Smith or Cash (and by extension, CHS) 'knowingly' misrepresented material facts with the specific intent 'to deceive, manipulate, or defraud the public'" because (1) all that is alleged is that Smith and Cash sold stock after changes in the Blue Book were made, but before they became public; and (2) with "threadbare allegations" Plaintiff contends that Smith and Cash personally focused on admissions. (Docket No. 178 at 21). The former fails, Defendants assert, because, in accordance with Konkol v. Diebold, 590 F.3d 390, 399 (6th Cir. 2009), to raise an inference of scienter, "plaintiffs must provide a meaningful trading history for purposes of comparison to the stock sales within the class period." The latter fails, according to Defendants, because "the essence of the duty of loyalty" for executives of a for-profit hospital is to earn profits, quoting ECA, Local 134 IBEW v. JP Morgan Chase Co., 553 F.3d 187, 200 (2nd Cir. 2009). In the Court's opinion, Defendant's citation to the case law is too cabined and they read Plaintiff's allegations too narrowly.

As Defendants' claim, the Sixth Circuit in Konkol noted the requirement for a trading history to show scienter. But it also observed that "'[i]nsider trading at a suspicious time or in an unusual amount' is one of the nine factors 'usually relevant to scienter' that this court first applied in Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001)." Konkol, 590 F.3d at 399. This point was confirmed in Omincare II, where the Sixth Circuit wrote that, with regard to the knowledge of an individual, a court should consider various factors, such as whether there was:

(1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness

30

in time of an allegedly fraudulent statement or omission and the later disclosure of
inconsistent information; (4) evidence of bribery by a top company official; (5)
existence of an ancillary lawsuit charging fraud by a company and the company's
quick settlement of that suit; (6) disregard of the most current factual information
before making statements; (7) disclosure of accounting information in such a way
that its negative implications could only be understood by someone with a high
degree of sophistication; (8) the personal interest of certain directors in not informing
disinterested directors of an impending sale of stock; and (9) the self-interested
motivation of defendants in the form of saving their salaries or jobs.

Omnicare II, 769 F.3d at 473 (quoting Helwig, 251 F.3d at 552).

Moreover, Konkol was decided before Matrixx Initiatives, Inc. v. Siascusano, 131 S. Ct.

1309 (2011), at a time when the Sixth Circuit "conducted [its] scienter analysis in section 10(b)

cases by sorting through each allegation individually before concluding with a collective approach."

Frank v. Dana Corp., 646 F.3d 954, 961 (6th Cir. 2011).  Discussing the change, the Sixth Circuit in

Frank observed that in Matrixx,

the Court provided for us a post-Tellabs example of how to consider scienter
pleadings "holistically" in section 10(b) cases. . . . Writing for the Court, Justice
Sotomayor expertly addressed the allegations collectively, did so quickly, and,
importantly, did not parse out the allegations for individual analysis. . . . This is the
only appropriate approach following Tellabs's mandate to review scienter pleadings
based on the collective view of the facts, not the facts individually. . . .  Our former
method of reviewing each allegation individually before reviewing them holistically
risks losing the forest for the trees. Furthermore, after Tellabs, conducting an
individual review of myriad allegations is an unnecessary inefficiency.

646 F.3d at 961 (internal citations and quotations omitted).

Thus, it falls on the Court to "decide whether all of the facts alleged, *taken collectively*, meet

the PSLRA's requirements," and whether there is a "strong inference" of fraudulent intent, that is,

fraudulent intent that is "'more than merely plausible or reasonable—it [is as] cogent and at least

as compelling as any opposing inference of nonfraudulent intent.'"  Ashland, Inc. v. Oppenheimer

& Co., Inc., 648 F.3d 461, 469 (6th Cir. 2011) (italics in original) (quoting, Tellabs, 551 U.S. at 314).

31

That strong inference exists in this case.

