IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| NORFOLK COUNTY RETIREMENT SYSTEM, individually and on behalf of others similarly situated, | ) ) ) | |
| | ) | NO. 3:11-cv-00433 |
| Plaintiff, | ) | CONSOLIDATED CASES |
| | ) | JUDGE RICHARDSON |
| v. | ) | |
| | ) | |
| COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, and LARRY CASH, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Before the Court is Lead Plaintiff NYC Funds' Motion for Class Certification. (Doc. No. 270, "Class Certification Motion".) Defendants Community Health Systems ("CHS"), Wayne T. Smith, and Larry Cash responded in opposition (Doc. No. 276), and Lead Plaintiff replied (Doc. No. 283). For the reasons discussed below, the motion will be granted.

## BACKGROUND

This case is a securities class action brought on behalf of all persons or entities who purchased and/or sold the publicly traded securities of CHS from July 27, 2006 through October 26, 2011 (the "Proposed Class Period") against CHS and its senior officers, namely CEO and Chairman of the Board Wayne T. Smith ("Smith") and CFO and Director W. Larry Cash ("Cash"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5. (Doc. No. 170 (First Amended Complaint, "FAC") ¶ 2.) Lead Plaintiff seeks recovery of monetary damages exceeding $891

1

million plus prejudgment interest accruing from the filing of the initial class action on May 9, 2011. (*Id.*)

The certification stage is not the appropriate time for the Court to "engage in free-ranging merits inquiries[.]" *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

Accordingly, on a motion to certify a class, the court generally must accept as true the allegations (at least those related to the merits) contained in the plaintiff's complaint. *See, e.g., Porcell v. Lincoln Wood Prod., Inc.*, 713 F. Supp. 2d 1305, 1309 (D.N.M. 2010); *Moreno–Espinosa v. J & J Ag Prods., Inc.*, 247 F.R.D. 686, 691 (S.D. Fla.2007) (citing *Heffner v. Blue Cross and Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006)); *Rankin v. Rots*, 220 F.R.D. 511, 517 (E.D. Mich. 2004); *Edwards v. McCormick*, 196 F.R.D. 487, 490 (S.D. Ohio 2000). In addition, the Court may rely on affidavits or declarations submitted in support of the Class Certification Motion. *See, e.g., Steward v. Janek*, 315 F.R.D. 472, 477 (W.D. Tex. 2016) (declining to exclude declarations submitted in support of motion to certify class); *Clay v. CytoSport, Inc.*, No. 3:15-CV-00165-L-AGS, 2017 WL 10592138 (S.D. Cal. Apr. 6, 2017). *Cf. Frazier v. PJ Iowa, L.C.*, 337 F. Supp. 3d 848, 865 (S.D. Iowa 2018) (quoting *Stouder v. Turblex, Inc.*, No. 10-3069-CV-S-DW, 2010 WL 11619552, at *2 (W.D. Mo. Aug. 31, 2010)) ("Signed declarations or affidavits provide appropriate support for motions to conditionally certify a class" in a proposed collective action under the Fair Labor Standards Act.) Likewise, the Court can consider deposition testimony. *See, e.g.*, *Crutchfield v. Sewerage & Water Bd. of New Orleans*, No. CIV.A. 13-4801, 2015 WL 3917657, at *5 (E.D. La. June 25, 2015) (declining to strike

plaintiffs' deposition testimony submitted in support of motion for class certification even though unpersuasive and self-serving at best), *aff'd and remanded*, 829 F.3d 370 (5th Cir. 2016).

"Resolution of the class certification may, however, require the court 'to probe behind the pleadings before coming to rest on the certification question.'" *Edwards*, 196 F.R.D. at 490 (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982)). And the Court "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may . . . consider the legal and factual issues presented by plaintiff's complaints." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290 n. 7 (10th Cir.1999). With respect to issues relating not to the merits but rather to the appropriateness of certifying the class under Rule 23, "if there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class." *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (citation, alterations, and internal quotation marks omitted). The factual issues related to the Rule 23-inquiry that the court must resolve may, to an extent, overlap with issues related to the merits, but the court is to resolve only the Rule 23 issues, and not the merits issues. *See, e.g.*, *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 453 (S.D.N.Y. 2013) (citing *Wal–Mart Stores v. Dukes*, 564 U.S. 338 (2011) and *Amgen)*. In deciding whether Rule 23's requirements for certification have been met, a district court may draw reasonable inferences from the facts before it. *Rankin*, 220 F.R.D. at 517 (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 520 (6th Cir. 1976)).

With these standards squarely in mind, the Court accepts as true for purposes of the Class Certification Motion the following alleged merits-based facts—taken from the FAC and the Declaration of Inga Van Eysden (Doc. No. 272-1. The Court, of course, is aware that these alleged facts are unproven and that a great many of them remain highly contested by Defendants.

Lead Plaintiff, the proposed class representative, is a group of defined benefit pension funds established by the City of New York pursuant to municipal law and state statutes. (Doc. No. 271 at 14.) Collectively, Lead Plaintiff has more than $193.98 billion in assets, which are managed by outside investment managers. (Doc. No. 272-1 ¶¶ 6-7.) Lead Plaintiff serves more than 750,000 active and retired New York City employees. (*Id.*) Lead Plaintiff acquired 825,226 shares of CHS common stock during the Proposed Class Period. (*Id.* ¶ 5.)

This proposed class action was precipitated by disclosures made publicly for the first time by Tenet Healthcare Corporation ("Tenet") in a complaint against CHS filed on April 11, 2011. (FAC ¶ 3.) Tenet, a competitor hospital owner, revealed that CHS's successful track record of increasing revenues at other acquired hospitals was attributable to unsustainable Emergency Room ("ED" or "ER") patient admissions practices that CHS employed to improperly drive up revenues. (*Id.*) Improperly boosting inpatient admissions generated more Medicare revenues for CHS than would have discharging patients or treating them in observation status. (*Id.*)

These improper and concealed practices included an edict for "ZERO" observations for Medicare patients via employment of aggressive admission justifications known as the "Blue Book" and programming the "Pro-MED" software system used in CHS's ERs to prompt patient admissions to boost revenues. (*Id.* ¶ 4.) CHS implemented bonus programs, admission-rate quotas approaching fifty percent for Medicare patients, (corporate, apparently) messaging, and terminations to compel CHS personnel to adhere to CHS's aggressive admissions justifications. (*Id.*) Defendant Cash emphasized that hospitals must generate admission volume to meet analysts' earnings expectations and impact CHS's stock price favorably. (*Id.* ¶ 5.) Increasing CHS's market capitalization facilitated its growth-by-acquisition strategy by increasing the value of CHS's stock,

thereby facilitating CHS's ability to issue higher levels of debt to support additional acquisitions. (*Id.*)

Defendants Smith and Cash were repeatedly warned that CHS's use of the Blue Book and "no observation" policy created a substantial risk of a Medicare fraud enforcement action. (*Id.* ¶ 6.) CHS's long-time Medicare consultant concluded that the Blue Book criteria: (1) lacked specificity, allowing all cases to be classified as inpatient; (2) would likely be construed as statistically biased; (3) resulted in inpatient over-certification; and (4) could be construed as an avoidance of best practice. (*Id.*) Defendants were expressly told that these criteria, along with CHS's refusal to use observation status, presented a compliance risk. (*Id.* ¶ 7.) Defendants actively misled investors about the reasons for CHS's success. For example, Defendants touted the consistent execution of CHS's centralized and standardized operating strategies, its ED initiatives, and its hospital acquisition strategy as key factors in growing its business. (*Id.* ¶ 8.) However, as discussed above, these statements failed to disclose that the strategies depended in large part on utilizing aggressive non-industry admissions criteria that were a substantial Medicare compliance risk. (*Id.*) Also, Defendants' representations that CHS hospitals were in substantial compliance with regulations and standards (federal, state, and local) were materially false and misleading in failing to disclose long-standing potential Medicare violations at numerous hospitals. (*Id.* ¶ 10.)