Smith and Cash both profited handsomely from the sale of stock an opportune time. This occurred not once, but twice. Both ditched stock after learning, from their roles on the Physician Advisory Board, that observation was going to be included in the Blue Book. Maybe this occurred on two separate occasions by two individuals for entirely innocuous reasons. But the Court cannot ignore the numerous allegations that Smith and Cash were the driving force behind increased admissions, all the while concealing these practices in touting CHS's success. Among other things, it is alleged that Smith and Cash (1) supervised the implementation of the Blue Book and its training at all CHS hospitals in order to improperly convert observations into admissions; (2) assured admissions by using a "no observation" policy; (3) implemented Pro-Med's Test Mapping and QualCheck features, and tracked compliance by doctors; (4) awarded incentive bonuses to hospitals' CEOs and ED staff for meeting the benchmark admissions percentages, while terminating or changing the schedules of physicians who failed to meet benchmarks; and (5) were repeatedly told their admissions practices gave rise to Medicare violations.

Defendants argue that "[o]f course Smith and Cash, as executives of a for-profit hospital operator, focused on admissions (among other things) to drive CHSI's stock value, and point out that "'[e]arning profits for the shareholders is the essence of the duty of loyalty, and therefore it would be an unusual case where accomplishment of this objective constitutes the requisite motive to defraud the shareholders.'" (Docket No. 178 at 22, emphasis in original) (quoting ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 200 (2nd Cir. 2009)). But the essence of the allegations in this case are that Smith and Cash focused on fraudulent admissions and benefitted from that practice. Misleading investors and bilking Medicare until

32

caught is not in the interest of interest of shareholders. In any event, "where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, <u>Tellabs</u> instructs that the complaint should be permitted to move forward." <u>Frank</u>, 547 F.3d at 571.

### 3. *Causation*

A claim under Section 10(b) and Rule 10b-5 requires proof of "the traditional elements of causation and loss." <u>Dura</u>, 544 U.S. at 346. "To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered,'" and "may do so either by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" <u>Carpenters Pension Trust Fund of St. Louis v. Barclays PLC</u>, 750 F.3d 227, 232-33 (2nd Cir. 2014) (citations omitted).

In this case, Plaintiff proceeds on a "fraud on the market theory" and pegs loss causation on the fact that, after the Tenet lawsuit was filed, the value of CHS's stock dropped dramatically. Defendants argue this is an insufficient basis on which to base loss causation for two reasons – the Tenet complaint raised allegations of fraud that were not "new," and the filing of a complaint is not a corrective disclosure. While the first argument has some facial appeal, the Court finds the second argument to be dispositive.

"Loss causation is 'easiest to show when a corrective disclosure reveals the fraud to the public and the [company's share] price subsequently drops.'" <u>In re KBC Asset Mgmt. N.V.</u>, 572 F. App'x 356, 360 (6th Cir. 2014) (quoting, <u>In re Williams Sec. Litig.-WCG Subclass</u>, 558 F.3d 1130,

1137 (10th Cir. 2009)). However, such a theory only works when a 'disclosed fact [is] . . . new to the market.'" Id. (quoting In re Omnicom Grp., Inc. Sec. Litig., 541 F. Supp. 2d 546, 551 (S.D.N.Y. 2008). "'Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, if investors already know the truth, false statements won't affect the price.'" Rand-Heart of New York, Inc. v. Dolan, 812 F.3d 1172, 1180 (8th Cir. 2016) (quoting Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 473 (4th Cir. 2011)).

Defendants argue that the Tenet lawsuit merely presented that which was already publicly available. This is shown by the allegations in the Tenet complaint itself, which stated that "[t]he information set forth in this Complaint is based on public information relating to Medicare patients alone." (Docket No. 83-3, Tenet Complaint ¶ 4 fn. 2). Similarly, the First Amended Complaint in this case alleges that the Tenet suit was based on "available data from CMS." (Docket No. 167, FAC ¶ 189).

Further, in the Consolidated Class Action Complaint in this Court (now superseded by the First Amended Complaint), Plaintiff alleged that "these same allegations of improper admissions practices were raised in [a] *Qui Tam* Action", (Docket No. 68 Consolidated Complaint ¶ 31) styled United States *ex rel.* Reuille v. Community Health Sys., Case No. 1:09-CV-007 (N.D. Ind. 2009). That suit was unsealed on December 27, 2010, more than three month before Tenet filed its suit.