As previously mentioned, on April 11, 2011, Tenet filed an anti-takeover complaint revealing that CHS's successful acquisition track record was attributable to CHS's Blue Book. (*Id.* ¶¶ 3, 420.) When Tenet's lawsuit exposed CHS's practices and ongoing government investigations, CHS stock immediately plummeted $14.41, or nearly 36 percent. (*Id.* ¶ 12.) This decline involved a trading volume exceeding 44 million shares, reducing CHS's stock value by $1.3 billion in a single day. (*Id.*) While in the possession of material, non-public information

concerning impending revisions to the Blue Book that they knew would reduce ED admission rates, Defendants Smith and Cash sold 980,000 CHS shares through the exercise of vested options in 2009 and 2010, reaping millions in unlawful profits each year. (*Id.* ¶ 14.)

Defendants made a series of misrepresentations that were intended to obscure the importance of the Blue Book to the Company's performance after the Tenet complaint. For example, Defendant Cash downplayed the Blue Book, saying that the "current version" of the Blue Book was "close" to the InterQual standard, (*Id.* ¶¶ 258, 454), and falsely assured analysts that the transition from the Blue Book to the widely accepted InterQual criteria would be completed by year-end without impacting financial results. (*Id.* ¶ 423.) However, past experience had shown precisely the opposite—a steep admission decline—when CHS sought to conform with the industry standard. (*Id.* ¶¶ 252-53.)

On October 26, 2011, CHS disclosed that inpatient admissions for 3Q 2011 were down 7.0 percent from the prior year. Defendant Cash conceded the impact of phasing out the Blue Book: 75 percent of the hospitals that converted from Blue Book to InterQual criteria saw inpatient admissions decline. (FAC ¶¶ 16, 463-64.) Smith acknowledged that "there's no question we've had some adverse impact related to issues . . . around the Tenet lawsuit." (*Id.* ¶ 465.) On October 27, 2011, CHS's stock price dropped $2.32 per share, or 11.4% percent to $17.96 from the prior day's closing price of $20.28. (*Id.* ¶ 467.)

## DEFENDANTS' ASSERTIONS RELEVANT TO RULE 23 ISSUES

Defendants contend that more than six months before the filing of Tenet's complaint, Change to Win Investment Group ("CtW"), a union-backed shareholder advocacy organization that engages in corporate governance initiatives for pension funds, was aware of improprieties in CHS's admissions practices. (*See* Doc. No. 277-3 at 4-5.) On September 28, 2010, CtW allegedly

sent CHS's Board of Directors a nine-page letter alleging improprieties in CHS's admissions practices. (*See* Doc. No. 277-1.) Defendants claim that CtW's letter previewed many of Tenet's later claims and analyses. For instance, according to Defendants, CtW alleged that CHS's affiliated hospitals were engaged in "aggressive and unsustainable" Medicare billing by admitting ER patients to obtain higher reimbursement than can be obtained from observation stays. (Doc. No. 277-1 at 1.) Its letter also accused CHS of an improper corporate strategy to increase ED admissions that had resulted in the admission of many patients who may not have required inpatient care. (*Id*. at 3-5.) In its letter, CtW premised its allegations against CHS on an analysis of publicly available Medicare data, which compared CHS's admission rates to nationally-based expectations. (*Id.* at 3, 6.) From that comparative analysis, CtW expressed its conclusion that the data was "alarming" and that "many CHS hospitals exceed their expected ED admissions." (*Id.* at 6.) CtW thus accused CHS in the letter of promoting "Aggressive Emergency Room Admission Practices" and risking government intervention. (*Id.* at 6.) In its letter, CtW demanded that CHS's Board immediately appoint a special committee to investigate and "correct inadequate disclosure on this issue." (*Id.* at 8.)

Defendants assert that Lead Plaintiff was aware of this information from Michael Garland, who allegedly reviewed and assessed CtW's letter to CHS before he joined the New York City Comptroller's Office. From 2006 to 2010, according to Defendants, Michael Garland was the Director of Value Strategies at CtW, where he was responsible for leading shareowner initiatives for CtW and its affiliated union pension funds. (Doc. No. 277-3 at 4.)[1] Defendants claim that while

---

[1] In making these factual assertions regarding Garland, Defendants here rely (appropriately enough) upon the transcript of the deposition of Michael Garland, which Defendants have filed as Doc. No. 277-3). That is, apparently Defendants have essentially adopted Garland's version of these facts as their own. There does not appear to be any substantive dispute about the truth of these facts.

still there and shortly before CtW sent its September 2010 letter to CHS, Garland reviewed a fairly final draft of the letter. (*Id.* at 7-9.) Garland allegedly understood that letter to raise questions about CHS's billing practices and disclosure. (*Id.* at 11.) According to Defendants, Garland believed that the allegations made by CtW's letter "could impact [CHS's] share price." (*Id.* at 12.)

On September 13, 2010, allegedly, Garland left CtW and joined the Office of the New York City Comptroller's Office as its Executive Director for Corporate Governance. (*See id.* at 3, 6.) At least according to Lead Plaintiff's declarant, the New York City Comptroller's Office manages the Lead Plaintiff's investments. (Doc. No. 272-1 ¶¶ 7-8.) In his position at the Comptroller's Office, Garland allegedly leads Lead Plaintiff's program of "engaging portfolio companies"—including CHS—"on corporate governance and sustainability and responsible business practices." (Doc. No. 277-3 at 13.) Allegedly, despite what Garland knew, the Lead Plaintiff proceeded to purchase nearly 450,000 shares of CHS stock after he joined the Comptroller's Office but before Tenet revealed to the market what Garland allegedly knew. (*See* Doc. No. 277-6.) According to Defendants, those shares account for more than half of the CHS shares that Lead Plaintiff held when Tenet made its accusations. (*Id.*)

## PROCEDURAL BACKGROUND

The procedural history of this case starts eight years ago. In May and June 2011, three different shareholders initially filed putative securities fraud class actions against CHS and certain of its officers and directors. On January 3, 2012, Judge John T. Nixon granted Lead Plaintiff's motion to consolidate cases, for appointment as lead plaintiff, and for approval of selection of lead counsel, thereby appointing Lead Plaintiff as lead plaintiff and Lead Plaintiff's counsel as lead counsel. (Doc. No. 64.) On July 13, 2012, Lead Plaintiff filed an Amended Complaint. (Doc. No. 68.) On September 11, 2012, Defendants filed a motion to dismiss the Amended Complaint (Doc.

No. 73), which the parties briefed through the end of January 2013 and again from December 2013 through June 2014.

On August 20, 2015, Magistrate Judge Joe Brown granted Lead Plaintiff's oral motion to file an amended complaint to take account of developments in the law, thereby mooting the pending motion to dismiss. (Doc. No. 159.) Lead Plaintiff, in turn, filed its First Amended and Consolidated Class Action Complaint, *i.e.*, the FAC. (Doc. No. 170.) Defendants filed a motion to dismiss that complaint. (Doc. No. 177.)

Judge Kevin Sharp granted Defendants' motion and dismissed the case with prejudice on June 16, 2016. (Doc. No. 249.) This order was appealed, and the Sixth Circuit reversed and remanded. (Doc. No. 253.) Defendants filed a petition for an *en banc* review, which was denied (*see* No. 16-6059, App. Dkt. No. 59-1 (6th Cir. Jan. 18, 2019)), as was Defendants' subsequent petition to the Supreme Court for a writ of certiorari. (Doc. No. 291.)

Separately, on February 9, 2018, Defendants filed a renewed partial motion to dismiss. (Doc. No. 257.) Chief Judge Waverly Crenshaw denied the partial motion to dismiss on September 24, 2018. (Doc. No. 285.)

On May 7, 2018, Lead Plaintiff filed a Motion to Certify Class—the subject of this memorandum opinion. (Doc. No. 270.) This case was transferred to the undersigned District Judge on October 19, 2018. (Doc. No. 292.)

Lead Plaintiff now seeks certification of a class consisting of all persons and entities who purchased or otherwise acquired the publicly traded common stock of CHS from July 27, 2006 through October 26, 2011, inclusive, and who were damaged thereby. (Doc. No. 271 at 1 (citing FAC ¶ 481).) Excluded from the proposed Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. (*Id.*) Lead Plaintiff also seeks an order appointing Lead Plaintiff as Class Representative and Lowey Dannenberg, P.C. as Class Counsel.