Defendants also point to a letter from the Service Employees International Union to a Dr. Solhanki. That letter cited several false claims cases that had been filed, and detailed concerns about the ER initiative given that "doctors and staff have accused CHS management of coercing them to admit patients unnecessarily, and firing those who object." (Docket No. 179-1).

As noted, Defendant's first argument has some appeal, but the Court agrees with Plaintiff

34

that whether the allegations in the Tenet lawsuit were new raises a factual question. While this Court can take judicial notice of documents filed in court, the letter from the union is an altogether different matter and is even more problematic since it does not appear that it was publicly disseminated.

As for the Tenet Complaint, even though Plaintiff alleged that it was based on "available data from CMS," it also alleged that Tenet "retained two 'leading' healthcare consulting firms" to study the data, which, in turn, conducted "statistical analyses" of the data. (Docket No. 167, FAC ¶ 189-190). "[R]aw data itself" that may be "technically available to the public" may have "little to no probative value in its native state":

> While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace. Under a Rule 12(b)(6) analysis, it is plausible that . . . the efficient market was not aware of the hidden meaning of the Medicare data that required expert analysis, especially where the data itself is only available to a narrow segment of the public and not the public at large.

Pub. Emp. Ret. Sys. of Miss., Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 323 (5th Cir. 2014).

Reuille presents a closer question because the complaint there raised numerous allegations about improper Medicare billing, including false 23-hour observation billing and the intentional assignment of inpatient status where such status was unwarranted so as to receive more reimbursement from Medicare even though the patients did not require such care. But the allegations were directed a one hospital, specifically the Lutheran Hospital in Fort Wayne, Indiana. It is unclear whether that information should be considered publicly available because, as the Supreme Court has explained, "[t]he markets for some securities are more efficient than the markets

35

for others, and even a single market can process different kinds of information more or less efficiently, depending on how widely the information is disseminated and how easily it is understood." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2409 (2014). "[M]arket efficiency is a matter of degree and accordingly . . . a matter of proof." Id. at 2410.

New information or not, loss causation is "context dependent," Miller v. Thane, Int'l, Inc., 615 F.3d 1094, 1102 (9th Cir. 2010). Nevertheless, many courts have held that loss causation (sometimes called a "loss event") cannot be based on the filing of a civil complaint or the commencement of an investigation. The theory undergirding such holdings is that allegations of fraud do not reveal a previously undisclosed truth. See In re Almost Family, 2012 WL 443461, at *13 ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure").

Most analogous in this regard is Sapssov v. Health Management Associates, Inc., 608 F. App'x 855 (11th Cir. 2015). There, plaintiffs alleged that HMA (which also used Pro-Med Software in its emergency departments "to control physicians and increase patient admissions by ordering an extensive series of tests") "devised a corporate policy mandating unnecessary admission of Medicare patients to HMA hospitals to boost its financial position and stock price." Id. at 857. It was also alleged that "HMA admitted patients for observation, when they did not need to be admitted, and admitted inpatients, who should have been admitted for observation." Id. Based on factual allegations quite similar to those in this case, the district court concluded that (1) plaintiffs "had satisfied the PLSRA heightened pleading requirements"; (2) plaintiffs "had 'sufficiently plead the false and misleading statements' to show material misrepresentation . . . based on particularized allegations"; (3) because defendant "'put the source of HMA's success at issue, the alleged failure

to disclose the true source of this revenue could give rise to liability under § 10(b)'"; and (4) the allegations (including "aggressive admissions policies," "heavy involvement in daily operations," "'the upgrade of Pro-MED software,'" and the "widespread nature of the fraud") "when viewed holistically create[d] a strong inference of scienter.'" Id. at 861 (citations omitted). Nevertheless, plaintiff's securities fraud complaint failed on the loss causation element because the commencement of an investigation did not constitute a corrective disclosure, and "[t]he filing of a civil complaint certainly does not establish that the defendant committed or is liable for the conduct alleged." Sappsov v. Health Mgmt. Assoc., Inc., 22 F. Supp. 3d 1210, 1230 (M.D. Fla. 2014).