**LEGAL STANDARD**

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and to the courts. *Gen. Tel. Co. of the Southwest*, 457 U.S. at 159. As an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). Before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Id.* at 161. A class action may not be certified merely on the basis of its designation as such in the pleadings. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). District courts have broad discretion in deciding whether to certify a class but must exercise that discretion within the framework of Rule 23. *See Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002). However, "when in doubt as to whether to certify a class action, the district court should err in favor of allowing a class." *Rankin,* 220 F.R.D. at 517 (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985)).

As touched on above, in evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Gen. Tel. Co. of the Southwest*, 457 U.S. at 160; *see also In re Am. Med. Sys.*, 75 F.3d at 1079. Moreover, the party seeking class certification bears the burden of

establishing that the prerequisites are met by a preponderance of the evidence. *See Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003).

A class action will be certified only if, after rigorous analysis, the court is satisfied that the prerequisites of Fed. R. Civ. P. 23(a) have been met and that the action falls within one of the categories prescribed in Fed. R. Civ. P. 23(b). *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). A party seeking to maintain a class action must be prepared to show that Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements have been met. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013). In addition, the party must satisfy, through evidentiary proof, at least one of Rule 23(b)'s provisions. *Id.* at 34.

Where, as here, Plaintiff relies on Rule 23(b)(3), the court can certify a Rule 23(a)-compliant class if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The factors pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

## DISCUSSION

Although Lead Plaintiff retains the initial burden of demonstrating compliance with the provisions of Rule 23(a) and Rule 23(b)(3), Defendants challenge compliance with these rules only in two respects: whether the Lead Plaintiff has typical claims, and whether Lead Plaintiff is an adequate class representative. Accordingly, the Court will first consider Defendants' two

objections and then, if necessary, consider whether Lead Plaintiff has carried its burden in all other respects.

## I. Typicality and Adequacy

Rule 23(a)(3) requires Lead Plaintiff to show that its claims are typical of the claims of the proposed class. A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and if it is based on the same legal theory. *In re Am. Med. Sys.*, 75 F.3d at 1082. Lead Plaintiff's interests must be aligned with those of the putative class and, in pursuing its own claims, Lead Plaintiff must also advance the interests of the class members. *Id.*

Rule 23(a)(4) requires the Court, before certifying the proposed class, to find that Lead Plaintiff will fairly and adequately protect the interests of the class. To satisfy the requirement of adequacy, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Young v. Nationwide Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012) (quoting *Wal–Mart Stores,* 564 U.S. at 348-49). In other words, Lead Plaintiff must have common interests with unnamed members of the class and must be able to vigorously prosecute the interests of the class through qualified counsel.

Lead Plaintiff argues that it meets the typicality requirement because its theory of liability is the same as those of the proposed class members. Thus, Lead Plaintiff asserts that its interests are aligned with those of the proposed class and that, in pursuing its own claims, it will adequately advance the interests of the proposed class. Defendants, however, argue that Lead Plaintiff does not satisfy the typicality and adequacy requirements for class certification, because (according to Defendants) Lead Plaintiff is subject to a unique defense as to reliance.

## A. Whether the Unique Defense Asserted Against Lead Plaintiff Defeats Typicality and Adequacy

### 1. Legal Landscape

"Courts of appeals have held that unique defenses bear on both the typicality and adequacy of a class representative." *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006). "The presence of even an arguable defense peculiar to the [proposed class representative] may destroy the required typicality of the class as well as bring into question the adequacy of the . . . representative." *Id.* (quoting *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980)). As to unique defenses, "the adequacy prong of Rule 23 overlaps with considerations of typicality." *O'Neil v. Appel*, 165 F.R.D. 479, 493 (W.D. Mich. 1996). Thus, "to the extent that [a proposed representative's] claims are not typical, he also must be deemed an inadequate representative." *Id.*

Litigating a unique defense "can distract the named plaintiff to such an extent that its representation of the interests of the rest of the class will suffer." *Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 WL 3245393, at *4 (M.D. Tenn. 2009). The facts and circumstances underlying the unique defense may "become the focus of cross-examination . . . at trial," *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 177 (S.D.N.Y. 2008) (citing *In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 144 (S.D.N.Y. 2007)), and risk "focus[ing] the jury's attention away from the relevant class issues." *Richburg v. Palisades Collection LLC*, 247 F.R.D. 457, 464 (E.D. Pa. 2008).

Defendants do not have to *prove* a unique defense against the proposed class representatives to defeat certification. It is problem enough that the proposed representatives are "subject to such defenses," which "renders their claims atypical of other class members." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 314 (E.D. Va. 2007). At the class-certification stage, therefore, the court has to make only "a preliminary determination of whether the [proposed representative]

would be subject to unique defenses, not whether such defenses will ultimately be successful." *Beach*, 2009 WL 3245393, at *4. However, at the same time, "a defendant must show some degree of likelihood a unique defense will play a significant role at trial. If a court determines an asserted unique defense has no merit, the defense will not preclude class certification." *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006); *see also Lapin*, 254 F.R.D. at 179 (stating that a unique defense must be meritorious enough to require the plaintiff to devote considerable time to rebut).

In securities class actions, unique defenses barring class certification most commonly concern reliance. *See Fleck v. Cablevision VII, Inc.*, 763 F. Supp. 622, 627 (D.D.C. 1991) ("Several courts have denied class certification in securities actions when the proposed class representatives were subject to special reliance issues.").[2] For example, in *Beach*, the court declined class certification because the proposed class representative's agent had met with the defendant company's officers before recommending to the proposed class representative that it buy stock, thereby subjecting the proposed class representative to unique defenses based on possibly learning non-public information about the defendant company before purchasing some of its stock. 2009 WL 3245393, at *5.

---

[2] As discussed below, Lead Plaintiff invokes the presumption of reliance established by the fraud-on-the market doctrine. This presumption can be rebutted by showing that the Plaintiff actually knew the information that was not disclosed to the market. As the Supreme Court has noted, an investor cannot have said to have relied on the integrity of a price he knew had been manipulated. *See Basic v. Levinson*, 485 U.S. 224, 249 (1988); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) (presumption of reliance "would not apply" to a plaintiff who was "aware that the stock's price was tainted by fraud"). For that reason, "[i]t is well settled that a private plaintiff may not recover under § 10(b) unless the defendant misrepresented or omitted a material fact and the plaintiff had no knowledge of that fact." *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 755 (2d Cir. 1986).

## 2. Application

Defendants argue that Lead Plaintiff is subject to a unique reliance defense because it bought over half its relevant CHS stock during a time in which Michael Garland, one of its investment manager's senior-most employees, knew of allegations concerning Defendants' supposed improper admissions scheme that had been concealed from the market. Defendants thereby contend that Garland's knowledge raises significant and unique triable issues of fact that make Lead Plaintiff's claims atypical and Lead Plaintiff an inadequate class representative. Referring to the set of asserted circumstances referenced above concerning Michael Garland's move from CtW to the New York City Comptroller's Office, Defendants advance the following alleged facts to support their argument:

- Shortly before joining the Comptroller's Office on September 13, 2010, Garland reviewed a "fairly final" draft of CtW's letter to CHS. (Doc. No. 277-3 at 8-9.)

- Basing its accusations on analyses of publicly available Medicare data, CtW claimed in its letter that "CHS had instituted a corporate policy that appears to have resulted in the admission of many patients who may not have required inpatient care" and that such higher-than-expected admissions rates seem to begin after CHS acquires a hospital and then continue to grow thereafter. (Doc. No. 277-1 at 2, 4-5.)

- Garland recalls understanding CtW's letter to allege the nub of the supposed admissions scheme about which, according to Lead Plaintiff, Defendant misled it for almost another seven months. (Doc. No. 277-3 at 9-10.) Garland further understood CtW's letter to raise concerns about "long-term sustainability or risk to shareholder value" that "could impact [CHS's] share price." (*Id.* at 11-12.)