On appeal, the Eleventh Circuit "agree[d] with the district judge's analysis regarding the second-amended complaint as to particularity, material misrepresentation, and scienter reflected in the purchase and sale of HMA stock." Id. It also agreed with the trial court's conclusion on loss causation, noting that "[r]evelation of the OIG investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure." Id. at 863. Moreover, the filing of a "whistleblower case" which served as the basis for an equity analyst's report "was not proof of fraud, because a civil suit is not proof of liability." Id.

Obviously, Sapssov is not controlling authority. Not only is it out-of-circuit, it is unpublished and subject to a petition for rehearing to boot. However there is published appellate authority for the proposition that an investigation is insufficient to be a corrective disclosure and, while not from the Sixth Circuit, the Court finds that authority persuasive.

Sappsov's conclusion about an investigation not being a corrective disclosure was based on Meyers v. Greene, 710 F.3d 1189 (11th Cir. 2013), an earlier Eleventh Circuit case. There, the court noted that a plaintiff can "go about proving loss causation . . . by: '(1) identifying a "corrective

37

disclosure (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a substantial amount of the price drop.'" Id. at 1196-97 (quoting FindWhat, 658 F.3d at 1311-12). The Eleventh Circuit went on to hold:

> In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b). The announcement of an investigation reveals just that – an investigation – and nothing more. . . . To be sure, stock prices may fall upon the announcement of an SEC investigation, but that is because the investigation can be seen to portend an added risk of future corrective action. That does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent.

Id. at 1201 (internal citation omitted). In an accompanying footnote, the court further observed:

> That is not to say that an SEC investigation could never form the basis for a corrective disclosure. We merely hold that the disclosure of an SEC investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not "reveal[ ] to the market the pertinent truth" of anything, and therefore does not qualify as a corrective disclosure . . . It is, after all, impossible to say that an SEC investigation was the moment when the "relevant truth beg[an] to leak out" if the truth never actually leaked out. . . . . It may be possible, in a different case, for the disclosure of an SEC investigation to qualify as a partial corrective disclosure for purposes of opening the class period when the investigation is coupled with a later finding of fraud or wrongdoing.

Id. at 1201 n.13.

In Loos v. Immersion Corp., 762 F.3d 880, 890 (9th Cir. 2014), the Ninth Circuit "agree[d] with the Eleventh Circuit's reasoning" in Meyers, writing:

> The announcement of an investigation does not "reveal" fraudulent practices to the market. Indeed, at the moment an investigation is announced, the market cannot

38

> possibly know what the investigation will ultimately reveal. While the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a potential future disclosure of fraudulent conduct. Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred. This type of speculation cannot form the basis of a viable loss causation theory. Accordingly, we hold that the announcement of an investigation, without more, is insufficient to establish loss causation.

Id. And like the Eleventh Circuit, the Ninth Circuit, did "not mean to suggest the announcement of an investigation can never form the basis of a loss causation theory" where the "announcement contains and express disclosure of actual wrongdoing." Id. at 890 n.13.

To be sure, Loos and Meyers dealt with investigations. But notice of an investigation no more reveals fraud than a complaint does, and while both may be "ominous events," neither shows that a company's previous statements were false or fraudulent.

Plaintiff links investor losses solely to the filing of the Tenet complaint, not a series of partial disclosures of which that complaint was a part. But the market reaction to that filing was just as likely (if not more likely) due to the proposed takeover being thwarted. Whether either of those scenarios or something else caused the price drop is not a question that can be resolved on the pleadings. See In re Harman Int'l Indus., Inc. Sec. Litig., 791 F.3d 90, 111 (D.C. Cir. 2015) ("plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price"); Lo. Mun. Police Emp. Ret. Sys. v. KPMG LLP, 822 F. Supp. 2d 711, 725 (N.D. Ohio 2011) (stating in the context of a motion to dismiss that "[w]hat ultimately caused Plaintiff's loss is not ripe for the Court to decide"). The fact remains, however, that the Tenet complaint revealed no truths, only allegations, and "the market cannot respond to fraud until it has been revealed." In re Almost Family, 2012 WL 443461 at *2.