For purposes of the Class Certification Motion, the Court will accept the truth of these asserted facts, as well as the other asserted facts related to these circumstances discussed above.

In response, Lead Plaintiff argues that Defendants string together thin coincidence to make a legally and factually groundless argument. Lead Plaintiff hits the nail on the head for the following reasons. First, and most important, even assuming *arguendo* that Garland knew about CtW's draft letter (an alleged fact disputed by Lead Plaintiff), Lead Plaintiff cannot be charged

with Garland's knowledge based on the current record before the Court. Under the Restatement (Third) of Agency § 5.03, which Defendants themselves have specifically invoked as applicable here (Doc No. 276 at 15-16):

> For purposes of determining a principal's legal relations with third parties, notice of a fact that an agent knows or has reason to know is imputed to the principal *if knowledge of the fact is material to the agent's duties to the principal*, unless the agent (a) acts adversely to the principal as stated in § 5.04, or (b) is subject to a duty to another not to disclose the fact to the principal.

*Id.* (emphasis added). It is worth breaking that down. According to this rule, not all facts known by an agent are imputed to the principal. Rather, two parameters limit the extent to which an agent's knowledge of facts is imputed to the principal: (1) the agent's duties to the principal; and (2) the materiality—or significance—of the facts in question to those duties.

The comments to the rule elaborate further. "The scope of an agent's duties delimits the content of knowledge that is imputed to the principal." *Id.* § 5.03 cmt. b. The Restatement (Third) of Agency illustrates this point with the following example:

> P Corporation manufactures construction supplies, using numerous chemicals in its manufacturing processes. Governmental regulations applicable to P Corporation require that it dispose of chemicals used in manufacturing in a manner that does not degrade the natural environment and that it promptly investigate and rectify environmentally damaging spills of chemicals. P Corporation employs A, an environmental engineer, whose duties include monitoring P Corporation's facilities for compliance with applicable environmental regulations and reporting the results of A's findings to S, a superior agent within P Corporation. While touring the exterior of P Corporation's plant, A inspects a pipe that drains used chemicals into storage vats. A observes that a chemical is leaking from a pipe into the ground in close proximity to a stream. A does not tell S or any other agent of P Corporation about the leaky pipe. Notice of the fact that the pipe leaks, known to A, is imputed to P Corporation . . . [But under a different scenario where] the leaky pipe is observed by B, a clerk in P Corporation's accounts-payable department[, and where] B's duties do not include monitoring P Corporation's compliance with environmental regulations[,][n]otice of the fact that the pipe leaks, known to B, is not imputed to P Corporation.

*Id.* § 5.03 cmt. b, illus. 5 & 7.

In addition, even if knowledge lies within the scope of an employee's duties, that knowledge is not necessarily imputed to the employer. As previously mentioned, to justify imputation, the knowledge must also be *material* to the employee's duties to the employer. "In other words, the employee's knowledge of facts may be imputed to the employer only if that knowledge is *important to the function the employee is employed to perform*." *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 107 (3d Cir. 2009) (emphasis added); *see also Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 939-40 (9th Cir. 2017).

Based on the current record, Garland's alleged knowledge of the draft letter cannot be imputed to Lead Plaintiff, because the scope of his duties did not encompass the purchasing and selling of securities—a fact which is not disputed by the parties. Rather, according to Garland's testimony, he was tasked with casting proxy votes for the shares held by "the systems" (by which, the Court can only presume, he means the funds that comprise Lead Plaintiff) and engaging portfolio companies on corporate governance. (Doc. No. 277-3 at 13-14.)

Citing to the deposition testimony of Garland's top deputy, Defendants assert that Garland's division within the Comptroller's Office[3] would have taken Medicare fraud at a portfolio company into consideration in performing its duties. (Doc. No. 15 at 12.) However, this asserted fact does not mean that investment decision-making was part of Garland's division's duties. Nor does it mean that Garland's division, in performing its duties with due consideration for Medicare fraud at a portfolio company, would or should have told those responsible for investment decision-

---

[3] Defendants' theory is that Garland's knowledge is attributable to Lead Plaintiff as of the time Garland joined the Comptroller's Office. (Doc. No. 276 at 14.) Therefore, its theory implicitly is that the Comptroller's Office is part of Lead Plaintiff for purposes of the principal/agent analysis on which it relies.

making (Lead Plaintiff's outside investment managers)[4] about such Medicare fraud. As Garland explained, "I don't think [advising someone else to consider selling CHS stock] would be appropriate for me to do . . . external investment managers aren't looking to me to provide investment advice. I think that people would see that as outside of my responsibility . . . at the time in question here, the corporate governance unit wasn't even in asset management." (Doc. No. 284-3 at 12-13.) Significantly, he further stated that investment decision-making is something "I have never done [] in any circumstance." (Doc. No. 284-3 at 12.) In addition, the Court has not been pointed to any evidence in the record suggesting that Garland actually shared his alleged knowledge about CtW's draft letter with any outside investment manager.

Second, the Court cannot impute Garland's knowledge (*i.e.*, the knowledge of an employee of Lead Plaintiff *without* pertinent duties) to the outside investment managers in order that the outside investment managers' knowledge (*i.e.*, the knowledge of agents of Lead Plaintiff *with* pertinent duties) can be imputed back to Lead Plaintiff. As Lead Plaintiff aptly contends, agency law rejects downward imputation from a principal (meaning, in the context of Defendant's theory, the Comptroller's Office via Garland) to its agents (outside investment managers). The general rule is that "[n]otice of facts that a principal knows or has reason to know is not imputed downward to an agent." Restatement (Third) of Agency § 5.03 cmt. g (2006); *see also United States v. $6,976,934.65, Plus Interest Deposited into Royal Bank of Scot. Int'l Account No. 2029–56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 129 (D.C. Cir. 2009) ("'[N]otice of facts that a principal knows . . . is not imputed downward to an agent.'"); *Schmitt v. FMA All.*, 398 F.3d 995,

---

[4] The evidence seems clear that outside investment managers make investment decisions for Lead Plaintiff. *See* Doc. No. 284-4 at 4 ("[T]he actual buy and sell decision is solely the discretion of the investment manager. They're doing that using guidelines given to them by the Office of the Comptroller."); *see also id.* at 3 ("The investment managers hired on behalf of the pension funds" do the trading on behalf of NYC Funds.).

997 (8th Cir. 2005) ("[W]hile the knowledge of the agent is imputed to the principal, the converse is not true."). In any event, the applicable evidence suggests that neither Garland nor anyone else at the Comptroller's Office ever communicated such knowledge to outside investment advisors. Thus, Defendants are left with no agent with authority over investment decisions having any of the knowledge of Medicare fraud that Defendants seek to impute to Lead Plaintiff

Third, Defendants' assertion that Lead Plaintiff's investments were made with Lead Plaintiff's knowledge of CHS's fraudulent scheme (imputed to Lead Plaintiff from Garland or some other, allegedly authorized agent who received the knowledge from Garland ) is undermined in two vital ways. First, as the parties apparently agree and the record reflects (Doc. No. 277-6), Lead Plaintiff increased its position in CHS after Garland joined the Comptroller's Office and before Tenet's April 11, 2011 revelations. This is exactly the opposite of what one would have expected from an entity appropriately deemed to have knowledge of wrongdoing at CHS. *See In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 1002 (W.D. Ark. 2017) (stating that when a party has "insider knowledge of wrongdoing it is in his financial interest to deplete his reservoir of stock holdings before the wrongdoing becomes public"). From these facts, the Court can and does infer for the limited purposes of the Class Certification Motion that Lead Plaintiff behaved as if it had no such knowledge and that therefore it is less likely that such knowledge is appropriately attributed to Lead Plaintiff. In addition, the Court has not been pointed to any evidence in the record that Garland shared his alleged knowledge about the draft letter from CtW with anyone else at the Comptroller's Office whose knowledge could be attributed to Lead Plaintiff.

For the foregoing reasons, Defendants have failed to show any degree of likelihood that the defense discussed herein will play a significant role at trial. Accordingly, Lead Plaintiff's motion for class certification will not be denied based on Defendants' unique-defense argument.