**B. Allegations Regarding Public Statements After the Filing of the Tenet Complaint**

Plaintiff alleges that, after the filing of the Tenet complaint, CHS (1) continued to mislead investors about the merits of the Tenet complaint, and (2) misrepresented the true impact discontinuing the Blue Book would have on CHS's financial performance. This resulted in loss Plaintiff alleges because, on October 26, 2011, CHS released its 3Q2011 results, indicating the rate of admissions fell by 7%, and, the day following that corrective disclosure, CHS's stock price dropped by 12%.

As with the pre-Tenet complaint allegations, Defendants argue that Plaintiff fails to state a claim for the post-Tenet statements because the First Amended Complaint (1) does not plead any actionable misstatements; (2) fails to plead a strong inference of scienter; and (3) fails to plead the decline in stock price was caused by any alleged misstatement. Defendants also argue that the post-Tenet claim is time-barred. The Court agrees with the last argument.

A "private cause of action that involves a claim of fraud, deceit, manipulation or contrivance in contravention of a regulatory requirement of the securities laws . . . may be brought not later than the earlier of – (1) 2 years after the discovery of facts constituting the violation; or (2) five years after such violation." 28 U.S.C. § 1658(b)(1). "[T]he limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation' whichever comes first." Merck & Co. v. Reynolds, 559 U.S. 633, 653 (2010).

Defendants contend that, "[a]t the very least, Plaintiff was on notice of the alleged new claim concerning an October 2011 corrective disclosure when Plaintiff filed its Initial Consolidated Class Action Complaint on July 13, 2012," (Docket No. 178 at 33), but waited until the filing of the First

Amended Complaint on October 15, 2015 to raise the claim. Plaintiff does not argue otherwise, but contends that the claim for the post-Tenet statements relate back to the filing of the initial Complaint on May 9, 2011, making it timely.

"Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations." Krupski v. Costa Crociere S. p. A., 560 U.S. 538, 541 (2010). Pertinent to this case, "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

> In their moving papers, Defendants argue:
>
> In deciding whether to permit amendment, a court also should consider "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." . . . Those factors also disfavor treating the Amended Complaint as relating back to the prior Complaint. . . . [T]he new allegations in the Amended Complaint are futile because they fail to state a claim of securities fraud. In addition, Plaintiff's course of conduct is the very picture of "undue delay." Plaintiff's motive for this tardy addition is no secret: Plaintiff sought leave to amend their complaint two days after Defendants brought to the Court's attention just how baseless their prior (April 11, 2011) theory of loss causation was. . . . Plaintiff slept on its proposed new claims for three years—until well after the lapse of the statute of limitations. It should not be permitted to add new claims at this late date.

(Docket No. 178 at 34, internal citations and footnote omitted). In response, Plaintiff asserts that "Defendants cannot establish prejudice" and "Plaintiff has not engaged in delay in asserting its claims." (Docket 185 at 33).

In the context of Rule 15(c)(1), these arguments miss the mark.[6]  In <u>Krupski</u>, the Supreme

Court made clear that "[t]he Rule plainly sets forth an exclusive list of requirements for relation

back, and the amending party's diligence is not among them.  Moreover, the Rule mandates relation

back once the Rule's requirements are satisfied; it does not leave the decision whether to grant

relation back to the district court's equitable discretion." <u>Krupski</u>, 560 U.S. at 552-53.

Still, relation back is only appropriate if an amended complaint asserts a claim arising out

of the same conduct, transaction, or occurrence that was already pleaded or attempted to be plead.