**B.  Whether Lead Plaintiff Satisfies the Typicality and Adequacy Requirements**

Lead Plaintiff otherwise meets the typicality and adequacy requirements. Lead Plaintiff satisfies the typicality requirement because all members of the class were victims of an alleged fraud on the market throughout the Proposed Class Period and sustained damages as a result.

Lead Plaintiff also establishes the adequacy requirement. Lead Plaintiff's interests are neither antagonistic to nor in conflict with the interests of other members of the proposed class (as modified by the Court as discussed below). Lead Plaintiff, like the other putative class members, purchased CHS stock during the Proposed Class Period (as also modified by the Court as discussed below). and allegedly has been damaged as a result of Defendants' allegedly false and misleading statements. In addition, Lead Plaintiff during the past seven years of this litigation has demonstrated its commitment to conducting the vigorous prosecution of these claims. Inga Van Eysden, Senior Counsel in the Affirmative Litigation Division of the New York City Law Department, has declared that Lead Plaintiff is familiar with the claims at issue, understands its duties as the class representatives, and has been actively involved in all aspects of the case since its appointment as Lead Plaintiff. (*See* Doc. No. 272-1.) Lead Plaintiff also has a significant financial stake in this litigation and undisputedly has retained qualified attorneys with considerable experience in securities class actions and complex litigation (*see* Doc. No. 272-3). Accordingly, the Court finds that Lead Plaintiff has satisfied the typicality and adequacy requirements.

## II.     Numerosity

Lead Plaintiff also satisfies the numerosity requirement. Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. "While there is no strict numerical test, "substantial" numbers usually satisfy the numerosity requirement." *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 237 (N.D. Ohio 2014) (quoting *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)) (internal quotation marks omitted). "Numerosity is generally assumed to have been met in class action suits involving nationally traded securities." *In re Direct Gen. Corp. Sec. Litig.*, Case No. 3:05-0077, 2006 WL 2265472, at * 2 (M.D. Tenn. Aug. 8, 2006) (citing *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 479 (W.D. Mich. 1994)). Lead Plaintiff states that while the exact number of persons who acquired CHS stock during the Proposed Class Period is not known, at least 834 major institutional investors owned CHS common stock during the Proposed Class Period. (Doc. No. 272-2 at 20.) The Court, therefore, finds that the numerosity requirement is met.

## III.     Commonality

Finally, Lead Plaintiff satisfies the commonality requirement. Class certification requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). To demonstrate commonality, Plaintiffs must show that class members have suffered the same injury. *Wal-Mart Stores, Inc.*, 564 U.S. at 349-50. "Their claims must depend upon a common contention of such a nature that it is capable of class-wide resolution, which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. What matters to class certification is not the *raising of common questions*, but the capacity of a class-wide proceeding to *generate common answers* apt to drive the resolution of the litigation. *Id.* The mere fact that after the common questions as to the defendant's liability have

been resolved, questions peculiar to each individual member of the class remain does not mean that a class action is impermissible. *See Young*, 693 F.3d at 543 (holding that presence of questions peculiar to each individual member of the class was no bar when liability arose from a single course of conduct).

The FAC alleges that Defendants made uniform misrepresentations nationwide through, *inter alia*, SEC filings, press releases, earnings calls, and healthcare conferences and that Defendants' material misrepresentations and omissions injured each class member who acquired CHS stock during the Proposed Class Period. (*See* FAC ¶¶ 268-462.) Based on the causes of action and allegations in the FAC, the Court credits Lead Plaintiff's assessment that virtually all of the questions of law and fact are common to it and the other members of the proposed class (as modified by the Court), including: (1) whether the alleged statements and omissions were false or misleading; (2) whether the misstatements and omissions were material; (3) whether Defendants acted with scienter in their statements and insider sales; (4) whether the Exchange Act was violated by Defendants' acts as alleged herein; and (5) the extent to which class members have sustained damages and the proper measure of damages. Based on the foregoing, it is clear that Lead Plaintiff's claims depend upon a common contention of such a nature that is capable of class-wide resolution, *i.e.*, a determination on the previously discussed allegations will resolve in one stroke issues that are central to the validity of each claim. Accordingly, the Court finds that Lead Plaintiff has satisfied the four factors under Rule 23(a) for class certification.

## IV.    Rule 23(b)(3) Requirements

### A. Predominance

In addition to meeting Rule 23(a)'s requirements, the Court finds that Lead Plaintiff also satisfies Rule 23(b)(3)'s predominance and superiority requirements. "In securities class action

cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." *Halliburton*, 573 U.S. at 276. Lead Plaintiff relies on Rule 23(b)(3), which allows for certification of a Rule 23(a)-compliant class if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Id*. The predominance inquiry asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. *Id.*; *Thompson v. Allianz Life Ins. Co. of N. Amer.*, 330 F.R.D. 219, 225 (D. Minn. 2019).

Plaintiff argues that common questions of law and fact predominate because the class is entitled to a presumption of reliance under the "fraud-on-the-market" theory and the *Affiliated Use* doctrine.[5] "The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court that obviate the need to prove reliance on an individual basis." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 (S.D.N.Y. 2016), *aff'd but criticized on other grounds sub nom. Waggoner v. Barclays PLC*, 875

---

[5] Lead Plaintiff asserts alternatively that the common questions or law and fact described above (with regard to commonality) predominate over individual questions in this case. (Doc No. 271 at 16.) This alternative is asserted in cursory and conclusory fashion, however, and the Court declines to address it because the Court finds predominance based on the applicability of the two presumptions discussed herein.

F.3d 79 (2d Cir. 2017). *Halliburton*, 573 U.S. at 276 (noting that, if applicable, the *Basic* presumption discussed below satisfies the plaintiff's burden of showing predominance).

As the Second Circuit has explained:

[A] plaintiff may also seek to take advantage of two presumptions of reliance established by the Supreme Court.

The first—the *Affiliated Ute* presumption—allows the element of reliance to be presumed in cases involving primarily omissions, rather than affirmative misstatements, because proving reliance in such cases is, in many situations, virtually impossible. *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981); *see also Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. 1456.

The second—the *Basic* presumption—permits reliance to be presumed in cases based on misrepresentations if the plaintiff satisfies certain requirements.

*Waggoner*, 875 F.3d at 93.

Here, as set forth below, common questions of law and fact predominate because the putative class is entitled to a presumption of reliance under *Basic's* fraud-on-the-market theory and *Affiliated Ute*'s omission doctrine.

### 1. Reliance Under *Basic*

In an efficient market, reliance can be presumed under certain circumstances. *Halliburton*, 573 U.S. at 278 (2014) (citing *Basic*, 485 U.S. at 248 n.27). That is, "whenever an investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b–5 action.'" *Id.* at 268 (citing *Basic*, 485 U.S. at 247). However:

[There are several] prerequisites for invoking the presumption—namely, publicity, materiality, market efficiency, and market timing. The burden of proving those prerequisites still rests with plaintiffs and (with the exception of materiality) must be satisfied before class certification.

*Id.* at 276.

"The fact that a misrepresentation was reflected in the market price at the time of [the] transaction . . . is *Basic*'s fundamental premise." *Id.* at 278 (brackets in original, citations and internal quotations omitted). This is because an efficient market rapidly reacts to new information about a listed company or its prospects, causing the price of its securities to rise or fall as investors trade upon the news. "[I]f a plaintiff shows that the defendant's misrepresentation was public and material and that the stock traded in a generally efficient market, he is entitled to a presumption that the misrepresentation affected the stock price." *Id.* at 279. And "if the plaintiff also shows that he purchased the stock at the market price during the relevant period, he is entitled to a further presumption that he purchased the stock in reliance on the defendant's misrepresentation." *Id.*

If reliance is properly presumed under *Basic*, individual issues of proof do not predominate. *See Basic*, 485 U.S. at 247. Instead, as indicated above, plaintiffs who can establish the *Basic* presumption of reliance are able "to demonstrate [] predominance." *Halliburton*, 573 U.S. at 276.