"In determining whether the new claims arise from the same 'conduct transaction or occurrence,'"

a court's "analysis is guided by 'whether the party asserting the statute of limitations defense had

been placed on notice that he could be called to answer for the allegations in the amended

pleading.'"  <u>Durand v. Hanover Ins. Grp., Inc.</u>, 806 F.3d 367, 375 (6th Cir. 2015) (quoting <u>United

States <i>ex rel</i>. Bledsoe v. Cmty Health Sys., Inc.</u>, 501 F.3d 493, 516 (6th Cir. 2007)).  "This standard

is usually met 'if there is an identity between the amendment and the original complaint with regard

to the general wrong suffered and with regard to the general conduct causing such wrong.'"  <u>Id</u>.

(quoting <u>Miller v. Am. Heavy Lift Shipping</u>, 231 F.3d 242, 250 (6th Cir.2000)).

"Though not expressly stated, it is well-established that the touchstone for relation back is

fair notice, because Rule 15(c) is premised on the theory that 'a party who has been notified of

litigation concerning a particular occurrence has been given all the notice that statutes of limitations

---

[6]  Given a bit of a wrinkle in the procedural posture of this case, the making of such arguments is understandable.  During a status conference in which the filing of a proposed amended complaint was discussed, Defendants indicated that they might have an objection to such a filing, particularly since they had already filed a Motion to Dismiss.  The Magistrate Judge stated, however, that, after consultation with the Judge previously assigned to this case, the matter would be short-circuited so that the Court would not have to address issues twice.  That is, he would grant leave to file an Amended Complaint after which Defendants could make any arguments they wished in a renewed Motion to Dismiss.

were intended to provide.'" Glover v. F.D.I.C., 698 F.3d 139, 145-46 (3rd Cir. 2012) (quoting

Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n. 3 (1984)). Thus,

> only where the opposing party is given 'fair notice of the general fact situation and the legal theory upon which the amending party proceeds' will relation back be allowed. . . . Conversely, amendments 'that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously.'

Id. (internal citation omitted) (quoting, United States v. Hicks, 283 F.3d 380, 388 (D.C. Cir. 2002)).

Here, the 3Q2011 report was not mentioned in the original complaint for the obvious reason that it had yet to issue. However, some nine months after the issuance of that quarterly report, Plaintiff filed its Consolidated Class Action Complaint. While that Complaint alleged material misstatements were made by CHS in each of its released financial results from the Second Quarter of 2006 to the Fourth Quarter of 2010, no mention is made of the Third Quarter of 2011. Moreover, the class period is defined to include purchasers of stock from July 27, 2006 through April 8, 2011, with the close date corresponding to the filing of the Tenet complaint. Indeed, the Consolidated Class Action Complaint alleged that "[t]his class action was precipitated by disclosures made in April 2011 by Tenet" that caused "CHS stock [to] immediately plummet[] by nearly 36% in one day." (Docket No. 68, Consolidated Complaint ¶ 3).

"[T]he purpose of relation back [is] to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." Krupski, 560 U.S. at 550. That purpose would be thwarted, the Court believes, by allowing relation back under the particular circumstances of this case.

Allegations of post-Tenet conduct constitutes an entirely new securities fraud claim. It

alleges a different fraud and alleged corrective disclosure that expands the size of the putative class, extends the class period, and (by Defendants' calculations) adds hundreds of millions of dollars in potential damages. The initial Consolidated Class Action Complaint hardly gave Defendants notice of the potential scope of Plaintiff's expanded claim, although it certainly could have and should have. Instead Plaintiff waited another three years to assert a claim based on post-Tenet statements. While diligence is not a factor in the 15(c)(1)(B) analysis, surprise is. Bledsoe, 501 F.3d at 516 (quoting Santamarina v. Sears, Roebuck & Co., 466 F.3d 570, 573 (7th Cir. 2006)). ("'The criterion of relation back is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one'" ); Marshall v. H & R Block Tax Servs., Inc., 564 F.3d 826, 829 (7th Cir. 2009) ("And if we are right that the liability asserted in the original claim was significantly less extensive than the liability now claimed . . ., there is no relation back; from the standpoint of the original claim, the expansion of potential liability was a surprise.").

## IV. Conclusion

On the basis of the foregoing, Defendants' Motion to Dismiss the Amended Complaint will be granted. An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

44