The proposed class here is defined by Lead Plaintiff in terms of those who bought *or otherwise acquired* publicly traded shares of CHS during the relevant time period. However, the Court, in considering whether the *Basic* presumption is applicable, will apply it to a modified class consisting only of those who *bought* publicly traded shares.[6] This is due, in part,[7] to the fact that only such *purchasers* (and not, for example, persons who acquired CHS shares by inheritance)

---

[6] As explained below, the Court has the discretion to modify a proposed class definition when certifying a class.

[7] This is also, and primarily, due to the fact, as discussed below, that only purchasers (and not other kinds of acquirers) have a cause of action for securities fraud.

could satisfy *Basic*'s requirements for the presumption of reliance and thereby satisfy Rule 23(b)(3)'s requirement of predominance.[8]

For such putative class members, all of whom were allegedly injured by public and material misrepresentations, what remains to be shown to raise the presumption of reliance under *Basic*, so as to establish the predominance of the issue of reliance, is proof of an efficient market. In *Freeman v. Laventhol & Harwath*, 915 F.2d 193 (6th Cir. 1990), the Sixth Circuit cited with approval the five factors identified in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), as useful in determining whether securities were traded in an efficient market. These factors include: (1) the stock's large weekly average trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. *Freeman*, 915 F.2d at 199; *see also In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216, 2006 WL 1716910, at *7 (W.D. Tenn. April 19, 2006) (quoting *Freeman*, 915 F.2d at 199).[9] Additional factors considered by courts in this district include: (1) the market capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock, not held by insiders (i.e., the float). *See Kasper v. AAC Holdings, Inc.*, No. 15-cv-00923 JPM-jsf, 2017 WL 3008510, at *8 (M.D. Tenn. July 14, 2017); *Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882,

---

[8] One of *Basic's* requirements is a sale or purchase, and therefore it appears to the Court that modes of acquisition other than buying (purchasing) would not suffice.

[9] The Sixth Circuit concluded that after "[c]onsidering these criteria, it appears that securities traded in national secondary markets such as the New York Stock Exchange, as was the case in [*Basic*], are well suited for application of the fraud on the market theory." *Freeman*, 915 F.2d at 199; *see also Burges v. Bancorpsouth, Inc.*, No. 3:14-cv-01564, 2017 WL 2772122, at *9 (M.D. Tenn. Nov. 14, 2017) ("[S]hares of the Bank's stock traded in an efficient market because they were traded on the NYSE.").

2012 WL 1071281, at *35 (M.D. Tenn. Mar. 29, 2012). Each of these factors supports a finding that the market for CHS stock was efficient, as discussed below.

### a. *Cammer* Factors

#### i. Average Trading Volume

An average weekly trading volume that exceeds two percent of the total outstanding shares of the company is widely recognized as a sign of an efficient market. *See Accredo*, 2006 WL 1716910, at *7 n.3 ("Courts have found that there is a substantial presumption of an efficient market if the securities' average weekly trading volume is 1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%."). Here, the benchmark is far exceeded, as CHS's average weekly trading volume during the Proposed Class Period was 7.98 percent of its outstanding shares. (Doc. No. 272-2 ¶ 51.)

#### ii. Number of Reports by Securities Analysts

The existence of numerous analysts following a company indicates that new information is rapidly being disseminated to, and acted upon by, investors. *Burges*, 2017 WL 2772122, at *8. Here, there were analysts from at least 53 firms that followed CHS during the Proposed Class Period, easily satisfying this factor. (Doc. No. 272-2 ¶¶ 53-57.)

#### iii. Existence of Market Makers

A market maker agrees to purchase or sell securities on demand to support a liquid market for the shares. The more market makers a security has, the more traders there are and the more efficient the market will be in incorporating new information into the market price. *See Cammer*, 711 F. Supp. at 1286-87. During the Class Period, there were at least 360 market makers for CHS stock, including Barclays, Citigroup, Goldman Sachs, and Morgan Stanley. (Doc. No. 272-2 ¶ 68.) The Court finds that the presence of these market makers supports a finding of market efficiency.

### iv. S-3 Registration Statement

The SEC permits the use of an S-3 short form Registration Statement only by issuers whose securities are presumed to be actively traded and widely followed, as demonstrated by a history of making required SEC filings and a market capitalization in excess of $75 million. *See Accredo*, 2006 WL 1716910, at *7 n.4 ("[E]ligibility to file the S-3 form is predicated upon the SEC's belief that the market for the company's stock already operates efficiently . . ."). As a public company with a market capitalization average of $3.0 billion, and an average float of $2.4 billion, CHS was eligible to use the Form S-3 Registration Statement throughout the Proposed Class Period. (*See* Doc. No. 272-2 ¶¶ 70-74, 76.)

### v. History of Stock Price's Immediate Movement Caused by Unexpected Corporate Events or Financial Releases

Evidence that the price of a security regularly reacts to news about the issuer is strong evidence of an efficient market. *See Cammer*, 711 F. Supp. at 1287. In the present case, the event study test conducted by Professor Feinstein demonstrates that CHS's stock reacted rapidly to new and unexpected information throughout the Class Period. (Doc. No. 272-2 ¶¶ 131-172.)

### b. Additional Factors

The Court also finds that additional factors discussed above indicate market efficiency.

### i. Market Capitalization

As noted above, CHS's market capitalization averaged $3.0 billion throughout the Class Period, which supports a finding of market efficiency. (Doc. No. 272-2 ¶¶ 76-78); *see Garden City*, 2012 WL 1071261, at *32 (capitalization between $600 million and $1.2 billion indicates market efficiency); *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 212 (E.D. Pa. 2008) (capitalization between $12 million and $300 million indicates market efficiency).

### ii. Bid-Ask Spread

The bid-ask spread reflects the difference between the price at which investors are willing to buy and the price at which they are willing to sell a security; a high bid-ask spread is indicative of an inefficient market. Bradford Cornell, *Market Efficiency and Securities Litigation: Implications of the Appellate Decision in Thane*, 6 Va. L. & Bus. Rev. 237, 247 (2011). The smaller the bid-ask spread, the more efficient the market may be presumed to be. *Id.* Here, the average bid-ask spread for CHS common stock was 0.08 percent during the Proposed Class Period. (Doc. No. 272-2 ¶ 87.) Therefore, this factor also weighs in favor of a finding of market efficiency. *See In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1339 (N.D. Ga. 2007) (spread never exceeded 1.9 percent, thus "weigh[ing] heavily in favor of a finding of market efficiency").

### iii. Stock Float

A large stock float[10] is indicative of the efficiency of the market for a stock. *See* Cornell, *Market Efficiency and Securities Litigation*, at 247-48. CHS's float averaged $2.4 billion during the Proposed Class Period. (Doc. No. 272-2 ¶ 79.) On average during the Proposed Class Period, there were 91.8 million shares of CHS's float and 94.2 million shares outstanding, resulting in an average float of 97.5 percent of shares outstanding. (*Id.* ¶ 83.) CHS's average float was larger than the total market capitalization of at least 80 percent of all other publicly traded companies in the United States. (*Id.* ¶ 79.)

---

[10] As indicated above, "[s]tock float is the total number of shares held by the public, rather than insiders." *In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2015 WL 1043321, at *9 (N.D. Ill. Mar. 5, 2015) (quoting *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001)), *objections overruled*, No. 12 CV 2450, 2015 WL 13628131 (N.D. Ill. May 12, 2015).

In sum, the market for CHS securities was efficient throughout the Proposed Class Period. Accordingly, the presumption of reliance should be applied in this action. *See Basic*, 485 U.S. at 248. As a result, common issues will predominate. *Id.*

### 2. Reliance Under *Affiliated Ute*

Lead Plaintiff also contend they alternatively are entitled to the "*Affiliated Ute* Presumption." The Court agrees.

In *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), the Supreme Court held that in securities actions involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. *Id.* at 155. "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153-54.

The Court alternatively finds that, for the purposes of class certification, Lead Plaintiff is entitled to the *Affiliated Ute* presumption as it applies to the omissions (failures to disclose) alleged in the FAC, which are clearly material and on balance fairly deemed to be "primarily" what underlies this securities fraud action.[11] Based on the allegations and record before it, the Court finds that a reasonable investor could view the nondisclosures at issue in this case, such as the non-disclosure of the use of the Blue Book, as important to their investing decisions because they were related to CHS's successful performance.

---

[11] Paragraph after paragraph of the FAC alleges that certain statements of Defendants were false and misleading due to Defendants' alleged failure to disclose CHS's alleged improper admission practices. *E.g.,* FAC ¶¶ 269-273. And, in part for the reasons Lead Plaintiff sets forth (Doc. No. 283 at 4 n.8), contrary to Defendants' assertion (Doc. No. 276 at 11 n.8), those alleged omissions are not accurately characterized as the kind of omissions that fails to trigger the *Affiliated Ute* presumption, *i.e.*, an alleged omission "of the truth that an affirmative statement misrepresents."

## B. Superiority

Rule 23(b)(3)'s superiority requirement provides the following four factors for courts to consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

The superiority requirement is fulfilled here. "Numerous courts have found the class action device to be a superior method of proceeding in a securities law fraud case." *Davis v. Avco Corp.*, 371 F. Supp. 782, 792 (N.D. Ohio 1974) (collecting cases). Defendants' alleged securities fraud allegedly caused economic injury to a large number of geographically dispersed investors, making the cost of pursuing individual claims impracticable and inefficient. The alternatives to a class action are not superior. Therefore, the Court finds that Lead Plaintiff has satisfied the requirements under Rule 23(b)(3).

Because the Court finds that all requirements for class certification are satisfied, the Court will grant Lead Plaintiff's motion. The question remains as to whether the class should be certified precisely as Lead Plaintiff would have it, or whether instead whether the class definition should be modified. As discussed below, the Court will prescribe a modified class definition (which incorporates a modification to the Proposed Class Period).

## V.    Whether the Certified Class Must be Limited to Investors who Purchased Stock at Market Price on or Before April 8, 2011

Plaintiff asks the Court to certify a class defined as follows:

all persons and entities who purchased or otherwise acquired the publicly traded common stock of Community Health Systems, Inc. ("CHS" or the "Company") from July 27, 2006 through October 26, 2011, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest (the "Class").

Defendants argue that if the Court certifies a class, it should modify the proposed class definition to correct three deficiencies. A district court retains significant discretion to make modification decisions and its decision is reviewed for abuse of discretion. *See Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) ("[D]istrict courts have broad discretion to modify class definitions."). It is generally "plaintiff's burden to show how the action may be subclassed to avoid certification problems." *Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.*, 993 F.2d 11, 14-15 (2d Cir. 1993) (citing *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980)).

First, Defendants argue that the Court should limit any certified class to persons or entities that purchased CHS stock at market price. The Court believes, however, that the class, being limited to those "who purchased the publicly traded common stock of CHS," is already limited to those who presumptively, and very likely, purchased the sock "at market price." Certainly the Court has been provided nothing to belie this belief. In fact, to support their argument that the Court should include the qualifying language "at market price" in the class definition, Defendants include a mere two sentences. (Doc No. 276 at 18.) For its part, Lead Plaintiff does not address the argument in its reply brief. The Court finds the parties' briefing on this issue to be inadequate to properly address the issue. The Court will not construct here the parties' (especially Defendants') argument for them. *See United States v. Zannino*, 895 F.2d 1, 8 (1st Cir. 1990) ("It is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's

work, create the ossature for the argument, and put flesh on its bones."). Nor will it attempt this proposed carve-out from the class definition based on the current record. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-4394 (AJN), 2017 WL 1331288, at *9 (S.D.N.Y. Apr. 4, 2017) ("The parties having thus far largely confined their briefing on potential modified class definitions to passing footnotes addressed to hypotheticals, the Court is ill-positioned to attempt an appropriate carve-out and will decline to do so.").

Second, Defendants ask the Court to strike the words "or otherwise acquired" from the class definition. This request is well taken. Rule 10b-5 prohibits misstatements "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. For that reason, "the plaintiff class for purposes of [§] 10(b) and Rule 10b-5 private damage actions is limited to purchasers and sellers of securities." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731-32 (1975). "[A] person who receives a security as a gift or through inheritance, but who parts with no consideration and incurs no liabilities in connection therewith, is not a purchaser or seller of the security entitled to maintain a § 10(b) and Rule 10b-5 cause of action." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. H-01-3624, 2008 WL 4178151, at *9 (S.D. Tex. Sept. 8, 2008); *see also Sanderson v. H.I.G. P-XI Holding, Inc.*, No. 99-3313, 2000 WL 1042813, at *9 (E.D. La. July 27, 2000) (only purchasers and sellers of securities are entitled to bring 10b-5 actions); *Rose v. Ark. Valley Envtl. & Util. Auth.*, 562 F. Supp. 1180, 1188-89 (W.D. Mo. 1983) (persons who received stock by inheritance are not entitled to bring 10b-5 actions). Based on this authority, the Court will strike the words "or otherwise acquired" from the proposed class definition.

Third, Defendants argue that the Court should limit any certified class to persons or entities who purchased CHS stock between July 27, 2006 and April 8, 2011, and exclude from it any persons or entities who first acquired CHS stock only on or after April 9, 2011 because their claims

are time-barred. Defendants state that those proposed class members were not members of the putative class pleaded in this action until Lead Plaintiff filed the FAC on October 5, 2015—almost four years after the last of the events at issue. *Compare* FAC ¶ 2, *with* Doc. No. 70 ¶ 2 (previous complaint asserting claims only on behalf of investors who purchased CHS stock through April 8, 2011). Securities claims are subject to a two-year statute of limitations. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010).

In response to Defendants' argument, Plaintiff asserts that the Sixth Circuit already rejected that argument in this case. The Court, accordingly, reviews the Sixth Circuit's decision here. In *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687 (6th Cir. 2017), the Sixth Circuit, in ruling on the motion to dismiss, pertinently stated the following:

> The Funds argue first that the allegations in the amended complaint are timely because any new allegations relate back to those in the original consolidated complaint. The Funds' claims of securities fraud are subject to a two-year statute of limitations, which begins to run (as relevant here) when the plaintiff discovers the alleged fraud. *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010). No one disputes that the original consolidated complaint was timely: the Funds first discovered the defendants' alleged fraud no earlier than April 2011 (when the Tenet suit was filed), and the Funds filed the consolidated complaint less than two years later, in July 2012. Nor does anyone dispute that, absent some other rule, any new allegations in the amended complaint are untimely: the Funds filed that complaint on October 15 [sic], 2015, well over two years after the events at issue here.

> But there is some other rule here. Under Federal Rule of Civil Procedure 15(c), otherwise untimely allegations in an amended complaint become timely if they "relate back" to allegations in the initial complaint. Specifically, allegations relate back to the original filing if they "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" Fed. R. Civ. P. 15(c)(1)(B). As interpreted by our court, this standard is met if the original and amended complaints allege the same "general conduct" and "general wrong." *Durand*, 806 F.3d at 375. For if the original complaint puts a defendant on notice of the plaintiff's general claim, then new allegations that merely build on that claim should come as no surprise. *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 516-18 (6th Cir. 2007).

> That is all that the allegations in the amended complaint did here. The original complaint alleged that the defendants defrauded investors by concealing the Blue

Book's role in padding Community's bottom line, and that the Tenet suit aimed to expose that fraud. The amended complaint built on that claim by alleging more expressly that, after the Tenet suit was filed, the defendants engaged in a series of lulling misrepresentations that were designed to preserve the fraud's effect. Those later misrepresentations included, among other things, the falsehood that the Blue Book was "fairly close" to the industry standard in its effect on inpatient admissions. Eventually the artifice fell away when Community's earnings report for the third quarter of 2011 belied its lulling misrepresentations and Community's own executives admitted that the reason for those disappointing results was—notwithstanding its recent assurances—its discontinuation of the Blue Book procedures. The lulling misrepresentations thus served the same function as the earlier ones: to convince investors that Community's revenues were sustainable when in fact they were not. All the misrepresentations served the same fraud.

Both the original and amended complaints therefore allege the same "general conduct": namely that the defendants obscured their improper admissions practices both before and after the Tenet complaint. *Durand*, 806 F.3d at 375. And both allege the same "general wrong": namely that investors bought and kept Community's artificially inflated shares only to lose their investments when the artifice was revealed. *Id*. The allegations in the amended complaint thus relate back to those in the original complaint. Indeed, most of those allegations were already in the original complaint, which recites the defendants' allegedly misleading responses to Tenet's complaint. (The district court seemed to overlook those allegations in finding the amended complaint untimely.) *Of course, the amended complaint did expand the class definition to include investors that held their stock until October 2011, rather than until only April 2011. But that change only conformed the class definition to the scope of the same fraud "set out" in the original complaint. Fed. R. Civ. P. 15(c)(1)(B). That should have come as no surprise. The allegations in the amended complaint were therefore timely.*

*Id.* at 693-94 (emphasis added). Based on the emphasized language above, the Court finds that the Sixth Circuit did not specifically address the issue Defendants raise here—whether any claims of investors who first acquired CHS stock only on or after April 9, 2011 are time-barred. The Sixth Circuit's language by its terms addresses only those investors who *held* their stock until October 2011, rather than until *only* April 2011; the Sixth Circuit apparently is referring to investors who held the stock until October 2011 and acquired the stock *before* April 2011. Thus, contrary to Plaintiff's argument, (Doc. No. 283 at 10 n.17), the Sixth Circuit's prior holding in this case does not address the present issue.

Defendants argue that persons and entities who first purchased CHS stock after April 8, 2011 are time-barred new plaintiffs who must be excluded from the class because there is no "relation back" for an amendment which adds a new party. Defendants are correct that there is no relation back for an amendment which adds a new party, because such an amendment creates a new cause of action that cannot be maintained when the statute of limitations has run. *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318-19 (6th Cir. 2010). However, as Lead Plaintiff correctly implies, (Doc. No. 283 at 10 n.17), non-named class members are not "parties" prior to certification. *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011). But *after* certification, non-named class members *are* parties (at least for certain purposes). (*Id.*) So even under Lead Plaintiff's correct implication, arguably an amendment to expand the group of non-named class members is not subject to relation back, because it constitutes an amendment to add to the group of purchasers who would be "parties" *after* certification.

Ultimately, however, the Court need not decide the applicability of "relation back" to the proposed expanded class definition, or indeed any aspect of the timeliness of the expanded class definition. Instead, the Court concludes that expanding the class to include the later group of purchasers is inappropriate for a different reason. The Ninth Circuit was confronted with a similar request to expand a class definition in a case cited by Defendants,[12] *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922 (9th Cir. 1996). In *Syntax Corp.*, the plaintiffs filed their first amended class action

---

[12] Defendants cited *Syntax Corp.* for its holding that the "relation back" doctrine was inapplicable to the claims of proposed new class members who would have been included within the expanded class definition. Because that holding was based on specific Ninth Circuit standards concerning "relation back" with respect to new parties that differ from such standards in the Sixth Circuit, the Court does not rely on that holding. Instead, it relies on *Syntax Corp.* for its cogent observations regarding the divergence of interests—relevant to the Rule 23 analysis, if not to the "relation back" analysis in the Sixth Circuit—between the two categories of purchasers represented in the present case by the members of the original proposed class and the additional members of the expanded proposed class.

complaint on November 13, 1992, on behalf of those persons who purchased Syntex stock at allegedly artificially inflated prices between November 25, 1991 and May 26, 1992. On January 13, 1993, the district court certified the class. *Id.* at 925. On November 30, 1993, plaintiffs filed their second consolidated amended class action complaint on behalf of the class of persons who purchased Syntex stock between November 25, 1991 and August 6, 1992. *Id.* The difference between the cut-off date of May 26, 1992 and the cut-off date of August 6, 1992 was very significant, however. The plaintiffs' allegations specifically referred to the defendants' and analysts' statements in June, July, and August of 1992, and to the corresponding decline in Syntex's stock. *Id.* at 935. The Ninth Circuit observed:

> Here, [the p]laintiffs did not show that the two groups of plaintiffs had an identity of interests. The claims of the proposed plaintiffs are different because the newly proposed class members bought stock at different values and after different disclosures and statements were made by [the d]efendants and analysts. Therefore, [the p]laintiffs from the original class period would have different interests than those who bought stock after May 26, 1992.

*Id.* at 935. The instant case is likewise. Lead Plaintiff alleges that on April 11, 2011, Tenet made vital disclosures of Medicare fraud and CHS stock immediately dropped precipitously in value. It may be that, as Lead Plaintiff alleges, those who purchased only after April 11, 2011 were (like prior purchasers) subjected to continuing material misrepresentations all the way until the disclosures of October 26, 2011 alleged in the FAC. Nevertheless, under Lead Plainitiff's own allegations, these purchasers bought CHS stock at a different price point based on very different information (including substantial information about the nature, extent and harm of alleged Medicare fraud) than did those who purchased only before April 11, 2011.[13] Presumably, many of

---

[13] The occasionally gap between April 8 and April 11 in the Court's (and parties') discussion is attributable to the fact that April 11, 2011, a Monday, was the first business day after April 8, 2011, a Friday.

them purchased CHS stock even after the original complaint was filed in this action on May 9, 2011, publicly laying out in extensive detail the alleged fraud. Thus, "[t]he claims of the [newly] proposed [class members] are different because the newly proposed class members bought stock at different values and after different disclosures and statements were made by Defendants and analysts. Therefore, [proposed class members] from the original [proposed] class period would have different interests than those who bought stock after" April 8, 2011. *Id.*

The Court believes that these differences render expansion of the proposed class incompatible with Rule 23. For example, Lead Plaintiff's claims are not typical of the claims of the proposed additional class members, who had access to vital disclosed information unavailable to (and were buying at a price point not encountered by) Lead Plaintiff when it made purchases prior to April 11, 2011. Moreover, Lead Plaintiff likely would not be an adequate representative of the additional class members, as Lead Plaintiff well may focus heavily on the fact of, and resulting harm from, the prior withholding of information that was revealed on April 11, 2011; any such focus would likely be to the detriment of the proposed additional class members. Accordingly, in its discretion, the Court will carve out those who first purchased CHS stock after April 8, 2011.

Thus, investors who purchased CHS stock on or before April 8, 2011 may bring claims based on events that transpired through October 26, 2011 (to the extent they held their stock until October). But investors who did not purchase on or before April 8, 2011 will be excluded from the class based on Rule 23 considerations.

## VI.     Class Counsel

"When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under [Federal Rule of Civil Procedure] 23(g)(1) and

(4)." Fed. R. Civ. P. 23(g)(2). Rule 23(g)(1) requires the Court, in appointing class counsel, to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). Rule 23(g)(1) also lists other matters the Court may consider and actions the Court may take in appointing Class Counsel. Fed. R. Civ. P. 23(g)(1)(B)-(E). Rule 23(g)(4) requires Class Counsel to "fairly and adequately represent the interests of the class."

In this case, Lowey Dannenberg has done significant work in identifying and investigating the potential claims in the action, as clearly evidenced from its eight years of persistently litigating this case. (*See* Doc. No. 272-1 at 6-7.) Lowey Dannenberg has extensive experience and knowledge with securities class actions, to say the least. (*See* Doc. No. 272-3.) The Court has no reason to believe that Lowey Dannenberg will be unable to commit the resources necessary to represent the class. Therefore, because the Court finds Lowey Dannenberg clearly satisfies the requirements of Rule 23(g), it will appoint Lowey Dannenberg as Class Counsel.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Lead Plaintiff's motion for class certification. The Court will **CERTIFY** the following Class:

> All persons and entities who purchased the publicly traded common stock of CHS from July 27, 2006 through April 8, 2011, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entities in which Defendants have or had a controlling interest.

NYC Funds will be **APPOINTED** as Class Representative, and Lowey Dannenberg will be **APPOINTED** as Class Counsel.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE